1   certificate, or should say "is" because it is probably

2   still present tense, is there, to your knowledge, any

3   other kit approved or not approved that has ever been

4   installed on a Lake aircraft to comply with this AD?

5        A    Yes.

6        Q    What was the source or how many different

7   sources --

8        A    Let's probably not include the word "kit".

9        Q    Okay.

10       A    But alternate means of compliance.

11       Q    A-M-O-C, an AMOC?

12       A    AMOC.

13       Q    Okay.  Describe if you could please, what is

14  an AMOC?

15       A    An alternate means of compliance.  That is an

16  AMOC.

17       Q    Why would an aircraft owner use an AMOC as

18  opposed to either the Canadian STC kit or the Aerofab

19  kit, what would the reasons be for that?

20       A    That's speculation on my behalf.

21       Q    You said you had knowledge that somebody has

22  done this on their airplane?

23       A    Yes.

24       Q    How many individuals?

25       A    I have absolute knowledge of one.

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1      Q    Describe what that alternate means of

2   compliance is please?

3      A    The owner retained an engineer to prepare

4   documentation of an alternate means of compliance.

5      Q    Did it include a -- did it include components

6   that were relatively similar to the patented kit?

7      A    Yes.

8      Q    Who was that owner please?

9      A    Say again?

10     Q    Who was that owner again?

11     A    Oh, I'm getting old.  I'll think of it in a

12   minute.  The owner committed suicide, and I have a

13   mental block on that.  But prior to the owner's demise

14   he retained an engineer, who must submit his

15   documentation to the FAA, have it approved, and then the

16   owner can produce the parts for the compliance.

17     Q    The owner can produce the parts for

18   compliance?  So there is a method for the owner to

19   fabricate their own parts to comply with the AD?

20     A    Yes.

21     Q    But that would require an AMOC?

22     A    Yes.

23     Q    Are those AMOCs approved on a one-by-one basis

24   by the FAA?

25     A    To the best of my knowledge, yes.

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 97

1     Q    And to your knowledge, there's only been one

2  aircraft owner who has done that?

3     A    No, I said I'm positive of one that has been

4  completed.

5     Q    Do you have knowledge of others that were

6  started?

7     A    Some were started.  I don't know their status.

8     Q    Would there be records at the FAA that would

9  indicate whether an AMOC had been approved for a

10  particular aircraft?

11     A    I don't know.

12          MR. THOMAS:  Let's go off the record, and note

13       the time, if you would.  I have 12:00.  Mark, do

14       you agree with that?

15          MR. YOUNG:  Yeah.

16             (Off the record at 12:00 PM.)

17             (Back on the record at 12:55 PM.)

18  BY MR. THOMAS:

19     Q    One question about the aircraft owners who

20  came to you or your company for compliance with the AD,

21  for those you said that some of the kits you installed

22  were the Aerofab kits and some of them were the Canadian

23  kits?

24     A    Yes.

25     Q    Who made the determination which kit would be

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    installed on a particular owner's airplane?

2         A    The owner.

3         Q    Did they rely on your recommendation for which

4    kit to select?

5         A    Occasionally.

6         Q    When you had the opportunity to recommend a

7    kit, did you recommend one kit over the other generally?

8         A    No, both complied with the AD.

9         Q    Both complied with the AD, and there was

10   virtually no difference in the kits; is that correct?

11        A    In the compliance, the effective compliance

12   with the AD, there was no difference.

13        Q    The Canadian was a cheaper kit than the

14   Aerofab kit?

15        A    There was a difference in price.

16        Q    You would communicate that to the aircraft

17   owner?

18        A    Yes.

19        Q    Generally speaking, would the aircraft owner

20   make a determination which kit to use just simply based

21   on price then?

22        A    Not always.

23        Q    Some selected the Aerofab kit even though it

24   was more expensive?

25        A    Yes.

1       Q       Now, you own a flying Lake aircraft, correct?

2       A       I own a what?

3       Q       You own an airworthy Lake aircraft, correct?

4       A       Yes.

5       Q       You had the Canadian kit installed on your

6    aircraft; is that correct?

7       A       Yes.

8       Q       What is the identification of your airplane?

9       A       November 80125.

10      Q       Did you file a 337 with the FAA for your

11   aircraft?

12      A       Yes.

13      Q       Have you ever owned any other Lake airplanes?

14      A       Briefly.

15      Q       When was that?

16      A       We're talking about 14 years ago.

17      Q       What was -- Do you recall the identification

18   of that airplane?

19      A       No.  I was assisting -- It had been a foreign

20   registered airplane.  It needed to be registered to a US

21   entity to achieve US registration.  And the owner

22   entrusted me with the ownership of the airplane to

23   accomplish that.  Then the aircraft was subsequently

24   sold.

25      Q       Do you have documentation in either your

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    possession or in your company's possession that would

2    indicate the date you installed the kit on your

3    airplane?

4         A    Yes.

5         Q    Would that be in your possession or your

6    company's possession?

7         A    Yes.

8         Q    Both?

9         A    It's probably in the company possession.

10        Q    Physically located in the Bartow facility?

11        A    Yes.

12        Q    Do you recall what date that was?

13        A    No.

14        Q    Do you recall month or year?

15        A    '01, '02.

16        Q    So if we requested that documentation from you

17   again, you would be able to produce it?

18        A    You've got a 98 percent chance of getting it.

19        Q    Did you have anybody assist you in installing

20   that kit on your airplane?

21        A    I may not have personally installed the kit,

22   but my entity may have installed the kit.

23        Q    Let's see.  The other aircraft that you owned

24   14 years ago, did you -- was that aircraft transferred

25   from your ownership prior to the AD coming out?

1      A    Yes.

2      Q    So that kit really while you owned it, wasn't

3   subject to the AD?

4      A    It was 14 years ago.   When was the AD issued?

5      Q    Right.

6      A    Thank you.

7      Q    I'm just making sure.

8      A    I'm trying to keep you from stumbling.

9      Q    I don't believe you told me when you sold it.

10  I think you told me you owned it 14 years ago.

11     A    It was probably within a year of us acquiring

12  it.  Our sole reason for assuming ownership of the

13  airplane was to assist the owner in selling the

14  airplane, or the foreign owner.

15     Q    The other aircraft, I think you mentioned 40

16  plus 26, if I've got the number right, so 66 aircraft

17  total?

18     A    About.

19     Q    You installed or your entity installed kits

20  on, do you recall the time frame that that spanned?

21     A    '01, '02.

22     Q    The documentation that you have in your

23  possession or in your company's possession, would it

24  indicate more precisely what dates those installations

25  were done?

1       A    Yes.

2       Q    Were you involved in any way in the process

3    that led to the issuance of the AD?   What I mean by that

4    is, did you participate with communication with the FAA

5    regarding the AD?

6       A    Yes.

7       Q    In what manner did you communicate?

8       A    We're going to talk here for just a minute.

9    When we got word of the Australian crack, there was an

10   aircraft in my shop that we were repairing, doing

11   some -- we had just initially started doing some

12   corrosion work on it, which entailed removing the wings.

13          When we compared those wings to the

14   information from the Australian report, we found

15   identical cracks.  This was communicated to Aerofab.

16   And, in my opinion, largely ignored.  Okay?

17          Subsequent to that my company spent thousands

18   of dollars to acquire equipment to allow for a

19   relatively easy inspection of the wing spars on numerous

20   Lake Amphibians, numerous probably in the neighborhood

21   of 20 to 30, to determine if cracks were present in a

22   wider range and models of the aircraft.

23          The results of those inspections were

24   communicated with the FAA.

25       Q    When you say you purchased equipment, what

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    kind of equipment was that?

2        A    It's technically called a <mark>borescope</mark>.

3        Q    It allows you to get up there and look?

4        A    This particular spot required a very specific

5    diameter and a mirror to be able to look at it.

6        Q    And a light, was there a light associated with

7    that as well?

8        A    It was a lighted borescope video camera.

9        Q    You provided that inspection data to the FAA?

10       A    Yes.

11       Q    Other than that, did you provide any

12   information or communication with the FAA regarding the

13   AD process?

14       A    I don't think I was a commenter on the AD, per

15   se.  I do remember writing a letter encouraging,

16   basically encouraging, the FAA to get off of dead

17   center, and let's do something.

18            As a person who operates Lake Amphibians, I

19   don't want to be going through the clouds.  There's no

20   flight manual provision.  There's no instruction

21   available to teach you how to deal with a wing

22   separating from an airplane.

23       Q    Were there ever any in-flight airframe

24   failures due to this problem, the cracks in the wings?

25       A    Due to the wing cracks, no.

1            And one other recorded incident on that, I did

2     a -- a potential buyer asked me to do what is referred

3     to do as a pre-buy on an airplane, pre-purchase --

4          Q     Inspection?

5          A     Yeah.  And I went to that aircraft, and on

6     that aircraft I found a severely cracked lower support

7     cap and doubler.  That airplane was the proverbial train

8     waiting for the wreck.

9          Q     So you may have saved somebody there by

10     finding that then?

11          A     Potentially, yes.

12          Q     This was a serious issue with these aircraft?

13          A     That issue was reported, you know, on that

14     serial number of that particular instance; but yes, this

15     is a serious issue with the airplane.

16          Q     We talked about the Canadian kit.  We talked

17     about the Aerofab kit.  We talked about the AMOC, the

18     one known instance by you where you had personal

19     knowledge.  As far as you know, was there ever any other

20     kit produced to either comply with the AD or at least

21     I'll say repair the wing to the point where it would be

22     safe to fly the airplane?

23          A     I don't have -- I don't have any knowledge of

24     a kit marketed for that purpose.  Like I say, some

25     owners did AMOCs.  I have specific knowledge of one --

1       Q     One of those?

2       A     -- compliance.

3       Q     In your opinion as a mechanic and an IA, what

4    is the best way to determine the source of one of these

5    kits that's installed on an aircraft?

6       A     Logbook.

7       Q     Logbook is the best way?  What about physical

8    inspection of the airplane?  Again, we're trying to

9    identify the source, Aerofab versus Canadian, not

10   whether the kit's installed or not, but who made it.

11      A     Right.  The installed appearance of the kits

12   are very similar depending on the fasteners used and

13   other things that could have occurred on installation.

14   It's not a hundred percent of just looking at it.

15      Q     If you had -- I'll follow up with, are some of

16   these kits ever painted over?

17      A     Yes.

18      Q     Does that painting have to be done by a

19   certificated mechanic?

20      A     No.

21      Q     I assume the paint would be to prevent

22   corrosion; is that correct?

23      A     Yes.  Or some people are very aesthetic.

24      Q     They want it to look pretty up in there?

25   You're waving your hands.

1    A    I'm waving my hands, but some people are
2    particular about the appearance of their aircraft.
3    Q    I understand.  If you were to be handed a kit
4    that was either, say either Canadian or Aerofab, could
5    you distinguish by holding in your hands the parts of
6    the kit as to whether it was a Canadian or an Aerofab
7    kit?
8    A    If it were unpainted, if it were in its
9    original state --
10   Q    As it came from the factory.
11   A    -- from the two sources, yes.
12   Q    You would be able to?  What would be the
13   distinguishing identifier of one kit over the other?
14   A    The part number identifications, the QA
15   markings.
16   Q    That would be the markings themselves, not
17   physical features of the kit?
18   A    A slight difference in color, but right now I
19   couldn't tell you which one looked which way.
20   Q    If I showed you a picture of a kit, would you
21   be able to identify which kit it is?
22   A    Not necessarily.
23   Q    Let me show you such a photograph.
24   A    Okay.
25   Q    We're going to make this Exhibit B.  I'm

1   handing you a photograph.  First of all, let me ask:

2   Does that look to you the type of kit we're talking

3   about here?

4        A    This does appear to be the type of kit we're

5   talking about.

6        Q    Can you tell from any aspect of the photograph

7   there whether this would be a Canadian kit, Aerofab kit

8   or some other kit?

9        A    This appears to be a Canadian kit.

10       Q    How can you tell?

11       A    I want to say that the AC number, if my memory

12  is correct, that is the identification that they placed

13  on the components of the doubler and the filler.

14       Q    You feel that was a JMC nomenclature that was

15  placed on that part?

16       A    Correct.

17       Q    Is there any -- when you look at this

18  photograph -- is there any doubt in your mind that this

19  is a kit that was one of the kits that you installed on

20  these aircraft in order to achieve compliance with the

21  AD?  In other words, is there anything on this

22  photograph that tells you this is some other kit?

23       A    No.

24       Q    Is there anything in this photograph that is

25  left out?  In other words, is this a photograph of a

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    complete kit?

2        A    This appears to be a photograph that is

3    capable of doing one wing.

4        Q    Okay.  I understand.

5        A    Okay.

6        Q    You would require two of these to do an entire

7    aircraft?

8        A    That's correct.

9        Q    I should have asked this before:  There's no

10   difference between -- there's no left and right kit; is

11   that correct?

12       A    That's incorrect.

13       Q    There is a left and a right?

14       A    The Aerofab kits are considered left and

15   right.  The Canadian kits are not marketed as a left and

16   right kit.  I'm trying to remember if the JCM kit was

17   actually marketed by the wing or by the aircraft.  I

18   know you could buy a single wing if you chose to.  But

19   the JCM kit was not marked left or right.  Aerofab kit

20   was marked left or right.

21       Q    Okay.  They were marked, okay, there was a

22   difference in the marking between the two, but was there

23   a difference in the physical difference in the kits that

24   caused one kit to be left or right, the Aerofab, and

25   allowed the JCM kit not --

1     A     If we're defining, physical difference was the

2     shape of --

3     Q     Dimensions of --

4     A     -- the dimensions and so forth.  There's no

5     difference between left and right.

6     Q     Okay.  So you didn't have to worry if you had

7     the Aerofab kits in your hand, when I say kits, if you

8     had a complete aircraft kit --

9     A     To do an aircraft.

10    Q     -- to do an aircraft, one for each wing, you

11    really didn't have to worry about which one of those

12    kits went on which wing when you did the Aerofab; is

13    that correct?

14    A     Yes, you did.  Because the Aerofab kit was

15    marked.

16    Q     Because they were marked that way?

17    A     Correct.  Let me rephrase that.  They were

18    marked in a fashion that required appropriate left or

19    right orientation.

20    Q     But again, just to be clear, to your

21    knowledge, there was no dimensional distinction between

22    the left and the right kits?

23    A     That is correct, no dimensional difference.

24    Q     Going back to this photograph for a second.

25    You've identified it as a Canadian kit I think you said

Page 110

1   by the nomenclature.  Other than the nomenclature is

2   there anything in this photograph, I'll say from a

3   dimensional aspect as you look at these components on

4   here, that would tell you that this is a Canadian kit?

5        A    There's a possibly that the length of the

6   bolts, the thread style of the bolts, and the head style

7   of the bolts would also tend to indicate that this is a

8   Canadian kit.

9        Q    There was some differentiation in the bolts

10  that came with the kit between the Aerofab and the

11  Canadian kit?

12       A    Yes.

13       Q    Other than the bolt differences, is there

14  anything in this photograph you would use to identify

15  this as Canadian versus Aerofab kit?

16       A    I'm dealing on memory now that's approaching

17  ten years old, but two of the nutted fasteners may be

18  different from the Aerofab kit.

19       Q    Those look like the kind of fasteners that

20  have nylon inserts; is that correct?

21       A    That's not the two I'm referring to.  The

22  other fasteners do indeed have a nylon insert.

23       Q    Self locking of some type, or anti --

24       A    Yes.

25       Q    -- back out type feature?

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1      A    Yes.

2      Q    Looking at the straps, is there any feature of

3  the straps that would tell you, other than the marking

4  on the strap, is there any dimensional feature on the

5  strap that would tell you that this is a Canadian kit

6  versus an Aerofab kit?

7      A    From this picture, no.

8      Q    Is there any physical difference in the

9  Canadian straps, say not in this picture, but just that

10 you recall?

11     A    To hold it in hand, there's a possibility of a

12 bevel on one end, but other than that.

13     Q    Other than that, no?

14     A    Right.

15     Q    Is it an FAA requirement that aircraft owners

16 maintain these logbooks that we've been talking about

17 today?

18     A    I'm mentally trying to review the regulation

19 applicable.  There may be a requirement that the owner

20 sees that an entry is made, but not actually make the

21 entry.

22     Q    I understand.  Thank you for being detailed.

23 Is there a requirement, generally, that each aircraft

24 have a logbook?

25     A    Yes.

1      Q     And is it generally the aircraft owner's

2  responsibility to make sure the logbook is up-to-date no

3  matter who makes the entry?

4      A     That could be the regulation.

5      Q     I'll flip the question around the other way,

6  and just make sure we're talking -- we're saying the

7  same thing.  Is it likely that there would be an

8  airworthy Lake aircraft out there in the US that did not

9  have a logbook?

10     A     Logbooks have been lost, so there is that

11  possibility.  Is it likely?  No.

12     Q     It would be a rare occurrence?

13     A     I would consider it a rare occurrence.

14     Q     If you lose a logbook, what do you do if

15  you're an aircraft owner?

16     A     There is a process that you go through.  You

17  can find other records to substantiate work done on the

18  airplane, physical inspection of the airplane to

19  determine the applicability or the compliance of ADs,

20  maintenance invoices, the shop records of where you had

21  your airplane worked on.

22     Q     Is it fair to say most of those records would

23  reside with the mechanics who did the work or the shops?

24     A     It would depend on the shop.  Some shops keep

25  nothing.  Some shops keep more.

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    Q    Is there an FAA requirement that the shops

2    keep records as to which aircraft they worked on, who

3    did the work, et cetera?

4    A    If the shop is a certificated repair station,

5    they are required to keep records for a given period of

6    time, typically 12 months.

7    Q    That's all, just 12 months?

8    A    Twelve months.

9    Q    Staying with the records issue for a minute.

10   You said that you have some records or your company does

11   at the Bartow facility regarding the installation of

12   these kits on particular airplanes.  Other than the

13   logbook, I should say the logbooks that are in the hands

14   of the owners, and those records that you have already

15   mentioned, do you know of any other documents that would

16   identify which kits have been installed on which

17   airplanes?

18   A    If the owner had a receipt of the purchase of

19   his kit; the logbook entry as you've stated; a 337 filed

20   with the FAA if it was executed in conjunction with a

21   Canadian kit; that's a pretty inclusive list.

22   Q    To your knowledge, how many shops or mechanics

23   participated in the installation of these kits on these

24   airplanes to achieve compliance with the AD?

25   A    No.

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    Q    Let me back up.  Do you know of other shops

2  who did this work?

3    A    Yes.

4    Q    Can you list for me the ones you know about?

5    A    Aircraft Innovation and Repair.

6    Q    Any others?

7    A    I could think of some, but none off -- Lake

8  Central in Canada; Talon Aviation, Puyallup, Washington.

9  There are very few shops that specialize in that

10  aircraft, so other shops would be onesies and twosies.

11    Q    A question about the installation of these

12  kits on wings, and then those wings being installed on

13  other airplanes other than the original airplane; does

14  that happen?

15    A    Yes.

16    Q    To your knowledge, how often, is that a rare

17  occurrence, onesie, twosie?

18    A    I would put it in rare occurrence.

19    Q    If a kit were installed on a wing, and then

20  that wing were removed from an airplane and installed on

21  another airplane, the entire kit would go with the wing;

22  correct?

23    A    Yes.

24    Q    In a situation like that would the compliance

25  with the AD from the logbook of the first airplane be

1    translated to the logbook of the second airplane that

2    accepted the wing?

3         A    It could, but not necessarily.

4         Q    Would you lose track then if you're the owner

5    of that rebuilt airplane with the wing that came from

6    somewhere else, would your logbook of that airplane not

7    show -- would it lack -- show in compliance with the AD?

8         A    No, it could -- the person installing the

9    replacement wing could make a logbook entry, "AD

10   complied with by installation of doubler kit."  Okay?

11   So it would be a previously complied with Airworthiness

12   Directive.

13        Q    I guess my question is:  The logbook of the

14   newly built airplane would have to have some indication

15   of compliance with the AD; would it not?

16        A    I believe I just mentioned that the person

17   installing the wing could inspect the wing and determine

18   that it had been complied with.  That person may not be

19   knowledgeable enough to determine which kit, but in all

20   likelihood compliance.

21        Q    Now, this is the second time -- this lawsuit

22   is the second time you've been a defendant in a lawsuit

23   over this patent; is that correct?

24        A    Yes.

25        Q    The first lawsuit was filed a number of years

Page 116

1   ago, correct?

2        A     Correct.

3        Q     That lawsuit was voluntarily dismissed by the

4   plaintiff; is that correct?

5        A     To my knowledge, yes.

6        Q     Who was your attorney for that first lawsuit

7   if you had one?

8        A     His name was Jim Buesse.

9        Q     And he's in Orlando; is that correct?

10       A     Yes.

11       Q     Mr. Buesse is a patent attorney?

12       A     Yes, I believe so.

13       Q     During the course of that previous lawsuit the

14   re-exam request was filed with the US Patent Trademark

15   office; is that correct?

16       A     Yes.

17       Q     And isn't it true that Enpat -- that there

18   was -- Let me back up.  Isn't it true that your attorney

19   moved for a stay pending the outcome of the

20   reexamination in that original lawsuit?

21       A     Exactly what he did, I'm not sure of.  I mean,

22   I hired an attorney to do the legal side of it.

23       Q     So you're not sure if he moved for a stay of

24   the proceedings in the initial lawsuit?

25       A     No, I'm not sure.

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1      Q    Okay.  Did you ever get an opinion of any

2  attorney -- Let me back up, and say this a different

3  way.  Did you ever see an opinion of an attorney that

4  the kit you have installed on your aircraft does not

5  infringe the '260 patent?

6      A    Yes.

7      Q    Who produced that opinion?

8           MR. YOUNG:  Objection to the extent we're

9           getting in attorney-client privileged information.

10  BY MR. THOMAS:

11     Q    Let's find out who produced it.  I don't think

12  that's privileged.  Then we can determine whether

13  there's a privilege or not.

14     A    Jim Salter (phonetic).

15     Q    Where is Mr. Salter located or where was he

16  located at the time?

17     A    I believe he was located in California.

18     Q    Did you pay him for that opinion?

19     A    No.

20     Q    Did you execute a contract with him to secure

21  that opinion?

22     A    No.

23          MR. THOMAS:  I'm going to assert that there

24          was no attorney-client relationship.

25          MR. YOUNG:  Do you want to discuss that now?

Page 118

1   BY MR. THOMAS:

2        Q    Let's don't discuss it now.  I'm going to ask

3   you:  What was his opinion?

4        A    His opinion was the patent was invalid.

5        Q    Well, the specific question I had was:  Did

6   you secure an opinion regarding infringement of this

7   patent, separate issue from invalidity?

8        A    I'm going to say that -- I want to say that

9   the information provided by Mr. Salter was intended to

10  constitute an opinion of non infringement relative to

11  the '260 patent.

12       Q    Okay.  By that, do you mean that the kit -- it

13  was his opinion that the kit that was installed on the

14  airplane, on your airplane, did not come within the

15  scope of the claims of the '260 patent, or do you mean

16  to say that his opinion was that the '260 patent was

17  invalid, and therefore not enforceable?

18       A    I would lean towards your latter comment as

19  being correct.

20       Q    That more of the opinion went to the validity

21  as opposed to infringement?

22       A    Correct.

23       Q    When was that opinion given to you?

24       A    I want to say plus or minus a few months,

25  2002.

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1     Q    Was that given to you in written form?

2     A    Yes.

3     Q    Do you have a copy of that opinion?

4     A    Yes.

5          MR. THOMAS:  Was that produced, do you recall?

6          MS. SWARTZ:  I don't recall seeing it.

7          MR. THOMAS:  I'm just going to ask, was that

8     produced in the response to the request to produce?

9          MR. YOUNG:  Do you want me to answer?

10         MR. THOMAS:  Yes.

11         MR. YOUNG:  No, it wasn't?

12   BY MR. THOMAS:

13    Q    You do have a copy of it?

14    A    Yes.

15    Q    When I say you --

16    A    Yes.

17    Q    -- personally have a copy of it?

18    A    It's at the office.

19    Q    It's in your possession or control?

20    A    Yes.

21    Q    Why was it Mr. Salter's opinion that the

22    patent was invalid?

23    A    Mr. Salter --

24         MR. YOUNG:  Objection to the extent we're

25    getting into privileged information.

1            MR. THOMAS:  The question stands on the table.

2        You can either instruct to not answer the question

3        or we can get an answer.

4            MR. YOUNG:  Could we have a minute?

5            MR. THOMAS:  Sure.

6                (Off the record at 1:30 PM.)

7                (Back on the record at 1:32 PM.)

8    BY MR. THOMAS:

9        Q    While you were out we talked about marking the

10   copies of the certifications Exhibit C.  And what we've

11   done is, we've asked the court reporter to mark these

12   confidential.  These will go in a separate envelope when

13   the transcript is produced.

14            MR. YOUNG:  My only concern is the personal

15        information that may be on those.

16            MR. THOMAS:  I understand.

17   BY MR. THOMAS:

18       Q    I think the question was:  What were the

19   reasons stated by Attorney Salter to support his opinion

20   of invalidity?

21       A    I don't recall all of the reasons, but Mr.

22   Salter is a patent attorney with a reputable patent

23   firm, who had an interest in Lake Amphibians as a Lake

24   owner.  And in his opinion on each claim of the '260

25   patent went through and said it's not valid because of

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    this.  He just touched on every point of the '260 patent

2    with an opinion of why it was not valid.

3         Q    Is he still a Lake owner, do you know?

4         A    I don't know.

5         Q    Have you ever spoken with him personally?

6         A    I spoke with him in the very beginnings of

7    these proceedings, meaning the very beginnings of the

8    reexamination.

9         Q    Have you communicated with him in any written

10   form since the lawsuit started?

11        A    Define lawsuit.

12        Q    This particular lawsuit.

13        A    No.

14        Q    Have you communicated with him in written form

15   at any time?

16        A    I'm sure I have.

17        Q    E-mail?

18        A    I'm not sure.  I'm going to say possibly, yes,

19   with Jim.

20        Q    Is it possible that you would have copies of,

21   you know, your written communication?

22        A    It's possible.

23        Q    Would it be in the banker's box?

24        A    There's a very good chance, if we have it, it

25   would be, and realizing that's approaching ten years

1    ago.

2         Q    I appreciate that.  Memories are what they

3    are.  Thank you.

4              Other than the opinion of Mr. Salter and

5    present counsel accepted, have you seen any opinion by

6    any patent attorney that addressed the issue of either

7    invalidity or infringement?

8         A    Yes.

9         Q    When did you see this opinion?

10        A    Through the course of the reexamination.

11        Q    Other than -- You're talking about the

12   re-exam, the actual documents filed in the re-exam?

13        A    Yes.

14        Q    Other than that, have you seen any opinion

15   expressed by an attorney regarding invalidity or

16   infringement?

17        A    Not what I would consider acceptable.

18        Q    Not credible?

19        A    I won't say not credible, but maybe

20   acceptable.

21        Q    Define what you mean by not acceptable?

22        A    The few times I ventured onto the forum some

23   people reputed to be attorneys rendered ideas about the

24   invalidity of the situation, so.

25        Q    When you say the forum, you mean the bulletin

1   board?

2        A    The bulletin or forum, yes.

3        Q    The one you mentioned before?

4        A    Yes, that is the same.

5        Q    The postings on that bulletin board, do they

6   persist indefinitely?

7        A    I don't know.

8        Q    Who would know that answer?

9        A    I don't know.

10       Q    Somebody at the Lake Aircraft -- forgive me

11  for not knowing the name of the club.  I thought I wrote

12  it down.  Somebody at the Lake Aircraft owners --

13       A    There is a possibility that someone at the

14  Lake Amphibian Flyers Club may know the status of those

15  postings.

16       Q    How long has that bulletin board been in

17  operation, to your knowledge?

18       A    To my knowledge, maybe ten years.  I'm not

19  sure of that because I am not an active participant.

20       Q    You mentioned that there was an opinion

21  expressed in the reexamination papers that were filed.

22  The question I had asked was:  Do you know of any

23  opinions regarding infringement or invalidity, but the

24  opinion that was filed and the re-exam was really,

25  really focused on invalidity, correct?

1       A     That is correct.

2       Q     The infringement at that point wasn't an

3   issue, the re-exam itself?  The infringement of any

4   particular airplane's kits as in regards to the patent

5   wasn't really an issue in the re-exam, the re-exam was

6   focused on invalidity, correct?

7       A     To my knowledge, again I'm not a patent

8   attorney, but to my knowledge that was the focus of the

9   re-exam.

10      Q     You're aware the ultimate outcome of the

11  reexamination was that all of the claims of the '260

12  patent were upheld as valid?

13      A     I intuitively disagree with that.

14      Q     Why do you disagree with that?

15      A     My opinion of what I've read, as a layman, to

16  keep me from stumbling, was that the patent was upheld

17  on one of its 14 claims.

18      Q     That's what you understand occurred in the

19  reexamination?  So, in other words, the other 13 claims

20  were invalidated; is that what you think?

21      A     Yeah.

22      Q     I don't believe that's correct, but I'm here

23  to coach.

24      A     You have your opinion.

25      Q     So I'm only here to ask.

1        A    That's right.

2        Q    Did you read the complaint that was served on

3    you in this case?

4        A    Yes.

5        Q    Your attorney filed an answer with defenses

6    and counterclaims.  Did you read the answer that your

7    attorney --

8        A    Yes.

9        Q    -- served on us?

10        A    Yes.

11        Q    There was an assertion under the general

12    allegations -- this is, just for reference sake, it was

13    allegation nine -- "The anticipated cost for compliance

14    with the NPRM would have been approximately $40,000 or

15    more per airplane."  And that was denied by your

16    attorney.

17        A    Yes.

18        Q    And tell me why that was denied please.

19        A    Because I complied with the existence of

20    cracked spars for approximately $20,000 per aircraft.

21        Q    This is prior to the availability of the kit?

22        A    Yes.

23        Q    Allegation ten is read like this, this was

24    also denied.  "In response to the NPRM non-party

25    Aerofab, Inc. developed a wing spar modification kit

1   that could be installed on Lake aircraft to address the

2   problem identified in the NPRM while avoiding the costs

3   and expense and risks associated with removing the

4   aircraft wings."

5          I know that's a long sentence.  I'll read it

6   again if you like.

7      A    Go ahead.

8      Q    "In response to the NPRM non-party Aerofab,

9   Inc. developed a wing spar modification kit that could

10  be installed on Lake aircraft to address the problem

11  identified in the NPRM while avoiding the costs, expense

12  and risks associated with removing the aircraft wings."

13         That was denied.

14     A    Okay.

15     Q    But isn't that in fact an accurate statement?

16     A    I'm going to say no.

17     Q    Why is it not accurate?

18     A    There's another inventor.

19     Q    Okay.  Who is the other inventor?

20     A    Elton Townsend.

21     Q    Why do you claim that Elton Townsend is an

22  inventor?

23     A    Elton provided the doubler concept for the

24  repair of the wing.

25     Q    How do you know this?

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1       A    I've seen the communication from Elton to the

2   inventors, actually specifically to Jack Tarbox, prior

3   to a doubler being an option to repair the airplane.

4       Q    Jack Tarbox being one of the inventors who is

5   a named inventor on the patent?

6       A    That is correct.

7       Q    I'm going to present a couple of things to

8   you.  One is a copy of the patent itself.  I've handed

9   it to your attorney to look at, and then if you could

10  take a quick look.  If you'd identify that as -- if you

11  could let me know if you identify that as the patent

12  that we're talking about.

13      A    That appears to be the '260 patent.

14      Q    That is going to be Exhibit D.  I'm going to

15  show you now a copy of what looks like a fax, and at the

16  top it says, "Lake Central Air Services."  We'll mark

17  this as Exhibit E.

18           Now, you said you saw the communication from

19  Mr. Townsend to Tarbox, correct?

20      A    Yes.

21      Q    Is that the communication that you're talking

22  about?

23      A    That appears to be the communication we're

24  talking about.

25      Q    So that's then Exhibit E.  Okay.  If you would

1   take a minute and look at that, do you have any

2   knowledge, first of all, the date appears to be February

3   2nd, 1999?

4        A    I would agree with that.

5        Q    At least that's what's on the face of the

6   document.  Amazingly enough almost exactly 12 years ago.

7             Do you have any knowledge as to how far along

8   in the development process Tarbox was when he received

9   this fax?

10       A    We're dealing with memory only ten years out.

11  At that point it appeared to me as a maintenance entity

12  that there had not been much progress in the repair.

13       Q    Do you have any documentation to support that

14  appearance?

15       A    It's possible, but I'm not positive because

16  there were early additions of paperwork relative to this

17  that reflected changing the spar caps.

18       Q    Okay.  Were you in communication with Tarbox

19  prior to the date about this issue with these airplanes?

20       A    Yes.

21       Q    Prior to date of this fax?

22       A    Yes.

23       Q    Did he share with you his concepts for fixing

24  the problem of the airplane?

25       A    No.

1    Q    How did you come to receive this fax?  I know
2    we have it here today, but you've seen it before today,
3    correct?
4    A    Yes, sir.  If you notice, my name is on the
5    cover sheet.  I believe it might be evident that Elton
6    Townsend sent it to me.
7    Q    Why did he send it to you and not to Tarbox?
8    A    To my knowledge, it had been previously
9    communicated with Tarbox.  If you'll note the date on
10   the cover sheet and the actual date, if it's accurate of
11   the fax date header, are a little bit different.  And I
12   believe Elton had previously communicated this with
13   Mr. Tarbox.
14   Q    Actually they're quite a bit different, aren't
15   they?  On the top of sheet it has what appears to be May
16   7th, 2001?
17   A    That's what it has.
18   Q    And that's more than two years after the date
19   that's written into the box there on the actual fax
20   itself?
21   A    That's right.
22   Q    Okay.  Do you recognize that number there,
23   (705)687-8983?
24   A    I know the 705 code appears to be the code I
25   would associate with Lake Central.

1      Q     In Canada?

2      A     In Canada.  If we look at his letterhead, it

3  bears a strikingly similarity to one of the numbers.

4      Q     Sure.  Okay.  Now, if you look back at the

5  body, look at the second page of the fax, there's a

6  diagram and handwritten words on there.  Well, let's

7  look at the entire fax.  This fax consists of four

8  sheets, one of which is a cover sheet, correct?

9      A     I agree.

10     Q     Does this look like a complete copy of the fax

11  to you?  In other words, is it missing anything?

12     A     It to my knowledge, it's not missing anything.

13     Q     This is a document upon which you rely for

14  your assertion that Elton Townsend was a co-inventor?

15     A     Yes.

16     Q     Is there any other document other than this

17  document upon which you rely for your assertion that

18  Elton Townsend is a co-inventor of the patent?

19     A     No.

20     Q     Is there any other person you know of, say

21  other than Mr. Townsend himself, who would testify that

22  he was a co-inventor?

23     A     I don't know of anyone.

24     Q     Looking at the second page of the fax, does

25  the filler plate show up anywhere in here?

1    A    No.

2    Q    What about on the second page?

3    A    No.

4    Q    What about on the third page?

5    A    No.

6    Q    What about on the fourth page?

7    A    I don't see any mention of a filler plate.

8    Q    Is there any mention of the coating for the

9    doubler plate?

10   A    No.

11   Q    It doesn't address coating of the doubter

12   plate?

13   A    To my knowledge, no.

14   Q    Does it address anywhere in this fax is it

15   described or addressed the upper inboard end angle of

16   the strap?

17   A    No.

18   Q    Is there any mention of 4340 steel being used?

19   A    No.

20   Q    Is there any mention in this fax of

21   Mr. Townsend's of heat treating the doubler-straps to

22   180,000 PSI?

23   A    I don't think so.

24   Q    Is there -- We've already said the

25   filler-straps aren't mentioned.  There's no mention of a

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    five-degree angle on the doubler-strap in this fax?

2        A    No.

3        Q    No mention of a six-degree angle on the lower

4    doubler-strap?

5        A    No.

6        Q    No mention of the doubler-strap being

7    protected by a powder coating that is heat cured to

8    perform a ceramic coating?

9        A    No.

10       Q    No mention of an alodine conversion coating on

11   any of the parts here in this fax?

12       A    No.

13       Q    No mention of an epoxy primer, correct?

14       A    Correct.

15       Q    Again, I'm a layperson, but looking at the

16   drawing on the second page, if we kind of run down the

17   spar, there's a series of looks like five original

18   boltholes, correct?

19       A    There appears to be five original.

20       Q    Then continuing on down the spar he says,

21   three additional holes, correct?  And he has little

22   arrows there.  Do you see where I'm talking about?

23       A    Correct.

24       Q    Then there's a note at the bottom of the page,

25   it says, "Add minimum of three additional bolts in

1    doubler extension."  Do you think that's the three holes

2    he's talking about in that note?

3          A    It appears that that is the case.

4          Q    The actual kit itself actually didn't use

5    bolts, correct, the kit available from Aerofab and

6    Canadian company; is that correct?

7          A    No.

8          Q    It used rivets?

9          A    It used rivets or bolts.

10         Q    Did rivets come with the kit or bolts come

11   with the kit?

12         A    Normally rivets came with the kit.

13         Q    You could replace the rivets with bolts,

14   though?

15         A    Yes.

16         Q    Do you claim that there was any other inventor

17   other than Mr. Townsend who is not named on the face of

18   the patent?

19         A    Do I claim?

20         Q    Yes.

21         A    Yes.

22         Q    And who would that be please?

23         A    Federal Aviation Administration.

24         Q    What is your basis for making that assertion?

25         A    In communication with FAA employees it

1    appeared that there was a dialogue between the inventors

2    and the FAA with the FAA saying we would desire this as

3    part of the fix.  And some of those items were indeed

4    incorporated.

5         Q    What were those items specifically?

6         A    The one that I'm familiar with was a request

7    for the, I believe, it was for the alloy, the material.

8         Q    This would be the aluminum alloy?

9         A    No.

10        Q    Steel?

11        A    Steel.

12        Q    Which alloy was requested by the --

13        A    It is my opinion that they requested 4340.

14        Q    Do you have a document to that effect?

15        A    No.

16        Q    Do you know of the existence of any document

17   to that effect?

18        A    Perhaps.

19        Q    Who would be in possession of that document if

20   it existed?  When you say "perhaps," you must have

21   something in mind.

22        A    I think the FAA has possession of that

23   document.

24        Q    But you haven't seen it yourself?

25        A    No.

1      Q    Have you seen such a document in anybody

2    else's possession?

3      A    No.

4      Q    Then are you just relying on intuition?

5      A    I'm relying on conversation with FAA

6    employees.

7      Q    Who did you have the information with?

8      A    Richard Knoll (phonetic).

9      Q    Who is he?

10     A    He's an FAA employee.

11     Q    What is his job function at the FAA?

12     A    I may not describe it accurately, but

13   Mr. Knoll was the contact person for Aerofab regarding

14   the resolution of this AD situation.

15     Q    When did you have this conversation with

16   Mr. Knoll?

17     A    I'm going to say multiple dates during the

18   development of the FAA, and I spoke with Mr. Knoll a few

19   weeks ago.

20     Q    You spoke to him about this subject?

21     A    Yes.

22     Q    Did he tell you that he has documents in his

23   file to the effect of what you're describing here?

24     A    No, he did not tell me that.

25     Q    Did you ask him to look?

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1      A    Yes.

2      Q    Did he tell you he would look?

3      A    He told me he couldn't look.  He retired from

4   the FAA.

5      Q    So was he going on memory then?

6      A    Yes.

7      Q    Did he recommend that you contact anybody else

8   at the FAA?

9      A    He said the FAA could be contacted, and that

10  information may be available.

11     Q    Did he give you a contact name at the FAA?

12     A    No.

13     Q    Did he tell you that --

14     A    I take that back.  I think he said that the

15  records for the airplane were at the Atlantic ACO.  He

16  did mention that.

17     Q    Have you attempted to contact the Atlanta --

18  did you say ACO?

19     A    ACO, yes.

20     Q    To get those?

21     A    No, I have not attempted to contact the ACO.

22     Q    Other than the suggestion -- and this is your

23  assertion, we're certainly not agreeing to it -- that

24  the 4340 alloy suggestion was made by Mr. Knoll at the

25  FAA, do you assert that he provided any other input as

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1   to inventorship of the '260 patent?

2        A    I'm going to say that is very possible.  I

3   cannot assert anything with a hundred percent.  Because

4   one, we're dealing with memory.  But there appeared to

5   be significant dialogue.  And Mr. Knoll in recent

6   conversation indicated that there was dialogue between,

7   specifically, Mr. Knoll mentioned Jack Tarbox.

8        Q    Have you spoken with Mr. Tarbox --

9        A    Yes.

10       Q    -- about this 4340 issue?

11       A    No.

12       Q    You said yes, so you have spoken with him in

13   the past?

14       A    You paused.  You said, "Have you spoken to

15   Mr. Tarbox?"  I answered that question.

16       Q    When was the last time you spoke with

17   Mr. Tarbox?

18       A    Probably over a year, might have been two

19   years.  I'm not sure.  I haven't spoken with him much

20   recently.

21       Q    What was the nature of your discussion with

22   Mr. Tarbox last time you spoke with him?

23       A    I could document this, I think, but I had a

24   repair that had been done on a Lake Amphibian.  I asked

25   his opinion as an engineer relative to the validity of

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 138

1    that repair.

2         Q    Have you spoken with Mr. Tarbox about any of

3    the issues in this lawsuit?

4         A    If we include the development of the AD, and

5    so forth, and if they're included in the lawsuit, then

6    yes; but since this lawsuit has been issued, no.

7         Q    Have you spoken to him at any time about

8    inventorship, specifically, have you spoken to him about

9    your claim that there is an unnamed inventor?

10        A    No.

11        Q    Have you spoken with him about your claim

12   that -- Well, let me back up and ask it a different way.

13   Have you spoken with him at any time about whether the

14   claims of the patent cover the Canadian kit?

15        A    No.

16        Q    Other than the FAA and Mr. Townsend, is there

17   anybody else you claim who was a named inventor?

18        A    No.

19        Q    Those are the only two?

20        A    Yes.

21        Q    Now, we referred to the Canadian kit as the

22   knock-off kit in the complaint.  And we made an

23   allegation, this is number 25, that the knock-off kit

24   infringes one or more claims of the '260 patent.

25             And my question for you is:  When this was

1    denied, it was denied in your answer, were you really

2    thinking of the invalidity issue or the infringement

3    issue in denying this allegation?

4         A    As a layman, I'm going to say I think it was

5    based on the invalidity of the patent.

6         Q    Would you agree that the Canadian kit -- this

7    is separate from the invalidity issue, I understand that

8    you have an argument as to invalidity, and that

9    certainly is a subject among the Lake aircraft owners

10   and one of the stated defenses here, I understand

11   that -- but separate from -- we disagree with that

12   obviously -- but separate from that, would you agree

13   that the Canadian kit falls within the scope of at least

14   one of the claims of the '260 patent?

15        A    I want to answer that with a qualification.

16   No.  The claims of the '260 patent are only valid if

17   that patent is valid.  So it can only fall within the

18   scope of those claims if it's a valid patent.  If it's

19   not a valid patent, then it doesn't fall in the scope of

20   any --

21        Q    That's why I tried to qualify the question by

22   putting the invalidity to the side.  That will be

23   decided separately.

24        A    As a layman I have difficulty separating those

25   issues.

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1      Q    I understand that.  But just assume that the

2   patent is valid, that doesn't give up anything.

3           MR. YOUNG:  I'm going to object for improper

4       foundation because I don't think we've gone through

5       the claims.

6           MR. THOMAS:  Well, we can do that.

7           MR. YOUNG:  Maybe that would be productive.

8   BY MR. THOMAS:

9      Q    Let's turn to the patent, which is in front of

10  you there, and turn back to the claims section, which is

11  column seven, this last page of it.  And I want to start

12  with the list of elements of the kit itself.  Turning to

13  claim one.

14          MR. YOUNG:  I'm going to object because we're

15      skipping over the preamble.

16          MR. THOMAS:  It's my question.  I get to ask

17      the question any way I want.  We all know the

18      preamble is not to be read into the claims.

19          MR. YOUNG:  Not in all cases.

20  BY MR. THOMAS:

21     Q    Let's look at the elements comprising the kit.

22  The first one is an upper doubler-strap and an upper

23  filler-strap.  Does the Canadian kit have those two

24  elements?

25     A    Yes.

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1      Q    A lower doubler-strap and a lower filler-strap

2   is the next one.  Does the Canadian kit have those two

3   elements?

4      A    Yes.

5      Q    A plurality of wing-spar attachment-bolts,

6   just means more than one attachment bolt.  Does the

7   Canadian kit have that element?

8      A    Yes.

9      Q    The next one is kind of long.  We may have to

10  read it once or twice.  "Wherein said -- wherein each

11  said upper filler-strap and each said upper

12  doubler-strap have a third series of wing-attach

13  boltholes that correspond precisely with a first series

14  of wing-attach boltholes in an upper edge of a wing spar

15  web, and said lower filler-strap and said lower

16  doubler-strap have a fourth series of wing-attach

17  boltholes that corresponds precisely with a second

18  series of wing-attach boltholes in a lower edge of said

19  wing spar."

20          Does the Canadian kit have that element?

21     A    Yes.

22     Q    Next one down, "Wherein said upper and said

23  lower doubler-straps have a doubler-protective-coating

24  and said upper and said lower filler-straps have a

25  filler-protective-coating."

1           Does the Canadian kit have that element?

2      A    Yes.

3      Q    "Wherein said upper doubler-strap has an upper

4   inboard-end angle and said lower doubler-strap has a

5   lower inboard end angle."

6           Does the Canadian kit have that element?

7      A    Yes.

8      Q    Okay.  Let's continue on.  Claim two is, "The

9   kit of claim one -- and it adds an additional

10  limitation -- wherein said upper and said lower

11  doubler-straps are made of 4340 steel."

12          Is the Canadian -- Are the Canadian

13  doubler-straps made of 4340 steel, to your knowledge?

14     A    I think they are.

15     Q    Claim three, "Wherein said upper and said

16  lower doubler-straps are heat treated the kit -- let me

17  back up.  "The kit of claim two, wherein said upper and

18  said lower doubler-straps are heat treated to a 180,000

19  PSI."

20          To your knowledge, is the Canadian kit heat

21  treated in such a manner?

22     A    I will acknowledge that the Canadian kit is

23  heat treated.  I cannot verify the level to which it is.

24     Q    Who would know the answer?

25     A    The people who made the kit.  Perhaps the FAA

1   as well.

2        Q    Claim four, "The kit of claim one, wherein

3   said upper and said lower filler-straps are made of

4   2024-T3 aluminum?

5        A    I can't verify the alloy of the Canadian

6   filler.  It could have been a different alloy.

7        Q    I understand.  Claim five, "The kit of claim

8   one, wherein said upper inboard-end angle on said upper

9   doubler-strap is approximately five degrees."

10            The Canadian kit has that element?

11       A    Yes.

12       Q    Claim six, "The kit of claim one, wherein said

13   lower inboard end angle on said lower doubler-strap is

14   approximately six degrees?

15       A    Canadian kit appears to have an approximate

16   six-degree angle.

17       Q    Thank you.  Claim seven, "The kit of claim

18   one, wherein said double-protective-coating that is heat

19   cured to form a ceramic coating."

20            Does the Canadian kit have that coating?

21       A    No.

22       Q    Claim eight, "The kit of claim one, wherein

23   said filler-protective-coating includes a first coating

24   that is an alodine conversion coating and second coating

25   that is an epoxy primer."

1           Are the fillers on the Canadian kit coated

2     that way?

3     A    I know they're coated, but I don't know the

4     exact nature of your coating.

5     Q    Claim nine, "The kit of claim one, wherein

6     said each bolthole of said third and fourth series of

7     said wing-attach boltholes in said upper doubler-strap,

8     said lower doubler, said upper filler-strap, and said

9     lower filler-strap is free of said

10    doubler-protective-coating and of said

11    filler-protective-coating."

12    A    I'm not sure regarding the Canadian kit.

13    Q    So you're not sure if the boltholes are free

14    of coating on the Canadian kit?

15    A    That is correct.

16    Q    Claim ten is a long dependent claim.  Rather

17    than read it out loud, I'd like to just ask you to read

18    it, and take a minute to understand it.

19    A    It's not doing it today.  I just can't wrap

20    around the first series, second series, and so forth.

21    Q    I understand.  That's a long and complicated

22    claim.  Is it fair to say, as we sit here in this

23    deposition today, when you read claim ten, that you

24    don't understand it?

25    A    Today I don't understand claim ten.

1       Q      Then let's move to claim 11.  It's a little

2    easier to chew on.  "The kit of claim eight, wherein

3    said wing spar web has a first series of rivet holes on

4    said upper edge and a second series of rivet holes on

5    said lower edge, and said upper doubler-strap and said

6    upper filler-strap each have a series of rivet holes

7    that corresponds to said first series of rivet holes,

8    and said lower doubler-strap and said lower filler-strap

9    each have a series of rivet holes that corresponds to

10   said second series of rivet holes."

11          I think this just describes the rivet holes

12   there, is that --

13      A      Yes.

14      Q      Does the Canadian kit have the rivet holes?

15      A      Yes.

16      Q      Claim 12, "The kit of claim nine, wherein said

17   upper doubler-strap and said upper filler-strap each

18   have a series of five rivet holes, and said lower

19   doubler-strap and said filler-strap each have a series

20   of seven rivet holes."

21          Does the Canadian kit have five rivet holes on

22   the upper and seven on the lower?

23      A      They are added to the strap at installation.

24      Q      But as installed they do have those rivet

25   holes?

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1      A    As installed, yes.

2      Q    Claim 13, "The kit of claim one, further

3  comprising a plurality of wing-attach bolts, a plurality

4  of cap angle bolts, a corresponding plurality of nuts

5  and washers for said wing attach-bolts and said cap

6  angle bolts, and a plurality of rivets."

7           Does the Canadian kit have the bolts and the

8  rivets?

9      A    Most of the time.

10     Q    As installed does it have it?

11     A    As installed most of the time.

12     Q    When you say "most of the time," just please

13  tell me why you quantify it?

14     A    Occasionally you can use bolts in lieu of

15  rivets.

16     Q    Is it shoulder bolts that you use in that

17  case?  Do you know what I'm talking about when I say a

18  shoulder bolt?

19     A    No.

20     Q    We'll move on.  Item 14 or Claim 14, "The kit

21  of Claim 13, wherein said plurality of wing attach bolts

22  includes ten NAS 464-6A24 bolts, said plurality of

23  cap-angle bolts includes two NAS 464-7A24 bolts, said

24  plurality of nuts and washers includes two AN 364-720

25  nuts, ten AN 364-624 nuts, four AN 960-716 washers, and

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    twenty AN 960-616 washers, and said plurality of rivets

2    includes twelve AN 470-AD6-22 rivets."

3         Is this the hardware that comes with the

4    Canadian kit?

5        A    No.

6        Q    You mentioned earlier that the bolts are of a

7    different length in the Canadian kit?

8        A    Different length, different part number,

9    different nut.  And again we may not have rivets.

10       Q    I understand.  Okay.  Does the kit that's

11   installed on your aircraft have rivets?

12       A    Yes.

13       Q    If you're going to use bolts instead of rivets

14   with the Canadian kit installation, do you have to make

15   a notation in the logbook that bolts were used instead

16   of rivets?

17       A    No.

18       Q    Is it possible to tell from looking at the

19   logbook whether bolts or rivets were used?

20       A    Not necessarily.

21       Q    Assertion 31 or allegation 31 in our complaint

22   stated this:  "The US PTO determined that each and every

23   claim of the '260 patent remains valid and forcible and

24   unchanged as a result of the reexamination proceeding."

25            This was denied, but the record is clear that

1    this is in fact the case.  Why was this assertion

2    denied?

3         A    I didn't get the same opinion out of the -- of

4    what I read in the documentation.  And I'm not a lawyer,

5    but I can generate an opinion reading material.

6         Q    Assertion 33, "Defendant Shannon's use of an

7    aircraft is a direct violation -- I'm going to skip

8    that.

9              Assertion 34, "Despite being fully aware of

10   the '260 patent, Defendant Shannon has contributed to

11   and continues to contribute to infringement of the '260

12   patent by others, and has induced and continues to

13   induce others to infringe the '260 patent by encouraging

14   other Lake Aircraft owners to install knock-off kits on

15   Lake Aircraft."

16              First of all, you would admit, I think you've

17   already admitted, that you're fully aware of the '260

18   patent?

19         A    I am aware of the '260 patent.

20         Q    And have been since roughly from the time it

21   issued, correct?

22         A    Yes.

23         Q    And you have installed the Canadian kit on the

24   airplanes of others?

25         A    That is true.

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1     Q     And you've informed others that the Canadian

2   kit cost roughly half of the Aerofab kit?

3     A     They would notice that when I gave him a bill;

4   but yes, I've given them that information.

5     Q     Thereby lowering their cost of compliance with

6   the AD?

7     A     That is correct.

8     Q     Assertion 35, "Defendant Shannon is acting

9   without authorization or license from plaintiff Enpat or

10   any prior owner of the patent."

11     A     Say that again.

12     Q     "Defendant Shannon is acting without

13   authorization or license from plaintiff Enpat or any

14   prior owner of the patent."

15          That was denied.  So there's really two pieces

16   to this one.  One is, do you assert that you have a

17   license from Enpat to use and install these Canadian

18   kits?

19     A     At the time the Canadian kits were installed

20   there was no patent.

21     Q     But you have an airworthy Lake Aircraft today

22   that has the Canadian kit installed, correct?

23     A     Yes.

24     Q     Do you have authorization from Enpat to use

25   that kit today?

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1        A    No.

2        Q    Do you have authorization from some prior

3   owner of the patent to use that kit?

4        A    No.

5        Q    Well, then why was this denied?

6        A    It boils back again to my opinion of the

7   patent.   There's no infringement because it's not a

8   valid patent.

9        Q    Really what you're saying in the denial here

10   is not that you have authorization to use the kit, what

11   you're saying is you don't think the patent is valid,

12   correct?

13        A    That is true.

14        Q    Assertion 37, "Defendant Shannon is willfully

15   infringing the '260 patent."

16             That was denied.  But --

17        A    Yes.

18        Q    -- we just went through the claims of the

19   patent.  There doesn't seem to be a disagreement that

20   the elements of the kit as described in the claims, at

21   least one of the claims, and we went through all 14 of

22   them, covers the Canadian kit, that you're flying a

23   Canadian kit, that you don't have license from Enpat to

24   fly the Canadian kit, you don't have license from anyone

25   else to fly the kit, yet you claim you're not willfully

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 151

1    infringing the patent?

2            MR. YOUNG:   Objection.  I think that

3        mischaracterizes the testimony.  I don't think

4        you've gone through the entirety of the claims.  I

5        think you skipped over the preamble for obvious

6        reasons.

7            MR. THOMAS:  We skipped over the preamble

8        because it doesn't read into the claims.

9            MR. YOUNG:  I disagree.

10    A    I disagree.

11   BY MR. THOMAS:

12    Q    With all respect, you're not a patent

13   attorney.

14    A    I've listened to one.

15    Q    And I'm not an AI either.

16    A    That's true.

17    Q    Let's go back.  Your denial of infringement

18   here in Assertion 37 is based on your assertion that the

19   patent is invalid, correct?

20    A    Yes.

21    Q    Let's just get down to it.

22    A    In the preamble there's another reason --

23    Q    Okay.

24    A    -- that my aircraft is not mentioned in the

25   preamble.

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1       Q    I understand that's your position, and the

2    position of your attorney.  Okay?

3       A    That's correct.

4       Q    The preamble does not describe the invention.

5    It is the invention that is the subject of the patent.

6            MR. YOUNG:  Is there a question?

7    BY MR. THOMAS:

8       Q    I'm responding.  So based on that, and there

9    is a question in a second, we read the description of

10   the invention, and we went through each element.  Let's

11   take claim one because there's 14 claims, so we don't

12   want to get confused.  We read all through claim one,

13   and what you told me was that each element of the claim,

14   and I will say for purposes to avoid the objection

15   accepting what is located in the preamble, we didn't

16   discuss that, but the description of the invention

17   follows the word comprising, that the Canadian kit does

18   in fact have each one of these elements in claim one?

19      A    No.

20      Q    Yes, we did.

21      A    Claim one, we did, yes.

22      Q    I realize there was some question about

23   coating and that sort in some of the other claims, but

24   we're just talking about claim one.

25           MR. YOUNG:  I want to make clear that I object

1      to a characterization that part of claim one after

2      comprising defines the invention without the

3      preamble.

4           MR. THOMAS:  That's fine.  That's an okay

5      objection, but this is a deposition, and this is

6      not -- we're not arguing Markman here.

7           MR. YOUNG:  I understand.

8   BY MR. THOMAS:

9      Q    So taking what we just said, that each one of

10  these elements that describes the actual invention

11  itself, and not the airplane, okay, covers the Canadian

12  patent?

13      A    Canadian --

14      Q    I'm sorry, the Canadian kit.  And you've said

15  that you don't have a license from Enpat to use the kit

16  today, and you don't have a license from some prior

17  patent owner.  Then how can you say that you're not

18  infringing the patent?

19      A    There's no patent.  There's no valid patent.

20      Q    That's really your only argument, isn't it?

21      A    It is -- it's not my only argument -- but it

22  is a valid argument.

23      Q    Let's put it this way, and this is a perfectly

24  fine question, so to head off the objection, suppose the

25  court disagrees with you and the preamble is not read

1    into the claims, then are you infringing the patent by

2    your use of the Canadian kit?

3         A    Only if it's a valid patent.

4         Q    If it is otherwise held up as valid?

5         A    At that point in time then it may be

6    determined valid.

7         Q    But the question was:  At that point in time

8    would you agree with me that you are infringing the

9    patent?

10        A    No.

11        Q    Why not?

12        A    If the court held it up, I may be legally

13   obligated to the claim to the patent, but my opinion

14   will be it's an invalid patent.

15        Q    You can always have any opinion you like.

16        A    That is correct.

17        Q    It may not be determinative of any outcome.

18   There was also a denial of 38 under the code USC Section

19   282 that '260 patent enjoys a presumption of validity.

20   Is there some argument with that?  That's right in

21   statute.

22             MR. YOUNG:  You're looking at me.

23   BY MR. THOMAS:

24        Q    Why would you deny that the patent enjoys a

25   presumption of validity?

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1       A      It was patented, but in my opinion the patent

2    office looks, shall we say in the patent office, it

3    doesn't look elsewhere for what is obvious.

4       Q      Again, you just think the patent is invalid,

5    that's just what you think?

6       A      I believe I stated that earlier.

7       Q      Assertion 43, "Upon information believed

8    Defendant Shannon has had knowledge of the existence of

9    a '260 patent since an issue from the US PTO on December

10   11th, 2001."

11           Your testimony was that you had knowledge of

12   the existence of the patent from about that time; isn't

13   that correct?

14      A      Yes.

15           (This concludes Volume I of proceeding.  Refer

16        to Volume II.)

17

18

19

20

21

22

23

24

25

Page 156

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

_____
                             )
ENPAT, INC.,                 )
a Florida Corporation,       )
             Plaintiff,      )
                             ) Case No.:
      v.                     ) 6:11-cv-00084-PCF-KRS
                             )
HARRY SHANNON,               )
             Defendant.      )
                             )
_____)        VOLUME II
                             (Pages 156 - 255)


DEPOSITION OF HARRY SHANNON
Taken on Behalf of the Plaintiff


DATE TAKEN:        February 4, 2011
TIME:              9:30 AM - 5:50 PM
PLACE:             202 N. Harbor City Boulevard, Suite 300
                   Melbourne, Florida 32935



Examination of the witness taken before
Vicki Humphries, Court Reporter
and Notary Public, State of Florida at Large


King Reporting Service, Inc.
14 Suntree Place, Suite 101
Melbourne, Florida 32940

APPEARANCES

FOR PLAINTIFF

STEPHEN C. THOMAS, ESQUIRE
KELLY G. SWARTZ, ESQUIRE
Hayworth, Chaney & Thomas, P.A.
202 N. Harbor City Boulevard, Suite 300
Melbourne, Florida 32935

FOR DEFENDANT

MARK J. YOUNG
MARK YOUNG, P.A.
12086 Ft. Caroline Road, Suite 202
Jacksonville, Florida 32225

1                    INDEX OF DEPOSITION
                     OF HARRY SHANNON
2
                                              Page No.
3    Direct Examination by Mr. Thomas            4

4    Cross Examination by Mr. Young             216

5    Redirect Examination by Mr. Thomas         242

6    Recross Examination by Mr. Young           250

7    Certificate of Oath                        252

8    Certificate of Reporter                    253

9    Errata                                     254

10   Witness Review Letter                      255

11

12            I N D E X   O F   E X H I B I T S

13

14                 PLAINTIFF EXHIBITS

15   NO.              DESCRIPTION           REFERRED TO
     A    Airworthiness Directive               16
16   B    Photograph                           106
     C    Certifications                        21
17   D    Patent                               127
     E    Lake Central Air Services Fax        127
18   F    Rockwell Service Letter              164
     G    Postings from Bulletin Board         183
19

20

21                 DEFENDANT EXHIBITS

22   NO.              DESCRIPTION           REFERRED TO
     A    Drawing                              221
23   B    List of Components                   237

24

25

King Reporting and Video Conference Center
14 Suntree Place, Viera, FL 32940

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1                    (Continued from Volume I.)

2   BY MR. THOMAS:

3       Q    We're going to move on to the defenses that

4   were stated in your answer.   Your first defense was the

5   defense of non-infringement.   I think we're going to

6   beat a dead horse on that one.

7            Your first defense is that you have not

8   infringed and do not infringe literally or under the

9   doctrine of equivalence any valid or enforceable claim

10  of the patent.   Again, it's my understanding that you're

11  really basing defense on your assertion that the patent

12  is invalid?

13      A    Yes.

14      Q    Your second defense, "Defendant has not and is

15  not infringing any claim on the patent, at least due to

16  statements, representations and admissions made to the

17  US Patent and Trademark office during the prosecution or

18  reexamination of the application that matured into the

19  ''260 patent, as well as the prior art that in part or

20  collectively constitutes prosecution history barring

21  plaintiff from asserting claims of the patent encompass

22  or infringe by any product or activities of the

23  defendant."

24           Exactly what statements, representations and

25  admissions do you claim were made to the patent office

1    during the prosecution of the patent that constitute

2    prosecution history?

3         A    I need a copy of what you just read to me,

4    please, so I can read it.

5         Q    I don't know that I have a copy.  I didn't --

6    I'll ask the question another way.  Is there any

7    statement or claim that was made to the patent office,

8    to your knowledge, that takes the Canadian kit outside

9    the scope of the claims of the patent or that limits the

10   claims of the patent so that the Canadian kit is not

11   covered by the claims?

12        A    We're back to validity of claims made to the

13   patent office.  In other words, if not all claims made

14   to the patent office wherein good faith, then --

15        Q    You said, "good faith."  What was not, to your

16   knowledge, was not done in good faith during the

17   prosecution of the patent?

18        A    The verification of the angle at different

19   stages in the development of the patent.

20        Q    What do you mean by "verification of the

21   angle?"

22        A    They're stating that at one stage in the

23   development of the doubler there was no angle on the end

24   of it, and then later there was an angle on the end of

25   it.

1     Q    When you say "they," who did you mean by they?

2     A    Aerofab, the inventors.

3     Q    Tarbox?

4     A    And Baker.

5     Q    So you're saying that they didn't initially

6  disclose the angled end?

7     A    It is my opinion that the doubler always had

8  an angle.  They claimed that it didn't.  We have not

9  seen any kit without an angle.

10     Q    When you say they claim that it didn't have an

11  angle, how did they claim that?

12     A    In the prosecution of the patent.  Because

13  information was released in a service bulletin in a time

14  frame that I believe -- and again I'm not an attorney --

15  but I think it would have rendered applying for the

16  patent or it would have prevented applying for the

17  patent because the knowledge had been in the field.

18     Q    The knowledge of the angled end or non-angled

19  end had been in the field?

20     A    They're claiming that there was a non-angled

21  end on the initial kit.  There's no evidence that there

22  was ever a kit with a non-angled end.

23     Q    I want to make sure I understand the

24  significance of what you're saying.

25     A    If information is available to industry for a

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1   given period of time, and no action is taken to patent

2   it, then at some point in time the ability to patent

3   that thought, innovation, whatever, can't be done.

4        Q    How does that apply to the angle versus

5   non-angled?  That's where you're losing me.

6        A    The inventors claim that on presentation of

7   information in one of the service bulletins, one of the

8   proposed service bulletins regarding the repair of the

9   wing, that the doubler did not have an end angle.  Okay?

10  Where in a later service bulletin issued closer to the

11  time that application for the patent was made the

12  doubler does have an end angle.

13       Q    Do you have copies of those service bulletins

14  that you're talking about?

15       A    Yes.

16       Q    Is it SB-79?

17       A    Yes.

18       Q    You're saying the original SB-79 did not have

19  an angled end on it?

20       A    No.  I'm saying the original SB-79 did have an

21  angle on the end of it.  The inventors claim that it

22  didn't.

23       Q    You have a copy of that service bulletin?

24       A    Yes.

25       Q    Do you recall what date that issued?

```
1       A    No, I don't.

2       Q    When you say that the inventors claim that

3  original service bulletin did not have an angled end on

4  it, where do they make that claim?  You're saying in the

5  prosecution history of the patent itself, was that what

6  you said?

7       A    I'm not an attorney, but it was either in the

8  prosecution history of the patent or it was restated in

9  the reexamination of the patent.

10      Q    All right.  Your third defense -- Well, let me

11  back up and ask:  Was there anything else in the

12  prosecution of the patent, to your knowledge, that is

13  relied upon for this assertion that the patent should be

14  invalid?

15      A    Today with the stress of this interview I

16  don't know of another assertion at this moment.

17      Q    Third defense was anticipation and

18  obviousness, and assertion is that the claims of the

19  patent are invalid, unenforceable because they're either

20  anticipated or obvious.

21           The question I have for you, and I realize

22  you're not a patent attorney, but have you provided to

23  your attorney all of the documents that you have in your

24  possession that you feel support that allegation, that

25  the patent -- the claims of the '260 patent were
```

1   anticipated by some prior art?

2       A    I don't understand the question.

3       Q    This defense says that there is some prior art

4   out there that existed before the '260 application was

5   filed.  I'm paraphrasing a little bit.

6       A    Okay.

7       Q    That would render the '260 patent application

8   invalid.  It was anticipated by some prior art out

9   there.  My question for you is:  Have you provided to

10  your attorney all of the documents you have in your

11  possession to support that allegation?

12      A    It's more communication than document.  In

13  other words, I've -- in conversation with the attorney

14  we established that.

15      Q    Okay.  I want to ask you to look at a what's

16  called a Rockwell Service Letter.  I want to ask you --

17  I don't necessarily want to mark this as an exhibit

18  yet -- I just want to ask you to look at this document.

19  It says, Rockwell International on it.  For

20  identification purposes just so we can identify it down

21  at the bottom is a bates number HS001558.

22           Is this the kind of document you're talking

23  about relying upon as prior art that should invalidate

24  the '260 patent?

25      A    This potentially could be an example of such

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    prior art.

2         Q    Is this a document that you yourself dug up?

3         A    I could have because I researched a number of

4    documents relative to doublers.

5         Q    Just generally speaking, well, do you

6    recognize this Rockwell Service Letter?

7         A    I remember a number of Rockwell documents.

8         Q    If you need a another minute to look at it,

9    that's fine, but my question is:  Generally what does

10   this document describe for us?

11        A    It basically describes a wing spar repair.

12        Q    Which includes a doubler?

13        A    Which includes a doubler.

14        Q    Okay.  I'm going to ask you to take this

15   particular document, and if you could look through it,

16   and tell me anywhere in here does it describe using a

17   filler-strap either upper or lower?

18        A    It appears that the bill of materials or parts

19   list includes a shim, which may be a filler.

20        Q    Is there a drawing in here that tells you that

21   that's a filler?

22        A    No.

23        Q    Is there anything in here that describes the

24   doubler-straps being made of 4340 steel?

25        A    No.

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1      Q     How about, well, let me just continue on, how

2    about heat treating the steel to 180,000 PSI?

3      A     No.

4      Q     Is there anything in here that tells you

5    filler-straps are made of 2024-T23 aluminum?  I realize

6    the filler-straps are not referenced in here.  Let's

7    just take the shim, which we don't know what that is.

8    Anything in here that identifies the material of the

9    shim?

10     A     Yes.

11     Q     Where is that please?

12     A     Page four of six.  And by the way, you gave me

13   two.

14     Q     There were two of them together.  I realize

15   that now.  Where is that material identified?

16     A     Left-hand column about halfway down, first

17   group, 063 x 2 x 1, 2024-T3.

18     Q     Okay.  Anything in here where the upper --

19   first of all, is there anything in here that says

20   there's an upper and lower doubler?

21     A     No.

22     Q     Is there anything in here that talks about an

23   angled end on the doubler?

24     A     No.

25     Q     Is there any information in here on coating of

1    any of these of the doubler plates?

2       A    Not that I recall.

3       Q    There's various claims that address coating.

4    I won't go through each one of them for the sake of

5    time.

6            Is there anything in this Rockwell Service

7    Letter that addresses rivets?  Yes, there are.  I see

8    that, five.

9       A    Yes.

10      Q    I want to go ahead and attach that as the next

11   exhibit, F.  I've removed the second copy.

12           You said before that through communication

13   with your attorney you had described what you felt

14   represented prior art to the '260 patent.  And you said

15   that you had dug up some documents, and it sounded like

16   you weren't quite clear if this particular Rockwell

17   Service Letter that we just attached as an exhibit was

18   one that you came up with or not, but it was

19   representative of the kind of documents you came up

20   with; is that correct?

21      A    It could be, yes.

22      Q    The question I have for you is:  When it comes

23   to these documents that you assert are prior art, is

24   there anything you haven't given your attorney?

25      A    I'm going to say no.  I've given the

1    attorney -- some of what I gave the attorney was verbal

2    discussion of what a doubler is, and how it fits, and

3    why it must be angled, and things like that.

4         Q    I understand.  But as far as documents go, is

5    there anything you haven't given your attorney?

6         A    There was some other, other than these two,

7    there were some other Rockwell documents.  I want to say

8    there was an assessment document.  I'm not sure.  There

9    was a number we went through.  I did a search in a type

10   of library that I put in doubler, you know, it came back

11   with the hits.

12        Q    Those documents you gave to your attorney?

13        A    I gave him some of those documents that

14   appeared to be valid.

15        Q    The documents that you gave him, though, are

16   representative of the kind of documents you were pulling

17   up in research?

18        A    I think so, yes.

19        Q    The next defense was indefiniteness and

20   failure to disclose the best mode, so the question is --

21        A    Failure to disclose --

22        Q    The best mode.  It's a requirement of this

23   title 35.  When it comes to indefiniteness, is there

24   some assertion that you have that the claims of the

25   patent are indefinite for any reason?

1       A     I'm not wrapping on that one, so.

2       Q     Let me ask the question another way.  When you

3   read the claims of the patent, which we went through all

4   of them --

5       A     Okay.

6       Q     -- do you understand clearly what they are

7   claiming?

8       A     Except for Number 10 I understand what the

9   inventors are attempting to claim.

10      Q     I understand the way that you phrased that

11  because you assert invalidity.  Subject to that

12  assertion on your part, when you read the claims except

13  for Claim 10, do you clearly understand what the

14  inventor is trying to claim?

15      A     Yes.

16      Q     The first defense is the defense of

17  inequitable conduct.  And this assertion is that the

18  applicant or the inventors or their representatives made

19  statements to the PTO that were known to be false.

20            Do you know of any such false statements made

21  to the PTO?

22      A     As stated earlier, the absence or presence of

23  angles at a given point in time appear to have been

24  misrepresented.

25      Q     Other than that, was there -- is there any

1    false assertion or statement made to the PTO?

2         A    Inventorship.

3         Q    Other than that, is there anything else?

4         A    That's all I can think of now.

5         Q    The second half of the assertion here the

6    defense has to do with withholding material from the

7    PTO.  Other than the two things you just mentioned are

8    you aware of any material that was withheld from the PTO

9    by the inventors or their attorneys?

10        A    Yes.

11        Q    What material was withheld?

12        A    One material was the coating on the part.

13        Q    When you say the coating was withheld --

14        A    The coating that was used on the part claimed

15   in the invention was used on other Lake parts years

16   prior to the application.

17        Q    Okay.  I think the patent wasn't claiming to

18   invent the coating.  It was the coating on that

19   particular part.

20        A    It was claiming a protective coating, and that

21   same coating was used as a protective coating on an

22   aircraft part.

23        Q    Before the '260 application was filed?

24        A    Long before the '260 was filed.

25        Q    That's the basis of your assertion that that

1    was withholding --

2          A    That would be an example of withholding

3    information from the patent office.

4          Q    Other than that and what you just mentioned

5    here, is there anything else?

6          A    We mentioned angles.  We mentioned coating.

7    Give me a second, let me reread the claims here.  Fusing

8    a material is a common function of a doubler.  I think

9    the inventors claimed that 4340 was not used anywhere

10   else in the airplane, and it is.  Heat treatment to a

11   given level, a given task, is a textbook function of

12   creating a doubler.  Use of 2024-T3 is common in

13   aircraft structures.

14         Q    Other than use of materials and coatings,

15   which are listed there, the powder coating, and all of

16   that, and then the materials you just mentioned, other

17   than that sort of thing, do you assert there was

18   information withheld from the patent office by the

19   inventors or their agents.

20         A    Not at this time.  I don't know of any.

21         Q    We've already touched on the issue of

22   inventorship, which is the next defense, the sixth

23   defense that was raised by your attorney.  And you

24   mentioned that Elton Townsend, you felt, was an

25   inventor, and you stated the reasons for that, and the

1    FAA individual Knoll was an inventor, you stated the

2    reason for that.  Other than two individuals, do you

3    assert that there was any other inventor?

4         A    There was another individual who reviewed the

5    information, and I'm trying to think of his name, with

6    the FAA, who has the potential of being a named

7    inventor.

8         Q    Was he an employee of Lake?

9         A    No, he was with FAA.

10        Q    He worked with Knoll back in the day, did he?

11        A    Yes.

12        Q    He was just a reviewer of information?

13        A    The adequacy of the repair has to be

14   evaluated, and I believe Dick called in a specialist in

15   structures, dynamics, fatigue, whatever, to do that

16   evaluation.

17        Q    Anybody else?

18        A    Not that I know of.

19        Q    Do you have any reason to think that either

20   Tarbox or Baker did not contribute to the invention of

21   the '260 patent?

22        A    In any way?

23        Q    In any way?

24        A    No, I don't have any reason to believe that

25   they didn't contribute.

1      Q     In other words, you're not disputing their

2   inventorship themselves?

3      A     I'm not sure where the in-house engineering

4   came from.  Mr. Tarbox was a structures, but the

5   regulation that this aircraft was certified under did

6   not include at the time of its certification fatigue

7   analysis.  Fatigue analysis, in my opinion, was an issue

8   in evaluating the validity of the fix for the aircraft

9   using the doublers.

10      Q     What you're saying is you're not sure who did

11   the in-house engineering for that; is that correct?

12      A     Right.  I'm not sure if Mr. Tarbox's

13   certification was valid to include fatigue evaluation at

14   that time.  And to my knowledge, Mr. Baker is not a DER

15   or designated engineering rep on any level as certified

16   by the FAA.

17      Q     Okay.  Other than that engineering analysis

18   in-house there at Aerofab, is there anybody else that

19   you claim may be an inventor of the patent?

20      A     Not that I recall right now.

21      Q     The seventh defense raised is that Enpat's

22   claim should be barred by the doctrine of unclean hands.

23   Is there some act or omission that Enpat has done here

24   that should bar them from enforcing this patent?  This

25   is separate from the validity issue.

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 174

1       A       If it's a valid patent, I believe they can

2    enforce it.

3       Q       To your knowledge, they haven't done something

4    wrong here that should prevent them from enforcing the

5    patent?

6       A       From conception through the chain to purchase

7    didn't meet with my business ethics.

8       Q       You're talking about an Aerofab's part?  Who

9    in your opinion did not meet the standard of ethics?

10      A       Aerofab REVO and Enpat's response to REVO.

11      Q       Enpat has -- Would you agree that from the

12   time that Enpat got involved with this claim, that they

13   have been straightforward in their intention to assert

14   the patent?

15      A       They appear to have been straightforward, yes.

16      Q       Have they committed a fraud or been somehow

17   unethical in their communication with the Lake aircraft

18   owners?

19      A       I don't think it's a fraud.  But the general

20   feeling of Lake aircraft owners is that it borders on

21   extortion.

22      Q       But Enpat, to your knowledge, hasn't committed

23   an act of dishonesty here, they're just simply asserting

24   trying to enforce a patent that they own?

25      A       May not constitute dishonesty.

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1       Q     The eighth defense was the defense of

2   estoppel, and this goes to a claim that -- apparently an

3   assertion -- we just talked about the plaintiff, so

4   we'll talk about the inventors of the patent, that they

5   somehow did something inequitable that should bar them

6   from this patent being enforced.  They're not parties to

7   this lawsuit, the applicants aren't.  But did the

8   applicants, Baker and Tarbox, do something in the

9   application of the patent, the prosecution of the

10  patent, other than what we already talked about, that

11  should bar anybody from enforcing the patent?

12      A     To my knowledge, yes, as we discussed certain

13  issues.

14      Q     What we already talked about, but was there

15  something else done untoward in the prosecution of the

16  patent that we haven't already discussed here today?

17      A     To my knowledge, no.

18      Q     The ninth defense is the defense of laches.

19  And this goes, the way it reads is, "Plaintiff

20  unreasonably and inexcusably delayed in filing suit for

21  infringement, and that defendant has been materially

22  prejudiced by the delay."

23            So how have you been prejudiced by the delay

24  here in filing the lawsuit?

25      A     The initial suit back in 2000 whatever, 2002 I

1    believe, asked for, I believe, was infringement.  Okay?

2    This suit asks for substantially more than just

3    infringement, but I feel that I haven't been using the

4    system in any way.  I've used the same legal system that

5    Enpat has available to it, but they've chosen a very

6    different path on the second suit.

7         Q    How is the path different that they've chosen

8    on the second suit?

9         A    Say again?

10        Q    How is the path different on the second suit?

11        A    What was I being charged with in the first

12   suit?

13        Q    You tell me.

14        A    I believe it was infringement.

15        Q    Same as here.

16        A    Not limited to infringement, willful

17   infringement, other people contributing to infringe, and

18   numerous items far exceeding the damages asked in the

19   first suit.

20        Q    How has the delay -- The defense is that the

21   delay in filing the second suit has somehow prejudiced.

22   How has the delay prejudiced you is my question?

23        A    If they had dealt in a more timely fashion,

24   maybe I wouldn't have been asked these additional

25   charges.

1        Q     Would you agree with me that if your counsel

2   asked for the delay, that this defense would be

3   meaningless?  This defense says because of the delay

4   somehow you've been prejudiced.  Would you agree with me

5   that if it was your attorney that asked for delay, then

6   Enpat hasn't done anything here to prejudice you?

7        A     If the attorney did it.

8        Q     I mentioned before he had moved for a stay,

9   and you said you weren't sure of that.  Furthermore, it

10  looks like the Lake Aircraft community banned together,

11  and sought another channel of attack by filing the

12  re-exam request with the PTO?

13       A     Yes.

14       Q     Would you agree with me that that caused some

15  delay?

16       A     The delay that it created was far beyond all

17  expectations.

18       Q     Maybe, but would you agree with me that the

19  filing of the re-exam caused a significant delay in the

20  conclusion of this patent infringement issue?

21       A     Not necessarily.

22       Q     The re-exam was filed in 2002, correct?

23       A     Say again?

24       Q     The re-exam was filed in 2002?

25       A     Yes.

1       Q    And concluded in 2010, correct?

2       A    Yes.

3       Q    That's eight years?

4       A    Yes.

5       Q    Enpat didn't file the re-exam, correct?

6       A    No.

7       Q    The Lake Aircraft owners filed for re-exam?

8       A    No, I filed for re-exam.

9       Q    The Lake Aircraft owners contributed to it,

10  correct?

11      A    Yes.

12      Q    Financially?

13      A    Financially.

14      Q    The tenth defense is the defense of waiver.

15  It's a broad statement that, that somehow either Enpat

16  or the previous owners of the patent did something to

17  waive their claims.  Can you tell me what they possibly

18  did that waived their claims?

19      A    Providing false or improper information to the

20  patent office --

21      Q    Which we've already talked about at the

22  deposition here today, the issues you've already brought

23  up, correct?

24      A    Yeah.

25      Q    Is there anything other than that that you

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1   would assert they did to waive their --

2       A    Right here right now, no.

3       Q    I don't want to rush through it.  I want to

4   make sure the answers are complete.  So when you said

5   that, do you need a minute to think about it?  And I'm

6   not being --

7       A    No.  Well --

8       Q    -- I'm offering.

9       A    -- how many depositions do you do a year?

10      Q    I'm not being deposed, but some number.

11      A    Okay.  As the day wears on --

12      Q    I understand.

13      A    -- it is stressful upon a person not

14  accustomed to --

15      Q    I understand that, which is why I was offering

16  more time to answer the question if you need it.

17      A    It won't contribute to a better answer.

18      Q    I'm going to -- Well, with regard to the

19  eleventh defense, we'll move on to the twelfth defense

20  for the sake of time.  It's cost . . .

21           Okay.  The fifteenth defense was the defense

22  of license.  And what has been raised, and I'll just

23  read it, Defendant has been granted a license to make,

24  use, sell, offer to sell, import into the United States

25  kits under the '260 patent.  I'm paraphrasing for

1    clarity's sake.

2        A    Say that again.

3        Q    "Defendant has been granted a license to make,

4    use, sell, offer to sell or import into the United

5    States kits as recited in the claims of the '260

6    patent."  We're not really talking about importing at

7    this point although that may be an issue in the lawsuit.

8             But just for purposes of this initial

9    question, do you assert that you've been granted a

10   license to sell or use the patent?  I think before I

11   asked that question you said, no you don't have a

12   license?

13       A    Relative to the import and the sell when those

14   kits were sold, there was no patent, so it's not a --

15       Q    I understand.  But you've never received a

16   license from Enpat to do any of these things, have you?

17       A    No.

18       Q    And you didn't receive a license from any of

19   the previous patent owners, correct?

20       A    Well, the -- I'm going to say I received an

21   inferred license.  I'd pick up the phone, "I'd like to

22   buy a kit."  They sold it to me.

23       Q    When you say they --

24       A    If it had required a license at that point,

25   would they have requested it?

1      Q     -- you mean Aerofab?

2      A     JCM.

3      Q     Okay.  But Enpat never granted you a license

4   at any time to do any of these things with the patent,

5   correct?

6      A     I believe, yes.

7      Q     And previous patent owners did not grant you a

8   license to do any of these things with the exception

9   that they did sell you kits so you had the license that

10  may have come with a particular kit, correct?

11     A     I don't think a license document came with any

12  kit.

13     Q     Okay.  I understand.  The Canadian, the JCM,

14  to your knowledge, were they ever at any time an owner

15  of the '260 patent?

16     A     No.

17     Q     You really do know this, correct, they were

18  never an owner of the patent, we all know that?

19     A     No.

20     Q     Yet you know that the JCM kit is covered by

21  the '260 patent, although you may dispute its validity,

22  correct?

23     A     Correct.

24           MR. YOUNG:  I'm going to object based on the

25           preamble of the claims.

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1         MR. THOMAS:  Objection noted.

2   BY MR. THOMAS:

3         Q     And you are flying a Canadian kit today in

4   your airplane, correct?

5         A     There is a Canadian kit in my airplane.

6         Q     And you have installed Canadian kits on other

7   people's airplanes?

8         A     Yes.

9         Q     Okay.  At no time did you ever receive a

10  license from any patent, any owner of the '260 patent,

11  to install Canadian kits or to use Canadian kits,

12  correct?

13        A     No.

14        Q     That was a bad question, and probably

15  confusing when we read it later.

16        A     That's correct.

17        Q     Did you ever receive a license from any owner

18  of the '260 patent to install or use the Canadian kit?

19        A     No.

20        Q     There are counterclaims that have been raised

21  by you in your answer.  The first counterclaim you're

22  seeking a judgment of non infringement.  Other than the

23  things we've already talked about today in your

24  deposition, is there any other reason you assert that

25  your use of the Canadian kit does not infringe the

Page 183

1   patent?

2        A    No other reasons.

3        Q    The second counterclaim is seeking a judgment

4   of invalidity.  Other than the things that we've talked

5   about in here today, which we've explored fairly deeply,

6   do you have any other reason to assert that the patent

7   is invalid other than what you've already said here

8   today?

9        A    At this moment, no.

10       Q    The third counterclaim seeks a judgment of

11  unenforceability and specifically mentions the

12  applicants, the inventories breaching their duty with

13  the patent office, and breaching their duty of candor,

14  and good faith and honesty.

15            Other than what we've already talked about

16  here today, is there any other reason for you to claim

17  that they were somehow dishonest or breached their good

18  faith duty with the patent office?

19       A    At this time, no.

20       Q    I want to give you a document to look at here

21  that we may or may not mark as an exhibit.  I'd like you

22  to take a look at that please, along with your attorney,

23  and when you've had enough time to feel comfortable that

24  you understand what is there, answer for me please --

25  Identify this document if you can.

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 184

1          Do you recognize this document?

2     A    No.

3     Q    Do you recognize the name Puddle Jumper?

4     A    Not Puddle Jumper.

5     Q    There's a designation after Puddle Jumper,

6   it's 6686L.  What is that, do you know?

7     A    It appears to be a registration number for an

8   aircraft.

9     Q    Any idea which aircraft that would be?

10    A    The number does not --

11    Q    Doesn't tell you what kind of airplane it is?

12    A    No.

13    Q    That's the from line.  On the to line there's

14  an M. Rodstein.  Would this be the same Rodstein that

15  was mentioned earlier --

16    A    Yes.

17    Q    -- in the deposition today?  Mark Rodstein?

18    A    Probably, yes.

19    Q    And you mentioned he is the president of the

20  Lake Amphibian Flyers Club?

21    A    Correct.

22    Q    Would this appear to you to be a bulletin

23  board printout from the bulletin board you mentioned

24  earlier?

25    A    It could be.

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1      Q    Let's see, the third line down there's a

2    mention of Armand.  "I have not talked to Armand about

3    this," it says.

4              MR. YOUNG:  I'm going to object on relevance.

5              MR. THOMAS:  It's very relevant.  It's

6         communication regarding the lawsuit.

7              MR. YOUNG:  Not by him and not --

8      A    Not by me.

9              MR. THOMAS:  You can make a relevance

10         objection at trial, if you want, but this is

11         discovery.

12              MR. YOUNG:  I just wanted to go on record.

13              You can answer.

14    BY MR. THOMAS:

15      Q    Do you think that might be Armand Rivard?

16      A    Yes.

17      Q    There's a statement here that says, "I can

18    tell you this, based on the little I know of these

19    patent issues, if I were representing the

20    patent-collector, I sure as hell wouldn't want Armand on

21    the witness stand on my client's behalf."

22              Do you have any idea what that sentence means?

23      A    No.

24      Q    And I'm going to ask you again, do you have

25    any idea who the identity of Puddle Jumper is?

1      A    If you read the document, there's also another

2  name, Pete.

3      Q    Down at the signature line?

4      A    Yeah.  What is that?

5      Q    "Sponsoonerater Pete"?

6      A    I may, without certainty, have an idea of the

7  identification of this individual.

8      Q    Who would that be please?

9      A    A gentleman named -- an individual named Pete

10  Hartmann.

11      Q    Hartmann, is Pete Hartmann a Lake owner?

12      A    I think he is.

13      Q    Have you ever communicated directly with Pete

14  Hartmann?

15      A    Yes.

16      Q    When was the last time you communicated with

17  Mr. Hartmann?

18      A    A couple of weeks ago.  Pete had had some work

19  scheduled with our shop in conjunction with a Lake

20  fly-in.  Pete has since had an engine problem, and had

21  to cancel that work.

22      Q    Does Mr. Hartmann live in Florida?

23      A    No.

24      Q    What state does he reside in?

25      A    I think Arizona.

Page 187

1      Q     Has he come to you for his Lake work in the
2   past?
3      A     We have done some work on Mr. Hartmann's
4   airplane, but it's not usually in Florida.
5      Q     Did you install either one of the kits on
6   Mr. Hartmann's airplane?
7      A     To my knowledge, no.  As to Mr. Hartmann, you
8   know, I can check records as we've previously discussed
9   to see if that end number had a kit installed by our
10  shop, but I don't remember.
11     Q     Well, based on your -- I realize it's a guess
12  that this is Mr. Hartmann authoring this to
13  Mr. Rodstein, who we've already identified, and Armand
14  is addressed in here, and the patent is addressed, and
15  there's obviously a patent suit involved here.  Would
16  you be relatively certain that this is a communication
17  regarding the lawsuit?
18     A     It has that possibility.
19     Q     Well, I'll just point out at the bottom
20  there's a note edited November 8th, 2010.  Would you
21  agree that falls within the time frame of the lawsuit?
22     A     It could.
23     Q     And Armand's kit is addressed, the first
24  sentence, does that help you identify this as --
25     A     Could be.

1      Q      -- probably associated with the lawsuit?

2      A      Right.

3      Q      Let me ask it this way:  Given the factors we

4   just talked about, is it more probable than not that

5   this is a communication relative to the lawsuit?

6      A      We're going to define something.  A

7   communication relative to the lawsuit would be a

8   communication, in other words, my lawsuit would have to

9   include me.  Okay?  And I have not seen, prior to today,

10  this communication.

11     Q      Okay.  Very good.  You haven't seen this?  So

12  let's define relative to the lawsuit then in a different

13  way since you're going to define it as including you, a

14  communication addressing you.  Why don't we say a

15  communication relative to the issues of the lawsuit?

16     A      It could.  That could, not necessarily is it,

17  but that could be a definition.

18     Q      Let me show you another correspondence.  I

19  should characterize it as another document.  Do you know

20  who Gary Silver, MD is?

21     A      I'm not positive, but I think Mr. Silver is a

22  Lake owner, and again, location, I want to say out west,

23  but I'm not sure.

24     Q      Does this appear to you to be a bulletin board

25  message from the Lake Amphibian Flyers Club?

1     A    I can't verify that because it is examples of

2    this why I don't go on the bulletin board.

3     Q    I understand.  I'd like for you to go ahead

4    and hang on to it because I'm going to ask some

5    questions.  Again, M. Rodstein is the recipient, best

6    guess be that would be Marc Rodstein, correct?

7     A    Best guess, that is correct.

8     Q    Now, in the first sentence this talks about

9    registered Lake owners.  In the second paragraph it

10   addresses an opinion regarding lawsuits.  So again, I'm

11   going to ask the question more probable than not that

12   this is relative to the issues of the lawsuit?

13    A    I don't see that in this document.  What I see

14   in this document is the way owners are notified relative

15   to issues with their aircraft.

16    Q    Well, let me ask you this:  The first sentence

17   says, "Have you responded to the obviously misguided

18   letter?  This almost sounds like they're sending this

19   letter to every registered Lake owner."

20         Do you have any idea which letter he's

21   referring to here?

22    A    Technically, no.  Intuitively it has come to

23   my attention that some Lake owners have received a

24   demand letter in the mail.

25    Q    From Enpat?

Page 190

1      A     From Enpat.

2      Q     Regarding the patent and the installation of

3  infringing kits on Lake airplanes, correct?

4      A     Something like that.  I don't think it

5  consists of those few words, but yes.

6      Q     I understand it's longer than that.  Okay.

7            Obviously we're going to have a few of these.

8  I'm going to hand you another document.  Hopefully, we

9  can go a little more quickly through these.

10           For identification sake, from line is Puddle

11  Jumper, and to line is P. Furnee?

12     A     Yes.

13     Q     Now, Puddle Jumper was also in the from line

14  of the first one of these that we looked at.  At the

15  bottom there's a signature line, BS Hartmann.  The BS is

16  in quotes?

17     A     Yeah.  Yes, it is in quotes.

18     Q     It's in quotes?  Do you think that may be Pete

19  Hartmann?

20     A     There's a possibility of that.

21     Q     Here's another one.  We're going to eventually

22  attach this as a composite exhibit.  I've handed you

23  another document.  It looks similar in nature, at least,

24  to the others.  From line, CMcFarland2.  And it's signed

25  at the bottom, Charlie.  Do you know who CMcFarland2 is?

1       A     I know a Charlie McFarland.

2       Q     A Lake aircraft owner?

3       A     I believe he's a Lake aircraft owner.

4       Q     Is he a Florida resident, to your knowledge?

5       A     No.

6       Q     Do you know what state he lives in or the

7    general area of the country?

8       A     Oklahoma.

9       Q     There's a comment made in the second paragraph

10   towards the end of the second paragraph where he says,

11   "It is in all our best interests to support Harry.   I

12   will have a check in the mail tomorrow to him."

13            Did Charlie McFarland contribute to your

14   defense of this lawsuit?

15      A     It's possible.   I would have to look at that

16   list.

17      Q     And would you agree that in that portion of

18   the sentence I just read he is encouraging others to

19   support you in your defense?

20      A     Yes.

21      Q     The fourth paragraph down starts off with

22   this, "Let them spend time and money figuring out who

23   has the kit and who doesn't."

24            Moving on down there's a sentence that starts

25   with the word but, "But to just give them the

1    information after the first request letter seems to be

2    making it too easy for them.  Make them at least earn

3    it."

4         When he is talking about them, he's talking

5    about Enpat, isn't he?

6         A    He could be.

7         Q    Enpat requested information from the Lake

8    aircraft owners in an effort to determine who had

9    Canadian kits and who didn't, didn't they?

10        A    I believe they did.

11        Q    And it's true to say that there is a concerted

12   effort on the part of the Lake aircraft owners to

13   frustrate the efforts of Enpat to ascertain that

14   information?

15        A    I can't honestly verify that.

16        Q    Would you agree at least that this

17   correspondence would tend to support that notion?

18        A    I would agree that there is definitely some

19   unhappiness with the overall methods used to determine

20   that information.

21        Q    I understand.  Let's just be honest about it,

22   the Enpat owners aren't happy about the fact that Enpat

23   is requesting their log -- copies of their logbooks and

24   information relative to what kit they have in the

25   airplane, isn't that correct?

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1          A     I can't think for them.

2                MR. YOUNG:  Objection.

3          A     You're asking me --

4     BY MR. THOMAS:

5          Q     I'm asking you based on what you heard.

6                MR. YOUNG:  Can you read back the question?

7                (Requested portion read back.)

8     BY MR. THOMAS:

9          Q     The aircraft owners, the Lake aircraft owners,

10    are not happy because Enpat has requested copies of

11    their logbooks in an effort to figure out which kit they

12    have in their airplanes, isn't that correct?

13         A     Yes.

14         Q     And isn't it correct that there is an effort

15    on the part of a group of Enpat -- of -- I'll state it

16    again, of Lake aircraft owners to frustrate Enpat in

17    their efforts to try to understand which airplanes have

18    which kit?

19         A     Reading these documents it appears that you

20    are correct.

21         Q     These documents do tend to support that

22    theory, correct?

23         A     They do tend to support that theory.

24         Q     I'm going to try to move fairly quickly

25    because time is going to run out on us.  This next

Page 194

1    document is similar in nature, and it looks like the

2    from line is C-G-M-A-I-N-E.  Do you have any idea who

3    that -- the identity of that person is?

4         A    That person could be a Lake owner that I know.

5         Q    What's that Lake owner's name please?

6         A    Cliff Maine.

7         Q    Cliff Maine?  What state does Cliff reside in?

8         A    Michigan.

9         Q    Do you know a Rob Biceyskis?

10        A    I can't pronounce it either.

11        Q    Do you know this person?

12        A    Yes.

13        Q    He's identified in the to line of this

14   particular --

15        A    Yes.

16        Q    Is he a Lake aircraft owner?

17        A    Yes.

18        Q    The first line on this says, "public

19   information from the attorney, colon," which attorney is

20   that?

21        A    Cliff Maine.

22        Q    Cliff Maine is an attorney?

23        A    Yes.

24        Q    Has he provided an opinion to you regarding

25   any of the issues in this lawsuit?

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1      A      Other than the fact to retain appropriate

2   counsel, no.

3      Q      Has he contributed to your defense in this

4   lawsuit?

5      A      That's possible.  I would have to look.

6      Q      Take a minute and read this.  Would you agree

7   with me that in this correspondence apparently Attorney

8   Maine is providing a link for the file wrapper for the

9   patent?

10     A      Reading the document it appears that is the

11   case.

12     Q      On its face?  And he's also provided,

13   apparently, a separate copy of the Board of Patent

14   Appeals' decision, is that correct, just reading the

15   document on its face?

16     A      I'm not sure what the link is.

17     Q      Okay.  The next one, for identification

18   purposes at the top it says, message 2768.62, and in the

19   from line it's Lgs3128P.  The signature line says Gary.

20   Previously we had one of these.  He identified himself

21   as Gary Silver, MD.  Same from line.  To Puddle Jumper.

22          Second paragraph starts off, "I am with

23   Charlie and Paul on discovery.  I take a dim view of the

24   seemingly scatter-gun approach Enpat seems to be using."

25          The fourth paragraph down, "Enpat seems to

1   have no basis for their approach if people with REVO

2   kits are receiving demand letters."

3           The second sentence in, "I agree with Charlie

4   and Paul, I have no obligation to incriminate myself."

5           Would you agree with me that this

6   correspondence also tends to support the theory that the

7   Lake aircraft owners are frustrating Enpat's efforts to

8   obtain copies of the logbooks?

9       A    It may indicate that.

10      Q    The next one is identified at the top as

11  message 2768.63.  Again from Rob Biceyskis.  I'm

12  probably not pronouncing it correctly.

13  B-I-C-E-V-S-K-I-S.  To Puddle Jumper, who is identified

14  as Pete in the salutation.

15          Third paragraph, "Well if Enpat is the bunch

16  of ambulance chasers that we believe they are, then why

17  not have them work for their dinner."

18          Further down, "If everyone were to delay their

19  response, then we are helping each other.  Why should we

20  help them narrow their targets?"

21          Same question:  In light of what's on the face

22  of this communication, would you agree that this

23  communication tends to support the theory that the Lake

24  aircraft owners are acting in concert to frustrate

25  Enpat's efforts to obtain copies of the logbooks?

1      A    This communication indicates to me that there

2    are owners of Lake aircraft who are attempting to

3    frustrate the efforts of Enpat on some level.   And

4    notice I said, "some Lake owners."

5      Q    The next one at the top for identification

6    purposes only, message 2768.66.  The from line is from

7    LA4200EP.  It's signed signature Michael.  Do you know

8    who Michael would be?

9      A    No.  The from line is the model of the

10   airplane, so there's a Michael out there with that

11   model.  And I don't know.

12     Q    I understand.  First sentence states, "Why

13   would anyone respond to a letter from a lawyer anyway?

14   Unless it is a legal subpoena, I would throw the letter

15   in the trash.  I do not have to answer any questions

16   from an attorney just because they send me a letter."

17          Same question:  Does this correspondence on

18   the face of it tend to support the theory that some Lake

19   aircraft owners are attempting to frustrate the efforts

20   of Enpat --

21     A    This is certain circumstances.

22     Q    -- to obtain information regarding the kits?

23     A    None of that is mentioned here.  It just says

24   a letter from an attorney unless it's a subpoena.

25     Q    You would admit that the LA-4-200-EP is --

1       A       That's a Lake owner.

2       Q       And it's a model subject to the AD?

3       A       That I would admit to.

4       Q       This next one is rather short.  For

5    identification purposes it's message 2768.68.  The from

6    line looks like it's T-T-U-X-I-L-L, in parentheses

7    "TurboTax" or maybe "TurboTux".  Do you recognize Tom

8    Tuxill?

9       A       Tom Tuxill.

10      Q       Did he contribute to your defense?

11      A       I think so.

12      Q       The next one at the top has the identification

13   message 2768.70.  Would you agree this is from Paul

14   Furnee?

15      A       It appears to be.

16      Q       To Mark Rodstein?

17      A       It appears to be.

18      Q       Addressed to Marc, that's M-A-R-C.  I'll ask

19   you to take a minute and read it.  Would you agree that

20   in this correspondence Mr. Furnee is encouraging a group

21   of Lake aircraft owners to act in a concerted fashion?

22      A       That appears to be one of the thoughts in his

23   communication and it's -- Off the record?

24      Q       Sure.  We can go off the record for a second.

25      A       I need to go to the bathroom.

1              (Off the record at 3:46 PM.)

2              (Back on the record at 3:53 PM.)

3    BY MR. THOMAS:

4        Q    The next communication and from line, for

5    identification purposes at the top reads 2768.72.  Does

6    this appear to be a communication from Paul Furnee from

7    what you can tell?

8        A    It appears to be.  It has a from line of P.

9    Furnee.

10       Q    The to line is LakeWash, L-A-K-E-W-A-S-H.  Do

11   you know who LakeWash is?

12       A    No.  Well, I may know LakeWash, but I don't

13   know who this identifies.

14       Q    Who is the LakeWash you know?

15       A    I may know that person, but this doesn't

16   identify him.

17       Q    For you?  I understand.  The second -- maybe

18   it's the third sentence of the first paragraph --

19   "Furthermore, there were quite a number of kits sold

20   that were genuine kits, but -- then in caps -- were not

21   sold by Lake or Aerofab.  In other words, there was a

22   black market for these kits that Armand knew nothing

23   about."

24            What does he mean when he says there were

25   quite a number of kits sold that were genuine kits, but

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    were not sold by Lake or Aerofab?

2          A      At one time there were some kits sold by the

3    person who manufactured the kits, and those sales did

4    not go through Lake or Aerofab.

5          Q      Okay.  When you say the person who

6    manufactured the kits, who was that?

7          A      Mibec is the name that comes to mind.  At the

8    time these kits were produced, Aerofab did not have a

9    production certificate, so someone had to be retained

10   who could acquire an FAA --

11         Q      Uh-huh.

12         A      -- to make parts for production for

13   installation on certified airplanes.  This firm, I want

14   to say, was Mibec.

15         Q      Do you know how to spell that?

16         A      M-I-B-E-C.  It was the initials or something

17   of his daughters.  And somewhere, as this goes back now

18   nearly ten years, I may have the name of the person who

19   ran that shop.  And there was an issue of nonpayment,

20   this is rumor, by Aerofab, so he had kits.  People

21   needed kits, and people contacted him directly.

22         Q      Where was he located, what state?

23         A      Maine.

24         Q      City?

25         A      I'm not sure.  I've heard mention it was also

1    in New York.  Try Rochester, but I'm not positive.

2        Q    But you're saying he was a supplier to

3    Aerofab?

4        A    Yes.

5        Q    But that he also sold kits not through

6    Aerofab?

7        A    Yes.

8        Q    Did you ever order a kit from this Mibec?

9        A    I think I got one Aerofab kit from Mibec.

10        Q    You called it an Aerofab kit, but you ordered

11    it directly from Mibec?

12        A    Yes.

13        Q    The last sentence, "In other words, there was

14    a black market for these kits that Armand knew nothing

15    about," Mr. Furnee seems to be saying that Armand didn't

16    know that Mibec was selling kits?

17        A    That's Mr. Furnee's opinion.  I can't verify

18    that.

19        Q    He says here in the -- I guess it's the third

20    line again, "There were quite a number of kits sold in

21    this manner," do you have any idea what he means by

22    number of kits?

23        A    No.

24        Q    But you think that you purchased at least one

25    from Mibec?

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 202

1      A    I believe it was one and only one.

2      Q    The last sentence in the correspondence says,

3  "You should do whatever will cost them the most money,

4  and you will help everyone."

5           The first sentence in that last paragraph

6  says, "Inviting them out to inspect your airplane might

7  help you out, but would not help out the general cause."

8           The sentence I just read, the "them" there is

9  Enpat, isn't it?

10     A    It could be, yes.

11     Q    And would you agree with the assertion that

12  these statements tend to support the idea that at least

13  some of the aircraft owners are acting in concert to

14  frustrate the efforts of Enpat --

15     A    You can read --

16     Q    Let me finish the question, to ascertain which

17  --

18     A    When you pause, it appears to be an end.

19     Q    My brain is working more slowly as yours is

20  too.

21     A    Okay.

22     Q    But do you agree that this communication tends

23  to support the theory that Enpat may be frustrated by

24  some of the Lake aircraft owners?

25     A    I can't tell you if Enpat is frustrated, but

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 203

1    it appears that the Lake owners are -- there appear to
2    be some Lake owners who are attempting to frustrate some
3    of Enpat's efforts.
4        Q    When you say some Lake aircraft owners, based
5    on your communication in the industry, not only what
6    we've gone through here today, but what you know, would
7    you say that's a majority of the Lake aircraft owners.
8        A    No.
9        Q    Why do you say no?
10       A    The level of communication, in other words,
11   how many people, how many unique individuals are evident
12   in this communication.
13       Q    You would agree, though, that it's more than
14   likely that it's just a subset of the aircraft owners
15   that participate in the bulletin board, correct?
16       A    It has to be at least that.
17       Q    You said you don't participate very much?
18       A    I avoid it like the plague.
19       Q    The next is another message, and at the top it
20   says, message 2768.18.  Does this appear to be from Paul
21   Furnee?
22       A    It has a P. Furnee from line.
23       Q    In the to line do you recognize the name
24   SunnyDon?
25       A    No.

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1      Q      S-U-N-N-Y-D-O-N?

2      A      No, I don't.

3      Q      The third paragraph down about halfway through

4    the paragraph, "How can some kooky law firm prove that I

5    have an infringing kit installed?   They can't.   Not to

6    mention the fact that somehow, after the kit was

7    installed, I lost my logbooks.   The funny thing about

8    logbooks, they have a habit of disappearing."

9           The next paragraph down, "Now, of course,

10   someone could (only by court order) inspect my airplane

11   to see if they somehow could determine what kit might be

12   installed."

13          Skipping ahead, "but I just flew my airplane

14   to Siberia last week.   Have fun guys."

15          Is it fair to characterize this communication

16   as encouraging Lake aircraft owners to not produce their

17   logbooks and not to produce their airplanes for

18   inspection?

19     A      No.

20     Q      Why do you say no?

21     A      Because I think most Lake aircraft owners

22   would view this communication as something less than

23   most Lake aircraft owners would feel proper with.

24     Q      I understand that.   But my question was:   Is

25   it fair to characterize this as encouraging Lake

1    aircraft owners to not produce logbooks?

2         A    This individual appears to be encouraging

3    that.

4         Q    Would you agree with me, though, that Paul

5    Furnee enjoys some level of respect in the Lake Aircraft

6    community?

7         A    Yes.

8         Q    He is somewhat looked up to by the owners,

9    isn't that true?

10        A    Some owners do indeed look up to Paul.

11        Q    Okay.  Thank you.  This next posting is -- at

12   the top identifies message 2768.26.  In the from line it

13   says flyeddy, F-L-Y-E-D-D-Y.  Do you know who flyeddy

14   is?

15        A    No.

16        Q    In the to line it says simply to all.  Just to

17   paraphrase, he mentioned hiding slaves in the 1850s and

18   draft dodgers in the '60s and '70s.  "Would be easy to

19   understand how a US Lake owner may decide to use an

20   obscure Canadian base of operation for an unexpected

21   duration while exploring the North."

22             Would you agree that this correspondence tends

23   to support the notion that again there are at least some

24   Lake aircraft owners who are suggesting to the community

25   don't make your airplanes available for inspection?

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1        A     It appears this individual is suggesting that.

2        Q     This next message is, for identification

3    purposes at the top 2768.21.  In the signature line BS

4    Hartmann.  Again this is from Puddle Jumper at the top.

5    Do you think it's likely from Pete Hartmann?

6        A     It has a great possibility of being Pete.

7        Q     The to line is, to all.  I'm going to read

8    excerpts of this, "Bottom line, dash, stand behind Harry

9    on this."

10          Mr. Shannon, would you agree that the Harry in

11   that sentence most likely means you?

12       A     Good possibility.

13       Q     And further on down is a sentence that starts,

14   "But defending it will involve time, money and

15   aggravation, period.  Suggest we let Harry's lawyers

16   handle this."

17          Further on down, "Bottom line, support Harry,

18   dash, his fight is our fight."  Our is capitalized."

19          So would you agree that this communication to

20   all tends to support the theory that the Lake aircraft

21   owners, maybe not all of them, but in general as a

22   community, have been encouraged to stand behind you in

23   your fight to defend this lawsuit?

24       A     That is correct.

25       Q     Okay.  The next one is, at the top for

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1   identification purposes, message 2768.11.  Again it's

2   signed BS Hartmann.  In the from line it says Puddle

3   Jumper.  Would you agree most likely Pete Hartmann

4   authored this?

5        A    Yes.

6        Q    The fourth paragraph down in all caps, "United

7   we stand, together we fall.  This is our fight."

8   Exclamation point.  And then, "Now send Harry an

9   insurance check."

10            Again, would you agree that this

11  correspondence tends to support the notion that the Lake

12  aircraft owners, at least some of them, are united and

13  standing behind you in your defense of this case and

14  contributing money?

15       A    Yes.

16       Q    The next is another correspondence, and at the

17  top identifies message 2768.20.  This is from

18  F-S-T-E-E-V-E-S this time.  Do you know who that

19  identity of -- do you know the identity of this person

20  who has authored this correspondence?

21       A    No.

22       Q    It's addressed to Harry.

23       A    It assumes.

24       Q    The Harry would be you, yes?

25       A    I don't know.

1      Q      Most likely?

2      A      There is a chance.

3      Q      Well, it's -- when I say it's addressed to

4   Harry -- actually it's C-G-M-A-I-N-E, which is

5   Mr. Maine, I think you said earlier?

6      A      Could be.

7      Q      Then the salutation is, "Harry," comma, and

8   apparently this person asked one of their patent

9   attorneys to review this, whatever this means, then it

10  says, it says, "Frank," so do you think the Frank could

11  be the fsteeves up there?

12     A      Could be.

13     Q      Do you know a Frank Steeves?

14     A      I don't think -- I don't recall a Frank

15  Steeves.

16     Q      Okay.  This correspondence -- Apparently,

17  whoever addressed communication to Frank has reviewed

18  the Board of Patent Appeals decision on its face, and

19  the involved patent would be the '260 patent, then

20  provides some opinion down at the bottom, says, "In

21  order to develop more complex defenses, I would have to

22  review the file wrapper for the '260 patent, and do some

23  searching in Canada for a patent there.  I can do the

24  Canadian rather quickly, but perhaps I could simply talk

25  to Mark Young, the attorney for Harry Shannon.  If he

1    has a PDF copy of either, that would save time and

2    effort.  Also, I would be happy to give him my thoughts

3    on defenses, if that would help."

4            On the second page, "Let me know whether or

5    not to contact Mark Young.  I'll continue research on

6    the kit issue."  Signed Linda.

7            Did you ever talk with a Linda who apparently

8    is an attorney?

9        A    I got an e-mail from -- I think I got an

10   e-mail from someone I didn't recognize as knowing that

11   dealt with this subject, and I forwarded that to Mark.

12       Q    You did forward that to Mr. Young, your

13   attorney?

14       A    Yes.

15       Q    Did you engage this Linda as an attorney to

16   represent you in this case?

17       A    No.

18       Q    But she e-mailed you directly, did she?

19       A    Someone specifically pointed this

20   communication out to me, and it, like I said, I fight

21   going onto that forum with a passion, but someone had

22   said -- and I don't remember who it was -- said, check

23   this one, and I may have made a response to her to

24   contact Mark.

25       Q    Okay.  To your knowledge, did she contact

1   Mr. Young?

2        A    I don't know.

3        Q    Did she respond to you in any way?

4        A    To my knowledge, I never got another response.

5        Q    But you would agree that someone in the Lake

6   community asked her to get involved and provide some

7   opinion regarding the issues in the case?

8        A    It appears to be the case.

9        Q    Okay.  This last one I'm going to show you --

10  I shouldn't say last.  This next one is identified at

11  the top as message 2768.22.  Could you identify for me,

12  please, who you -- who would be your best guess as to

13  who that is in the from line there?

14       A    From line reads M. Rodstein.

15       Q    Would that be the same Marc Rodstein we talked

16  about earlier today?

17       A    Could be.

18       Q    Since it's signed Marc Rodstein?

19       A    Yes.

20       Q    The to line is fsteeves.  Take a minute and

21  read this if you would please.

22            Looking at this communication, it addresses

23  Enpat, and the bottom line in the bottom paragraph is,

24  "This is why I'm sending Harry my check for $500 on top

25  of the $1000 previously contributed."

1          Would the Harry in that line be you?

2      A    I think so.

3      Q    So would you agree that this communication is

4   related to the issues in the lawsuit here?

5      A    It could be.

6      Q    The next one is message 2768.24.  Could you

7   tell me, please, can you identify who this is from?

8      A    This name means nothing to me.

9      Q    S-A-N-V-E-8 addressed to Puddle Jumper, which

10   is most likely Pete Hartmann?

11      A    Could indeed be Pete Hartmann.

12      Q    This says, "In talking with Harry the other

13   day, he told me they are requiring the owners that they

14   potentially are going to sue to prove which kit they

15   have installed on their airplane."

16          Would you agree that on the face of this

17   communication it looks like the author of it spoke with

18   you about the lawsuit?

19      A    It could be.

20      Q    Does that help you identify snave8?

21      A    No.

22      Q    It follows in the bottom there, "My check to

23   Harry is going out Monday morning."

24          So someone you spoke with, someone who sent

25   you a check and is identified as snave8, you don't --

1     A    Snave8 does not allow me to identify the

2  individual referenced.

3     Q    Okay.  The next one, the top is 2768.30 from

4  Puddle Jumper to the person we've previously talked

5  about, Rob Bicevskis.  The third sentence down, "Face

6  it, we Lake owners are a cult of sorts.  Let's stick

7  together and support Harry."

8     A    Your point.

9     Q    The question is:  On the face of it, would you

10 agree that this correspondence is related to the issues

11 in the lawsuit?

12    A    It could be, yes.

13    Q    Okay.  I'd like to collect all of those up

14 that I just handed you, I don't know where you've been

15 putting them, and make that a composite exhibit.

16         Are you aware of -- Are you aware of a kit

17 that was manufactured in South Florida that was intended

18 to help aircraft owners comply with the AD?

19    A    No.

20    Q    Going back to the kit that was manufactured by

21 Mibec.  If you used a Mibec kit to comply with the AD,

22 would you have to file an AMOC?

23    A    No.

24    Q    Would you file a 337?

25    A    Probably, no.

1        Q    Would it fall under the protections of the FAA

2    approval that Aerofab had for that kit?

3        A    I think, yes.

4        Q    So it would have been possible to purchase a

5    kit from Mibec, and not pay Aerofab, comply with the AD,

6    and not have to file a 337 or an AMOC?

7        A    Yes.

8        Q    Do you recall what the price of that Mibec kit

9    was that you purchased?

10       A    I want to say -- it would be speculation -- I

11   mean, I know there was a price.  It can be determined.

12       Q    Do you have any records that would reflect

13   what the price was of the kit you purchased from Mibec?

14       A    I'm not 100 percent guaranteed, but reasonably

15   confident I do have a record.

16       Q    Would that be in your possession or the

17   company's possession?

18       A    Company.

19       Q    That's at the Bartow facility?

20       A    Yes.  And if I bought it, I installed it.  I

21   say "I," me or my entity installed it.

22       Q    I understand.  I'm going to ask you to

23   speculate here.

24       A    Okay.

25       Q    Based on the communication that you saw from

1  Paul Furnee where he said quite a number of these kits

2  were sold, is it likely, in your opinion, that Paul

3  Furnee would be accurate in the statements he made there

4  in that communication regarding the number of kits being

5  sold by Mibec?

6       A    There is potential of that.

7       Q    Just to put it in really common, you know,

8  just to boil it down, does Paul Furnee know what he's

9  talking about when he talks about this company selling

10  these kits?

11       A    It's likely that he does.

12       Q    Do you recall if the price of the Mibec kit to

13  you was less than the price of the Aerofab-ordered kit?

14       A    Yes.

15       Q    Substantially less?

16       A    Yes.

17       Q    I'm going to take a break, and go off the

18  record.

19            (Off the record at 4:27 PM.)

20            (On the record at 4:33 PM.)

21  BY MR. THOMAS:

22       Q    Regarding documents relative to any issues in

23  the lawsuit, do you know of anyone who we haven't

24  identified here today -- Scratch that.  Do you know of

25  any documents in the possession of anyone other than you

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    or your attorney that are related to the issues in the

2    lawsuit, and if so, who possesses those documents?  I'm

3    going to except from that the FAA.  We understand that

4    they have records and certainly the plaintiff.

5        A    The FAA has records.  I'm sure there are other

6    communications similar to what you exposed here today

7    that may have been e-mailed or snail mailed that could

8    have --

9        Q    Would that be back and forth between the Lake

10   aircraft owners?

11       A    I don't know.

12       Q    Is it likely that there are such documents out

13   there, e-mail communications and such, documents other

14   than you --

15       A    Are you assured that you have all of the

16   communications on the website?

17       Q    No, absolutely not.

18       A    Neither am I.  You're asking me a question far

19   beyond my reach to answer.

20       Q    I'm asking if you have specific knowledge

21   as --

22       A    No, I don't have specific knowledge.

23       Q    Today, as we've been in your deposition here

24   today, have you been on any medication that would render

25   it difficult for you to give clear and precise answers?

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1      A    No.

2      Q    Have you ever been convicted of a felony?

3      A    No.

4      Q    In any state have you ever been convicted of a

5  crime involving fraud or dishonesty?

6      A    No.

7      Q    Have you ever been convicted of a crime that

8  could have resulted in imprisonment for more than a

9  year?

10     A    No.

11         MR. THOMAS:  We'll tender the witness for

12     cross.

13                    CROSS EXAMINATION

14 BY MR. YOUNG:

15     Q    For the record, my name is Mark Young.  I'm

16 your attorney.  And I'm going to ask you a few questions

17 to clarify some things, maybe help clear up some things

18 that were addressed previously today.  The same

19 admonitions apply.  Please answer yes or no.  If you

20 don't understand the question, please ask me to restate

21 it.  I'll do my best to be as quick as possible.  I

22 understand it's been a long day.

23         MR. YOUNG:  Is this a copy of the exhibits

24     that we have?

25         MR. THOMAS:  I have a complete set for you.

1        It's gotten messed up.  What we can do -- What are
2        you looking for?
3    BY MR. YOUNG:
4        Q    I can work off my copy of the patent for now.
5    Mr. Shannon, would you mind turning your attention to
6    claim one of the patent labeled Exhibit D.  I'll try to
7    be as clear and concise as possible.  Does claim one
8    require a root rib angled relative to a vertical plane?
9             MR. THOMAS:  I'm going to object.  That calls
10       for a legal conclusion, but go ahead and answer.
11       A    Claim one appears to state, "Wherein said root
12   rib is angled relative to the vertical plane of said
13   amphibious airplanes."
14   BY MR. YOUNG:
15       Q    Let me rephrase the question to address the
16   objection.  Does claim one recite a root rib angled to a
17   vertical -- angled relative to the vertical plane?
18            MR. THOMAS:  Objection, mischaracterizes the
19       claim.
20       A    Yes.
21   BY MR. YOUNG:
22       Q    Is the root rib of a Lake aircraft angled
23   relative to the vertical plane of the aircraft?
24       A    No.
25       Q    How do you know?

Page 218

1       A    I've worked on them, taken them apart, put

2    them together.  You can look at it visually.  And the

3    root rib of the wing is parallel with the vertical

4    access of the aircraft.

5       Q    Does that language in the claim make it

6    confusing and unclear?

7       A    Well, they're talking about an airplane here

8    that has a root rib with angle relative to the vertical

9    access.  My aircraft is not configured that way.

10      Q    Is there another element that's recited in the

11   claim that has an angle related to the root rib?

12           MR. THOMAS:  Objection that you've

13           characterized the root rib as an element of the

14           claim.

15   BY MR. YOUNG:

16      Q    You can answer.

17      A    I believe it says -- claim five says upper

18   doubler-strap -- inboard-end angle on said upper

19   doubler-strap is approximately five degrees.

20      Q    Okay.

21      A    And further, actually the answer to your

22   question is yes, claims five and six reflect that, and

23   indicate angles on the inboard ends of the doubler.

24      Q    What about claim one, is there anything in

25   claim one that refers to the inboard end of the doubler?

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1     A    Yes.  Claim one does indicate an upper

2    doubler-strap -- where it says upper doubler-strap has

3    an upper inboard end angle and said lower doubler-strap

4    has a lower inboard end angle, so that would also be

5    reflected in claim one.

6     Q    Would changing the angular orientation of the

7    root rib impact the inboard end of the doubler?

8     A    Yes.

9     Q    How?

10     A    The root rib is attached to the spar.  The

11    root rib is attached to the spar in close proximity to

12    the bolts that attach the wing to the airplane.  If that

13    angle is changed, to maintain an appropriate

14    relationship of the inboard bolthole, then that angle

15    would also have to be changed on the doubler.  I think I

16    got that right.

17     Q    Did you previously initiate a reexamination

18    proceeding against the patent?

19     A    Yes.

20     Q    By patent, I'm referring to the same patent

21    that we've been discussing all day.

22     A    The '260 patent.

23     Q    In connection with that, did you identify

24    prior art that was cited against the claims of the

25    patent in that reexamination?

EXHIBIT E ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 220

1      A    I know I submitted information to the firm

2   doing the reexamination to specify prior art, you know.

3   We talked about numerous things during that period.

4      Q    Do you recall if you included any prior art

5   that showed or described a doubler having an inboard

6   angled end?

7      A    At that time I can't remember specifically

8   including a doubler with an inboard end angle.  I know

9   I've dealt with doublers with angles, but I don't know

10  if that was provided to counsel at that time.

11         MR. THOMAS:  Objection.  Mark, when you say

12      cited, cited by whom?  You said cited against the

13      claims of the patent.

14  BY MR. YOUNG:

15      Q    Of the prior art that you supplied, what you

16  recall that you supplied, did you include any prior art

17  that showed a doubler having an angled inboard end?

18      A    No.

19      Q    As a follow-on question:  Did you include any

20  prior art that showed a doubler having an angled inboard

21  end to accommodate some adjacent structure?

22      A    No.

23      Q    Do you recall what happened during the

24  reexamination proceeding initially, prior to appeal?

25      A    There was a tremendous amount of

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    communication, but I remember actually at the first

2    review or reexamination all 14 claims were rejected.

3         Q    On appeal do you recall -- you had an

4    opportunity to review the appellate decision, the

5    decision by the Board of Patent Appeals, didn't you?

6         A    I read them.  But if you will, counsel was

7    handling that.  They knew a lot more of how this is

8    worded, and so forth, than I did; but yes, I reviewed

9    them briefly when they came back.

10        Q    Do you recall if the panel considered a lack

11   of prior art relating to the angle of the inboard end of

12   the doubler to be important in their decision?

13        A    I don't recall that.

14        Q    Have you ever seen this drawing before?

15        A    Yes.

16        Q    I want to mark this as an exhibit.  I don't

17   know how we're going to deal with it.  I believe earlier

18   you testified that you were in the aircraft maintenance

19   business?

20        A    Yes.

21        Q    And you, in particular, you focus on Lake

22   aircraft?

23        A    Since 1987 Lake amphibians have been a major

24   portion of my work.

25        Q    What does an aircraft maintenance professional

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    like yourself do?

2        A    We inspect.  We repair.  We counsel customers.

3    We have participated in development of ADs.  In '99 I

4    was National Aviation Maintenance Technician for the

5    United States, and selected by the FAA process.  And in

6    essence that related or one of reasons for that

7    selection for that honor, if you will, was the work put

8    into another AD, specifically on the LA-4-200.  And so

9    we -- in my case, as I'm also a licensed pilot, I test

10   fly the work that we perform, and make sure it's ready

11   for true delivery to a customer.

12       Q    What kind of tools do you use in your

13   business?

14       A    Wrenches, socket screwdrivers, sheet metal

15   tools, things that would cut metal, shape metal, measure

16   metal, you know, rivet guns, screw guns, bucking bars,

17   shears.

18       Q    Do you ever work with drawings?

19       A    Drawings are a frequent part of that.

20   Drawings were supplied with the kits to install them

21   from the AD.

22       Q    Earlier you testified about some familiarity

23   with the job of Jack Tarbox and Phil Baker?

24       A    Yes.

25       Q    Would they ever have occasion to work with

1    drawings?

2         A    They more so than the average mechanic because

3    at the factory all of drawings of the aircraft would be

4    available to someone like Mr. Tarbox or Mr. Baker.

5         Q    Ever have occasion to use a compass?

6         A    Say again?

7         Q    Did you ever have occasion to use a compass?

8         A    Yes.

9         Q    Is this the type of drawing that a

10   professional such as yourself might use in the ordinary

11   course of your business?

12        A    If you have access to such a drawing, yes.  It

13   can be very useful in repairing and developing things

14   for aircraft.

15        Q    Did you have access to such a drawing?

16        A    I have a copy of this drawing, but it came

17   into my possession relatively recently.

18        Q    Is this something that Mr. Tarbox and

19   Mr. Baker, the named inventors on the patent, might have

20   access to while they were working for Aerofab or REVO?

21        A    I would think, yes.  I'm not -- they worked

22   for the factory, you know, and at times in the past I've

23   called Mr. Tarbox, and said, "I need an answer about a

24   given component of the airplane."

25             Jack's reply could be, "Just a moment, let me

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1   look at the drawings."  So Jack had access probably to

2   these drawings.

3        Q    Is there anyway of determining when this

4   drawing may have been created?

5        A    There appears to be a failure of the print

6   mode here, but this says, "checked by," it could be Jack

7   Tarbox.  This date appears to be 11/6/53, perhaps.

8        Q    Are drawings like this occasionally amended

9   from time to time?

10       A    Yes, this drawing would have been amended from

11   its original.

12       Q    Why might a drawing be amended?

13       A    As we progress through different models of an

14   airplane, different structural changes to accommodate

15   more weight, different engines, you know, different

16   equipment.

17       Q    What, in general, does this drawing show?

18   Take a moment to look it over if you need to.

19       A    Like I say, there appears to be a lack of

20   print here, but I believe this BEA is the first letters

21   of beam, B-E-A-M.  Meaning that beam is one definition

22   of the wing spar of the Lake amphibian.  And this

23   appears to be a drawing that would depict construction

24   and details of the wing spar of a Lake amphibian.

25       Q    Do you believe this drawing has been revised?

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1      A    Yes.

2      Q    Why?

3      A    This drawing shows wing doublers on the

4   inboard end of the beam assembly.

5      Q    Can you point to the doublers that you're

6   referring to?

7      A    The doublers appear to be this material here,

8   and this material here.  There was a picture earlier,

9   and also in the patent, that shows the installation of

10  the doubler positioned on the spar.  But earlier there

11  was perhaps something submitted that would show the

12  similar shape.

13     Q    And are the doublers the parts that are

14  horizontal and parallel near the left corner of the

15  document, each of which says one-and-five-eighths on

16  them?

17     A    Okay.  In this area there is a description of

18  one-and-five-eights -- to be more specific, I think if

19  you look here, it calls a -96, -93.  Here it calls

20  a -101, -99.  There's a chance that those numbers would

21  be related over here.  So let's see if we can find -101,

22  I think is one of the numbers I gave you.  It says

23  doubler steel.  It could reflect, if we had a little

24  better copy of this, what the alloy was.  So there's a

25  good chance that those items identified are the doublers

1    used to satisfy the wing spar AD on the Lake Amphibian.

2          MR. THOMAS:  I'm going to object, Mark, when

3       we're reading the transcript, it's going to be very

4       difficult, if not impossible, to understand here

5       and here when we're pointing on the drawing.

6          MR. YOUNG:  Could we mark up the drawing,

7       would that be okay?

8          MR. THOMAS:  Sure.

9          MR. YOUNG:  Do it in pencil?  We could always

10      erase it.

11         MR. THOMAS:  Ink would be better.

12   BY MR. YOUNG:

13      Q    Why don't you -- would you be so kind as to

14   label the upper doubler, and let's use the language from

15   the patent, is it lower or bottom?  Upper and lower

16   doubler-straps?

17      A    (Complying.)

18      Q    Thank you.  Okay.  For the record, Mr. Shannon

19   has labeled the upper doubler upper doubler, and labeled

20   the lower doubler lower doubler.

21         If you were designing a doubler to address a

22   cracking issue near the root rib, would a drawing like

23   this be helpful?

24      A    Yes.

25      Q    How so?

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1       A      It gives you the angle, you know, it gives you

2   the shape of what you're attempting to make a piece

3   from.  Here in a room with pencil and paper we can

4   accurately draw the exact shape of a doubler to fit what

5   we're working on.

6       Q      Can you clarify that for me please?

7       A      One, let's define where cracks have been

8   discovered on the wing beam.  They were found primarily,

9   to my knowledge, they were found on the lower, the

10  phrase is cat strip of the beam.  As the lower beam is

11  in tension, it's attempting to tear things apart as

12  opposed to compression, which the upper beam is pretty

13  dominantly in compression.

14          To date, to my knowledge, we found no cracks

15  in the upper beams.  In the lower beams we found

16  numerous cracks in this radius of the spar-cap cutout,

17  which is in detail here.  And on the aircraft that I

18  inspected on the pre-purchase, that showed the spar near

19  a potential failure, showed a crack through the outboard

20  lower bolthole that included the spar cap and the

21  spar-cap doubler at that time.

22      Q      For the record, would you mind identifying

23  those parts by marking them as crack or cracking?

24      A      Okay.  We will describe this as an inboard-end

25  crack.  And in this area, where this -83 is, is the

1   doubler.  And I'm trying to think.  This is -- I'm

2   looking at this from the front, so this would be a

3   hidden line -- but we have a crack through this point,

4   this area, that includes -- this is a crack in the lower

5   spar-cap doubler and the lower spar-cap angle.

6         Let me define that.  The lower spar cap has an

7   unique angle that is attached to the bottom of the beam

8   making the lower spar cap --

9         Q    What is that angle due to?

10        A    Well, this word "angle" here refers to an

11  extrusion in an angle.  Here is an end view of the lower

12  spar-cap angle.  Meaning a physical angle.  Not -- it

13  does have an -- the angle has an angle to, but it is

14  defined as an angle like an angle extrusion or -- let's

15  say you could buy an angle at Lowe's or Home Depot --

16  but this is a specific angle made for the lower spar cap

17  of this spar structure.

18        Q    When referring to angles, you may be referring

19  to a structure, or you may be referring to an

20  orientation of a particular component?

21        A    Or an end or shape of a particular component.

22  And this particular thing, I'm referring to a crack in a

23  physical angle, not an angular measurement.

24        Q    Now, are the wings of the Lake aircraft

25  dihedral?

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    A    Yes.

2    Q    What does that mean?

3    A    It means relative to the horizontal access of

4    the aircraft the wing tips, the wings I'm going to say,

5    slope upward.  We have then what is considered a

6    positive dihedral meaning the wings from the root to the

7    tip go up.

8    Q    And what does that mean in terms of the

9    internal wing structure?  Just let me restate the

10   question.  What does that mean in terms of the spars

11   comprising the internal wing structure?

12   A    On the Lake spar or Lake wing we have positive

13   dihedral, and we have a wing that tapers from root to

14   tip.  So we have a four-sided polygon that those angles

15   through there are going to have a total to 360 degrees

16   on a polygon.  We have a dihedral, if my memory is

17   correct, of approximately five-and-a-half degrees on the

18   aircraft.  So the reference line of the spar is sloped

19   up at five-and-a-half degrees.

20   Q    Does that mean the top spar and bottom spar

21   are both sloped up at five-and-a-half degrees?

22   A    No.  Because as we mentioned earlier, the wing

23   spar has a taper.  So that the upper spar cap is going

24   to have a slightly different angle from dihedral, and

25   the lower spar cap will have a slightly different angle.

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1      Q     Can you estimate the angle for the lower spar?

2      A     You can measure it with a protractor.  We have

3   a drawing, and we're estimating this appears to be a

4   reference line of the vertical -- a reference line of

5   the doubler.  This measures from 90.  This is going to

6   give us a six-degree angle off of the -- at the end of

7   the doubler or six degrees from the 90.  In other words,

8   you're measuring --

9      Q     Would you mind marking that on the drawing for

10  the record?

11     A     We're going to mark here to here, six degrees.

12  That is this angle from vertical.

13     Q     Would you mind doing the same for the upper

14  doubler?

15     A     Let's see if I can accomplish that.  This

16  drawing is measuring approximately four, four-and-a-half

17  degrees.  I would say four-and-a-half is what we're

18  measuring on the drawing.

19     Q     Okay.  Having a drawing such as this, would

20  that make it easier to design a doubler to fit the

21  spars?

22     A     Yes.

23     Q     Can you clarify that?

24     A     If you're designing -- Let me back up a little

25  bit.  We're designing a doubler to re-enforce the weak

1   areas of this spar.  It appears that the research done

2   in developing the doubler showed that we were

3   experiencing potential fatigue failure at the lower

4   outboard attach bolt in normal operations, 1G, you know

5   flying along in stable level flight.

6          Due to a phenomenon called first effect, this

7   outboard fastener does the majority of attaching the

8   wings.  Under those conditions, likewise, as you hit

9   small bumps in flying, this one bolt is exposed to a lot

10  more fatigue forces than the other fasteners attached.

11  When you go the ultimate strength of the structure, the

12  things stretch, and now other fasteners do more of the

13  job.

14         Because of the discovery of the crack at this

15  point, the initial cracks were found inboard, we found

16  that the doubler had to extend to include -- to

17  strengthen the area here.  We need a doubler to bridge

18  that fatigue area on that.  We need a doubler that gives

19  us good attachment.  As we go through the six bolts, if

20  this doubler were cut at a vertical angle or square on

21  the end of it, we lose effective edge distance on the

22  inboard attach bolt.

23     Q    Let me see if I understand correctly.  Does

24  referring to the drawing facilitate determining a

25  suitable angle for the doubler so that it abuts or

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    nearly abuts the structure at the end?

2         A    The drawing shows you what the angle is.  In

3    other words, that's the angle, that's where it needs to

4    fit.

5         Q    To your knowledge, was this drawing or any

6    version of this drawing or drawings similar to this

7    drawing ever submitted to the US Patent and Trademark

8    Office as prior art in connection with the patent?

9         A    To my knowledge, no.

10        Q    I'm done with this drawing for now.  Are you

11   familiar with the manufacturer and installation of

12   aircraft reinforcing structures?

13        A    I have seen things that are to reinforce

14   aircraft manufactured in the past, yes.

15        Q    Would a doubler be an example of a reinforcing

16   structure?

17        A    Yes.

18        Q    If you were to, referring to the patent, if

19   you were to replicate that kit from the patent so that

20   you could use the patent as a recipe to make a suitable

21   kit, what type of information would you need?

22        A    We would need the physical dimensions of the

23   strap, you know, the -- how thick it is.

24        Q    Would you need information about the material?

25        A    Yes.

1    Q    Would you need information about the coatings?

2    A    Well, I believe your question was if we were

3  making a doubler to reinforce something on an aircraft.

4  There's general practices that want you to protect the

5  materials involved.  There are publications that as a

6  mechanic you're exposed to that say protect the

7  material, so you want a coating on the material to

8  protect the base and the doubler itself.

9    Q    Let me rephrase the question.  Assume this

10  patent is your recipe.

11    A    Okay.

12    Q    Your goal is to replicate the doubler

13  described in the patent so you can use it for a

14  particular Lake aircraft.

15    A    Okay.

16    Q    To create that doubler, would you need

17  information about the material?

18    A    Yes.

19    Q    Would you need information about the coatings?

20    A    To create this specific doubler, yes.

21    Q    What about the heat treating?

22    A    You would need that information as well.

23    Q    Would you need information about dimensions?

24    A    Yes.

25    Q    What dimensions?

1      A     The width of it, thickness of it, length, any

2   angular cuts that need to be done on it.

3      Q     Could you determine length and height by

4   examining a two-dimensional CAD drawing?

5      A     You could, yes.

6      Q     What if you did not have a thickness, would

7   that create a problem for you?

8      A     Yes.

9      Q     To your knowledge, does this patent provide

10  any thicknesses for the filler?

11     A     To my knowledge, there's no specified

12  thickness on the fillers in this patent.

13     Q     Does the filler thickness make any difference

14  whatsoever?

15     A     It could indeed make a difference.

16     Q     Could it be inadequate?

17     A     Say again?

18     Q     Could it be too --

19     A     Too thick?

20     Q     Could it be excessive?

21     A     It could be excessive and too thick.

22     Q     Referring to this patent how would you

23  possibly know what the thickness of the filler should be

24  from this patent?

25     A     You don't.

1      Q     I believe earlier you mentioned that you are

2    familiar with the individuals that are named as

3    inventors in this patent; is that correct?

4      A     That's correct.

5      Q     And I believe earlier you mentioned that

6    you're familiar with Elton Townsend?

7      A     That is correct.

8      Q     For clarification, who is Elton Townsend?

9      A     Elton Townsend is a principal or owner of Lake

10   Central Air Services, an operation in Canada.  He has

11   been dealing with Lakes for a long time.

12     Q     I believe you mentioned earlier that Elton

13   Townsend had faxed some document to you regarding a

14   proposed doubler?

15     A     Yes.

16     Q     Is that correct?

17     A     That is correct.

18     Q     Do you recall in the reexamination proceeding

19   whether there was any declaration or similar document

20   that was submitted on behalf of Elton Townsend?

21     A     I am not positive.  I think there was

22   discussion on that, but I don't know if it was actually

23   submitted.

24     Q     Okay.  Let me shift gears a bit.  Prior to the

25   doubler kit that is claimed in the patent had you

1   yourself seen doublers in use before?

2        A    Yes.

3        Q    Have doublers been around for a long time?

4        A    Yes.

5        Q    Are you aware of other doublers used on Lake

6   aircraft?

7        A    I have created and used doublers on Lake

8   aircraft.

9        Q    Can you elaborate?

10       A    Another area of Lake exposed to high stresses

11  is the bottom, the forward bottom of the main hull.  And

12  in essence, it's a boat on the water exposed to waves.

13  These areas can be cracked.  They can be worn down in

14  improper landings, and they need to be repaired to

15  restore the airworthiness of the airplane.  So you're in

16  essence doubling an area of the bottom by installing

17  another later of material.

18       Q    Are there other doublers with angled ends, one

19  end angled or both even, ends angled to use in

20  connection with Lake aircraft or other aircraft?

21       A    I have seen others that have doublers on them.

22  The bottom of the Lake aircraft is a polygon with a

23  mixture of straight and curved lines with angled

24  relationship between edges.  So if a bottom doubler is a

25  doubler, then yes, it has an angle on it.

1      Q     Are doublers often shaped to accommodate

2  adjacent structures?

3      A     Doublers are often shaped to accommodate their

4  relationship with adjacent structures.

5      Q     Were any such doublers in use before October

6  25, 2000?

7      A     I have made patches to the bottom of Lakes

8  that had an angle prior to October 25, 2000.

9      Q     I'll hand you what's marked as Defendant's

10 Exhibit B.  This document identifies -- does this

11 document identify certain components for an aircraft?

12     A     This document appears to identify components

13 for an airplane, yes.

14     Q     Do you have any idea what aircraft those

15 components are for?

16     A     This goes way back in my history.  This

17 appears to identify components used on an aircraft

18 referred to as the mid-jet Mustang, as in small Mustang.

19     Q     To your knowledge, how long has the mid-jet

20 Mustang been around?

21     A     I want to say early '60s.  I want to say '70,

22 '71, I started building a Mustang kit personally.

23     Q     Would you describe what the kit is?

24     A     Well, there's a lot more available now in kit

25 form.  But at that time in my career you bought a set of

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    blueprints.  Then you made components to those

2    blueprints.  As years have gone by, people who market

3    the blueprints also market components to make building

4    an amateur-built aircraft easier so that you can -- to

5    qualify for an amateur-built airplane, the builder has

6    to do 51 percent, but you can buy a lot of 49 percent

7    that helps.

8        Q    Do you still have those drawings?

9        A    I don't have the complete set of drawings for

10   the airplane.

11       Q    Can you describe for me -- Before we get to

12   that, does the mid-jet Mustang have dihedral wings?

13       A    Yes.

14       Q    Does the wing structure of the mid-jet Mustang

15   include spars?

16       A    Yes.

17       Q    Do the spars have an angled inboard end?

18       A    Yes.

19       Q    Does this document identify any components

20   related to the spars for a mid-jet Mustang?

21       A    Yes.

22       Q    Can you describe what component?

23       A    Component 130.316, what is described as a wing

24   rear spar reinforcement left and right.

25       Q    Is the inboard end of that rear spar

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 239

1   reinforcement -- is the inboard angled -- is the inboard

2   end of that component angled?

3       A    Yes.

4       Q    Would that angle have any relationship to the

5   angle of the spar?

6       A    The angle cut on that doubler, which matches

7   the cut on the spar, is due to the relationship between

8   the fit of that spar between the spar and the fuselage.

9       Q    I have just a few more questions.  Earlier you

10  mentioned that you were previously sued for infringement

11  of this patent?

12      A    Yes.

13      Q    About when was that?

14      A    Approximately 2002.

15      Q    I believe earlier you mentioned that the

16  lawsuit was dismissed with prejudice -- without

17  prejudice -- about how long after the lawsuit was

18  dismissed did you receive a copy of the complaint in

19  this lawsuit?

20          MR. THOMAS:  I'm going to object because that

21      mischaracterizes the testimony.  I think what he

22      testified was he wasn't sure what his attorney did.

23          MR. YOUNG:  Thank you.

24  BY MR. YOUNG:

25      Q    After the lawsuit was filed, was a

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 240

1    reexamination proceeding initiated in the Patent and

2    Trademark Office?

3         A    Yes.

4         Q    From the time the reexamination proceeding was

5    initiated until the time that you were sued in this

6    lawsuit, did Enpat send any correspondence threatening

7    to sue you?

8         A    No.

9         Q    Did the examiner assigned to the reexamination

10   initially reject the claims of the patent?

11        A    Yes.

12        Q    Do you recall about how long the claims stood

13   rejected?

14        A    Nearly eight years.

15        Q    During this time did you believe that any

16   risks of infringement was extinguished?

17        A    Not extinguished, but confident of no

18   infringement there.  I wasn't the only person with an

19   opinion that the claims were not valid.

20        Q    Earlier when discussing the Canadian kits,

21   also referred to as JCM kits, you mentioned that the JCM

22   kits were installed on approximately 26 aircraft?

23        A    I mentioned that I installed or my

24   organization installed JCM kits on approximately 26

25   aircraft.

1      Q     Were any of those kits installed before

2   December 11, 2001?

3      A     Yes.

4      Q     To the best of your recollection about how

5   many?

6      A     My recollection is 25.

7      Q     Earlier today there seemed to be some

8   confusion in addressing the subpoena that was served and

9   the request for production of documents that was served

10   in this action.  Were you confused in answering the

11   questions relating to the subpoena versus the request to

12   produce documents?

13      A     Yes.

14      Q     Earlier today you had mentioned -- Well, were

15   you ever instructed not to destroy any evidence relating

16   to this case?

17      A     Not instructed, no.

18      Q     Let me rephrase the question.  Were you ever

19   instructed to preserve materials related to this case?

20      A     No.

21      Q     You spoke earlier about e-mails that you had

22   deleted.  Were any of the e-mails that you deleted

23   material to this case?

24           MR. THOMAS:  I'm going to object because that

25        calls for a legal conclusion, but you can go ahead

1        and answer.

2        A    It's possible, but there would not be -- I

3    don't have a system of saving e-mails, you know.  But

4    e-mails that are not relevant, I don't need to keep them

5    in my possession.  I didn't consciously reject or to --

6    what was the word we just used?  An effort to eliminate

7    e-mails relative to the case was not made.  In other

8    words, in casual communications it could, you know,

9    there was no conscious effort to eliminate e-mails

10   pertinent to this case.

11            MR. YOUNG:  I have no further questions at

12       this point.

13                 REDIRECT EXAMINATION

14   BY MR. THOMAS:

15       Q    Okay.  We want to refer to defendant's -- the

16   big drawing -- which is exhibit Defendant's A.  I'm

17   going to ask you, to your knowledge, has this drawing

18   ever been published to the public?

19       A    To the public?

20       Q    Made available to the public through

21   publication?

22       A    Yes.

23       Q    Where?

24       A    Made available to the public?  Someone

25   outside -- someone outside the factory has possession.

1   Does that mean available to the public?

2       Q    What I mean by that is, available to someone

3   who is not under -- not involved with the construction

4   or maintenance of the airplane?

5       A    I would think that would be unlikely that

6   someone not involved with the construction or

7   maintenance would have a drawing.

8       Q    Can you tell from looking at the title block

9   here who created this drawing?

10      A    Part of the title block is not evident.

11      Q    Right, it's been wiped out.

12      A    I would have seen it on other drawings, that's

13  Mr. Tarbox's.

14      Q    You can identify that under the -- in the

15  drawn by block?

16      A    In the drawn by block there's a good chance

17  Mr. Tarbox drew this original.

18      Q    Is there anything in the title block to tell

19  you if there was a corporate entity to control this

20  document?

21      A    Lake Aircraft.

22      Q    Written above Sanford?

23      A    Right.

24      Q    This drawing has a revision history on its

25  face, correct?

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 244

1      A    Yes.

2      Q    What was the level of the last revision?

3      A    Probably K.

4      Q    As far as this copy is concerned?

5      A    That's correct.

6      Q    So this drawing was revised at least up

7    through Revision K?

8      A    Correct.

9      Q    And you testified earlier that this drawing

10   originated in 1953.  How did you get there?

11     A    The date here, normally by the "drawn by"

12   there's a date.

13     Q    Is there anything that to you indicates that

14   the doublers that are indicated where you made your

15   notations earlier were on the original drawing, in other

16   words, the Rev 0 of this drawing?

17     A    There's nothing on the drawing to indicate

18   that they weren't there at Rev 0.  There is other

19   evidence to indicate that they weren't there.

20     Q    That they were not there when the drawing was

21   originally created?

22     A    That's correct.

23     Q    When you looked at the title block to find the

24   date we mentioned for the original drawing, is it your

25   testimony back then when the drawing was originally

1   created it did not include doublers?

2        A     That's correct.

3        Q     That they were added some time later?

4        A     That's correct.

5        Q     When Mr. Young was asking you if you had ever

6   created doublers for the aircraft, I think your answer

7   was you created what you called patches for Lake

8   aircraft?

9        A     Repairs, yes, doubling certain areas, patching

10  areas, yes.

11       Q     What do you mean by patch?

12       A     You have an area on the bottom that has a

13  crack, for example, so you will map out an area that

14  you're going to double, bring it to existing seams or

15  existing edges, and install that material.  That is

16  often referred to as patching the airplane.

17       Q     So you were using it exchangeably with the

18  word doubler; is that correct?

19       A     Yes.

20       Q     Just curious.  Earlier you testified that, to

21  your knowledge, this drawing had never been provided to

22  the Patent and Trademark Office; is that correct?

23       A     To my knowledge, it has not.

24       Q     But you admit you don't have perfect knowledge

25  of everything that has ever been submitted to the patent

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    office?

2         A    That's correct.

3         Q    You also testified that this drawing would aid

4    in fabricating the doubler that's shown here on the wing

5    spar, correct?

6         A    What I think I said is, it would help in

7    designing and fabricating a component to fit in that

8    area of the wing.

9         Q    That's because there's dimensional information

10   on this drawing?

11        A    There's dimensions on this drawing.

12        Q    You could refer to this drawing to fabricate

13   the part?

14        A    That's correct.

15        Q    That's the purpose of a fabrication drawing,

16   is it not?

17        A    That's one of the purposes.

18        Q    This is a fabrication drawing?

19        A    I would assume the factory has to maintain

20   enough drawings to build an airplane.

21        Q    When did you first come into possession of a

22   copy of the drawing that we have here as Defendant's A?

23        A    Three, four months ago.

24        Q    The first time you came into possession was

25   three or four months ago?

1        A      Of this particular drawing, yes.

2        Q      You were asked with regard to the

3    reexamination what the initial action from the patent

4    office regarding validity of claims was.  And you had

5    said all 14 claims had been rejected?

6        A      It is my opinion that the first examiner at

7    the patent office when reviewing the patent rejected all

8    14 claims.

9        Q      Mr. Young neglected to ask you this question,

10   but I'm going to ask it.  You also knew that there was

11   an appeal of that decision?

12       A      Yes.

13       Q      So you understood that there was an appeal in

14   process?

15       A      It was in reexamination, so as it went through

16   the process people are talking and communicating.

17       Q      And you got copies of things like the appeal,

18   for instance?

19       A      It's in that banker's box.

20       Q      So I'm going to change your statement that you

21   thought that you were free.  I'm going to

22   characterize -- these are not your exact words -- but

23   free to operate because the claims were invalid.  That's

24   not entirely accurate because you also knew that an

25   appeal was pending?

Page 248

1      A     Yes.

2      Q     You knew that decision appealed?

3      A     That process continued.

4      Q     The reality is while you wanted to believe the

5   patent wasn't validated, you understood that there was

6   an appeal in process, and you assumed the risk of

7   continuing to fly your airplane using the Canadian kit,

8   true statement?

9      A     Could be a true statement.

10     Q     Could be a true statement?

11     A     Yeah.

12     Q     In fact, the general Lake aircraft community,

13  let's extend it to the general Lake aircraft community,

14  there is a feeling that the patent should be

15  invalidated?  There was an understanding that there was

16  an appeal in the process in the general Lake aircraft

17  community; was there not?

18     A     No, sir.

19     Q     You're telling me that the general Lake

20  aircraft community out there did not understand that

21  appealed?

22     A     That's correct.

23     Q     You don't know that?

24     A     I don't.  I base that on conversation with

25  Lake owners.  When the review board rendered its opinion

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1   of the patent, and I was sued, a number of people said I

2   thought that was all over.

3        Q    Okay.  But are you saying that that

4   communication only occurred after you were served with a

5   complaint in the current action?

6        A    That would be my memory of it.

7        Q    Okay.  Just one minute please.

8             Would you agree with me that if it was your

9   attorney in the original lawsuit who requested that the

10  lawsuit be stay pending the outcome of the

11  reexamination, that Enpat would not be responsible for

12  the delay in filing the current lawsuit?

13       A    No.

14       Q    How can you say that?

15       A    I can't make decisions based on Enpat's

16  benefit or loss.

17       Q    Well, I'm not asking you to make a decision.

18  What I'm asking you is:  If it was your attorney who

19  requested the delay, Enpat can't be held responsible for

20  the delay, can they?  It doesn't seem reasonable, does

21  it?

22       A    A lot of attorneys request a lot of things.

23  People don't always respect those requests.

24       Q    Do you maintain that Enpat took any action,

25  whatsoever, to delay the re-exam process at the PTO?

Page 250

1          A     No.

2          Q     In fact, Enpat doesn't really have any control

3    of the re-exam process at the PTO, does it?

4          A     To the best of my knowledge, no.

5          Q     Is it your -- Well, let me back up.  The

6    present lawsuit was -- Would you agree with me that the

7    present lawsuit was filed in general terms almost

8    immediately after the re-exam process was concluded?

9          A     It appears it was.

10         Q     That doesn't sound like an unreasonable delay,

11   does it?

12         A     No.

13         Q     Thank you.  I need to confer with Kelly.

14   We'll go off the record for a second.  I'll be right

15   back.

16                     (Off record at 5:47 PM.)

17                     (On record at 5:49 PM.)

18              MR. THOMAS:  I don't have any more questions.

19                     RECROSS EXAMINATION

20   BY MR. YOUNG:

21         Q     I have one more question to clear up.

22   Previously I had asked you if you had been advised to

23   retain records, and I believe you indicated that you

24   weren't advised.  Were you indicating in your response

25   that Mr. Buesse did not advise you to retain records?

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 251

1      A     Mr. Buesse did not.  And when you asked the

2   question, that was my fault.

3           MR. THOMAS:  I'm going to object because on

4        the record this question has been asked and

5        answered.  In fact, you answered it a couple of

6        different ways.  These questions are now being

7        asked after the deponent had an opportunity to

8        confer outside of record here.

9   BY MR. YOUNG:

10     Q     Do you recall our initial meeting at the

11   inception of this lawsuit?

12     A     Yes.

13     Q     And at our initial meeting did I instruct you

14   to maintain records?

15     A     You said keep records.  It was a three-hour

16   meeting, so there was a discussion.

17          MR. YOUNG:  Nothing further.

18          (Deposition concluded at 5:50 PM.  Reading and

19        signing were not waived.)

20

21

22

23

24

25

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 252

1                  CERTIFICATE OF OATH

2    STATE OF FLORIDA   )

3    COUNTY OF BREVARD  )

4

5

6           I, VICKI HUMPHRIES, Court Reporter,

7            the undersigned authority, hereby

8                 certify that the witness

9                      HARRY SHANNON

10    personally appeared before me on February 4, 2011

11                  and was duly sworn.

12

13           WITNESS MY HAND AND OFFICIAL SEAL

14            this 4th day of February, 2011

15               at Melbourne, Florida.

16                 Produced ID:_____

17              Personally Known:_____

18       Accompanied by Counsel: Mark Young, Esquire

19

20

21

22    _____
                    VICKI HUMPHRIES
23         Court Reporter and Notary Public,
              State of Florida at Large
24

25

Page 253

1                    CERTIFICATE OF REPORTER

2    STATE OF FLORIDA    )

3    COUNTY OF BREVARD )

4

5         I, VICKI HUMPHRIES, Court Reporter, do hereby
     certify that I was authorized to and did
6    stenographically report the deposition of HARRY
     SHANNON, that a review of the transcript WAS
7    requested; and that the foregoing transcript, pages
     1 through 251, inclusive, are a true and correct
8    record of my stenographic notes.

9         I FURTHER CERTIFY that I am not a relative,
     employee, or attorney, or counsel of any of the
10   parties, nor am I a relative or employee of any of
     the parties' attorney or counsel connected with the
11   action, nor am I financially interested in the
     action.

12
          DATED this 9th day of February, 2011.
13

14

15   _____
                    Vicki Humphries,
16                  Court Reporter

17

18

19

20

21

22

23

24

25

Page 254

1                        ERRATA SHEET
2           DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
3      IN RE:  Enpat v Shannon
       CASE NO: 6:11-cv-00084-PCF-KRS
4      DEPOSITION OF:  Harry Shannon
       TAKEN: February 4, 2011
5      _____
       Page No.     Line No.     Change          Reason
6
       _____
7      _____
       _____
8      _____
       _____
9      _____
       _____
10     _____
       _____
11     _____
       _____
12     _____
       _____
13     _____
       _____
14     _____
       _____
15     _____
       _____
16     _____
       _____
17     _____
       _____
18     _____
       _____
19     _____
       _____
20     _____
       _____
21     _____
       _____
22     Under penalties of perjury, I declare I have read my
       deposition in this matter and that it is true and
23     correct, subject to any changes in form or substance as
       reflected above.
24
       _____        _____
25          Date                           Harry Shannon

Page 255

```
1              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
2

3   _____
                                    )
4   ENPAT, INC.,                    )
    a Florida Corporation,          )
5                    Plaintiff,     )
                                    ) Case No.:
6        v.                         ) 6:11-cv-00084-PCF-KRS
                                    )
7   HARRY SHANNON,                  )
                     Defendant.     )
8                                   )
    _____)
9

10  IN RE:  Deposition of Harry Shannon
            Taken:  February 4, 2011
11          Date Letter Sent:_____

12  TO:     Harry Shannon
            c/o Mark Young, Esquire
13          12086 Ft. Caroline Road, Suite 202
            Jacksonville, Florida 32225
14
         The transcript of your deposition has been
15  completed and awaits reading and signing.
         Please call our office at 321-242-8080 and make
16  arrangements to review the transcript as soon as
    possible.
17       If the reading and signing have not been completed
    prior to _____, we shall conclude that the
18  reading and signing of the transcript have been waived.
         The original of this deposition has been forwarded
19  to the ordering party.  The errata, once completed, is
    to be forwarded to all ordering parties as listed below.
20

21                        Thank you,

22
                          Vicki Humphries
23

24  cc:  Stephen C. Thomas, Esquire; Mark Young, Esquire.

25
```

EXHIBIT E  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS