UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

_____
                              )
ENPAT, INC.,                  )
a Florida Corporation,        )
                Plaintiff,    )
                              ) Case No.:
       v.                     ) 6:11-cv-00084-PCF-KRS
                              )
HARRY SHANNON,                )
                Defendant.    )
                              )
_____)            VOLUME I
                                        (Pages 1 - 155)

DEPOSITION OF HARRY SHANNON
Taken on Behalf of the Plaintiff

DATE TAKEN:      February 4, 2011
TIME:            9:30 AM - 5:50 PM
PLACE:           202 N. Harbor City Boulevard, Suite 300
                 Melbourne, Florida 32935

Examination of the witness taken before
Vicki Humphries, Court Reporter
and Notary Public, State of Florida at Large

King Reporting Service, Inc.
14 Suntree Place, Suite 101
Melbourne, Florida 32940

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

APPEARANCES

FOR PLAINTIFF

STEPHEN C. THOMAS, ESQUIRE
KELLY G. SWARTZ, ESQUIRE
Hayworth, Chaney & Thomas, P.A.
202 N. Harbor City Boulevard, Suite 300
Melbourne, Florida 32935

FOR DEFENDANT

MARK J. YOUNG
MARK YOUNG, P.A.
12086 Ft. Caroline Road, Suite 202
Jacksonville, Florida 32225

1                    INDEX OF DEPOSITION
                     OF HARRY SHANNON
2
                                              Page No.
3   Direct Examination by Mr. Thomas              4

4   Cross Examination by Mr. Young              216

5   Redirect Examination by Mr. Thomas         242

6   Recross Examination by Mr. Young           250

7   Certificate of Oath                        252

8   Certificate of Reporter                    253

9   Errata                                     254

10  Witness Review Letter                      255

11

12           I N D E X   O F   E X H I B I T S

13

14              PLAINTIFF EXHIBITS

15  NO.              DESCRIPTION           REFERRED TO
    A     Airworthiness Directive               16
16  B     Photograph                           106
    C     Certifications                        21
17  D     Patent                               127
    E     Lake Central Air Services Fax        127
18  F     Rockwell Service Letter              164
    G     Postings from Bulletin Board         183
19

20

21              DEFENDANT EXHIBITS

22  NO.              DESCRIPTION           REFERRED TO
    A     Drawing                              221
23  B     List of Components                   237

24

25

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1   WHEREUPON:

2                     HARRY SHANNON,

3   a DEFENDANT herein, acknowledged having been duly sworn,

4   and testified upon his oath as follows:

5           THE WITNESS:  I will.

6           MR. THOMAS:  Good morning.  My name is Stephen

7       Thomas.  I represent the plaintiff in this case

8       that we're going to be taking your deposition in

9       today, Enpat.  And I think we need to go around the

10      table here and identify everybody in the room.  I'm

11      an attorney representing the Enpat, Inc.

12          MS. SWARTZ:  I'm Kelly Swartz.  I'm also an

13      attorney representing Enpat, Inc.

14          MR. YOUNG:   I'm Mark Young representing

15      Defendant Harry Shannon.

16          THE WITNESS:  I'm Harry Shannon, the

17      Defendant.

18                  DIRECT EXAMINATION

19  BY MR. THOMAS:

20      Q    Just some things to get started with.  First

21  off, have you ever had your deposition taken before?

22      A    Yes.

23      Q    When was that please?  First of all, how many

24  times has that happened?

25      A    Once.

1      Q      Can you tell me when?

2      A      It would be approximately 14 years.

3      Q      14 years?

4      A      14 years ago.

5      Q      What was the subject of that deposition?

6      A      I believe the subject of that one had to do

7    with a bankruptcy or a pleading of a bankruptcy nature,

8    something like that.

9      Q      It didn't have anything to do with aircraft or

10   maintenance of aircraft or that sort of that?

11     A      It had to do with an aircraft company, but not

12   the actual maintenance or anything like that.

13     Q      Other than that, you haven't had your

14   deposition taken before?

15     A      Not to my knowledge.

16     Q      Since it's been a while, I'll go ahead and

17   just kind of put some rules out so we're all on a level

18   playing field.  You have been sworn in by the court

19   reporter, and she's going take your deposition here

20   today.  I'm going to ask questions.  Your attorney

21   Mr. Young is here to represent you in this depo.

22            Later on when we read the transcript, we're

23   going to assume that the answers you give are accurate,

24   truthful and complete.  So having said that, and the

25   fact that you're under oath, if you do want to back up

Page 6

1    and, you know, if I ask a question, you answer it, and

2    you feel like you need to add to it, please do that.

3    We're going to assume later on that the answers are

4    complete.

5              If we need to take a break, we will.  I'm

6    guessing in a couple of hours we'll probably take a

7    short break.  Under the federal rules we have seven

8    hours for the deposition.  And since we're getting

9    started about 9:30 -- when we start and stop I'd like to

10   record the time, if you could.  And my watch says it's

11   9:35 now, and we've been in about five minutes.  I think

12   we started at 9:30.  We'll record the time when we stop

13   and start again to make sure we'll get our full sevens

14   in.  I'm not saying it will take seven hours.  I'm just

15   saying that's what the rule allows.

16             If you don't understand a question that I ask,

17   please ask me to repeat it.  I'll be happy to do that.

18   If I mutter or if it's just not a very good question or

19   you don't understand it.  Because we'll also assume that

20   when I've asked a question, you understand what I've

21   asked.

22             Let's just get some things out of the way.

23   What is your personal address please?

24        A    My what?

25        Q    Your personal address?

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1       A       7209 Crystal Beach Road, Winter Haven, Florida

2    33880.

3       Q       How long have you lived at that address?

4       A       Approximately 15 years.

5       Q       Are you currently employed?

6       A       Yes.

7       Q       And who is your employer please?

8       A       Amphibians Plus, LLC.

9       Q       Is that your company?

10      A       Yes.

11      Q       So you're an owner of Amphibians Plus, LLC?

12      A       Yes.

13      Q       Are there any other owners of Amphibians Plus?

14      A       No.

15      Q       Just generally what is the business Amphibians

16   Plus engages in?

17      A       We repair aircraft.

18      Q       Strictly Amphibians --

19      A       No.

20      Q       -- or all kinds?  How long has Amphibians Plus

21   been in business?

22      A       Amphibians Plus, LLC has been in business

23   approximately 14 months.

24      Q       Was it known by another name before that?

25      A       It was known as Harry Shannon doing business

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    as Amphibians Plus.

2        Q    You basically set up a business entity here

3    recently, not too long ago?

4        A    Yes.

5        Q    Where is that, where is Amphibians Plus'

6    primary place of business?

7        A    Bartow Municipal Airport.

8        Q    How long have, either as yourself doing the

9    DBA, or as Amphibians Plus, LLC, all told, how long have

10   you been operating out of the Bartow airport there?

11       A    Approximately 15 years.

12       Q    Were you employed prior to coming to Bartow

13   and operating as Amphibians Plus?

14       A    Define employed.

15       Q    Did you have a job?

16       A    I worked for myself prior to coming to Bartow.

17       Q    Self employed?

18       A    Self employed.

19       Q    As self employed what did you do?

20       A    During that period I fixed airplanes, aircraft

21   mechanic.

22       Q    How long did you work self employed as an

23   aircraft mechanic?  This is prior to coming to Bartow.

24       A    Amphibians Plus operated approximately two

25   years, I want to say, prior to coming to Bartow.  In

1    other words, Harry Shannon DBA.

2        Q    Where did you do that?

3        A    Kissimmee.

4        Q    Did you work as an aircraft mechanic prior to

5    that two-year period in Kissimmee?

6        A    Yes.

7        Q    Where did you work as a mechanic?

8        A    Lake Aircraft.

9        Q    Where was that location?

10       A    606 North Dyer Kissimmee.

11       Q    That's at the Kissimmee Airport?

12       A    Yes.

13       Q    How long did you work for Lake Aircraft?

14       A    Approximately five years.

15       Q    Now I've lost track.  We've gone back how many

16   years now?  Can you tell me what year you started

17   working for Lake Aircraft?

18       A    1987.

19       Q    While at Lake did you have a supervisor?

20       A    No.

21       Q    You pretty much directed your own activities

22   then?

23       A    I directed my department.

24       Q    What was your title at Lake?

25       A    Service manager.

1      Q      What duties did you have as service manager?

2      A      Supervise the mechanics to maintain the

3   aircraft either owned by Lake or customer aircraft.

4      Q      So that was a maintenance function?

5      A      Yes.

6      Q      Were you involved in the building of the

7   airplanes, the original builds or just the maintenance

8   after they were built and delivered?

9      A      Maintenance.

10     Q      Who did you answer to at Lake?

11     A      Armand Rivard.

12     Q      He was the owner of the company, is that

13   correct?

14     A      I believe he was.

15     Q      I'll just get some definitions out on the

16   table today so that later on when we read the

17   transcript, it's all clear what we're talking about.

18          You've already mentioned Mr. Rivard and Lake

19   Aircraft.  So I assume when we speak of Armand Rivard or

20   Mr. Rivard, you know who I'm talking about, correct?

21     A      Yes.

22     Q      Lake Aircraft, we certainly know who that

23   company is, correct?

24     A      Yes.

25     Q      During the course of the deposition I'll make

1   reference to the lawsuit.  When I do, I'm talking about

2   this action that we're currently engaged in where Enpat

3   has filed a complaint against you for patent

4   infringement.  So --

5       A    Would you repeat that please?

6       Q    Sure.  As we go through the deposition today

7   I'll refer to the lawsuit.  And when I do, I'm talking

8   about Enpat, Inc. versus Harry Shannon, the lawsuit

9   we're here today.  I know there have been other -- there

10  are other lawsuits pending, and there was a prior

11  lawsuit, too, that was dismissed along the way some

12  years ago.  So today when I talk about the lawsuit, I'm

13  talking about the current lawsuit that we're here in the

14  deposition of today.  Is that clear?

15      A    That's clear.

16      Q    When I mention the patent today, I'm going to

17  make reference to the US Patent 6,328,260.  And later on

18  we're going -- I'm just going to slide it across the

19  table -- later on we're going to go through it in some

20  detail.  When I talk about the patent, that's the patent

21  that I'm talking about.  Hopefully that will be clear as

22  well.

23          I guess one other thing I should say is if you

24  have to answer a question yes or no, if you could please

25  go ahead and articulate yes or no so the court reporter

1    can take that down.

2         A    I will try to do that.

3         Q    It's a personal habit we all have.  If I ask

4    you to please answer the question yes or no, please

5    don't take offense at that.  I'm just trying to make

6    sure that the record is clear.

7              Later on today we're going to refer to some

8    other things.  I'm going to refer to the REVO kit, and

9    we're also going to be talking about a Canadian kit.  I

10   want to make sure when we talk about those kits, we know

11   what we're talking about.  So when I talk about the REVO

12   kit, that will be the kit that was available from REVO

13   to modify the wings in accordance with a service

14   bulletin that was out.  I want to make sure that that is

15   clear when I talk about the REVO kit, that's what we're

16   talking about.  Is that okay?

17        A    Okay.

18        Q    And when we talk about the Canadian kit, we'll

19   be talking about a kit that was very similar that was

20   manufactured by a Canadian company.

21              MR. THOMAS:  Is it JCM?

22              MS. SWARTZ:  JVC.

23              MR. THOMAS:  JVC?

24              MS. SWARTZ:  JCM?

25              MR. THOMAS:  Let's look it up.  JCM I believe.

1          MS. SWARTZ:  I think you're right.

2          MR. THOMAS:  JVC makes tape recorders and

3     such.  Just so there is no confusion about the

4     Canadian kit, Kelly will look it up.

5          So having said all of that, we'll verify the

6     identity of the kit.

7          MS. SWARTZ:  It's JCM.

8  BY MR. THOMAS:

9     Q    You're familiar with the JCM kit, correct?

10    A    Yes.

11    Q    We'll just call it the Canadian kit for

12  purposes of the deposition so that we're all clear about

13  what that is.

14         You said you ran the maintenance department at

15  Lake Aircraft, is that correct?

16    A    Yes.

17    Q    Did you have people working for you in that

18  capacity?

19    A    Yes.

20    Q    How many?

21    A    Typically five.

22    Q    Do you recall the identities of those

23  individuals?

24    A    A few, but not all.

25    Q    How many models of these Lake aircraft did

1   Lake make, different models?  I guess when I say that, I

2   mean basic models.  I realize you could probably get

3   some options on some of the models, but the basic

4   models.

5        A    Basic models consisted of C-1, C-2, LA-4

6   LA-4-200 and the LA-250.

7        Q    Do you have knowledge as to how many of each

8   model was made?

9        A    Not of each model, no.

10        Q    Do you have any idea as to how many total were

11   made by Lake over the years?

12        A    Between 800 and 1,000, I would say.  Maybe a

13   little more than that, but not much.

14        Q    These are flown internationally, correct?  In

15   other words, are aircraft in the US and aircraft outside

16   the US operating, to your knowledge?

17        A    Yes.

18        Q    Now, some of this will just be general

19   history.  In the business that you currently operate,

20   Amphibians Plus, you do maintenance and repair of Lake

21   aircraft, correct?

22        A    Yes.

23        Q    Do you currently work on all five of these

24   models?

25        A    I'm not sure about the C-2, but we have worked

1    on pretty much all models of Lakes.

2        Q    Could you briefly describe for me, you know,

3    what is a C-1, for instance, start with that?  I'd like

4    to get a differentiation between the models.

5        A    C-1, if my memory is correct, is a two-place

6    Lake, 180 horsepower, excuse me, 150 horsepower.  The

7    C-2 is a derivative.  Actually all of these aircrafts

8    are derivatives of the C-1.  C-2 is a larger wing.  I

9    don't remember a horsepower change on it.

10           The LA-4 is a derivative of the C-2 with a 180

11   horsepower.  Technically a four seat airplane.  The

12   LA-4-200 is a derivative of the LA-4, a 200 horse

13   aircraft.  The LA-250 a derivative of the LA-4-200,

14   which is a 250 horse.  I believe it was certificated as

15   a six-place aircraft.

16       Q    Do you know who currently holds the type

17   certificates for all four of those models?

18       A    I believe that REVO holds the type

19   certificate.

20       Q    When we talk about installing either the REVO

21   kit or the Canadian kit to comply with the Airworthiness

22   Directive that we'll talk about later today, but I think

23   you know what I mean when I say the Airworthiness

24   Directive.

25       A    I'm familiar with the Airworthiness

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    Directives.

2         Q    The AD that applies to the Lake aircraft, does

3    it apply to all models of Lake or just a subset of the

4    models?

5         A    No.

6         Q    Which models does the AD apply to?

7         A    To the best of my knowledge, the AD applies to

8    the LA-4, LA-4-200, and the LA-250.

9         Q    Not to the C-1 and not to the C-2, to the best

10   of your knowledge?

11        A    To the best of my knowledge, no.

12        Q    Since we have mentioned the Airworthiness

13   Directive, we're going to make this an exhibit.  I'd

14   like for you to take a look at this, and this will be

15   Exhibit A.

16        A    How much do you want me to look at it?

17        Q    Look at it until you're familiar enough with

18   it that you can answer some questions about it.

19        A    If I can refer to it during the questioning?

20        Q    Absolutely.  It's there for you to look at.

21        A    All right.

22        Q    Do you recognize that document?

23        A    I recognize the format of an Airworthiness

24   Directive, and this is AD -- I'm looking for the number.

25   Different prints have different layouts.

1    Q    Would the AD number be the AD number that's

2  reflected on the first page there, AD-2000-10-22?

3    A    Yes.

4    Q    It's kind of hard to find on that page.  Have

5  you seen this AD before?

6    A    Yes.

7    Q    What does this -- what is the subject of this

8  AD?

9    A    The subject of the AD is to correct a

10  condition of cracks or potential cracks in the wing of

11  certain models of the Lake Amphibian.

12    Q    Are the models listed on the face of the AD?

13    A    Yes.

14    Q    Which models are they please?

15    A    The affected aircraft are the LA-4, the LA-4A,

16  the LA-4P, LA-4-200, the Lake Model 250.

17    Q    Thank you.  Now, you gave me some -- you gave

18  me five different models, and some of those numbers I

19  see in that list you just gave off the Airworthiness

20  Directive.  I'd like to look at them again.  The LA-4,

21  that first one listed there, you had mentioned that's

22  the 180 horsepower four place Lake, correct?

23    A    Yes.

24    Q    The LA-4A, is that -- you didn't mention that

25  before -- but is that just a derivative of the LA-4?

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1       A    Yes.

2       Q    What is the A model, what is the

3  differentiation there?

4       A    A couple of airplanes had a different, I

5  believe, landing gear configuration.  A few were built

6  as seaplanes, not Amphibians.  And I think there were a

7  total of like three.  Two of these aircraft and the

8  LA-4P was another example of a "one of" derivative of

9  the basic LA-4 models.

10      Q    So the LA-4A and LA-4P were basically LA-4s

11  with some mod to the airplane?

12      A    Some unique change that warranted a

13  differentiation in the type certificate data sheet.

14      Q    The other one here, the LA-4-200, you

15  mentioned before is 200 horse four-place aircraft?

16      A    Correct.

17      Q    Then the 250 is the 250 horse six-place

18  aircraft?  Okay.  So reading the face of this, would

19  this AD apply to either the C-1 or C-2 models as far as

20  you can tell?

21      A    It does not appear to.

22      Q    Are you familiar with an Airworthiness

23  Directive similar to this that does apply to the C-1 and

24  the C-2s?

25      A    I think there are, but I would want to refer

1   to documents to say here now.

2       Q    Since I'm a layperson when it comes to FAA

3   regulations and Airworthiness Directives, could you

4   please explain what is the impact of an Airworthiness

5   Directive?  What does it cause us to do when we get an

6   Airworthiness Directive?

7       A    An Airworthiness Directive is effectively a

8   federal law that says certain actions will be taken

9   relative to, let's call it a repair, alteration, or

10  operation of certificated aircraft.

11      Q    So looking at this specific AD, well, let me

12  back up and say, if you do not -- if an aircraft owner

13  does not comply with an Airworthiness Directive, what

14  are the ramifications of that?

15      A    In some cases, none.

16      Q    What's the range of ramifications that could

17  result from not complying with an Airworthiness

18  Directive?

19      A    That's a very broad question, sir.

20      Q    Well, give me a broad answer.

21      A    I prefer not to.  If you're not operating your

22  airplane, then there's zero ramifications of not

23  complying with an AD.  That's one.

24           If the aircraft is operating, then the owner

25  is responsible to see that the aircraft has -- its AD is

1    complied with in a timely matter.

2         Q     Is there a date for a compliance?

3         A     Typically there is.

4         Q     Is there a date for compliance on this

5    particular AD, the one in front of you?

6         A     Let's look and see.  Yes, there is a date for

7    a compliance.

8         Q     Thank you.  Where is that reflected in the AD?

9    It's hard to see the page number.

10        A     We'll go for paragraph D as in Delta.

11        Q     Is there a page number?  Okay.  This is at the

12   bottom of looks like page nine.

13        A     The bottom of what appears to be page nine.

14        Q     So there's a table there that says "Action,

15   When and Procedures," is that the table you're referring

16   to?

17        A     That's correct.

18        Q     So the date for compliance appears to be

19   "Within the next 50 hours time-in-service after June

20   20th, 2000," is that correct?

21        A     That's the beginning of the compliance period.

22        Q     Or, "On or before June 20th, 2001"?

23        A     Correct.

24        Q     Correct?  Is that telling us then that no

25   matter what the Airworthiness Directive must be complied

1    with prior to June 20th, 2001?

2         A    For the aircraft to be airworthy, yes.  Let me

3    rephrase that.  For the aircraft to be airworthy

4    relative to this AD.  Compliance with this AD does not

5    necessarily render an airplane airworthy.

6         Q    I understand there may be other issues.  Do

7    you hold any FAA certifications?

8         A    Yes.

9         Q    Please list them for me.

10        A    My I refer to them?

11        Q    Sure, just let us know what you're referring

12   to.

13        A    I'm referring to those FAA certifications that

14   I carry in my wallet.

15        Q    I assume we can get a copy of these?

16        A    I would think that might be possible.

17        Q    We have a copy machine.  If you don't mind, we

18   can copy them while we're here.

19        A    Most of this information would be --

20             MR. YOUNG:  Let's mark it as confidential.

21             MR. THOMAS:  We can.  I assume that

22        certifications are public knowledge, but we can

23        mark it as confidential if you like.

24             MR. YOUNG:  Thank you.

25        A    Yes, do that.  The first certification was an

1    airframe power plant certificate, which is basically a

2    mechanic's license.  Although this is a second

3    certification received from the FAA was an inspection

4    authorization.  This particular license is renewed

5    currently every two years.

6            The next certificate I got was a pilot's

7    certificate with appropriate ratings.  This one reflects

8    that I'm a commercial pilot with airplane single engine

9    land and sea, airplane multi-engine land, and

10   demonstrate English proficiency.  And I believe it also

11   includes an instrument airplane rating, and also a

12   certified flight instructor.  That certificate also

13   renews every two years.

14           MR. THOMAS:  Thank you very much.  If we could

15       take these, could you get these copied?

16           MS. SWARTZ:  Sure.

17   BY MR. THOMAS:

18       Q    Now, you mentioned one of those is a

19   mechanic's certification?

20       A    Yes.

21       Q    And one was an inspection authorization, is

22   that what you called it?

23       A    Yes.

24       Q    An IA?

25       A    Yes.

1       Q       Referring to the mechanic's certification,

2    what does that allow you to do, that certification?

3       A       In a very basic sense it allows me to inspect

4    and repair aircraft, and return to service after doing

5    those inspections and repairs, certain inspections and

6    repairs.

7       Q       Is there a limitation on the inspections you

8    can do as a mechanic?

9       A       Yes.

10      Q       What is that limitation?

11      A       It varies with my familiarity with the

12   equipment, what maintenance library I have, and that

13   sort of thing.  What you're not qualified to work on,

14   you shouldn't work on.

15      Q       Is there a limitation to the type of aircraft

16   you can work on on your mechanics certification?  I'm

17   thinking here in broad terms.  For instance, you know,

18   everything from the airliners down to the --

19      A       Actually I think no.  No.

20      Q       So the only limitation is your own knowledge

21   of the aircraft itself?

22      A       Not exactly limited to one's knowledge, but

23   you have to have the infrastructure to do it properly.

24      Q       In other words, referring back to the big

25   example of a jet airliner, a 737 let's say, if you

1    didn't have the tooling and equipment to do the work,

2    then you wouldn't do the work?

3        A    Typically not.

4        Q    But there's nothing specific in the mechanic's

5    certification itself that would prevent you from doing

6    that work, it's more what your capabilities, are is that

7    correct?

8        A    Capabilities and training.

9        Q    What does the inspection authorization

10   certification allow you to do?

11       A    Perform annual inspections, progressive

12   inspections, approve return to service after a major

13   repair alteration.

14       Q    How long -- I don't have a copy of your

15   mechanic certification here, it's being copied -- but

16   when did you first become certified as a FAA mechanic?

17       A    The date on the license being copied is 1967.

18   There's a possibility of being certified before that

19   because that license reflects the airframe rating.  And

20   if my memory is correct of that period, I received the

21   power plant rating approximately six months prior to

22   that date.

23       Q    But at least as far back as 1967 you were --

24       A    As least as far as 1967.

25       Q    Have you had any gaps in your certification

1    since then?

2         A     No.

3         Q     When did you first become certified with the

4    IA certification?

5         A     This would be have been '73, 1973.

6         Q     Have you had any gaps in that IA certification

7    since then?

8         A     No.

9         Q     The issue that is addressed by the

10   Airworthiness Directive that's in front of you -- can we

11   go ahead and mark that Exhibit A -- when did you first

12   become aware of the issue that is addressed by this

13   Airworthiness Directive?

14        A     It's been a few years, but '98, '99.

15        Q     How did you become aware of it?

16        A     Cracks were being discovered in certain areas

17   of the wing spar on the Lake Amphibian.

18        Q     Was it a particular model that had the issue

19   or pervasive throughout all of the models?

20        A     The first model that we were aware of was the

21   LA-250.

22        Q     How were those cracks discovered in that first

23   250, do you recall?

24        A     The first instance, I believe, was a report

25   from the Australian equivalent of our FAA.

1      Q    Was that report made to Lake Aircraft?

2      A    Undoubtedly it was.  Typically a manufacturer

3   is contacted regarding such information.

4      Q    Was that something that was uncovered, do you

5   know, during like in an annual inspection?

6      A    I think it was uncovered during a repair.

7      Q    What year was that again?  I didn't write the

8   year down.

9      A    '98, '99.

10     Q    What steps did Lake Aircraft take after they

11  received that notice?

12          MR. YOUNG:  Objection calls for speculation.

13  BY MR. THOMAS:

14     Q    Please speculate.

15     A    I don't know.

16     Q    Do you have any knowledge at all of any steps

17  they took to either inspect other airplanes or analyze

18  the situation?

19     A    I have no knowledge of what Lake did to pursue

20  that issue.

21     Q    Were you employed at Lake at the time?

22     A    No.

23     Q    Was this before your employment at Lake?

24     A    No.

25     Q    Or after you left Lake?

1      A      After.

2      Q      Have you spoken with anyone about the work, if

3   any, that Lake did to address the issue that's addressed

4   in that AD?

5      A      Repeat the question.

6      Q      Have you spoken with anybody about actions

7   that Lake took to address the issues in that AD?

8      A      Have I spoken with anyone about actions that

9   Lake took to correct the issue?  That's possible.

10     Q      Well, tell me what you know about the

11  relationship between -- When we say Lake Aircraft,

12  there's REVO, Inc., you're familiar with REVO, Inc?

13     A      Yes.

14     Q      When we say Lake Aircraft, we're really

15  talking about REVO, Inc., correct?

16     A      No.

17     Q      Okay.  Tell me the difference.

18     A      My memory is that Lake Aircraft was a service,

19  sales and marketing arm.  REVO, Inc. is the type

20  certificate holder.

21     Q      Well, then I'll ask the same question about

22  REVO, Inc.  Do you know if REVO, Inc. took any action as

23  a result of being notified by the Australian version of

24  the FAA that there were cracks discovered in a LA-250?

25     A      To my knowledge, initially, no.

1      Q     You qualified that by saying initially.  Did

2    they eventually take some action?

3      A     We have an AD as Exhibit A.

4      Q     I'll just go ahead and say it.  REVO developed

5    a kit to address this issue that was discovered with

6    these cracks, correct?

7      A     Can we include Aerofab in the REVO umbrella?

8      Q     Sure, if you will define for me what you mean

9    by Aerofab and the relationship with REVO.

10     A     I believe Aerofab was an entity licensed by

11   REVO to produce the parts and to produce the Lake

12   Amphibian.

13     Q     Eventually REVO offered a kit for sale?

14   Sorry, Aerofab offered a kit for sale?

15     A     My memory is Aerofab offered a kit.

16     Q     That kit was meant to provide aircraft owners

17   with a way of complying with the Airworthiness

18   Directive; is that correct?

19     A     Repeat that.

20     Q     The kit that was offered by Aerofab was

21   intended to aid aircraft owners in complying with this

22   Airworthiness Directive, correct?

23     A     Yes.

24     Q     The Airworthiness Directive we're talking

25   about is Exhibit A?

1       A    Yes.

2       Q    To your knowledge, did Aerofab sell any of

3   these kits they offered for sale?

4       A    Yes.

5       Q    Do you know how many?

6       A    No.

7       Q    Do you have any speculation as to how many?

8       A    Why should I speculate?

9       Q    The only reason I ask is, sometimes when I ask

10  a direct question, I can tell that you're very careful

11  with your answers --

12      A    Yes.

13      Q    -- sometimes we don't know the exact answer,

14  but we know approximately the answer.  I was just trying

15  to get to, do you have any idea approximately?

16      A    If I had to guess, I would think approximately

17  300.

18      Q    How did you come up with that number?  I

19  realize you said it was a guess, but do you have any

20  basis for that?

21      A    How many I sold, how many aircraft were in the

22  initial compliance.

23      Q    Let's talk about how many you sold.  Did you

24  sell these kits?

25      A    Yes.

1     Q    Did you sell them through your business there

2  at the Bartow airport?

3     A    Yes.

4     Q    When you say you sold them, were you a -- did

5  you have some sort of license to sell these kits?

6     A    Yes.

7     Q    Do you have a document or set of documents

8  that memorializes that license?

9     A    No.  I have a retail sales license with the

10  County of Polk County.

11     Q    So you purchased kits from Aerofab and resold

12  them; is that correct?

13     A    Yes.

14     Q    When you did that, did you mark them up any?

15     A    Yes.

16     Q    How much was your markup?

17     A    I don't remember.

18     Q    What did you buy them for?

19     A    I don't remember.

20     Q    What did you sell them for?

21     A    More than I bought them for.

22     Q    How many kits did you sell?

23     A    An estimate of about 40.

24     Q    I want to make sure the testimony is clear.

25  These are 40 Aerofab kits?

1        A    Forty Aerofab kits.  And this would be 40

2    aircraft because we haven't defined kit.

3        Q    That's right, we need to define kit.  When you

4    say 40 aircraft, there's my understanding there's one

5    kit per wing required; is that correct?  So when we say

6    kit, we need to identify what we're saying when we say

7    kit?  What do you call a kit?

8        A    I call a kit enough to comply with the AD on

9    the aircraft, which includes two wings.

10       Q    Each wing has an upper and a lower doubler and

11   filler-strap, and so forth, correct?

12       A    Yes.

13       Q    When -- Let me back up and ask it a different

14   way.

15            Did you order the Aerofab kits as you needed

16   them, as aircraft owners come to you for the mods, or

17   did you order them in bulk to build an inventory?

18       A    Initially prior to the availability of kits we

19   collected and forwarded deposits to Aerofab in

20   anticipation of the forthcoming kit.  Those people --

21   and this has been a couple of years -- but those people,

22   I believe, had a locked-in price or something to benefit

23   from doing that.

24       Q    When you say those people, you mean those

25   aircraft owners?

1      A     Aircraft owners that I did business with.

2      Q     So there was a backlog at the beginning it

3   sounds like, a back order?

4      A     No, we never -- The initial kits, in other

5   words, the FAA wanted to time the issuance of the

6   Airworthiness Directive in conjunction with the

7   availability of a kit to comply with that AD.  The FAA,

8   I don't think, had a desire to ground aircraft without a

9   means to remedy the reason for that grounding.  Okay?

10          So deposits, you know, some customers made

11   deposits.  Some customers didn't.  These were forwarded

12   to Aerofab giving us, in theory, a priority on when we

13   could receive a kit out of that production.  And then

14   when the kit was actually ordered, it was ordered

15   against a serial number and was paid for.

16     Q     I understand.  And eventually when the kits

17   became available, they filled the order, and then what

18   happened?

19     A     The kits were shipped to people who could

20   install kits.  Sometimes they were shipped to owners,

21   and the kits got installed.

22     Q     Did you yourself install any of these Aerofab

23   kits on Lake aircraft?

24     A     Yes.

25     Q     How many, do you know?

1       A    No.

2       Q    Approximately?

3       A    Probably I would have been an active

4    participant in the first five to ten.

5       Q    When you say an active participant, does that

6    mean this would have be five to ten aircraft owners who

7    came to you to have the kits installed as a mechanic?

8       A    Correct.

9       Q    Did you do any more than that in the years

10   following or is that the limitation, five to ten, that

11   you actively participated in?

12      A    When we say actively participated in, we're

13   referring to with my hands physically installing the

14   kit.

15      Q    Okay.  Did you have employees who had their

16   hands on these kits?

17      A    Yes, I did.

18      Q    When I say you, let me refer to your company

19   or your employees, you or anybody under your supervision

20   or control.  How many kits did that group of people

21   install?

22      A    Aerofab kits, like I mentioned, 40.

23      Q    Forty total?  Okay.  That's --

24      A    That's 40 aircraft.

25      Q    I understand, 40 airplanes.  We talked briefly

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1   about the kit that was available from JCM, the Canadian

2   kit?

3       A    Yes.

4       Q    How many of those kits did you yourself or

5   those under your supervision or control install?

6       A    Twenty-six.

7       Q    Twenty-six aircraft?

8       A    Twenty-six aircraft.

9       Q    Why did you install 40 of the Aerofab and 26

10  of the Canadian, why not just install all Aerofab kits?

11      A    There was a price differential between the two

12  kits.

13      Q    What was that differential?

14      A    Approximately half.

15      Q    This is the Canadian kits were approximately

16  half the price of the Aerofab kits?

17      A    Yes.

18      Q    Do you recall what the Canadian kit cost you?

19      A    No.

20      Q    You mentioned the Aerofab kits becoming

21  available at a certain time.  Did the Canadian kit's

22  availability precede that time or they became first

23  available after the Aerofab kits were available?

24      A    They were available after the Aerofab kits.

25      Q    Do you recall how long a period that was?

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1      A    I'm not positive, but eight months to a year.

2      Q    I want to make sure I have this right.

3    Aerofab offered a kit for sale, become available at a

4    certain time, and approximately eight months to a year

5    later, JCM offered a kit for sale at about half the

6    price of the Aerofab kit; is that correct?

7      A    Essentially, yes.

8      Q    Do you recall when you installed the first

9    Canadian kit?

10     A    No.

11     Q    Do you have any records that would indicate

12   when you --

13     A    With some digging that could be probably

14   developed.

15     Q    As a mechanic, are you required to keep --

16   when I say required by the FAA -- to keep documentation

17   that identifies what work you've done on aircraft?

18     A    I'm assuming are you saying am I required to

19   retain documentation of what work I've done on aircraft?

20     Q    Yes.

21     A    No.

22     Q    I would also expand that to include not just

23   you but those under your supervision?

24     A    That's correct.  They are not required to.

25     Q    Do you keep documentation that identifies what

1    work was done on which airplanes over the years?

2        A    Some we do.  Some we don't.

3        Q    When you say we, do you mean your company?

4        A    We company, yes.

5        Q    How many employees total does your company

6    have?

7        A    It varies between six and eight.

8        Q    Do you have an administrative assistant or a

9    clerk that helps you keep your records straight?

10       A    I have someone who helps me with paperwork,

11   yes.

12       Q    What is their name please?

13       A    That's my wife.

14       Q    What is her name please?

15       A    Cathy.

16       Q    Does she have a middle name?

17       A    Ann.

18       Q    Is it Catherine Ann or Cathy Ann?

19       A    No, Cathy.

20       Q    Cathy with a K or with a C?

21       A    C.

22       Q    I'll ask this question, it may seem obvious,

23   but do you live with Cathy?

24       A    Yes.

25       Q    How long has she worked in your business?  All

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1   along the way?

2        A    All along.

3        Q    You're looking at me and kind of nodding your

4   head, but all along the way?

5        A    All along the way.

6        Q    Would she have knowledge as to where records

7   would be kept regarding work that was done on Lake

8   aircraft by --

9        A    She might.

10       Q    You said you might have some documentation

11  regarding this.  Where would those documents -- Are we

12  talking paper documents?

13       A    Typically paper.

14       Q    Any of these documents stored in computer

15  form, electronic form?

16       A    Typically not.  There's obviously some in a

17  computer because we do use a computer, but our long-term

18  records are not computer records.

19       Q    Got it.  Where would these paper documents be

20  stored?

21       A    Typically Bartow airport.

22       Q    You have an office there?

23       A    Yes.

24            MR. THOMAS:  I want to take a quick break for

25       only like 60 seconds, maybe two minutes.

1          (Off the record at 10:22 AM.)

2          (On the record at 10:28 AM.)

3   BY MR. THOMAS:

4      Q    Mr. Shannon, we asked your attorney to provide

5   to us documents in response to a request to produce that

6   we served on some date.  I'm not sure what the date was.

7   It looks like it was -- These are the answers.  We had

8   responses on January 7th.  I think the request went out

9   beginning of December.

10          MS. SWARTZ:  Mid November.

11   BY MR. THOMAS:

12      Q    One of the categories of documents requested

13   were documents related to the subject matter of the

14   litigation.  And you've indicated that you have

15   documents available that are related to the installation

16   of these kits on Lake aircraft?

17      A    Yes.

18      Q    In your possession?

19      A    Yes.

20      Q    Did you provide these documents to your

21   attorney?

22      A    No.

23      Q    Were you aware that we had asked for documents

24   related to the subject matter of the litigation?

25      A    Who did you specifically ask for those

1   documents?

2        Q    The request is to you as a party, but of

3   course we had to submit that through your attorney.

4        A    Please look at the document.

5        Q    Are you saying that you are not in possession

6   of these documents?

7        A    No, I'm not saying that.

8        Q    Why weren't the documents provided?  Let me

9   have that back please?  I'll take the stickers off.

10  This is the response, this is the response, not the

11  original request.

12       A    This is the response?

13       Q    Uh-huh.

14       A    Then I think what I need to see is the

15  original request.

16       Q    Okay.  Well, tell me why they weren't provided

17  please?

18       A    You asked the wrong entity.

19       Q    Who did we ask?

20       A    I don't remember, but it wasn't me.

21       Q    Okay.  Then tell me, identify for me please,

22  the entity who is in possession of these documents?

23       A    Amphibians Plus, LLC.

24       Q    You're saying that even though that is your

25  company, that you have knowledge of the documents, and

Page 40

1    you know where they're located, are you saying that

2    they're not in your possession or control?

3        A    No, I'm not.  I'm saying you did not ask

4    Amphibians Plus, LLC for the documents.

5        Q    Oh.  Well, that's -- Okay.  Well, then let's

6    ask this question:  Let's go back to request number one

7    since this is the game we're going to play.

8            Request number one is, "All communications to

9    or from any party or non party related to the subject

10   matter of the litigation."

11           Does Amphibians Plus have such documents that

12   relate to communication to or from any party or non

13   party relating to the litigation?

14       A    There may be a few notes on that, but that's

15   really sketchy.

16       Q    What do you mean by "sketchy"?

17       A    You said any communication.  I don't log all

18   phone calls or communications or conversations or

19   whatever for --

20       Q    Did you read the definition of communication

21   that came with the request?

22       A    Yes, I did.

23       Q    You did?

24       A    Yes.

25       Q    Pretty clearly defined in there, wouldn't you

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1   agree?

2        A    I'm not questioning your definition of

3   communication.  I'm commenting on the amount of

4   documentation we have regarding communication.

5        Q    What is your comment on the amount of

6   documentation?

7        A    Very little.

8        Q    Did you provide any of it?

9        A    Did I provide any of it?

10        Q    Yes.

11        A    No.

12        Q    Why?

13        A    You didn't ask the right entity for any of the

14   information.

15        Q    Let's go to number two.  "All documents

16   evidencing that the patent at issue here, the '260

17   patent, is invalid or unenforceable."

18        A    You made a statement, sir.

19        Q    Does your company have documentation

20   responsive to that request?

21        A    Yes.

22        Q    Did you provide it?

23        A    No.

24        Q    For the same reason as you stated a few

25   minutes ago?

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 42

1     A     You didn't ask the correct company.

2     Q     Request number three, "For all affirmative

3  defenses --

4     A     For all of what?

5     Q     Affirmations defense, these are defenses

6  you've raised in your answer to the complaint.  "Provide

7  all documents providing a factual basis for raising an

8  affirmative defense."  These are the defenses of non

9  infringement, et cetera.  Does the company have such

10  documentation?

11     A     It may have some.  I'm not an attorney, so I

12  don't know what documents will accurately provide those

13  defenses.

14     Q     So I think what you're saying is -- Well,

15  we'll just go through the rest of these.  Request number

16  four was the same request for all of the counterclaims

17  that were raised in your answer, all of the documents

18  that you have.  The same answer for that, if the company

19  had them?

20     A     The company may have documents; but again, I'm

21  not an attorney, so I wouldn't know what documents would

22  apply to that.

23     Q     Are there any other owners of your company

24  other than you?

25     A     No.

1      Q     You're the sole owner of the LLC, it's a

2   single member LLC; is that correct?

3      A     Yes.

4      Q     Member managed?

5      A     Yes.

6      Q     Up until about, correct me if I'm wrong, about

7   14 months or a year ago you were operating as a sole

8   proprietor?

9      A     Yes.

10     Q     Doing business as, you were under a DBA, the

11  same company name, but just it was DBA?

12     A     Yes.

13     Q     Was that a registered fictitious name?

14     A     To my knowledge, yes.

15     Q     Do you have an attorney who handles your

16  corporate affairs?

17     A     No.

18     Q     Did you register your LLC personally yourself?

19     A     Yes.

20     Q     Through sunbiz.org?

21     A     Yes.

22     Q     Does the company maintain records that would

23  reflect what you paid for kits whether Aerofab or

24  Canadian in their file?

25     A     Typically, yes.

Page 44

1    Q    Does that documentation exist in your

2  company's file?

3    A    I can't guarantee it because some of these

4  documents you're asking for are a number of years old.

5    Q    Have you looked for them?

6    A    But typically they would be there.

7    Q    Have you looked for them?

8    A    I have not.

9    Q    Does the Amphibian Plus, LLC records contain

10  information regarding what you sold the kits for?

11    A    Technically, no.

12    Q    Why did you qualify it by saying technically?

13    A    Because Amphibians, LLC has not sold any kits.

14    Q    Let's back up then.  Is there any

15  documentation in the Amphibians Plus files regarding any

16  sale of any kit for any reason by anyone at any time?

17    A    Yes.

18    Q    Have you looked for this documentation?

19    A    No.

20    Q    Have you personally communicated -- and when I

21  say personally, whether yourself personally, or as an

22  employee or owner of Amphibians Plus, LLC, when I say

23  personally, I mean you with your own personal fingers,

24  used e-mail communication to communicate about any

25  aspect of the subject matter of this lawsuit with

1   anyone?

2        A     Yes.

3        Q     Is your attorney aware that you've

4   communicated with others by e-mail concerning this

5   lawsuit?

6        A     You would have to ask the attorney.

7        Q     Have you told him that you have?

8        A     Have I told him that I have?  I may have

9   referred to e-mailing individuals regarding the content

10  of the lawsuit.

11       Q     Have you forwarded e-mails to him that were

12  originally e-mail between you and someone else regarding

13  the lawsuit that you then forwarded to the attorney?

14       A     That's possible.  I'm not going to guarantee

15  it.

16       Q     Would you agree that -- can I have that

17  back -- would you agree that an e-mail between you and

18  another individual regarding the subject matter of the

19  lawsuit would fall under the definition of our request

20  to you for copies of all communication regarding the

21  lawsuit?

22       A     Say that again please.

23       Q     Would you agree that an e-mail between you and

24  another individual would fall under the definition of

25  communication as requested by our firm to you in the

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 46

1    request for production?

2         A    It could.  Again, I'm not an attorney.

3         Q    But you have such e-mail, correct?

4         A    If they're in hard copy, I have the potential

5    of having them.

6         Q    Why do you limit that to hard copy?

7         A    Say again.

8         Q    Why do you qualify that by saying, "if they're

9    in hard copy"?

10        A    I'm not gentle on computers.

11        Q    Describe what you mean by you're not gentle on

12   computers?

13        A    I have physically damaged computers rendering

14   them inoperative holding communications that I can't

15   access.

16        Q    Communications regarding the subject of the

17   lawsuit?

18        A    That's possible.

19        Q    Describe the event you're talking about or if

20   it's a plurality of events describe the events you're

21   talking about.

22        A    I have physically beat upon a computer

23   rendering it inoperative in a moment of distress.

24        Q    When was the last time this happened?

25        A    I think I damaged a piece of equipment about

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1   three weeks ago.

2        Q     Describe the equipment please.

3        A     That was just a keyboard and a mouse, so.  But

4   we're going back six or eight months, maybe a little

5   more than that.

6        Q     Was this a computer that you damaged six or

7   months years ago, the CPU itself?

8        A     Say again.  It's a laptop, so yes.

9        Q     The data on the hard drive in that laptop, did

10  you recover the data?

11       A     No.

12       Q     Where is that laptop today?

13       A     I don't know.

14       Q     Was it your personal laptop or did it belong

15  to your company?

16       A     I'll say company because it stayed at the

17  company.

18       Q     You don't know where it is today?

19       A     I'm not sure if I threw it away.

20       Q     Is there anybody else who would know the

21  answer to that question?

22       A     Probably I'm the one.  I'd just have to look

23  in the office to see if it's still there.  I kept the

24  keyboard as an example to myself that I shouldn't do

25  this.

Page 48

1       Q      Why did you destroy this computer?

2       A      I was angry.

3       Q      Why were you angry?

4       A      To tell you truth, I don't remember.

5       Q      It seems like a significant event to destroy a

6    piece of equipment like that.  You can't remember why

7    you were angry?

8       A      It could be something someone said.  I don't

9    remember the specific event, but the computer does.

10      Q      Did you have a backup of the data that was on

11   that hard drive?

12      A      No.

13      Q      Do you regularly back up your computer data?

14      A      No.

15      Q      What computer program do you use for e-mail?

16   Let me back up and ask that a different way.  What

17   computer program did you use on that laptop for e-mail?

18      A      I'm not sure if that's a good question.  Via

19   Internet Explorer I access AOL.com.

20      Q      So you have an AOL e-mail account?

21      A      Yes.

22      Q      We would just normally call that web-based

23   e-mail.

24      A      I'm not a computer expert either.

25      Q      What is your -- Do you have multiple e-mail

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

```
 1   addresses?

 2        A     There are some, but the e-mail address I use

 3   is typically one e-mail address.

 4        Q     What is that e-mail address?

 5        A     HD Shannon at AOL.com.

 6        Q     How long have you that e-mail address?

 7        A     As long as I've had e-mail.

 8        Q     How long has that been?

 9        A     Fourteen, 15 years.

10        Q     Okay.  Did you replace that laptop with

11   another computer?

12        A     Yes.

13        Q     Did you get a new laptop?

14        A     Yes.

15        Q     Have you used that laptop to e-mail any person

16   about the subject matter of this lawsuit?

17        A     Probably, yes.

18        Q     And for that e-mail do you have hard copies of

19   some or all of that e-mail?

20        A     Perhaps some.

21        Q     Why didn't you provide that to us in response

22   to our request for production?

23        A     The request for production asked for those

24   communications from a specific entity.  That specific

25   entity was not me by that description.
```

1      Q    You're saying that when the request was made

2    to you personally that --

3      A    The request was not made to me personally.

4           MR. THOMAS:  Do we have the request here?

5      This is the response.

6           MS. SWARTZ:  Uh-huh.

7           MR. THOMAS:  Do we have the request?

8           MS. SWARTZ:  No.

9    BY MR. THOMAS:

10     Q    Let's make sure that we're talking about --

11   Let's make sure we understand what entities you seem to

12   be making a distinction between.  There is you

13   personally, correct, you are being personally sued in

14   this lawsuit?

15     A    That's correct.

16     Q    Correct?

17     A    I believe my name is on it.

18     Q    When you say we did not ask the correct

19   entity, who would be the correct entity?

20     A    I guess me.

21     Q    Then you're saying that we never asked you --

22     A    No, you didn't.

23     Q    -- for communication regarding the subject

24   matter of this lawsuit?

25     A    That's correct.

Page 51

1          MR. YOUNG:  Would you like to take a

2     one-minute timeout so that you and I can have a

3     discussion off the record?

4          MR. THOMAS:  Sure.

5          (Off the record at 10:46 AM.)

6          (Back on the record at 10:51 AM.)

7  BY MR. THOMAS:

8     Q    Going back to the destroyed computer, the

9  laptop that you talked about --

10    A    Uh-huh.

11    Q    -- how long had you utilized that laptop for

12 e-mail communications?

13    A    A year, year and a half.

14    Q    Did you have a computer prior to that laptop

15 that you used for e-mail communications?

16    A    Yes.

17    Q    Was that also a laptop?

18    A    No.

19    Q    So it was a desk top computer?

20    A    Yes.

21    Q    PC or a Mac?

22    A    PC.

23    Q    Where did that computer physically reside?

24    A    On my desk.

25    Q    At your office or at your home?

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1       A     At my office.

2       Q     Was that an asset of the company or personal

3    asset?

4       A     Company.

5       Q     Where is that computer today?

6       A     I don't know.

7       Q     Did you back up the data from that computer?

8       A     No.

9       Q     How long had you had that computer?

10      A     Probably about five years, six years.

11      Q     Did you utilize that computer to access and

12   communicate through your AOL e-mail account?

13      A     Yes.

14      Q     Did you print out any of the e-mail utilizing

15   that computer relative to subject matters, the subject

16   matter, of the lawsuit?

17      A     That's possible.

18      Q     Where would those printouts be?

19      A     I have a legal box about that long with data

20   relative to not this lawsuit but actions relative to the

21   patent.  Typically I would put them in that banker box.

22      Q     And that banker box resides where please?

23      A     At the office.

24      Q     If I were to issue or our firm were to issue a

25   request for production for the documents in that

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 53

1   banker's box, if we were to issue that to you

2   personally, would you tell me that's not in your

3   possession or control?

4        A    No.

5        Q    So you would produce those documents?

6        A    Yes.

7        Q    The documents that we received in response to

8   our request, did they come from that box?

9        A    I'm not sure what documents you received.

10       Q    Did you provide those documents to your

11  attorney, the banker box documents?

12       A    He has been exposed to some of the documents

13  in the banker box.  I don't know what specifically was

14  used in response to that request.

15       Q    Who decided which documents in that banker box

16  were responsive to our request, did you decide that?

17       A    Not really because as stated earlier the

18  request was not -- the request for production of

19  documents did not name my company or me.

20       Q    I think with the discussion we just had we can

21  clarify the question a little bit.  The improperly named

22  company that request --

23       A    Okay.

24       Q    -- that was a subpoena that went to your

25  company.  Let's put that to the side for a minute.

Page 54

1      A    Okay.

2      Q    Separate and apart from that we issued a

3  request for production on you personally as a defendant

4  in this lawsuit.  We have your response to it right

5  here.

6      A    I don't -- Can we --

7      Q    No, let's just go ahead and keep going.

8      A    Excuse me, I can't consult with my attorney?

9      Q    Actually in a deposition you cannot turn to

10  your attorney for coaching.  Just answer the questions

11  honestly.

12      A    It's not a matter of answering the questions

13  honestly.  It's the way I interpreted what I received.

14      Q    If there's a problem with the way I'm asking

15  the questions, we can work that out to clarify.  That's

16  what I was trying to say before.

17      A    Okay.

18      Q    There was a request for documents, part of the

19  discovery in the lawsuit that went from our lawyer's

20  firm to your attorney, I believe it was on the very same

21  day we had the scheduling conference back in November,

22  correct?

23          MS. SWARTZ:  Within two days if not the same

24      day.

25  BY MR. THOMAS:

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

 1     Q    That was to you personally, that request.  We

 2 have your attorney's response here, and he did provide

 3 some documentation to us eventually.  My question for

 4 you is:  You mentioned a banker's box.  Did you provide

 5 the banker's box materials to your attorney?

 6     A    No.

 7     Q    So he could respond to our request, not the

 8 subpoena that was improperly named, but our request for

 9 documents?

10     A    No.

11     Q    Has he had an opportunity to go through that

12 box at your place, at your office?

13     A    I'm going to say yes.

14     Q    Is it fair to say that there are documents in

15 that box, that banker box, that resides in your office

16 that are related to the subject matter of the lawsuit?

17     A    Yes.

18     Q    And I think you told me a few minutes ago, in

19 response to my question, that if we requested that from

20 you personally as part of the lawsuit, that you would

21 provide those documents to us?

22     A    Yes.

23     Q    My question is:  Why didn't you do that in the

24 beginning when we first asked for them?

25     A    The request that I received, the sheet of

1   paper that said, I believe, it's production request or

2   request to produce, or something like that at the top of

3   the sheet, did not have me or my company on that sheet

4   of paper.  That sheet of paper was delivered via a

5   subpoena, but that sheet of paper did not have me or my

6   company on it.

7        Q    That's the subpoena we're talking about, and

8   we're not -- you're going back to the subpoena.  And

9   what we're saying is, let's put the subpoena to the side

10  for a minute.  There was another request made earlier

11  for all documents made relative to the lawsuit?

12       A    The only request I saw was that one made out,

13  like I said, to another entity, and did not include me.

14       Q    Okay.  All right.  Are you saying that before

15  you saw that subpoena that had the company improperly

16  named, before that, you did not know of any request for

17  documents from you?

18       A    That is correct.

19       Q    That is the first time that you knew that you

20  were being asked to produce documents?

21       A    That is correct.

22            MR. THOMAS:  When did the subpoena get served?

23            MS. SWARTZ:  I couldn't tell you without

24       looking.  I can go check the records.

25            MR. THOMAS:  Would you just check that?  You

1          might want to just grab the pleading file.

2                    (Pause in proceedings.)

3     BY MR. THOMAS:

4          Q     Our records show that the subpoena that we're

5     talking about that you say was where your company was

6     misidentified was served on November 23rd.  Does that

7     sound about right, right around Thanksgiving?

8          A     Possibly.

9          Q     And just so that we get this out on the

10    record, what was wrong with the naming of the company in

11    that, do you recall?  You said your company was

12    improperly named, improperly identified?

13         A     Yes.

14         Q     How was it improperly identified?

15         A     I could -- the document is probably in that

16    banker's box, and I could pull it, and I could read it,

17    but it was not me.

18         Q     If the subpoena were addressed to Amphibians

19    Plus, LLC, would that properly identify your company?

20         A     Yes.

21         Q     Now, you said that you had e-mailed others

22    about the subject matter of the lawsuit, correct?

23         A     Yes.

24         Q     Using your AOL e-mail account?

25         A     Yes.

Page 58

1        Q    With whom did you communicate via e-mail about

2    the subject matter of this lawsuit?

3        A    That's a relatively broad question.  I can

4    recall, and we're going to define subject matter as

5    having anything to do with the lawsuit?

6        Q    Related to the subject matter of the lawsuit,

7    correct, the patent the modification, et cetera.

8        A    Mark Rodstein, Elton Townsend, Mark Young.  I

9    can see his face, but I can't think of his name right

10   now.  It's possible some my customers, you know, in the

11   communication of it.  Possibly Ward House.

12       Q    Any others you can recall?

13       A    Say again?

14       Q    Any others that you can recall?

15       A    Not specifically.

16       Q    Paul Furnee, did you communicate with him via

17   e-mail regarding the subject of the lawsuit?  Furnee is,

18   I believe, F-U-R-N-E-E.

19       A    It's possible.  I have communicated with

20   Mr. Furnee via e-mail, but I'm not positive that the

21   subject of that is in there; but yes, let's include him

22   for safety's sake.

23       Q    Have you, since the time this complaint was

24   served on you, have you deleted any e-mail from your AOL

25   account that addressed the subject matter of this

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1   lawsuit?

2        A    It's possible.

3        Q    Were you warned at any time to not delete such

4   e-mail because it would be potential evidence in the

5   case?

6        A    No.

7        Q    Do you normally let e-mail accumulate in your

8   AOL account?  In other words, after you've received an

9   e-mail on a particular subject, do you read it and just

10  let it set there, or do have a routine habit of deleting

11  e-mail?

12       A    Some stay.  Some I delete.

13       Q    Let's go one by one through these.  Mark

14  Rodstein, who is he please?

15       A    Mark is a customer.  Mark is the -- I'm going

16  to use the word president or principal of the Lake

17  Amphibian Flyers Club.

18       Q    Where does he live?

19       A    Broadly, Florida.  I can't think of the town

20  right now.  He used to be in Boca, but he has since

21  moved a relatively short distance.

22       Q    He's a Lake aircraft owner?

23       A    Yes.

24       Q    How long has he been a Lake aircraft owner to

25  your knowledge?

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 60

1      A      Sixteen, 18 years.

2      Q      Does he have a kit installed on his airplane?

3      A      Yes.

4      Q      Do you know if it's a Canadian kit or Aerofab

5  kit?

6      A      I don't know.

7      Q      Did you install the kit on his airplane?

8      A      I probably did.

9      Q      Do you recall when you would have done that?

10     A      Probably from the issuance of the AD to a

11  period of one to two years subsequent.

12     Q      Is it possible that there are records

13  maintained by either you or by your company that would

14  identify the source of the kit?

15     A      Yes.

16     Q      And those records would be in the banker box?

17     A      No.

18     Q      But they would be located somewhere in the

19  office there in Bartow?

20     A      Somewhere in the office, typically.

21     Q      What was the nature of your communication with

22  Mr. Rodstein regarding the lawsuit, just generalize

23  please?

24     A      Status of the lawsuit.

25     Q      Did you discuss litigation strategy with Mr.

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

 1    Rodstein?

 2        A    You're asking -- You're using a term that I

 3    don't fully understand, that term being, "litigation

 4    strategy."

 5        Q    I'll rephrase.  Did you discuss with him

 6    actions that he or you felt should be taken during the

 7    course of the lawsuit?

 8        A    Again, you're asking another level.  You said

 9    actions that should be taken.  I discussed with him

10    actions that I was taking.

11        Q    Which actions did you discuss with him?

12        A    Basically that I planned to I'm going to say

13    contend the lawsuit.

14        Q    Did you discuss theories of defense?

15        A    That's possible, but only on a very non-lawyer

16    level of discussion.  And I just thought of another name

17    for the e-mail list.

18        Q    Who is that please?

19        A    Harry Lawrence.

20        Q    Going back to Mr. Rodstein, did he express

21    opinions to you as to the validity of the lawsuit?

22        A    No.

23        Q    Did you express opinions to him as to the

24    validity of the lawsuit?

25        A    Yes.

Page 62

1      Q      What was that opinion or those opinions?

2      A      I don't feel the patent is valid.

3      Q      Did he express any opinions to you as to the

4   validity of the patent?

5      A      I don't recall.

6      Q      Did you discuss with him location of documents

7   relative to the lawsuit?

8      A      No.

9      Q      Have you spoken with him on the telephone

10  about this lawsuit?

11     A      Yes.

12     Q      When was the last time you spoke with him?

13     A      Perhaps three weeks ago.

14     Q      What was the nature of that discussion please?

15     A      An oil filter he had sent me for examination.

16     Q      Have you spoken to him on the phone about the

17  lawsuit?

18     A      There's a good chance, yes.

19     Q      Has Mr. Rodstein is it mister or doctor, by

20  the way?

21     A      Mister, to my knowledge.

22     Q      Do you know what his occupation is?

23     A      No.

24     Q      If he has one?  Has he contributed financially

25  to your defense of this lawsuit?

Page 63

1       A       Yes.

2       Q       How much?

3       A       I don't know.  Somewhere there's a list.

4       Q       Somewhere there's a list?

5       A       Yeah.

6       Q       So more than one person has contributed to

7    your defense in this lawsuit?

8       A       Yes.

9       Q       How many individuals?

10      A       Between one and 200.

11      Q       Between one and 200 people?

12      A       Individuals.

13      Q       How many corporate entities have contributed

14   to your defense?

15      A       I don't know.

16      Q       Who maintains the list of the identities of

17   the individuals who have contributed to your defense?

18      A       My office.

19      Q       Well, your office, I asked you who, so your

20   office is not a response.

21      A       It could be the part-time girl or my

22   administrative assistant Cathy.

23      Q       Who is also your wife?

24      A       Who is also my wife.

25      Q       Who is the part-time girl?

```
 1      A     My daughter-in-law.

 2      Q     What is her name please?

 3      A     Crystal.

 4      Q     What is her full name please?

 5      A     Crystal Shannon.

 6      Q     Does she reside there in Bartow?

 7      A     No.

 8      Q     Where does she live?

 9      A     Winter Haven.

10      Q     What is her address?

11      A     I would have to refer to my phone.

12      Q     You can refer to your phone if you have it

13 with you.

14      A     I do.

15      Q     Do you have the address there on your phone?

16      A     I had it turned off.

17      Q     Oh, you're waiting for it to boot up?

18      A     I'm waiting for it to boot.

19      Q     While we're waiting for your phone to boot, of

20 these 100 to 200 individuals who have contributed to

21 your defense, do you communicate with these individuals

22 regularly?

23      A     Not regularly.

24      Q     Do you give them a status of the lawsuit, at

25 any point along the way have you given them the status
```

Page 65

1    of the lawsuit?

2        A    Actually, I'm going to say I need to amend

3    something that I said because the contributors to this

4    particular lawsuit probably are not that numerous.  They

5    would be less than 50 is my estimation.  Okay?

6        Q    Okay.

7        A    But we've had contributions for other actions

8    regarding this issue.

9        Q    You mean the other lawsuits that have been

10   filed by Enpat here in Florida?

11       A    That as well as the reexamination.

12       Q    The reexamination.  So is it fair to say this

13   100 to 200 individuals you're talking about, are they

14   all Lake aircraft owners?

15       A    Maybe not all, but the vast majority.

16       Q    So is it fair to say they're acting as a group

17   in the reexamination and the defense of these lawsuits?

18       A    It's not my prerogative to say that they are

19   acting as a group.

20       Q    I think what you said was, and if this

21   mischaracterizes your testimony, please stop me, there

22   are approximately one to 200 people who have contributed

23   to either the reexamination or the current round of

24   lawsuits that have been filed by Enpat; is that correct?

25       A    Yes.

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 66

1      Q      Yours being the chief among them you said with

2   something less than 50 had contributed to your defense

3   personally; is that correct?

4      A      Correct.

5      Q      Do you have the address there for Crystal?

6      A      We're working on that.  330 Avenue B,

7   Northeast, Winter Haven, Florida 33881.

8      Q      Thank you.  What is the total amount of

9   dollars that has been contributed by others to your

10  defense?

11     A      This is an estimate because I haven't reviewed

12  the numbers for a total.

13     Q      I understand.

14     A      Seventy-five, 85,000.

15     Q      Why would these individuals contribute to your

16  defense, what is in it for them?

17     A      You're asking me to make a decision regarding

18  other people's opinions.

19     Q      No, I'm asking you to tell me why in your

20  opinion they would do this?

21     A      I guess they want me to succeed in the defense

22  of the patent of the suit.

23     Q      Is that because they feel at some point they

24  may be a subject of a lawsuit as well?

25     A      That could be, but I don't know if that's

1    their motivation.

2        Q    Is that because the issues in this lawsuit

3    would be virtually identical in the issue in any lawsuit

4    filed against them?

5        A    It could be.

6        Q    Do you think they see you as typical of

7    being -- that the issues that you face here are typical

8    of the issues they would face in a lawsuit?

9        A    It's possible that they do.

10        Q    Over this patent?

11        A    It's possible.

12        Q    Is there, among the group that has contributed

13    to your defense, is there one among them who is a leader

14    of sorts?

15        A    No.  Well, most of these people, as we

16    mentioned earlier, are Lake owners.  Maybe not all, but

17    most.

18        Q    Have these individuals not only contributed

19    money, but have they contributed their thoughts and

20    opinions as to how the lawsuit should be conducted?

21        A    There have been comments, yeah, do this, do

22    that, and so forth, but that's, let's call it idle

23    conversation.  I have not relied on that group for legal

24    counsel.

25        Q    When they communicate with you, is that

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    primarily through e-mail?

2         A    No.  Checks come in the mail.

3         Q    Checks come in the mail?

4         A    Yes.

5         Q    But other than, you know, receiving checks

6    through the mail when you have communication with them,

7    typically how is that done?

8         A    I'm going to say an outbound e-mail by me or a

9    verbal communication when people are gathered.

10        Q    Have there been gatherings to discuss the

11   lawsuit?

12        A    No, not specific gatherings to discuss this

13   lawsuit.

14        Q    Bad question, as you're pointing out and

15   smiling.  Has the lawsuit been discussed during a

16   gathering of these individuals?

17        A    Yes, it has.

18        Q    When was the last time that happened?

19        A    I'd have to look.  But it's going to be, I

20   think, it was the last Lake Amphibian Flyers Club

21   gathering at River Ranch, Florida.  I want to say March,

22   but don't hold me to it because it's been a moving

23   target here lately.

24        Q    March of 2010?

25        A    That may be correct.  It may be in here.  I'm

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    not sure.  It depends on how far back it goes.

2         Q    Sure, if you can find it.

3         A    I don't see it.

4         Q    Approximately March of 2010?

5         A    Approximately March.

6         Q    How many people were there at that gathering

7    at River Ranch in March?

8         A    Approximately 150.

9         Q    All Lake aircraft owners?

10        A    The vast majority.

11        Q    So this was a fly-in of types?

12        A    Yes.

13        Q    And what was the nature of the discussions

14   that occurred regarding this -- This lawsuit didn't

15   exist at this time.

16        A    At that time there was a status report on the

17   reexamination.

18        Q    What was the status of the re-exam at that

19   time, do you recall?

20        A    Let's wait.  The counsel I had at that time

21   said wait.

22        Q    So as a group the Lake aircraft owners at that

23   were anticipating the outcome of the re-exam, waiting?

24        A    Yes.  Actually, no.  I don't think the group

25   truly understood the status of the reexamination.

1      Q      Well, what did they misunderstand?

2      A      Basically they thought it was over.

3      Q      When you say it was over, you mean they

4   thought the patent had been invalidated?

5      A      The status of the patent at that point in time

6   appeared that it was invalid.

7      Q      This was prior to the appeal of the re-exam,

8   is that correct?

9      A      Say again?

10      Q      That's okay.  I'll withdraw the question.

11      A      Okay.

12      Q      Prior to that date, that March of 2010 fly-in

13   date, was the subject of the lawsuit or the

14   reexamination, because at that time the lawsuit didn't

15   exist, was it discussed among the aircraft owners, the

16   Lake aircraft owners as a group?

17      A      You said of the group or as the group?

18      Q      When the group of aircraft owners convened

19   themselves --

20      A      There was a point of discussion of the

21   reexamination prior to that fly-in as well.

22      Q      Generally since the re-exam was filed because

23   you told me that a number of these people contributed to

24   the filing of the re-exam --

25      A      Correct.

1      Q    -- so from the date the re-exam was filed was

2  the reexamination discussed between the Lake aircraft

3  owners when they met as a group?

4      A    Yes.

5      Q    Now, the reexamination was filed, my records

6  show, July 15th, 2002, does that sound about right?

7      A    It sounds about right.

8      Q    So going back as far as mid 2002, is it fair

9  to say that the Lake aircraft owners operated as a group

10  with respect to defending themselves against the

11  enforcement of this patent?

12      A    No.

13      Q    Why is it not fair to say that?

14      A    Not everybody contributed.

15      Q    Not everybody contributed, but a number of the

16  aircraft owners did operate as a group?

17          MR. YOUNG:  I'm going to object because it

18      calls for speculation about what the --

19          MR. THOMAS:  I understand, but it's still

20      discoverable.

21      A    Say again?

22  BY MR. THOMAS:

23      Q    Your opinion is still discoverable.  The

24  speculation is still discoverable.

25      A    Okay.

Page 72

1       Q       Let me go back and make sure I have the answer

2   to the question on the record.  Going back as far as mid

3   2002, there was a group of Lake aircraft owners who did

4   operate as a group, maybe a subset of the total, in

5   defending themselves against the enforcement of this

6   patent; correct?

7       A       Yes.

8       Q       The general feeling among the Lake aircraft

9   owners as to whether this patent should be enforceable

10  is what please?

11      A       Extortion.

12      Q       Is that pretty much a universal opinion?  I

13  realize you can't speak for everyone.

14      A       A majority opinion.

15      Q       A great majority, fair to say?

16      A       A majority opinion.

17      Q       Okay.  We're going to move on to Elton

18  Townsend.  Describe for me who is Elton Townsend please?

19      A       To my knowledge, Elton Townsend is the

20  principal of Lake Central Air Services located in

21  Muscogee, Ontario, a long-time Lake sales and service

22  facility.

23      Q       Is he a mechanic, FAA certified mechanic?

24      A       No.

25      Q       He's not an IA either?

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

```
 1        A    No.

 2        Q    What have been the nature of your discussions

 3   with Mr. Townsend regarding the lawsuit?

 4        A    We have mutually worked towards terms of --

 5   mutually worked towards the determination of invalidity

 6   of the patent.

 7        Q    So he's assisted in this endeavor?

 8        A    Yes.

 9        Q    To invalidate the patent?

10        A    Yes.

11        Q    How long has he participated with you in

12   attempting to invalidate the patent?

13        A    When was the patent issued?

14        Q    December 11, 2001.

15        A    December 11, 2001.

16        Q    So you've had knowledge of this patent since

17   the date it was issued, is that correct?

18        A    Yes, maybe not the exact day.

19        Q    But close enough?

20        A    Yes.

21        Q    Is that generally true of the Lake aircraft

22   owner community?

23        A    Speculation.  I'd say within a year's frame,

24   yes, but to the day, not necessarily.

25        Q    Is Mr. Townsend an aircraft owner?
```

Page 74

```
 1      A    Yes.

 2      Q    Do you know what model he owns?

 3      A    I think he owns a LA-4.

 4      Q    Does he have a kit installed on that aircraft?

 5      A    I would think he does, yes.

 6      Q    Any idea which kit it would be?

 7      A    I'm pretty sure it's the Canadian kit.

 8      Q    Who would have installed that kit, to the best

 9  of your knowledge?

10      A    Lake Central Air Services.

11      Q    His company?

12      A    His company.

13      Q    So he has an FAA certified mechanic?

14      A    No, he does not.

15      Q    How would he install a kit or have the kit

16  installed not being --

17      A    He's in Canada, Muscogee, Ontario.

18      Q    So it would be the Canadian authority who

19  would --

20      A    That's affirmative.

21      Q    Does he ever fly his aircraft into the United

22  States, to your knowledge, or has he ever, to your

23  knowledge?

24      A    To my knowledge, no.

25      Q    Did he participate in the March 2010 fly-in at
```

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    River Ranch?

2         A    No.

3         Q    Are there other fly-ins throughout the year in

4    other places in the country, other Lake Aircraft

5    fly-ins?

6         A    There are other Lake Aircraft fly-ins.

7         Q    Do they happen periodically on a regular

8    basis?

9         A    Typically annually.

10        Q    Where are those places?

11        A    Two primarily, one at River Ranch -- or let's

12   rephrase that Florida because there's been other

13   locations.  And Killarney, Ontario.

14        Q    Now, you mentioned a company with relation to

15   Mr. Townsend.  I didn't write it down, but does

16   Mr. Townsend own that company?

17        A    Yes, to the best of my knowledge.

18        Q    So if we just refer to that as Mr. Townsend's

19   company would that clearly identify it for purposes --

20        A    The company is Lake Central Air Services.

21        Q    Does Lake Central Air Services perform, or to

22   your knowledge, have they performed the installation of

23   these kits, whatever the source, on any Lake Aircraft on

24   any other Lake Aircraft other than Mr. Townsend's?

25        A    Yes.

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1      Q     How many roughly speaking?

2      A     I don't know.

3      Q     Is it possible that US owners would have flown

4   their airplanes to Mr. Townsend's company to have these

5   kits installed and fly them back into the country?

6      A     Yes.

7      Q     If they do that, is it required that Mr.

8   Townsend's company or he personally meet the FAA

9   certifications or is it required that they meet the

10  Canadian certifications?

11     A     It depends on the nature of the repair.  There

12  is some bilateral between the two countries relative to

13  the alteration or repair of the aircraft.

14     Q     Does the bilateral agreement apply to the AD

15  and the installation of the kit in response to the AD?

16     A     Yes.

17     Q     So Mr. Townsend doesn't need to have an FAA

18  certification to install these kits on US owned

19  airplanes?

20     A     That is correct.

21     Q     Is Mr. Townsend's company still in business up

22  there in Canada?

23     A     Yes.

24     Q     Now, I'm going to move on.  You had mentioned

25  communication by e-mail with Mark Young.  Is that your

1    attorney here today?

2         A     Yes.

3         Q     You mentioned Ward House.  Who is Ward House

4    please?

5         A     A Lake owner.

6         Q     Live in Florida?

7         A     No.

8         Q     Where does he live?

9         A     I want to say Georgia.

10        Q     Did he have a kit installed on his airplane?

11        A     Yes.

12        Q     Did you install it?

13        A     I don't think so.  I'm not positive, but I

14   don't think I did.

15        Q     When you say you, I mean you or your company?

16        A     I don't think we did that one.  I can't

17   guarantee it, but I don't think we did that particular

18   kit.

19        Q     So you're not sure?  Okay.  Do you have

20   records?  When I say you again, are there records that

21   either you have possession of or your company has

22   possession of that would indicate whether or not you did

23   install a kit on Mr. House's airplane?

24        A     Yes.

25        Q     Those records would be in your Bartow

1    facility?

2         A    Yes.

3         Q    What was the nature of your communication with

4    Mr. House regarding the subject matter of the lawsuit?

5         A    An alternate to the '260 patent kit.

6         Q    What do you mean by alternate to the '260

7    patent kit?

8         A    A non-infringing kit.

9         Q    Is there such a kit?

10        A    Not yet.

11        Q    So you're talking about coming up with a

12   non-infringing kit, developing one?

13        A    It's a possibility we're discussing.

14        Q    When was the last time you spoke with

15   Mr. House regarding this topic?

16        A    Yesterday or the day before.

17        Q    Was that by telephone or e-mail?

18        A    E-mail.

19        Q    What specifically would the kit -- Let me back

20   up.  Strike that.

21             What features of this non-infringing kit, in

22   your opinion, would make it non infringing?

23        A    Qualifying that I am not a patent attorney,

24   we're investigating the possibility of a non-angled or

25   non-end-angled kit.

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1      Q     We're talking about the five or six degree

2    angle that's at the end of the --

3      A     Let's call it a non-angled end board to the

4    kit.

5      Q     And in your opinion that would make such a

6    kit, if it were not angled, it would take it outside the

7    scope of the claims of the '260 patent?

8      A     I think that's possible.

9      Q     Have you engaged a patent attorney to give you

10   an opinion on that?

11     A     Not yet.

12     Q     Have you produced any of those kits yet?

13     A     No.

14     Q     Would that kit -- and I'm going to ask a

15   layman's question, so we may stumble a bit here -- would

16   that kit fall within the FAA approval that exists for

17   the Aerofab kit or would you have to seek FAA approval

18   of such a non-angled kit?

19     A     FAA approval would have to be sought.

20     Q     Do you have any idea what that would cost?

21     A     No.

22     Q     Is there some engineering and analysis that

23   would have to go along with that approval?

24     A     Yes.

25     Q     Have you spoken with any engineers to provide

Page 80

1   that analysis to you?

2        A    Yes.

3        Q    Who have you spoken with please?

4        A    Ward House.

5        Q    He's an engineer?

6        A    Yes.

7        Q    He's qualified to do the analysis then?

8        A    No.

9        Q    Have you spoken to anyone who's qualified to

10  produce the analysis to satisfy the FAA requirements for

11  the non-angled kit?

12       A    No.

13       Q    Here's a question then, why at this point in

14  time would it be in anyone's interest to produce a

15  non-infringing kit if all of the aircraft have already

16  been modified?

17       A    All the aircraft have not been modified.

18       Q    Do you have knowledge as to how many of the

19  aircraft have been modified?

20       A    How many aircraft have what?

21       Q    How many of the aircraft remain to be

22  modified?

23       A    No.

24       Q    How do you know that all of the aircraft have

25  not been modified?

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1       A       I have possession of a non-modified aircraft.

2       Q       These are non-flying aircraft?

3       A       Yes.

4       Q       So they're not airworthy?

5       A       That's correct.

6       Q       How many non-airworthy Lake aircraft are there

7  out there that would be in need of such a kit?

8       A       I don't know.

9       Q       Do you have a speculation?

10      A       With access to the NPRM that may be

11  determined.

12      Q       What is the NPRM please?

13      A       Notice of Proposed Rulemaking.

14      Q       How often, roughly speaking, do you

15  communicate with Mr. House about this non-infringing

16  kit?

17      A       Once a month.

18      Q       By the way, is it Mr. House or Doctor House?

19  I don't know.

20      A       Mister.

21      Q       And for what period of time have you been

22  communicating with him roughly once a month?

23      A       Beyond the litigation issue, a number of

24  years.  Relative to the litigation issue probably --

25  actually the service of this suit is what motivated.

1      Q     Did you know Mr. House prior to being served

2    the lawsuit?

3      A     Yes.

4      Q     Did he contribute to your defense?

5      A     I'm not sure.

6      Q     Did he contribute to the reexamination?

7      A     I'm not sure.  It's possible.

8      Q     Moving on.  Harry Lawrence, you mentioned

9    Harry Lawrence.  Who is Harry Lawrence?

10     A     Harry Lawrence is a Lake owner.

11     Q     Live in Florida?

12     A     Yes.

13     Q     Where in Florida please?

14     A     Broadly Orlando.

15     Q     Somewhere in the Central Florida area?

16     A     Central Florida.

17     Q     And do you know what model Lake Mr. Lawrence

18   owns?

19     A     LA-4-200.

20     Q     Does his aircraft have a kit installed?

21     A     Say again?

22     Q     Does his aircraft have a kit installed?

23     A     Yes.

24     Q     Do you know which kit it is, the Aerofab,

25   Canadian or some other kit?

Page 83

1      A      Yes.

2      Q      Which kit is it?

3      A      The Canadian kit.

4      Q      So he has a Canadian kit?  Okay.  When was the

5    last time you spoke with Mr. Lawrence about this

6    lawsuit, any of the subject matter of this lawsuit?  Let

7    me ask the question a different way:  When was the last

8    time you communicated with Mr. Lawrence regarding the

9    nature of the lawsuit?

10     A      Potentially two months.

11     Q      What was the nature of that discussion?

12     A      I want to say it was defense strategy.

13     Q      Do you recall exactly what about the defense

14   strategy you discussed, communicated about?

15     A      No.

16     Q      Was that via e-mail?

17     A      I don't think so.  Harry and I have e-mailed

18   because I've also e-mailed with Harry relative to

19   aircraft maintenance issues.  They have been

20   interspersed, but most of the strategy discussion was

21   verbal.

22     Q      Okay.  Has Mr. Lawrence contributed either to

23   the re-exam or to your defense or both?

24     A      He may have, but I don't actually recall if he

25   is one of the contributors.

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1     Q     How did -- you mentioned it's a number of

2 people who have contributed, we'll just limit it to your

3 defense -- how did the word get out to the aircraft

4 owners that they should contribute to your defense, I

5 mean, how did this come about?

6     A     You speak to a few, you e-mail a few, it

7 multiplies.  There's a bulletin board Lake specific.

8     Q     Were there calls to contribute to your defense

9 going out on the bulletin board?

10     A     There could have been.  I'm a very rare

11 participant on the bulletin board.

12     Q     How does one get access to the bulletin board?

13     A     You have to be a Lake Amphibian Flyers Club

14 member.

15     Q     Someone in the flyers club would give then a

16 person access to the bulletin board?

17     A     Yes.

18     Q     I assume it's password controlled?

19     A     Yes.

20     Q     You have to have a password to get into it?

21     A     Correct.

22     Q     Do you know how many members there are in the

23 Lake Amphibian Flyers Club?

24     A     No.

25     Q     Any rough idea?

1      A     Two, three, 400.  I'm not sure.

2      Q     Besides the bulletin board and e-mail, are

3  there any other written forms of communication that

4  you've had with anyone else about the nature of this

5  lawsuit?

6      A     I'm trying to recall if I've written any

7  letters about it, and I may have, but . . .

8      Q     Would you have copies of those letters if you

9  had written them?

10      A     If I had, I typically would retain a copy.

11      Q     Would those be at the Bartow facility or at

12  your home?

13      A     Probably the Bartow facility.

14      Q     Would you consider those to be in your

15  possession and control?

16      A     Yeah.

17      Q     Mr. Furnee, we mentioned Mr. Furnee.  Have you

18  communicated with Mr. Furnee about the issues in this

19  lawsuit at any time?

20      A     Yes.

21      Q     When did you last communicate with Mr. Furnee

22  about the issues in this lawsuit?

23      A     I think I visited Mr. Furnee six, eight weeks

24  ago.

25      Q     At that time did you discuss the lawsuit then?

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1        A        In casual ways, yes.

2        Q        What was the nature of that discussion please?

3        A        I believe his words also used the word

4    extortion.

5        Q        So he thinks the lawsuit is extortion?

6        A        No.

7        Q        He thinks enforcing the patent is extortion?

8        A        Yes.

9        Q        Who is Paul Furnee?

10       A        Paul Furnee.

11       Q        Does he have an occupation?

12       A        I'm sure he does, yes.

13       Q        You don't know what he does for a living?

14       A        I'm not sure.  Sometimes visible means of

15   support is not evident.  Paul is associated in some way

16   with a company called Aircraft Innovation and Repair.

17       Q        What does Aircraft Innovation and Repair do?

18       A        They may repair aircraft.

19       Q        Including Lake aircraft?

20       A        Including Lake aircraft.

21       Q        Has Paul Furnee installed kits on these

22   airplanes, on Lake aircraft, in response to the AD, to

23   your knowledge?

24       A        We have to define install.  Mr. Furnee is not

25   a certificated mechanic.  Perhaps Aircraft Innovation

1    and Repair can install the kit, but it has to be

2    returned to service by someone certified.

3        Q    Such as yourself?

4        A    Such as myself.

5        Q    They would have to have somebody come out and

6    inspect the airplane before it could return to service,

7    is that correct?

8        A    In a broad sense of summary that doesn't

9    exactly summarize the regulations, but yes.

10       Q    Tell me exactly what would have to happen if

11   Mr. Furnee went to install a kit on an airplane.

12       A    Work performed on an aircraft has to be done

13   by or under the supervision of a mechanic.

14       Q    Okay.

15       A    Certain work done within that scope has to be

16   returned to service by an IA.

17       Q    Okay.  For this particular work that's covered

18   under this AD, does that have to be returned to service

19   by an AI?

20       A    No.

21       Q    So a --

22       A    I'm saying it's not mandatory depending on the

23   kit.

24       Q    Is there a distinction in the kits that --

25       A    Yes.

1    Q    -- would require it for one kit and not for

2    another?

3    A    Yes.

4    Q    What is that distinction?

5    A    Supplemental type certificate.

6    Q    What does that mean?

7    A    It typically means an approved change to the

8    original type certificate of the airplane, i.e.,

9    supplemental type certificate.

10   Q    Just so that I'm clear because again I'm a

11   layperson.

12   A    I understand.  I'll try to keep you from

13   falling.

14   Q    Thank you.  If one goes to install an Aerofab

15   kit on a Lake aircraft pursuant to the AD, is an STC, a

16   supplemental type certificate, required in that

17   instance?

18   A    No.

19   Q    Why?

20   A    That kit was produced by the manufacturer of

21   the airplane and typically requires, I'm going to say, a

22   logbook entry by a certificated mechanic.  At least

23   that's my interpretation of the regulations relative to

24   that particular part and kit.

25   Q    To be clear, again this falls under the AD, if

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1     a certificated mechanic installs an Aerofab kit, that

2     certificated mechanic can sign off on the logbook, and

3     there's nothing further that needs to be done as far as

4     filing an STC?  If that's the right way to say it.

5          A     That would be my opinion, yes.

6          Q     Now differentiate what happens when a

7     non-Aerofab kit is installed on an airplane.

8          A     The non-Aerofab kit, let's rephrase it, the

9     Canadian kit comes with an STC, a supplemental type

10    certificate, providing the eligibility of the

11    installation of that kit on aircraft covered under the

12    AD.

13         Q     Okay.  And it comes with that STC because the

14    Canadian company sought approval for the STC some time

15    ago; is that correct?  Or it acquired the STC some time

16    ago?

17         A     Backing up a little bit.  A mechanic can do

18    anything he cares to do to an aircraft so long as it's

19    done in accordance with approved or acceptable data.

20    Okay?  Factory kit and documentation in the AD creates

21    the approval basis for installation of that kit on a

22    certificated airplane.

23              The Canadian kit, the documentation of that

24    kit, is a supplemental type certificate, which becomes

25    the approved, in this case, the approved data to install

1    it on a type certificate airplane.

2         Q    Okay.

3         A    And it has to be a United States STC.

4         Q    Okay.  So that's -- Okay, got it.  So can a

5    certificated mechanic install the Canadian kit?

6         A    Yes.

7         Q    And return the airplane to service?

8         A    No.

9         Q    How does the airplane return to service once

10   he's installed the Canadian kit?

11        A    A document typically called Form 337 is

12   executed, and then an IA determines conformance of the

13   installation in accordance with the STC.

14        Q    What happens with that 337?

15        A    A copy goes to the airplane.  A copy goes to

16   the FAA.

17        Q    When you say it goes to the airplane, does

18   that mean it goes to the logbook, or the aircraft?

19        A    In some manner, flight manual, logbook, but

20   aircraft records.

21        Q    Is it true that the 337 does not always make

22   its way to the FAA records?

23        A    I would say yes.

24        Q    Any idea how often that happens?

25        A    No.

Page 91

1      Q      But there are some airplanes out there flying

2   around which have a Canadian kit, possibly, which do not

3   have a 377 on record at the FAA?

4      A      It's possible.

5      Q      In your experience, when you've had

6   opportunity, if you have had, to look at records over

7   the years, just in general, have you known instances

8   where this situation has occurred where a 337 should

9   have been filed with the FAA, but for one reason or

10  another either didn't get filed or was maybe misplaced?

11     A      I have seen that occur.

12     Q      Okay.  Thank you.  A question about annual

13  inspections.  If you're the owner of an airplane, you

14  have a logbook, is it required -- are annual inspections

15  required, let's limit this to Lake aircraft, are they

16  required by the FAA for that plane to remain airworthy?

17     A      Yes.

18     Q      Who is qualified to do those inspections?  Do

19  you have to be an IA to do that?

20     A      Yes.

21     Q      As an IA when you look at that airplane, do

22  you also review the logbook for the airplane?

23     A      Typically, yes.

24     Q      As an IA do you look at the FAA records to see

25  which ADs would apply to that particular airplane either

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    before or during the inspection process?

2         A    Typically, yes.

3         Q    Is it the IA's job to ensure that the ADs have

4    been complied with?

5         A    No.

6         Q    Is it anybody's job to make sure the --

7         A    Yes.

8         Q    Whose job is it?

9         A    Technically it is the owner's responsibility

10   to know the status of the ADs.  In reality the IA, shall

11   we say, helps the owner create that status.

12        Q    Is it fair to say that most of these owners

13   have other occupations and may be distracted to the

14   point where they may not be aware of all the ADs that

15   apply to their airplane?

16        A    Yes.

17        Q    So it's really the IA who has superior

18   knowledge regarding which ADs apply?

19        A    Yes.

20        Q    So you're providing guidance as an IA to an

21   owner then; is that correct?

22        A    That's correct.

23        Q    Which ADs apply, and then which ones have been

24   complied with?

25        A    Correct.

Page 93

1     Q     How do you ensure that an AD has been complied

2  with as an inspector?

3     A     You can use the logbooks, previous maintenance

4  entries.  You can use previous AD lists if they are

5  documented properly.  You can use physical inspection of

6  the aircraft.

7     Q     Okay.  Is it fair to say that inspection of

8  the aircraft, an inspection of the logbooks,

9  collectively,is a superior method of ensuring that the

10  AD has been complied with as compared to reviewing 337s

11  and the FAA records?

12     A     Yes.

13     Q     Thank you.  You mentioned an AD list a minute

14  ago.

15     A     Yes.

16     Q     What is an AD list?

17     A     The regulations, and what I'm referring to is

18  what's called Federal Aviation Regulations FARs, I

19  believe the wording loosely says an owner has to have a

20  status of the ADs that could affect his airplane.  And

21  to do that it's typically put in list of tabulation.

22     Q     It's listed for the owner's convenience so he

23  can look at his aircraft type and see which ADs apply?

24     A     It's listed for that individual airplane what

25  ADs apply.

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1      Q     So there's a record that's an FAA maintained

2   record?

3      A     No.

4      Q     That's his own maintained record?

5      A     Yes.

6      Q     Once you've inspected an airplane and ensured

7   compliance with an AD, do you make a notation in the

8   logbook so that next year when you, say you go to

9   inspect the same airplane on the annual inspection, you

10  don't cover the same ground, and then have to go back

11  again and ensure compliance with an AD you already

12  ensured compliance with last year?

13     A     That list can be very handy.

14     Q     Is it a requirement -- Well, let me back up

15  and lay a predicate.  When the AD is complied with for

16  one of these aircraft, a logbook entry is required; is

17  that correct?

18     A     Yes.

19     Q     Does that logbook entry necessarily, should

20  it -- rephrase -- should that logbook entry include the

21  identification of the source of the kit?

22     A     It should.

23     Q     Thank you.  We've mentioned the Aerofab kit

24  today, and we've mentioned the Canadian kit, the JCM

25  kit, for which there was a supplemental type

1    certificate, or should say "is" because it is probably

2    still present tense, is there, to your knowledge, any

3    other kit approved or not approved that has ever been

4    installed on a Lake aircraft to comply with this AD?

5         A    Yes.

6         Q    What was the source or how many different

7    sources --

8         A    Let's probably not include the word "kit".

9         Q    Okay.

10        A    But alternate means of compliance.

11        Q    A-M-O-C, an AMOC?

12        A    AMOC.

13        Q    Okay.  Describe if you could please, what is

14   an AMOC?

15        A    An alternate means of compliance.  That is an

16   AMOC.

17        Q    Why would an aircraft owner use an AMOC as

18   opposed to either the Canadian STC kit or the Aerofab

19   kit, what would the reasons be for that?

20        A    That's speculation on my behalf.

21        Q    You said you had knowledge that somebody has

22   done this on their airplane?

23        A    Yes.

24        Q    How many individuals?

25        A    I have absolute knowledge of one.

1      Q    Describe what that alternate means of

2  compliance is please?

3      A    The owner retained an engineer to prepare

4  documentation of an alternate means of compliance.

5      Q    Did it include a -- did it include components

6  that were relatively similar to the patented kit?

7      A    Yes.

8      Q    Who was that owner please?

9      A    Say again?

10      Q    Who was that owner again?

11      A    Oh, I'm getting old.  I'll think of it in a

12  minute.  The owner committed suicide, and I have a

13  mental block on that.  But prior to the owner's demise

14  he retained an engineer, who must submit his

15  documentation to the FAA, have it approved, and then the

16  owner can produce the parts for the compliance.

17      Q    The owner can produce the parts for

18  compliance?  So there is a method for the owner to

19  fabricate their own parts to comply with the AD?

20      A    Yes.

21      Q    But that would require an AMOC?

22      A    Yes.

23      Q    Are those AMOCs approved on a one-by-one basis

24  by the FAA?

25      A    To the best of my knowledge, yes.

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 97

1    Q    And to your knowledge, there's only been one

2    aircraft owner who has done that?

3    A    No, I said I'm positive of one that has been

4    completed.

5    Q    Do you have knowledge of others that were

6    started?

7    A    Some were started.  I don't know their status.

8    Q    Would there be records at the FAA that would

9    indicate whether an AMOC had been approved for a

10   particular aircraft?

11   A    I don't know.

12        MR. THOMAS:  Let's go off the record, and note

13       the time, if you would.  I have 12:00.  Mark, do

14       you agree with that?

15        MR. YOUNG:  Yeah.

16          (Off the record at 12:00 PM.)

17          (Back on the record at 12:55 PM.)

18   BY MR. THOMAS:

19   Q    One question about the aircraft owners who

20   came to you or your company for compliance with the AD,

21   for those you said that some of the kits you installed

22   were the Aerofab kits and some of them were the Canadian

23   kits?

24   A    Yes.

25   Q    Who made the determination which kit would be

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    installed on a particular owner's airplane?

2         A    The owner.

3         Q    Did they rely on your recommendation for which

4    kit to select?

5         A    Occasionally.

6         Q    When you had the opportunity to recommend a

7    kit, did you recommend one kit over the other generally?

8         A    No, both complied with the AD.

9         Q    Both complied with the AD, and there was

10   virtually no difference in the kits; is that correct?

11        A    In the compliance, the effective compliance

12   with the AD, there was no difference.

13        Q    The Canadian was a cheaper kit than the

14   Aerofab kit?

15        A    There was a difference in price.

16        Q    You would communicate that to the aircraft

17   owner?

18        A    Yes.

19        Q    Generally speaking, would the aircraft owner

20   make a determination which kit to use just simply based

21   on price then?

22        A    Not always.

23        Q    Some selected the Aerofab kit even though it

24   was more expensive?

25        A    Yes.

1       Q       Now, you own a flying Lake aircraft, correct?

2       A       I own a what?

3       Q       You own an airworthy Lake aircraft, correct?

4       A       Yes.

5       Q       You had the Canadian kit installed on your

6    aircraft; is that correct?

7       A       Yes.

8       Q       What is the identification of your airplane?

9       A       November 80125.

10      Q       Did you file a 337 with the FAA for your

11   aircraft?

12      A       Yes.

13      Q       Have you ever owned any other Lake airplanes?

14      A       Briefly.

15      Q       When was that?

16      A       We're talking about 14 years ago.

17      Q       What was -- Do you recall the identification

18   of that airplane?

19      A       No.  I was assisting -- It had been a foreign

20   registered airplane.  It needed to be registered to a US

21   entity to achieve US registration.  And the owner

22   entrusted me with the ownership of the airplane to

23   accomplish that.  Then the aircraft was subsequently

24   sold.

25      Q       Do you have documentation in either your

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1   possession or in your company's possession that would

2   indicate the date you installed the kit on your

3   airplane?

4        A    Yes.

5        Q    Would that be in your possession or your

6   company's possession?

7        A    Yes.

8        Q    Both?

9        A    It's probably in the company possession.

10       Q    Physically located in the Bartow facility?

11       A    Yes.

12       Q    Do you recall what date that was?

13       A    No.

14       Q    Do you recall month or year?

15       A    '01, '02.

16       Q    So if we requested that documentation from you

17  again, you would be able to produce it?

18       A    You've got a 98 percent chance of getting it.

19       Q    Did you have anybody assist you in installing

20  that kit on your airplane?

21       A    I may not have personally installed the kit,

22  but my entity may have installed the kit.

23       Q    Let's see.  The other aircraft that you owned

24  14 years ago, did you -- was that aircraft transferred

25  from your ownership prior to the AD coming out?

1       A     Yes.

2       Q     So that kit really while you owned it, wasn't

3   subject to the AD?

4       A     It was 14 years ago.  When was the AD issued?

5       Q     Right.

6       A     Thank you.

7       Q     I'm just making sure.

8       A     I'm trying to keep you from stumbling.

9       Q     I don't believe you told me when you sold it.

10  I think you told me you owned it 14 years ago.

11      A     It was probably within a year of us acquiring

12  it.  Our sole reason for assuming ownership of the

13  airplane was to assist the owner in selling the

14  airplane, or the foreign owner.

15      Q     The other aircraft, I think you mentioned 40

16  plus 26, if I've got the number right, so 66 aircraft

17  total?

18      A     About.

19      Q     You installed or your entity installed kits

20  on, do you recall the time frame that that spanned?

21      A     '01, '02.

22      Q     The documentation that you have in your

23  possession or in your company's possession, would it

24  indicate more precisely what dates those installations

25  were done?

1       A    Yes.

2       Q    Were you involved in any way in the process

3  that led to the issuance of the AD?  What I mean by that

4  is, did you participate with communication with the FAA

5  regarding the AD?

6       A    Yes.

7       Q    In what manner did you communicate?

8       A    We're going to talk here for just a minute.

9  When we got word of the Australian crack, there was an

10 aircraft in my shop that we were repairing, doing

11 some -- we had just initially started doing some

12 corrosion work on it, which entailed removing the wings.

13          When we compared those wings to the

14 information from the Australian report, we found

15 identical cracks.  This was communicated to Aerofab.

16 And, in my opinion, largely ignored.  Okay?

17          Subsequent to that my company spent thousands

18 of dollars to acquire equipment to allow for a

19 relatively easy inspection of the wing spars on numerous

20 Lake Amphibians, numerous probably in the neighborhood

21 of 20 to 30, to determine if cracks were present in a

22 wider range and models of the aircraft.

23          The results of those inspections were

24 communicated with the FAA.

25      Q    When you say you purchased equipment, what

1   kind of equipment was that?

2        A     It's technically called a borescope.

3        Q     It allows you to get up there and look?

4        A     This particular spot required a very specific

5   diameter and a mirror to be able to look at it.

6        Q     And a light, was there a light associated with

7   that as well?

8        A     It was a lighted borescope video camera.

9        Q     You provided that inspection data to the FAA?

10       A     Yes.

11       Q     Other than that, did you provide any

12   information or communication with the FAA regarding the

13   AD process?

14       A     I don't think I was a commenter on the AD, per

15   se.  I do remember writing a letter encouraging,

16   basically encouraging, the FAA to get off of dead

17   center, and let's do something.

18             As a person who operates Lake Amphibians, I

19   don't want to be going through the clouds.  There's no

20   flight manual provision.  There's no instruction

21   available to teach you how to deal with a wing

22   separating from an airplane.

23       Q     Were there ever any in-flight airframe

24   failures due to this problem, the cracks in the wings?

25       A     Due to the wing cracks, no.

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1          And one other recorded incident on that, I did

2     a -- a potential buyer asked me to do what is referred

3     to do as a pre-buy on an airplane, pre-purchase --

4          Q     Inspection?

5          A     Yeah.  And I went to that aircraft, and on

6     that aircraft I found a severely cracked lower support

7     cap and doubler.  That airplane was the proverbial train

8     waiting for the wreck.

9          Q     So you may have saved somebody there by

10    finding that then?

11         A     Potentially, yes.

12         Q     This was a serious issue with these aircraft?

13         A     That issue was reported, you know, on that

14    serial number of that particular instance; but yes, this

15    is a serious issue with the airplane.

16         Q     We talked about the Canadian kit.  We talked

17    about the Aerofab kit.  We talked about the AMOC, the

18    one known instance by you where you had personal

19    knowledge.  As far as you know, was there ever any other

20    kit produced to either comply with the AD or at least

21    I'll say repair the wing to the point where it would be

22    safe to fly the airplane?

23         A     I don't have -- I don't have any knowledge of

24    a kit marketed for that purpose.  Like I say, some

25    owners did AMOCs.  I have specific knowledge of one --

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    Q    One of those?

2    A    -- compliance.

3    Q    In your opinion as a mechanic and an IA, what

4    is the best way to determine the source of one of these

5    kits that's installed on an aircraft?

6    A    Logbook.

7    Q    Logbook is the best way?  What about physical

8    inspection of the airplane?  Again, we're trying to

9    identify the source, Aerofab versus Canadian, not

10   whether the kit's installed or not, but who made it.

11   A    Right.  The installed appearance of the kits

12   are very similar depending on the fasteners used and

13   other things that could have occurred on installation.

14   It's not a hundred percent of just looking at it.

15   Q    If you had -- I'll follow up with, are some of

16   these kits ever painted over?

17   A    Yes.

18   Q    Does that painting have to be done by a

19   certificated mechanic?

20   A    No.

21   Q    I assume the paint would be to prevent

22   corrosion; is that correct?

23   A    Yes.  Or some people are very aesthetic.

24   Q    They want it to look pretty up in there?

25   You're waving your hands.

1      A    I'm waving my hands, but some people are

2    particular about the appearance of their aircraft.

3      Q    I understand.  If you were to be handed a kit

4    that was either, say either Canadian or Aerofab, could

5    you distinguish by holding in your hands the parts of

6    the kit as to whether it was a Canadian or an Aerofab

7    kit?

8      A    If it were unpainted, if it were in its

9    original state --

10      Q    As it came from the factory.

11      A    -- from the two sources, yes.

12      Q    You would be able to?  What would be the

13    distinguishing identifier of one kit over the other?

14      A    The part number identifications, the QA

15    markings.

16      Q    That would be the markings themselves, not

17    physical features of the kit?

18      A    A slight difference in color, but right now I

19    couldn't tell you which one looked which way.

20      Q    If I showed you a picture of a kit, would you

21    be able to identify which kit it is?

22      A    Not necessarily.

23      Q    Let me show you such a photograph.

24      A    Okay.

25      Q    We're going to make this Exhibit B.  I'm

1    handing you a photograph.  First of all, let me ask:

2    Does that look to you the type of kit we're talking

3    about here?

4          A    This does appear to be the type of kit we're

5    talking about.

6          Q    Can you tell from any aspect of the photograph

7    there whether this would be a Canadian kit, Aerofab kit

8    or some other kit?

9          A    This appears to be a Canadian kit.

10         Q    How can you tell?

11         A    I want to say that the AC number, if my memory

12   is correct, that is the identification that they placed

13   on the components of the doubler and the filler.

14         Q    You feel that was a JMC nomenclature that was

15   placed on that part?

16         A    Correct.

17         Q    Is there any -- when you look at this

18   photograph -- is there any doubt in your mind that this

19   is a kit that was one of the kits that you installed on

20   these aircraft in order to achieve compliance with the

21   AD?  In other words, is there anything on this

22   photograph that tells you this is some other kit?

23         A    No.

24         Q    Is there anything in this photograph that is

25   left out?  In other words, is this a photograph of a

1    complete kit?

2         A    This appears to be a photograph that is

3    capable of doing one wing.

4         Q    Okay.  I understand.

5         A    Okay.

6         Q    You would require two of these to do an entire

7    aircraft?

8         A    That's correct.

9         Q    I should have asked this before:  There's no

10   difference between -- there's no left and right kit; is

11   that correct?

12        A    That's incorrect.

13        Q    There is a left and a right?

14        A    The Aerofab kits are considered left and

15   right.  The Canadian kits are not marketed as a left and

16   right kit.  I'm trying to remember if the JCM kit was

17   actually marketed by the wing or by the aircraft.  I

18   know you could buy a single wing if you chose to.  But

19   the JCM kit was not marked left or right.  Aerofab kit

20   was marked left or right.

21        Q    Okay.  They were marked, okay, there was a

22   difference in the marking between the two, but was there

23   a difference in the physical difference in the kits that

24   caused one kit to be left or right, the Aerofab, and

25   allowed the JCM kit not --

1        A    If we're defining, physical difference was the

2    shape of --

3        Q    Dimensions of --

4        A    -- the dimensions and so forth.  There's no

5    difference between left and right.

6        Q    Okay.  So you didn't have to worry if you had

7    the Aerofab kits in your hand, when I say kits, if you

8    had a complete aircraft kit --

9        A    To do an aircraft.

10        Q    -- to do an aircraft, one for each wing, you

11    really didn't have to worry about which one of those

12    kits went on which wing when you did the Aerofab; is

13    that correct?

14        A    Yes, you did.  Because the Aerofab kit was

15    marked.

16        Q    Because they were marked that way?

17        A    Correct.  Let me rephrase that.  They were

18    marked in a fashion that required appropriate left or

19    right orientation.

20        Q    But again, just to be clear, to your

21    knowledge, there was no dimensional distinction between

22    the left and the right kits?

23        A    That is correct, no dimensional difference.

24        Q    Going back to this photograph for a second.

25    You've identified it as a Canadian kit I think you said

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1  by the nomenclature.  Other than the nomenclature is

2  there anything in this photograph, I'll say from a

3  dimensional aspect as you look at these components on

4  here, that would tell you that this is a Canadian kit?

5       A    There's a possibly that the length of the

6  bolts, the thread style of the bolts, and the head style

7  of the bolts would also tend to indicate that this is a

8  Canadian kit.

9       Q    There was some differentiation in the bolts

10 that came with the kit between the Aerofab and the

11 Canadian kit?

12      A    Yes.

13      Q    Other than the bolt differences, is there

14 anything in this photograph you would use to identify

15 this as Canadian versus Aerofab kit?

16      A    I'm dealing on memory now that's approaching

17 ten years old, but two of the nutted fasteners may be

18 different from the Aerofab kit.

19      Q    Those look like the kind of fasteners that

20 have nylon inserts; is that correct?

21      A    That's not the two I'm referring to.  The

22 other fasteners do indeed have a nylon insert.

23      Q    Self locking of some type, or anti --

24      A    Yes.

25      Q    -- back out type feature?

 1        A    Yes.

 2        Q    Looking at the straps, is there any feature of

 3    the straps that would tell you, other than the marking

 4    on the strap, is there any dimensional feature on the

 5    strap that would tell you that this is a Canadian kit

 6    versus an Aerofab kit?

 7        A    From this picture, no.

 8        Q    Is there any physical difference in the

 9    Canadian straps, say not in this picture, but just that

10    you recall?

11        A    To hold it in hand, there's a possibility of a

12    bevel on one end, but other than that.

13        Q    Other than that, no?

14        A    Right.

15        Q    Is it an FAA requirement that aircraft owners

16    maintain these logbooks that we've been talking about

17    today?

18        A    I'm mentally trying to review the regulation

19    applicable.  There may be a requirement that the owner

20    sees that an entry is made, but not actually make the

21    entry.

22        Q    I understand.  Thank you for being detailed.

23    Is there a requirement, generally, that each aircraft

24    have a logbook?

25        A    Yes.

1      Q      And is it generally the aircraft owner's

2   responsibility to make sure the logbook is up-to-date no

3   matter who makes the entry?

4      A      That could be the regulation.

5      Q      I'll flip the question around the other way,

6   and just make sure we're talking -- we're saying the

7   same thing.  Is it likely that there would be an

8   airworthy Lake aircraft out there in the US that did not

9   have a logbook?

10     A      Logbooks have been lost, so there is that

11   possibility.  Is it likely?  No.

12     Q      It would be a rare occurrence?

13     A      I would consider it a rare occurrence.

14     Q      If you lose a logbook, what do you do if

15   you're an aircraft owner?

16     A      There is a process that you go through.  You

17   can find other records to substantiate work done on the

18   airplane, physical inspection of the airplane to

19   determine the applicability or the compliance of ADs,

20   maintenance invoices, the shop records of where you had

21   your airplane worked on.

22     Q      Is it fair to say most of those records would

23   reside with the mechanics who did the work or the shops?

24     A      It would depend on the shop.  Some shops keep

25   nothing.  Some shops keep more.

1     Q     Is there an FAA requirement that the shops

2  keep records as to which aircraft they worked on, who

3  did the work, et cetera?

4     A     If the shop is a certificated repair station,

5  they are required to keep records for a given period of

6  time, typically 12 months.

7     Q     That's all, just 12 months?

8     A     Twelve months.

9     Q     Staying with the records issue for a minute.

10  You said that you have some records or your company does

11  at the Bartow facility regarding the installation of

12  these kits on particular airplanes.  Other than the

13  logbook, I should say the logbooks that are in the hands

14  of the owners, and those records that you have already

15  mentioned, do you know of any other documents that would

16  identify which kits have been installed on which

17  airplanes?

18     A     If the owner had a receipt of the purchase of

19  his kit; the logbook entry as you've stated; a 337 filed

20  with the FAA if it was executed in conjunction with a

21  Canadian kit; that's a pretty inclusive list.

22     Q     To your knowledge, how many shops or mechanics

23  participated in the installation of these kits on these

24  airplanes to achieve compliance with the AD?

25     A     No.

1      Q    Let me back up.  Do you know of other shops

2    who did this work?

3      A    Yes.

4      Q    Can you list for me the ones you know about?

5      A    Aircraft Innovation and Repair.

6      Q    Any others?

7      A    I could think of some, but none off -- Lake

8    Central in Canada; Talon Aviation, Puyallup, Washington.

9    There are very few shops that specialize in that

10   aircraft, so other shops would be onesies and twosies.

11     Q    A question about the installation of these

12   kits on wings, and then those wings being installed on

13   other airplanes other than the original airplane; does

14   that happen?

15     A    Yes.

16     Q    To your knowledge, how often, is that a rare

17   occurrence, onesie, twosie?

18     A    I would put it in rare occurrence.

19     Q    If a kit were installed on a wing, and then

20   that wing were removed from an airplane and installed on

21   another airplane, the entire kit would go with the wing;

22   correct?

23     A    Yes.

24     Q    In a situation like that would the compliance

25   with the AD from the logbook of the first airplane be

1    translated to the logbook of the second airplane that

2    accepted the wing?

3         A    It could, but not necessarily.

4         Q    Would you lose track then if you're the owner

5    of that rebuilt airplane with the wing that came from

6    somewhere else, would your logbook of that airplane not

7    show -- would it lack -- show in compliance with the AD?

8         A    No, it could -- the person installing the

9    replacement wing could make a logbook entry, "AD

10   complied with by installation of doubler kit."  Okay?

11   So it would be a previously complied with Airworthiness

12   Directive.

13        Q    I guess my question is:  The logbook of the

14   newly built airplane would have to have some indication

15   of compliance with the AD; would it not?

16        A    I believe I just mentioned that the person

17   installing the wing could inspect the wing and determine

18   that it had been complied with.  That person may not be

19   knowledgeable enough to determine which kit, but in all

20   likelihood compliance.

21        Q    Now, this is the second time -- this lawsuit

22   is the second time you've been a defendant in a lawsuit

23   over this patent; is that correct?

24        A    Yes.

25        Q    The first lawsuit was filed a number of years

1    ago, correct?

2         A    Correct.

3         Q    That lawsuit was voluntarily dismissed by the

4    plaintiff; is that correct?

5         A    To my knowledge, yes.

6         Q    Who was your attorney for that first lawsuit

7    if you had one?

8         A    His name was Jim Buesse.

9         Q    And he's in Orlando; is that correct?

10        A    Yes.

11        Q    Mr. Buesse is a patent attorney?

12        A    Yes, I believe so.

13        Q    During the course of that previous lawsuit the

14   re-exam request was filed with the US Patent Trademark

15   office; is that correct?

16        A    Yes.

17        Q    And isn't it true that Enpat -- that there

18   was -- Let me back up.  Isn't it true that your attorney

19   moved for a stay pending the outcome of the

20   reexamination in that original lawsuit?

21        A    Exactly what he did, I'm not sure of.  I mean,

22   I hired an attorney to do the legal side of it.

23        Q    So you're not sure if he moved for a stay of

24   the proceedings in the initial lawsuit?

25        A    No, I'm not sure.

Page 117

1          Q     Okay.  Did you ever get an opinion of any

2     attorney -- Let me back up, and say this a different

3     way.  Did you ever see an opinion of an attorney that

4     the kit you have installed on your aircraft does not

5     infringe the '260 patent?

6          A     Yes.

7          Q     Who produced that opinion?

8          MR. YOUNG:  Objection to the extent we're

9          getting in attorney-client privileged information.

10    BY MR. THOMAS:

11         Q     Let's find out who produced it.  I don't think

12    that's privileged.  Then we can determine whether

13    there's a privilege or not.

14         A     Jim Salter (phonetic).

15         Q     Where is Mr. Salter located or where was he

16    located at the time?

17         A     I believe he was located in California.

18         Q     Did you pay him for that opinion?

19         A     No.

20         Q     Did you execute a contract with him to secure

21    that opinion?

22         A     No.

23         MR. THOMAS:  I'm going to assert that there

24         was no attorney-client relationship.

25         MR. YOUNG:  Do you want to discuss that now?

1    BY MR. THOMAS:

2        Q    Let's don't discuss it now.  I'm going to ask

3    you:  What was his opinion?

4        A    His opinion was the patent was invalid.

5        Q    Well, the specific question I had was:  Did

6    you secure an opinion regarding infringement of this

7    patent, separate issue from invalidity?

8        A    I'm going to say that -- I want to say that

9    the information provided by Mr. Salter was intended to

10   constitute an opinion of non infringement relative to

11   the '260 patent.

12       Q    Okay.  By that, do you mean that the kit -- it

13   was his opinion that the kit that was installed on the

14   airplane, on your airplane, did not come within the

15   scope of the claims of the '260 patent, or do you mean

16   to say that his opinion was that the '260 patent was

17   invalid, and therefore not enforceable?

18       A    I would lean towards your latter comment as

19   being correct.

20       Q    That more of the opinion went to the validity

21   as opposed to infringement?

22       A    Correct.

23       Q    When was that opinion given to you?

24       A    I want to say plus or minus a few months,

25   2002.

1        Q    Was that given to you in written form?

2        A    Yes.

3        Q    Do you have a copy of that opinion?

4        A    Yes.

5             MR. THOMAS:  Was that produced, do you recall?

6             MS. SWARTZ:  I don't recall seeing it.

7             MR. THOMAS:  I'm just going to ask, was that

8        produced in the response to the request to produce?

9             MR. YOUNG:  Do you want me to answer?

10            MR. THOMAS:  Yes.

11            MR. YOUNG:  No, it wasn't?

12   BY MR. THOMAS:

13       Q    You do have a copy of it?

14       A    Yes.

15       Q    When I say you --

16       A    Yes.

17       Q    -- personally have a copy of it?

18       A    It's at the office.

19       Q    It's in your possession or control?

20       A    Yes.

21       Q    Why was it Mr. Salter's opinion that the

22   patent was invalid?

23       A    Mr. Salter --

24            MR. YOUNG:  Objection to the extent we're

25       getting into privileged information.

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1          MR. THOMAS:  The question stands on the table.

2      You can either instruct to not answer the question

3      or we can get an answer.

4          MR. YOUNG:  Could we have a minute?

5          MR. THOMAS:  Sure.

6               (Off the record at 1:30 PM.)

7               (Back on the record at 1:32 PM.)

8  BY MR. THOMAS:

9      Q    While you were out we talked about marking the

10 copies of the certifications Exhibit C.  And what we've

11 done is, we've asked the court reporter to mark these

12 confidential.  These will go in a separate envelope when

13 the transcript is produced.

14         MR. YOUNG:  My only concern is the personal

15     information that may be on those.

16         MR. THOMAS:  I understand.

17 BY MR. THOMAS:

18     Q    I think the question was:  What were the

19 reasons stated by Attorney Salter to support his opinion

20 of invalidity?

21     A    I don't recall all of the reasons, but Mr.

22 Salter is a patent attorney with a reputable patent

23 firm, who had an interest in Lake Amphibians as a Lake

24 owner.  And in his opinion on each claim of the '260

25 patent went through and said it's not valid because of

1    this.  He just touched on every point of the '260 patent

2    with an opinion of why it was not valid.

3         Q    Is he still a Lake owner, do you know?

4         A    I don't know.

5         Q    Have you ever spoken with him personally?

6         A    I spoke with him in the very beginnings of

7    these proceedings, meaning the very beginnings of the

8    reexamination.

9         Q    Have you communicated with him in any written

10   form since the lawsuit started?

11        A    Define lawsuit.

12        Q    This particular lawsuit.

13        A    No.

14        Q    Have you communicated with him in written form

15   at any time?

16        A    I'm sure I have.

17        Q    E-mail?

18        A    I'm not sure.  I'm going to say possibly, yes,

19   with Jim.

20        Q    Is it possible that you would have copies of,

21   you know, your written communication?

22        A    It's possible.

23        Q    Would it be in the banker's box?

24        A    There's a very good chance, if we have it, it

25   would be, and realizing that's approaching ten years

1   ago.

2       Q    I appreciate that.  Memories are what they

3   are.  Thank you.

4            Other than the opinion of Mr. Salter and

5   present counsel accepted, have you seen any opinion by

6   any patent attorney that addressed the issue of either

7   invalidity or infringement?

8       A    Yes.

9       Q    When did you see this opinion?

10      A    Through the course of the reexamination.

11      Q    Other than -- You're talking about the

12   re-exam, the actual documents filed in the re-exam?

13      A    Yes.

14      Q    Other than that, have you seen any opinion

15   expressed by an attorney regarding invalidity or

16   infringement?

17      A    Not what I would consider acceptable.

18      Q    Not credible?

19      A    I won't say not credible, but maybe

20   acceptable.

21      Q    Define what you mean by not acceptable?

22      A    The few times I ventured onto the forum some

23   people reputed to be attorneys rendered ideas about the

24   invalidity of the situation, so.

25      Q    When you say the forum, you mean the bulletin

1    board?

2         A    The bulletin or forum, yes.

3         Q    The one you mentioned before?

4         A    Yes, that is the same.

5         Q    The postings on that bulletin board, do they

6    persist indefinitely?

7         A    I don't know.

8         Q    Who would know that answer?

9         A    I don't know.

10        Q    Somebody at the Lake Aircraft -- forgive me

11   for not knowing the name of the club.  I thought I wrote

12   it down.  Somebody at the Lake Aircraft owners --

13        A    There is a possibility that someone at the

14   Lake Amphibian Flyers Club may know the status of those

15   postings.

16        Q    How long has that bulletin board been in

17   operation, to your knowledge?

18        A    To my knowledge, maybe ten years.  I'm not

19   sure of that because I am not an active participant.

20        Q    You mentioned that there was an opinion

21   expressed in the reexamination papers that were filed.

22   The question I had asked was:  Do you know of any

23   opinions regarding infringement or invalidity, but the

24   opinion that was filed and the re-exam was really,

25   really focused on invalidity, correct?

1      A     That is correct.

2      Q     The infringement at that point wasn't an

3  issue, the re-exam itself?  The infringement of any

4  particular airplane's kits as in regards to the patent

5  wasn't really an issue in the re-exam, the re-exam was

6  focused on invalidity, correct?

7      A     To my knowledge, again I'm not a patent

8  attorney, but to my knowledge that was the focus of the

9  re-exam.

10     Q     You're aware the ultimate outcome of the

11 reexamination was that all of the claims of the '260

12 patent were upheld as valid?

13     A     I intuitively disagree with that.

14     Q     Why do you disagree with that?

15     A     My opinion of what I've read, as a layman, to

16 keep me from stumbling, was that the patent was upheld

17 on one of its 14 claims.

18     Q     That's what you understand occurred in the

19 reexamination?  So, in other words, the other 13 claims

20 were invalidated; is that what you think?

21     A     Yeah.

22     Q     I don't believe that's correct, but I'm here

23 to coach.

24     A     You have your opinion.

25     Q     So I'm only here to ask.

1        A      That's right.

2        Q      Did you read the complaint that was served on

3     you in this case?

4        A      Yes.

5        Q      Your attorney filed an answer with defenses

6     and counterclaims.  Did you read the answer that your

7     attorney --

8        A      Yes.

9        Q      -- served on us?

10       A      Yes.

11       Q      There was an assertion under the general

12    allegations -- this is, just for reference sake, it was

13    allegation nine -- "The anticipated cost for compliance

14    with the NPRM would have been approximately $40,000 or

15    more per airplane."  And that was denied by your

16    attorney.

17       A      Yes.

18       Q      And tell me why that was denied please.

19       A      Because I complied with the existence of

20    cracked spars for approximately $20,000 per aircraft.

21       Q      This is prior to the availability of the kit?

22       A      Yes.

23       Q      Allegation ten is read like this, this was

24    also denied.  "In response to the NPRM non-party

25    Aerofab, Inc. developed a wing spar modification kit

1   that could be installed on Lake aircraft to address the

2   problem identified in the NPRM while avoiding the costs

3   and expense and risks associated with removing the

4   aircraft wings."

5          I know that's a long sentence.  I'll read it

6   again if you like.

7          A    Go ahead.

8          Q    "In response to the NPRM non-party Aerofab,

9   Inc. developed a wing spar modification kit that could

10  be installed on Lake aircraft to address the problem

11  identified in the NPRM while avoiding the costs, expense

12  and risks associated with removing the aircraft wings."

13         That was denied.

14         A    Okay.

15         Q    But isn't that in fact an accurate statement?

16         A    I'm going to say no.

17         Q    Why is it not accurate?

18         A    There's another inventor.

19         Q    Okay.  Who is the other inventor?

20         A    Elton Townsend.

21         Q    Why do you claim that Elton Townsend is an

22  inventor?

23         A    Elton provided the doubler concept for the

24  repair of the wing.

25         Q    How do you know this?

1      A    I've seen the communication from Elton to the

2  inventors, actually specifically to Jack Tarbox, prior

3  to a doubler being an option to repair the airplane.

4      Q    Jack Tarbox being one of the inventors who is

5  a named inventor on the patent?

6      A    That is correct.

7      Q    I'm going to present a couple of things to

8  you.  One is a copy of the patent itself.  I've handed

9  it to your attorney to look at, and then if you could

10 take a quick look.  If you'd identify that as -- if you

11 could let me know if you identify that as the patent

12 that we're talking about.

13     A    That appears to be the '260 patent.

14     Q    That is going to be Exhibit D.  I'm going to

15 show you now a copy of what looks like a fax, and at the

16 top it says, "Lake Central Air Services."  We'll mark

17 this as Exhibit E.

18          Now, you said you saw the communication from

19 Mr. Townsend to Tarbox, correct?

20     A    Yes.

21     Q    Is that the communication that you're talking

22 about?

23     A    That appears to be the communication we're

24 talking about.

25     Q    So that's then Exhibit E.  Okay.  If you would

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 128

1    take a minute and look at that, do you have any

2    knowledge, first of all, the date appears to be February

3    2nd, 1999?

4         A    I would agree with that.

5         Q    At least that's what's on the face of the

6    document.  Amazingly enough almost exactly 12 years ago.

7              Do you have any knowledge as to how far along

8    in the development process Tarbox was when he received

9    this fax?

10        A    We're dealing with memory only ten years out.

11   At that point it appeared to me as a maintenance entity

12   that there had not been much progress in the repair.

13        Q    Do you have any documentation to support that

14   appearance?

15        A    It's possible, but I'm not positive because

16   there were early additions of paperwork relative to this

17   that reflected changing the spar caps.

18        Q    Okay.  Were you in communication with Tarbox

19   prior to the date about this issue with these airplanes?

20        A    Yes.

21        Q    Prior to date of this fax?

22        A    Yes.

23        Q    Did he share with you his concepts for fixing

24   the problem of the airplane?

25        A    No.

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    Q    How did you come to receive this fax?  I know

2    we have it here today, but you've seen it before today,

3    correct?

4    A    Yes, sir.  If you notice, my name is on the

5    cover sheet.  I believe it might be evident that Elton

6    Townsend sent it to me.

7    Q    Why did he send it to you and not to Tarbox?

8    A    To my knowledge, it had been previously

9    communicated with Tarbox.  If you'll note the date on

10   the cover sheet and the actual date, if it's accurate of

11   the fax date header, are a little bit different.  And I

12   believe Elton had previously communicated this with

13   Mr. Tarbox.

14   Q    Actually they're quite a bit different, aren't

15   they?  On the top of sheet it has what appears to be May

16   7th, 2001?

17   A    That's what it has.

18   Q    And that's more than two years after the date

19   that's written into the box there on the actual fax

20   itself?

21   A    That's right.

22   Q    Okay.  Do you recognize that number there,

23   (705)687-8983?

24   A    I know the 705 code appears to be the code I

25   would associate with Lake Central.

1      Q     In Canada?

2      A     In Canada.  If we look at his letterhead, it

3  bears a strikingly similarity to one of the numbers.

4      Q     Sure.  Okay.  Now, if you look back at the

5  body, look at the second page of the fax, there's a

6  diagram and handwritten words on there.  Well, let's

7  look at the entire fax.  This fax consists of four

8  sheets, one of which is a cover sheet, correct?

9      A     I agree.

10     Q     Does this look like a complete copy of the fax

11  to you?  In other words, is it missing anything?

12     A     It to my knowledge, it's not missing anything.

13     Q     This is a document upon which you rely for

14  your assertion that Elton Townsend was a co-inventor?

15     A     Yes.

16     Q     Is there any other document other than this

17  document upon which you rely for your assertion that

18  Elton Townsend is a co-inventor of the patent?

19     A     No.

20     Q     Is there any other person you know of, say

21  other than Mr. Townsend himself, who would testify that

22  he was a co-inventor?

23     A     I don't know of anyone.

24     Q     Looking at the second page of the fax, does

25  the filler plate show up anywhere in here?

Page 131

1      A     No.

2      Q     What about on the second page?

3      A     No.

4      Q     What about on the third page?

5      A     No.

6      Q     What about on the fourth page?

7      A     I don't see any mention of a filler plate.

8      Q     Is there any mention of the coating for the

9   doubler plate?

10     A     No.

11     Q     It doesn't address coating of the doubter

12   plate?

13     A     To my knowledge, no.

14     Q     Does it address anywhere in this fax is it

15   described or addressed the upper inboard end angle of

16   the strap?

17     A     No.

18     Q     Is there any mention of 4340 steel being used?

19     A     No.

20     Q     Is there any mention in this fax of

21   Mr. Townsend's of heat treating the doubler-straps to

22   180,000 PSI?

23     A     I don't think so.

24     Q     Is there -- We've already said the

25   filler-straps aren't mentioned.  There's no mention of a

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    five-degree angle on the doubler-strap in this fax?

2        A    No.

3        Q    No mention of a six-degree angle on the lower

4    doubler-strap?

5        A    No.

6        Q    No mention of the doubler-strap being

7    protected by a powder coating that is heat cured to

8    perform a ceramic coating?

9        A    No.

10        Q    No mention of an alodine conversion coating on

11    any of the parts here in this fax?

12        A    No.

13        Q    No mention of an epoxy primer, correct?

14        A    Correct.

15        Q    Again, I'm a layperson, but looking at the

16    drawing on the second page, if we kind of run down the

17    spar, there's a series of looks like five original

18    boltholes, correct?

19        A    There appears to be five original.

20        Q    Then continuing on down the spar he says,

21    three additional holes, correct?  And he has little

22    arrows there.  Do you see where I'm talking about?

23        A    Correct.

24        Q    Then there's a note at the bottom of the page,

25    it says, "Add minimum of three additional bolts in

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    doubler extension."  Do you think that's the three holes

2    he's talking about in that note?

3         A    It appears that that is the case.

4         Q    The actual kit itself actually didn't use

5    bolts, correct, the kit available from Aerofab and

6    Canadian company; is that correct?

7         A    No.

8         Q    It used rivets?

9         A    It used rivets or bolts.

10        Q    Did rivets come with the kit or bolts come

11   with the kit?

12        A    Normally rivets came with the kit.

13        Q    You could replace the rivets with bolts,

14   though?

15        A    Yes.

16        Q    Do you claim that there was any other inventor

17   other than Mr. Townsend who is not named on the face of

18   the patent?

19        A    Do I claim?

20        Q    Yes.

21        A    Yes.

22        Q    And who would that be please?

23        A    Federal Aviation Administration.

24        Q    What is your basis for making that assertion?

25        A    In communication with FAA employees it

EXHIBIT F ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    appeared that there was a dialogue between the inventors

2    and the FAA with the FAA saying we would desire this as

3    part of the fix.  And some of those items were indeed

4    incorporated.

5        Q    What were those items specifically?

6        A    The one that I'm familiar with was a request

7    for the, I believe, it was for the alloy, the material.

8        Q    This would be the aluminum alloy?

9        A    No.

10       Q    Steel?

11       A    Steel.

12       Q    Which alloy was requested by the --

13       A    It is my opinion that they requested 4340.

14       Q    Do you have a document to that effect?

15       A    No.

16       Q    Do you know of the existence of any document

17   to that effect?

18       A    Perhaps.

19       Q    Who would be in possession of that document if

20   it existed?  When you say "perhaps," you must have

21   something in mind.

22       A    I think the FAA has possession of that

23   document.

24       Q    But you haven't seen it yourself?

25       A    No.

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1      Q      Have you seen such a document in anybody

2  else's possession?

3      A      No.

4      Q      Then are you just relying on intuition?

5      A      I'm relying on conversation with FAA

6  employees.

7      Q      Who did you have the information with?

8      A      Richard Knoll (phonetic).

9      Q      Who is he?

10     A      He's an FAA employee.

11     Q      What is his job function at the FAA?

12     A      I may not describe it accurately, but

13  Mr. Knoll was the contact person for Aerofab regarding

14  the resolution of this AD situation.

15     Q      When did you have this conversation with

16  Mr. Knoll?

17     A      I'm going to say multiple dates during the

18  development of the FAA, and I spoke with Mr. Knoll a few

19  weeks ago.

20     Q      You spoke to him about this subject?

21     A      Yes.

22     Q      Did he tell you that he has documents in his

23  file to the effect of what you're describing here?

24     A      No, he did not tell me that.

25     Q      Did you ask him to look?

1      A    Yes.

2      Q    Did he tell you he would look?

3      A    He told me he couldn't look.  He retired from

4  the FAA.

5      Q    So was he going on memory then?

6      A    Yes.

7      Q    Did he recommend that you contact anybody else

8  at the FAA?

9      A    He said the FAA could be contacted, and that

10  information may be available.

11      Q    Did he give you a contact name at the FAA?

12      A    No.

13      Q    Did he tell you that --

14      A    I take that back.  I think he said that the

15  records for the airplane were at the Atlantic ACO.  He

16  did mention that.

17      Q    Have you attempted to contact the Atlanta --

18  did you say ACO?

19      A    ACO, yes.

20      Q    To get those?

21      A    No, I have not attempted to contact the ACO.

22      Q    Other than the suggestion -- and this is your

23  assertion, we're certainly not agreeing to it -- that

24  the 4340 alloy suggestion was made by Mr. Knoll at the

25  FAA, do you assert that he provided any other input as

1   to inventorship of the '260 patent?

2       A    I'm going to say that is very possible.  I

3   cannot assert anything with a hundred percent.  Because

4   one, we're dealing with memory.  But there appeared to

5   be significant dialogue.  And Mr. Knoll in recent

6   conversation indicated that there was dialogue between,

7   specifically, Mr. Knoll mentioned Jack Tarbox.

8       Q    Have you spoken with Mr. Tarbox --

9       A    Yes.

10      Q    -- about this 4340 issue?

11      A    No.

12      Q    You said yes, so you have spoken with him in

13  the past?

14      A    You paused.  You said, "Have you spoken to

15  Mr. Tarbox?"  I answered that question.

16      Q    When was the last time you spoke with

17  Mr. Tarbox?

18      A    Probably over a year, might have been two

19  years.  I'm not sure.  I haven't spoken with him much

20  recently.

21      Q    What was the nature of your discussion with

22  Mr. Tarbox last time you spoke with him?

23      A    I could document this, I think, but I had a

24  repair that had been done on a Lake Amphibian.  I asked

25  his opinion as an engineer relative to the validity of

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    that repair.

2         Q    Have you spoken with Mr. Tarbox about any of

3    the issues in this lawsuit?

4         A    If we include the development of the AD, and

5    so forth, and if they're included in the lawsuit, then

6    yes; but since this lawsuit has been issued, no.

7         Q    Have you spoken to him at any time about

8    inventorship, specifically, have you spoken to him about

9    your claim that there is an unnamed inventor?

10        A    No.

11        Q    Have you spoken with him about your claim

12   that -- Well, let me back up and ask it a different way.

13   Have you spoken with him at any time about whether the

14   claims of the patent cover the Canadian kit?

15        A    No.

16        Q    Other than the FAA and Mr. Townsend, is there

17   anybody else you claim who was a named inventor?

18        A    No.

19        Q    Those are the only two?

20        A    Yes.

21        Q    Now, we referred to the Canadian kit as the

22   knock-off kit in the complaint.  And we made an

23   allegation, this is number 25, that the knock-off kit

24   infringes one or more claims of the '260 patent.

25             And my question for you is:  When this was

1   denied, it was denied in your answer, were you really

2   thinking of the invalidity issue or the infringement

3   issue in denying this allegation?

4       A    As a layman, I'm going to say I think it was

5   based on the invalidity of the patent.

6       Q    Would you agree that the Canadian kit -- this

7   is separate from the invalidity issue, I understand that

8   you have an argument as to invalidity, and that

9   certainly is a subject among the Lake aircraft owners

10  and one of the stated defenses here, I understand

11  that -- but separate from -- we disagree with that

12  obviously -- but separate from that, would you agree

13  that the Canadian kit falls within the scope of at least

14  one of the claims of the '260 patent?

15      A    I want to answer that with a qualification.

16  No.  The claims of the '260 patent are only valid if

17  that patent is valid.  So it can only fall within the

18  scope of those claims if it's a valid patent.  If it's

19  not a valid patent, then it doesn't fall in the scope of

20  any --

21      Q    That's why I tried to qualify the question by

22  putting the invalidity to the side.  That will be

23  decided separately.

24      A    As a layman I have difficulty separating those

25  issues.

Page 140

1      Q    I understand that.  But just assume that the

2   patent is valid, that doesn't give up anything.

3           MR. YOUNG:  I'm going to object for improper

4        foundation because I don't think we've gone through

5        the claims.

6           MR. THOMAS:  Well, we can do that.

7           MR. YOUNG:  Maybe that would be productive.

8   BY MR. THOMAS:

9      Q    Let's turn to the patent, which is in front of

10  you there, and turn back to the claims section, which is

11  column seven, this last page of it.  And I want to start

12  with the list of elements of the kit itself.  Turning to

13  claim one.

14          MR. YOUNG:  I'm going to object because we're

15       skipping over the preamble.

16          MR. THOMAS:  It's my question.  I get to ask

17       the question any way I want.  We all know the

18       preamble is not to be read into the claims.

19          MR. YOUNG:  Not in all cases.

20  BY MR. THOMAS:

21     Q    Let's look at the elements comprising the kit.

22  The first one is an upper doubler-strap and an upper

23  filler-strap.  Does the Canadian kit have those two

24  elements?

25     A    Yes.

1      Q    A lower doubler-strap and a lower filler-strap

2    is the next one.  Does the Canadian kit have those two

3    elements?

4      A    Yes.

5      Q    A plurality of wing-spar attachment-bolts,

6    just means more than one attachment bolt.  Does the

7    Canadian kit have that element?

8      A    Yes.

9      Q    The next one is kind of long.  We may have to

10   read it once or twice.  "Wherein said -- wherein each

11   said upper filler-strap and each said upper

12   doubler-strap have a third series of wing-attach

13   boltholes that correspond precisely with a first series

14   of wing-attach boltholes in an upper edge of a wing spar

15   web, and said lower filler-strap and said lower

16   doubler-strap have a fourth series of wing-attach

17   boltholes that corresponds precisely with a second

18   series of wing-attach boltholes in a lower edge of said

19   wing spar."

20          Does the Canadian kit have that element?

21     A    Yes.

22     Q    Next one down, "Wherein said upper and said

23   lower doubler-straps have a doubler-protective-coating

24   and said upper and said lower filler-straps have a

25   filler-protective-coating."

1           Does the Canadian kit have that element?

2      A    Yes.

3      Q    "Wherein said upper doubler-strap has an upper

4  inboard-end angle and said lower doubler-strap has a

5  lower inboard end angle."

6           Does the Canadian kit have that element?

7      A    Yes.

8      Q    Okay.  Let's continue on.  Claim two is, "The

9  kit of claim one -- and it adds an additional

10  limitation -- wherein said upper and said lower

11  doubler-straps are made of 4340 steel."

12          Is the Canadian -- Are the Canadian

13  doubler-straps made of 4340 steel, to your knowledge?

14     A    I think they are.

15     Q    Claim three, "Wherein said upper and said

16  lower doubler-straps are heat treated the kit -- let me

17  back up.  "The kit of claim two, wherein said upper and

18  said lower doubler-straps are heat treated to a 180,000

19  PSI."

20          To your knowledge, is the Canadian kit heat

21  treated in such a manner?

22     A    I will acknowledge that the Canadian kit is

23  heat treated.  I cannot verify the level to which it is.

24     Q    Who would know the answer?

25     A    The people who made the kit.  Perhaps the FAA

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1   as well.

2       Q    Claim four, "The kit of claim one, wherein

3   said upper and said lower filler-straps are made of

4   2024-T3 aluminum?

5       A    I can't verify the alloy of the Canadian

6   filler.  It could have been a different alloy.

7       Q    I understand.  Claim five, "The kit of claim

8   one, wherein said upper inboard-end angle on said upper

9   doubler-strap is approximately five degrees."

10          The Canadian kit has that element?

11      A    Yes.

12      Q    Claim six, "The kit of claim one, wherein said

13  lower inboard end angle on said lower doubler-strap is

14  approximately six degrees?

15      A    Canadian kit appears to have an approximate

16  six-degree angle.

17      Q    Thank you.  Claim seven, "The kit of claim

18  one, wherein said double-protective-coating that is heat

19  cured to form a ceramic coating."

20          Does the Canadian kit have that coating?

21      A    No.

22      Q    Claim eight, "The kit of claim one, wherein

23  said filler-protective-coating includes a first coating

24  that is an alodine conversion coating and second coating

25  that is an epoxy primer."

1          Are the fillers on the Canadian kit coated

2    that way?

3        A    I know they're coated, but I don't know the

4    exact nature of your coating.

5        Q    Claim nine, "The kit of claim one, wherein

6    said each bolthole of said third and fourth series of

7    said wing-attach boltholes in said upper doubler-strap,

8    said lower doubler, said upper filler-strap, and said

9    lower filler-strap is free of said

10   doubler-protective-coating and of said

11   filler-protective-coating."

12       A    I'm not sure regarding the Canadian kit.

13       Q    So you're not sure if the boltholes are free

14   of coating on the Canadian kit?

15       A    That is correct.

16       Q    Claim ten is a long dependent claim.  Rather

17   than read it out loud, I'd like to just ask you to read

18   it, and take a minute to understand it.

19       A    It's not doing it today.  I just can't wrap

20   around the first series, second series, and so forth.

21       Q    I understand.  That's a long and complicated

22   claim.  Is it fair to say, as we sit here in this

23   deposition today, when you read claim ten, that you

24   don't understand it?

25       A    Today I don't understand claim ten.

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1       Q     Then let's move to claim 11.  It's a little

2   easier to chew on.  "The kit of claim eight, wherein

3   said wing spar web has a first series of rivet holes on

4   said upper edge and a second series of rivet holes on

5   said lower edge, and said upper doubler-strap and said

6   upper filler-strap each have a series of rivet holes

7   that corresponds to said first series of rivet holes,

8   and said lower doubler-strap and said lower filler-strap

9   each have a series of rivet holes that corresponds to

10  said second series of rivet holes."

11          I think this just describes the rivet holes

12  there, is that --

13      A     Yes.

14      Q     Does the Canadian kit have the rivet holes?

15      A     Yes.

16      Q     Claim 12, "The kit of claim nine, wherein said

17  upper doubler-strap and said upper filler-strap each

18  have a series of five rivet holes, and said lower

19  doubler-strap and said filler-strap each have a series

20  of seven rivet holes."

21          Does the Canadian kit have five rivet holes on

22  the upper and seven on the lower?

23      A     They are added to the strap at installation.

24      Q     But as installed they do have those rivet

25  holes?

1        A     As installed, yes.

2        Q     Claim 13, "The kit of claim one, further

3    comprising a plurality of wing-attach bolts, a plurality

4    of cap angle bolts, a corresponding plurality of nuts

5    and washers for said wing attach-bolts and said cap

6    angle bolts, and a plurality of rivets."

7              Does the Canadian kit have the bolts and the

8    rivets?

9        A     Most of the time.

10       Q     As installed does it have it?

11       A     As installed most of the time.

12       Q     When you say "most of the time," just please

13   tell me why you quantify it?

14       A     Occasionally you can use bolts in lieu of

15   rivets.

16       Q     Is it shoulder bolts that you use in that

17   case?  Do you know what I'm talking about when I say a

18   shoulder bolt?

19       A     No.

20       Q     We'll move on.  Item 14 or Claim 14, "The kit

21   of Claim 13, wherein said plurality of wing attach bolts

22   includes ten NAS 464-6A24 bolts, said plurality of

23   cap-angle bolts includes two NAS 464-7A24 bolts, said

24   plurality of nuts and washers includes two AN 364-720

25   nuts, ten AN 364-624 nuts, four AN 960-716 washers, and

 1    twenty AN 960-616 washers, and said plurality of rivets

 2    includes twelve AN 470-AD6-22 rivets."

 3           Is this the hardware that comes with the

 4    Canadian kit?

 5        A    No.

 6        Q    You mentioned earlier that the bolts are of a

 7    different length in the Canadian kit?

 8        A    Different length, different part number,

 9    different nut.  And again we may not have rivets.

10        Q    I understand.  Okay.  Does the kit that's

11    installed on your aircraft have rivets?

12        A    Yes.

13        Q    If you're going to use bolts instead of rivets

14    with the Canadian kit installation, do you have to make

15    a notation in the logbook that bolts were used instead

16    of rivets?

17        A    No.

18        Q    Is it possible to tell from looking at the

19    logbook whether bolts or rivets were used?

20        A    Not necessarily.

21        Q    Assertion 31 or allegation 31 in our complaint

22    stated this:  "The US PTO determined that each and every

23    claim of the '260 patent remains valid and forcible and

24    unchanged as a result of the reexamination proceeding."

25           This was denied, but the record is clear that

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1   this is in fact the case.  Why was this assertion

2   denied?

3       A    I didn't get the same opinion out of the -- of

4   what I read in the documentation.  And I'm not a lawyer,

5   but I can generate an opinion reading material.

6       Q    Assertion 33, "Defendant Shannon's use of an

7   aircraft is a direct violation -- I'm going to skip

8   that.

9            Assertion 34, "Despite being fully aware of

10  the '260 patent, Defendant Shannon has contributed to

11  and continues to contribute to infringement of the '260

12  patent by others, and has induced and continues to

13  induce others to infringe the '260 patent by encouraging

14  other Lake Aircraft owners to install knock-off kits on

15  Lake Aircraft."

16           First of all, you would admit, I think you've

17  already admitted, that you're fully aware of the '260

18  patent?

19      A    I am aware of the '260 patent.

20      Q    And have been since roughly from the time it

21  issued, correct?

22      A    Yes.

23      Q    And you have installed the Canadian kit on the

24  airplanes of others?

25      A    That is true.

1     Q     And you've informed others that the Canadian

2     kit cost roughly half of the Aerofab kit?

3     A     They would notice that when I gave him a bill;

4     but yes, I've given them that information.

5     Q     Thereby lowering their cost of compliance with

6     the AD?

7     A     That is correct.

8     Q     Assertion 35, "Defendant Shannon is acting

9     without authorization or license from plaintiff Enpat or

10    any prior owner of the patent."

11    A     Say that again.

12    Q     "Defendant Shannon is acting without

13    authorization or license from plaintiff Enpat or any

14    prior owner of the patent."

15          That was denied.  So there's really two pieces

16    to this one.  One is, do you assert that you have a

17    license from Enpat to use and install these Canadian

18    kits?

19    A     At the time the Canadian kits were installed

20    there was no patent.

21    Q     But you have an airworthy Lake Aircraft today

22    that has the Canadian kit installed, correct?

23    A     Yes.

24    Q     Do you have authorization from Enpat to use

25    that kit today?

1      A    No.

2      Q    Do you have authorization from some prior

3  owner of the patent to use that kit?

4      A    No.

5      Q    Well, then why was this denied?

6      A    It boils back again to my opinion of the

7  patent.  There's no infringement because it's not a

8  valid patent.

9      Q    Really what you're saying in the denial here

10  is not that you have authorization to use the kit, what

11  you're saying is you don't think the patent is valid,

12  correct?

13      A    That is true.

14      Q    Assertion 37, "Defendant Shannon is willfully

15  infringing the '260 patent."

16          That was denied.  But --

17      A    Yes.

18      Q    -- we just went through the claims of the

19  patent.  There doesn't seem to be a disagreement that

20  the elements of the kit as described in the claims, at

21  least one of the claims, and we went through all 14 of

22  them, covers the Canadian kit, that you're flying a

23  Canadian kit, that you don't have license from Enpat to

24  fly the Canadian kit, you don't have license from anyone

25  else to fly the kit, yet you claim you're not willfully

1    infringing the patent?

2            MR. YOUNG:  Objection.  I think that

3        mischaracterizes the testimony.  I don't think

4        you've gone through the entirety of the claims.  I

5        think you skipped over the preamble for obvious

6        reasons.

7            MR. THOMAS:  We skipped over the preamble

8        because it doesn't read into the claims.

9            MR. YOUNG:  I disagree.

10       A    I disagree.

11   BY MR. THOMAS:

12       Q    With all respect, you're not a patent

13   attorney.

14       A    I've listened to one.

15       Q    And I'm not an AI either.

16       A    That's true.

17       Q    Let's go back.  Your denial of infringement

18   here in Assertion 37 is based on your assertion that the

19   patent is invalid, correct?

20       A    Yes.

21       Q    Let's just get down to it.

22       A    In the preamble there's another reason --

23       Q    Okay.

24       A    -- that my aircraft is not mentioned in the

25   preamble.

1        Q     I understand that's your position, and the

2    position of your attorney.   Okay?

3        A     That's correct.

4        Q     The preamble does not describe the invention.

5    It is the invention that is the subject of the patent.

6              MR. YOUNG:   Is there a question?

7    BY MR. THOMAS:

8        Q     I'm responding.   So based on that, and there

9    is a question in a second, we read the description of

10   the invention, and we went through each element.   Let's

11   take claim one because there's 14 claims, so we don't

12   want to get confused.   We read all through claim one,

13   and what you told me was that each element of the claim,

14   and I will say for purposes to avoid the objection

15   accepting what is located in the preamble, we didn't

16   discuss that, but the description of the invention

17   follows the word comprising, that the Canadian kit does

18   in fact have each one of these elements in claim one?

19       A     No.

20       Q     Yes, we did.

21       A     Claim one, we did, yes.

22       Q     I realize there was some question about

23   coating and that sort in some of the other claims, but

24   we're just talking about claim one.

25             MR. YOUNG:   I want to make clear that I object

1          to a characterization that part of claim one after

2          comprising defines the invention without the

3          preamble.

4                  MR. THOMAS:  That's fine.  That's an okay

5          objection, but this is a deposition, and this is

6          not -- we're not arguing Markman here.

7                  MR. YOUNG:  I understand.

8    BY MR. THOMAS:

9          Q    So taking what we just said, that each one of

10   these elements that describes the actual invention

11   itself, and not the airplane, okay, covers the Canadian

12   patent?

13         A    Canadian --

14         Q    I'm sorry, the Canadian kit.  And you've said

15   that you don't have a license from Enpat to use the kit

16   today, and you don't have a license from some prior

17   patent owner.  Then how can you say that you're not

18   infringing the patent?

19         A    There's no patent.  There's no valid patent.

20         Q    That's really your only argument, isn't it?

21         A    It is -- it's not my only argument -- but it

22   is a valid argument.

23         Q    Let's put it this way, and this is a perfectly

24   fine question, so to head off the objection, suppose the

25   court disagrees with you and the preamble is not read

1   into the claims, then are you infringing the patent by

2   your use of the Canadian kit?

3        A    Only if it's a valid patent.

4        Q    If it is otherwise held up as valid?

5        A    At that point in time then it may be

6   determined valid.

7        Q    But the question was:  At that point in time

8   would you agree with me that you are infringing the

9   patent?

10       A    No.

11       Q    Why not?

12       A    If the court held it up, I may be legally

13  obligated to the claim to the patent, but my opinion

14  will be it's an invalid patent.

15       Q    You can always have any opinion you like.

16       A    That is correct.

17       Q    It may not be determinative of any outcome.

18  There was also a denial of 38 under the code USC Section

19  282 that '260 patent enjoys a presumption of validity.

20  Is there some argument with that?  That's right in

21  statute.

22            MR. YOUNG:  You're looking at me.

23  BY MR. THOMAS:

24       Q    Why would you deny that the patent enjoys a

25  presumption of validity?

Page 155

1      A    It was patented, but in my opinion the patent

2    office looks, shall we say in the patent office, it

3    doesn't look elsewhere for what is obvious.

4      Q    Again, you just think the patent is invalid,

5    that's just what you think?

6      A    I believe I stated that earlier.

7      Q    Assertion 43, "Upon information believed

8    Defendant Shannon has had knowledge of the existence of

9    a '260 patent since an issue from the US PTO on December

10   11th, 2001."

11         Your testimony was that you had knowledge of

12   the existence of the patent from about that time; isn't

13   that correct?

14     A    Yes.

15         (This concludes Volume I of proceeding.  Refer

16         to Volume II.)

17

18

19

20

21

22

23

24

25

Page 156

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

```
_____
                              )
ENPAT, INC.,                  )
a Florida Corporation,        )
               Plaintiff,     )
                              ) Case No.:
        v.                    ) 6:11-cv-00084-PCF-KRS
                              )
HARRY SHANNON,                )
               Defendant.     )
                              )
_____)        VOLUME II
                                  (Pages 156 - 255)
```

DEPOSITION OF HARRY SHANNON
Taken on Behalf of the Plaintiff

DATE TAKEN:        February 4, 2011
TIME:              9:30 AM - 5:50 PM
PLACE:             202 N. Harbor City Boulevard, Suite 300
                   Melbourne, Florida 32935

Examination of the witness taken before
Vicki Humphries, Court Reporter
and Notary Public, State of Florida at Large

King Reporting Service, Inc.
14 Suntree Place, Suite 101
Melbourne, Florida 32940

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

APPEARANCES

FOR PLAINTIFF

STEPHEN C. THOMAS, ESQUIRE
KELLY G. SWARTZ, ESQUIRE
Hayworth, Chaney & Thomas, P.A.
202 N. Harbor City Boulevard, Suite 300
Melbourne, Florida 32935

FOR DEFENDANT

MARK J. YOUNG
MARK YOUNG, P.A.
12086 Ft. Caroline Road, Suite 202
Jacksonville, Florida 32225

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1                    INDEX OF DEPOSITION
                      OF HARRY SHANNON
2
                                              Page No.
3   Direct Examination by Mr. Thomas              4

4   Cross Examination by Mr. Young              216

5   Redirect Examination by Mr. Thomas         242

6   Recross Examination by Mr. Young           250

7   Certificate of Oath                        252

8   Certificate of Reporter                    253

9   Errata                                     254

10  Witness Review Letter                      255

11

12              I N D E X   O F   E X H I B I T S

13

14                    PLAINTIFF EXHIBITS

15  NO.                 DESCRIPTION          REFERRED TO
    A     Airworthiness Directive                16
16  B     Photograph                            106
    C     Certifications                         21
17  D     Patent                                127
    E     Lake Central Air Services Fax         127
18  F     Rockwell Service Letter               164
    G     Postings from Bulletin Board          183
19

20

21                    DEFENDANT EXHIBITS

22  NO.                 DESCRIPTION          REFERRED TO
    A     Drawing                               221
23  B     List of Components                    237

24

25

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1                    (Continued from Volume I.)

2    BY MR. THOMAS:

3       Q    We're going to move on to the defenses that

4    were stated in your answer.  Your first defense was the

5    defense of non-infringement.  I think we're going to

6    beat a dead horse on that one.

7             Your first defense is that you have not

8    infringed and do not infringe literally or under the

9    doctrine of equivalence any valid or enforceable claim

10   of the patent.  Again, it's my understanding that you're

11   really basing defense on your assertion that the patent

12   is invalid?

13       A    Yes.

14       Q    Your second defense, "Defendant has not and is

15   not infringing any claim on the patent, at least due to

16   statements, representations and admissions made to the

17   US Patent and Trademark office during the prosecution or

18   reexamination of the application that matured into the

19   ''260 patent, as well as the prior art that in part or

20   collectively constitutes prosecution history barring

21   plaintiff from asserting claims of the patent encompass

22   or infringe by any product or activities of the

23   defendant."

24             Exactly what statements, representations and

25   admissions do you claim were made to the patent office

1    during the prosecution of the patent that constitute

2    prosecution history?

3        A    I need a copy of what you just read to me,

4    please, so I can read it.

5        Q    I don't know that I have a copy.  I didn't --

6    I'll ask the question another way.  Is there any

7    statement or claim that was made to the patent office,

8    to your knowledge, that takes the Canadian kit outside

9    the scope of the claims of the patent or that limits the

10   claims of the patent so that the Canadian kit is not

11   covered by the claims?

12       A    We're back to validity of claims made to the

13   patent office.  In other words, if not all claims made

14   to the patent office wherein good faith, then --

15       Q    You said, "good faith."  What was not, to your

16   knowledge, was not done in good faith during the

17   prosecution of the patent?

18       A    The verification of the angle at different

19   stages in the development of the patent.

20       Q    What do you mean by "verification of the

21   angle?"

22       A    They're stating that at one stage in the

23   development of the doubler there was no angle on the end

24   of it, and then later there was an angle on the end of

25   it.

1      Q    When you say "they," who did you mean by they?

2      A    Aerofab, the inventors.

3      Q    Tarbox?

4      A    And Baker.

5      Q    So you're saying that they didn't initially

6    disclose the angled end?

7      A    It is my opinion that the doubler always had

8    an angle.  They claimed that it didn't.  We have not

9    seen any kit without an angle.

10     Q    When you say they claim that it didn't have an

11   angle, how did they claim that?

12     A    In the prosecution of the patent.  Because

13   information was released in a service bulletin in a time

14   frame that I believe -- and again I'm not an attorney --

15   but I think it would have rendered applying for the

16   patent or it would have prevented applying for the

17   patent because the knowledge had been in the field.

18     Q    The knowledge of the angled end or non-angled

19   end had been in the field?

20     A    They're claiming that there was a non-angled

21   end on the initial kit.  There's no evidence that there

22   was ever a kit with a non-angled end.

23     Q    I want to make sure I understand the

24   significance of what you're saying.

25     A    If information is available to industry for a

1    given period of time, and no action is taken to patent

2    it, then at some point in time the ability to patent

3    that thought, innovation, whatever, can't be done.

4         Q    How does that apply to the angle versus

5    non-angled?  That's where you're losing me.

6         A    The inventors claim that on presentation of

7    information in one of the service bulletins, one of the

8    proposed service bulletins regarding the repair of the

9    wing, that the doubler did not have an end angle.  Okay?

10   Where in a later service bulletin issued closer to the

11   time that application for the patent was made the

12   doubler does have an end angle.

13        Q    Do you have copies of those service bulletins

14   that you're talking about?

15        A    Yes.

16        Q    Is it SB-79?

17        A    Yes.

18        Q    You're saying the original SB-79 did not have

19   an angled end on it?

20        A    No.  I'm saying the original SB-79 did have an

21   angle on the end of it.  The inventors claim that it

22   didn't.

23        Q    You have a copy of that service bulletin?

24        A    Yes.

25        Q    Do you recall what date that issued?

1       A    No, I don't.

2       Q    When you say that the inventors claim that

3   original service bulletin did not have an angled end on

4   it, where do they make that claim?  You're saying in the

5   prosecution history of the patent itself, was that what

6   you said?

7       A    I'm not an attorney, but it was either in the

8   prosecution history of the patent or it was restated in

9   the reexamination of the patent.

10      Q    All right.  Your third defense -- Well, let me

11  back up and ask:  Was there anything else in the

12  prosecution of the patent, to your knowledge, that is

13  relied upon for this assertion that the patent should be

14  invalid?

15      A    Today with the stress of this interview I

16  don't know of another assertion at this moment.

17      Q    Third defense was anticipation and

18  obviousness, and assertion is that the claims of the

19  patent are invalid, unenforceable because they're either

20  anticipated or obvious.

21          The question I have for you, and I realize

22  you're not a patent attorney, but have you provided to

23  your attorney all of the documents that you have in your

24  possession that you feel support that allegation, that

25  the patent -- the claims of the '260 patent were

1    anticipated by some prior art?

2        A    I don't understand the question.

3        Q    This defense says that there is some prior art

4    out there that existed before the '260 application was

5    filed.  I'm paraphrasing a little bit.

6        A    Okay.

7        Q    That would render the '260 patent application

8    invalid.  It was anticipated by some prior art out

9    there.  My question for you is:  Have you provided to

10   your attorney all of the documents you have in your

11   possession to support that allegation?

12       A    It's more communication than document.  In

13   other words, I've -- in conversation with the attorney

14   we established that.

15       Q    Okay.  I want to ask you to look at a what's

16   called a Rockwell Service Letter.  I want to ask you --

17   I don't necessarily want to mark this as an exhibit

18   yet -- I just want to ask you to look at this document.

19   It says, Rockwell International on it.  For

20   identification purposes just so we can identify it down

21   at the bottom is a bates number HS001558.

22            Is this the kind of document you're talking

23   about relying upon as prior art that should invalidate

24   the '260 patent?

25       A    This potentially could be an example of such

1   prior art.

2        Q    Is this a document that you yourself dug up?

3        A    I could have because I researched a number of

4   documents relative to doublers.

5        Q    Just generally speaking, well, do you

6   recognize this Rockwell Service Letter?

7        A    I remember a number of Rockwell documents.

8        Q    If you need a another minute to look at it,

9   that's fine, but my question is:  Generally what does

10  this document describe for us?

11       A    It basically describes a wing spar repair.

12       Q    Which includes a doubler?

13       A    Which includes a doubler.

14       Q    Okay.  I'm going to ask you to take this

15  particular document, and if you could look through it,

16  and tell me anywhere in here does it describe using a

17  filler-strap either upper or lower?

18       A    It appears that the bill of materials or parts

19  list includes a shim, which may be a filler.

20       Q    Is there a drawing in here that tells you that

21  that's a filler?

22       A    No.

23       Q    Is there anything in here that describes the

24  doubler-straps being made of 4340 steel?

25       A    No.

1      Q    How about, well, let me just continue on, how

2   about heat treating the steel to 180,000 PSI?

3      A    No.

4      Q    Is there anything in here that tells you

5   filler-straps are made of 2024-T23 aluminum?  I realize

6   the filler-straps are not referenced in here.  Let's

7   just take the shim, which we don't know what that is.

8   Anything in here that identifies the material of the

9   shim?

10     A    Yes.

11     Q    Where is that please?

12     A    Page four of six.  And by the way, you gave me

13   two.

14     Q    There were two of them together.  I realize

15   that now.  Where is that material identified?

16     A    Left-hand column about halfway down, first

17   group, 063 x 2 x 1, 2024-T3.

18     Q    Okay.  Anything in here where the upper --

19   first of all, is there anything in here that says

20   there's an upper and lower doubler?

21     A    No.

22     Q    Is there anything in here that talks about an

23   angled end on the doubler?

24     A    No.

25     Q    Is there any information in here on coating of

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    any of these of the doubler plates?

2        A    Not that I recall.

3        Q    There's various claims that address coating.

4    I won't go through each one of them for the sake of

5    time.

6            Is there anything in this Rockwell Service

7    Letter that addresses rivets?  Yes, there are.  I see

8    that, five.

9        A    Yes.

10       Q    I want to go ahead and attach that as the next

11   exhibit, F.  I've removed the second copy.

12           You said before that through communication

13   with your attorney you had described what you felt

14   represented prior art to the '260 patent.  And you said

15   that you had dug up some documents, and it sounded like

16   you weren't quite clear if this particular Rockwell

17   Service Letter that we just attached as an exhibit was

18   one that you came up with or not, but it was

19   representative of the kind of documents you came up

20   with; is that correct?

21       A    It could be, yes.

22       Q    The question I have for you is:  When it comes

23   to these documents that you assert are prior art, is

24   there anything you haven't given your attorney?

25       A    I'm going to say no.  I've given the

1    attorney -- some of what I gave the attorney was verbal

2    discussion of what a doubler is, and how it fits, and

3    why it must be angled, and things like that.

4         Q    I understand.  But as far as documents go, is

5    there anything you haven't given your attorney?

6         A    There was some other, other than these two,

7    there were some other Rockwell documents.  I want to say

8    there was an assessment document.  I'm not sure.  There

9    was a number we went through.  I did a search in a type

10   of library that I put in doubler, you know, it came back

11   with the hits.

12        Q    Those documents you gave to your attorney?

13        A    I gave him some of those documents that

14   appeared to be valid.

15        Q    The documents that you gave him, though, are

16   representative of the kind of documents you were pulling

17   up in research?

18        A    I think so, yes.

19        Q    The next defense was indefiniteness and

20   failure to disclose the best mode, so the question is --

21        A    Failure to disclose --

22        Q    The best mode.  It's a requirement of this

23   title 35.  When it comes to indefiniteness, is there

24   some assertion that you have that the claims of the

25   patent are indefinite for any reason?

1      A     I'm not wrapping on that one, so.

2      Q     Let me ask the question another way.  When you

3  read the claims of the patent, which we went through all

4  of them --

5      A     Okay.

6      Q     -- do you understand clearly what they are

7  claiming?

8      A     Except for Number 10 I understand what the

9  inventors are attempting to claim.

10     Q     I understand the way that you phrased that

11  because you assert invalidity.  Subject to that

12  assertion on your part, when you read the claims except

13  for Claim 10, do you clearly understand what the

14  inventor is trying to claim?

15     A     Yes.

16     Q     The first defense is the defense of

17  inequitable conduct.  And this assertion is that the

18  applicant or the inventors or their representatives made

19  statements to the PTO that were known to be false.

20           Do you know of any such false statements made

21  to the PTO?

22     A     As stated earlier, the absence or presence of

23  angles at a given point in time appear to have been

24  misrepresented.

25     Q     Other than that, was there -- is there any

Page 170

1    false assertion or statement made to the PTO?

2         A    Inventorship.

3         Q    Other than that, is there anything else?

4         A    That's all I can think of now.

5         Q    The second half of the assertion here the

6    defense has to do with withholding material from the

7    PTO.  Other than the two things you just mentioned are

8    you aware of any material that was withheld from the PTO

9    by the inventors or their attorneys?

10        A    Yes.

11        Q    What material was withheld?

12        A    One material was the coating on the part.

13        Q    When you say the coating was withheld --

14        A    The coating that was used on the part claimed

15    in the invention was used on other Lake parts years

16    prior to the application.

17        Q    Okay.  I think the patent wasn't claiming to

18    invent the coating.  It was the coating on that

19    particular part.

20        A    It was claiming a protective coating, and that

21    same coating was used as a protective coating on an

22    aircraft part.

23        Q    Before the '260 application was filed?

24        A    Long before the '260 was filed.

25        Q    That's the basis of your assertion that that

1    was withholding --

2         A    That would be an example of withholding

3    information from the patent office.

4         Q    Other than that and what you just mentioned

5    here, is there anything else?

6         A    We mentioned angles.  We mentioned coating.

7    Give me a second, let me reread the claims here.  Fusing

8    a material is a common function of a doubler.  I think

9    the inventors claimed that 4340 was not used anywhere

10   else in the airplane, and it is.  Heat treatment to a

11   given level, a given task, is a textbook function of

12   creating a doubler.  Use of 2024-T3 is common in

13   aircraft structures.

14        Q    Other than use of materials and coatings,

15   which are listed there, the powder coating, and all of

16   that, and then the materials you just mentioned, other

17   than that sort of thing, do you assert there was

18   information withheld from the patent office by the

19   inventors or their agents.

20        A    Not at this time.  I don't know of any.

21        Q    We've already touched on the issue of

22   inventorship, which is the next defense, the sixth

23   defense that was raised by your attorney.  And you

24   mentioned that Elton Townsend, you felt, was an

25   inventor, and you stated the reasons for that, and the

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    FAA individual Knoll was an inventor, you stated the

2    reason for that.  Other than two individuals, do you

3    assert that there was any other inventor?

4         A    There was another individual who reviewed the

5    information, and I'm trying to think of his name, with

6    the FAA, who has the potential of being a named

7    inventor.

8         Q    Was he an employee of Lake?

9         A    No, he was with FAA.

10        Q    He worked with Knoll back in the day, did he?

11        A    Yes.

12        Q    He was just a reviewer of information?

13        A    The adequacy of the repair has to be

14   evaluated, and I believe Dick called in a specialist in

15   structures, dynamics, fatigue, whatever, to do that

16   evaluation.

17        Q    Anybody else?

18        A    Not that I know of.

19        Q    Do you have any reason to think that either

20   Tarbox or Baker did not contribute to the invention of

21   the '260 patent?

22        A    In any way?

23        Q    In any way?

24        A    No, I don't have any reason to believe that

25   they didn't contribute.

1    Q    In other words, you're not disputing their

2    inventorship themselves?

3    A    I'm not sure where the in-house engineering

4    came from.  Mr. Tarbox was a structures, but the

5    regulation that this aircraft was certified under did

6    not include at the time of its certification fatigue

7    analysis.  Fatigue analysis, in my opinion, was an issue

8    in evaluating the validity of the fix for the aircraft

9    using the doublers.

10   Q    What you're saying is you're not sure who did

11   the in-house engineering for that; is that correct?

12   A    Right.  I'm not sure if Mr. Tarbox's

13   certification was valid to include fatigue evaluation at

14   that time.  And to my knowledge, Mr. Baker is not a DER

15   or designated engineering rep on any level as certified

16   by the FAA.

17   Q    Okay.  Other than that engineering analysis

18   in-house there at Aerofab, is there anybody else that

19   you claim may be an inventor of the patent?

20   A    Not that I recall right now.

21   Q    The seventh defense raised is that Enpat's

22   claim should be barred by the doctrine of unclean hands.

23   Is there some act or omission that Enpat has done here

24   that should bar them from enforcing this patent?  This

25   is separate from the validity issue.

1        A    If it's a valid patent, I believe they can

2    enforce it.

3        Q    To your knowledge, they haven't done something

4    wrong here that should prevent them from enforcing the

5    patent?

6        A    From conception through the chain to purchase

7    didn't meet with my business ethics.

8        Q    You're talking about an Aerofab's part?  Who

9    in your opinion did not meet the standard of ethics?

10       A    Aerofab REVO and Enpat's response to REVO.

11       Q    Enpat has -- Would you agree that from the

12   time that Enpat got involved with this claim, that they

13   have been straightforward in their intention to assert

14   the patent?

15       A    They appear to have been straightforward, yes.

16       Q    Have they committed a fraud or been somehow

17   unethical in their communication with the Lake aircraft

18   owners?

19       A    I don't think it's a fraud.  But the general

20   feeling of Lake aircraft owners is that it borders on

21   extortion.

22       Q    But Enpat, to your knowledge, hasn't committed

23   an act of dishonesty here, they're just simply asserting

24   trying to enforce a patent that they own?

25       A    May not constitute dishonesty.

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1      Q    The eighth defense was the defense of

2 estoppel, and this goes to a claim that -- apparently an

3 assertion -- we just talked about the plaintiff, so

4 we'll talk about the inventors of the patent, that they

5 somehow did something inequitable that should bar them

6 from this patent being enforced.  They're not parties to

7 this lawsuit, the applicants aren't.  But did the

8 applicants, Baker and Tarbox, do something in the

9 application of the patent, the prosecution of the

10 patent, other than what we already talked about, that

11 should bar anybody from enforcing the patent?

12     A    To my knowledge, yes, as we discussed certain

13 issues.

14     Q    What we already talked about, but was there

15 something else done untoward in the prosecution of the

16 patent that we haven't already discussed here today?

17     A    To my knowledge, no.

18     Q    The ninth defense is the defense of laches.

19 And this goes, the way it reads is, "Plaintiff

20 unreasonably and inexcusably delayed in filing suit for

21 infringement, and that defendant has been materially

22 prejudiced by the delay."

23          So how have you been prejudiced by the delay

24 here in filing the lawsuit?

25     A    The initial suit back in 2000 whatever, 2002 I

1    believe, asked for, I believe, was infringement.  Okay?

2    This suit asks for substantially more than just

3    infringement, but I feel that I haven't been using the

4    system in any way.  I've used the same legal system that

5    Enpat has available to it, but they've chosen a very

6    different path on the second suit.

7        Q    How is the path different that they've chosen

8    on the second suit?

9        A    Say again?

10       Q    How is the path different on the second suit?

11       A    What was I being charged with in the first

12   suit?

13       Q    You tell me.

14       A    I believe it was infringement.

15       Q    Same as here.

16       A    Not limited to infringement, willful

17   infringement, other people contributing to infringe, and

18   numerous items far exceeding the damages asked in the

19   first suit.

20       Q    How has the delay -- The defense is that the

21   delay in filing the second suit has somehow prejudiced.

22   How has the delay prejudiced you is my question?

23       A    If they had dealt in a more timely fashion,

24   maybe I wouldn't have been asked these additional

25   charges.

1      Q    Would you agree with me that if your counsel

2  asked for the delay, that this defense would be

3  meaningless?  This defense says because of the delay

4  somehow you've been prejudiced.  Would you agree with me

5  that if it was your attorney that asked for delay, then

6  Enpat hasn't done anything here to prejudice you?

7      A    If the attorney did it.

8      Q    I mentioned before he had moved for a stay,

9  and you said you weren't sure of that.  Furthermore, it

10  looks like the Lake Aircraft community banned together,

11  and sought another channel of attack by filing the

12  re-exam request with the PTO?

13      A    Yes.

14      Q    Would you agree with me that that caused some

15  delay?

16      A    The delay that it created was far beyond all

17  expectations.

18      Q    Maybe, but would you agree with me that the

19  filing of the re-exam caused a significant delay in the

20  conclusion of this patent infringement issue?

21      A    Not necessarily.

22      Q    The re-exam was filed in 2002, correct?

23      A    Say again?

24      Q    The re-exam was filed in 2002?

25      A    Yes.

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1      Q      And concluded in 2010, correct?

2      A      Yes.

3      Q      That's eight years?

4      A      Yes.

5      Q      Enpat didn't file the re-exam, correct?

6      A      No.

7      Q      The Lake Aircraft owners filed for re-exam?

8      A      No, I filed for re-exam.

9      Q      The Lake Aircraft owners contributed to it,

10     correct?

11     A      Yes.

12     Q      Financially?

13     A      Financially.

14     Q      The tenth defense is the defense of waiver.

15     It's a broad statement that, that somehow either Enpat

16     or the previous owners of the patent did something to

17     waive their claims.  Can you tell me what they possibly

18     did that waived their claims?

19     A      Providing false or improper information to the

20     patent office --

21     Q      Which we've already talked about at the

22     deposition here today, the issues you've already brought

23     up, correct?

24     A      Yeah.

25     Q      Is there anything other than that that you

1    would assert they did to waive their --

2        A    Right here right now, no.

3        Q    I don't want to rush through it.  I want to

4    make sure the answers are complete.  So when you said

5    that, do you need a minute to think about it?  And I'm

6    not being --

7        A    No.  Well --

8        Q    -- I'm offering.

9        A    -- how many depositions do you do a year?

10       Q    I'm not being deposed, but some number.

11       A    Okay.  As the day wears on --

12       Q    I understand.

13       A    -- it is stressful upon a person not

14   accustomed to --

15       Q    I understand that, which is why I was offering

16   more time to answer the question if you need it.

17       A    It won't contribute to a better answer.

18       Q    I'm going to -- Well, with regard to the

19   eleventh defense, we'll move on to the twelfth defense

20   for the sake of time.  It's cost . . .

21            Okay.  The fifteenth defense was the defense

22   of license.  And what has been raised, and I'll just

23   read it, Defendant has been granted a license to make,

24   use, sell, offer to sell, import into the United States

25   kits under the '260 patent.  I'm paraphrasing for

1    clarity's sake.

2         A    Say that again.

3         Q    "Defendant has been granted a license to make,

4    use, sell, offer to sell or import into the United

5    States kits as recited in the claims of the '260

6    patent."  We're not really talking about importing at

7    this point although that may be an issue in the lawsuit.

8              But just for purposes of this initial

9    question, do you assert that you've been granted a

10   license to sell or use the patent?  I think before I

11   asked that question you said, no you don't have a

12   license?

13        A    Relative to the import and the sell when those

14   kits were sold, there was no patent, so it's not a --

15        Q    I understand.  But you've never received a

16   license from Enpat to do any of these things, have you?

17        A    No.

18        Q    And you didn't receive a license from any of

19   the previous patent owners, correct?

20        A    Well, the -- I'm going to say I received an

21   inferred license.  I'd pick up the phone, "I'd like to

22   buy a kit."  They sold it to me.

23        Q    When you say they --

24        A    If it had required a license at that point,

25   would they have requested it?

1      Q      -- you mean Aerofab?

2      A      JCM.

3      Q      Okay.  But Enpat never granted you a license

4    at any time to do any of these things with the patent,

5    correct?

6      A      I believe, yes.

7      Q      And previous patent owners did not grant you a

8    license to do any of these things with the exception

9    that they did sell you kits so you had the license that

10   may have come with a particular kit, correct?

11     A      I don't think a license document came with any

12   kit.

13     Q      Okay.  I understand.  The Canadian, the JCM,

14   to your knowledge, were they ever at any time an owner

15   of the '260 patent?

16     A      No.

17     Q      You really do know this, correct, they were

18   never an owner of the patent, we all know that?

19     A      No.

20     Q      Yet you know that the JCM kit is covered by

21   the '260 patent, although you may dispute its validity,

22   correct?

23     A      Correct.

24            MR. YOUNG:  I'm going to object based on the

25            preamble of the claims.

1              MR. THOMAS:   Objection noted.

2     BY MR. THOMAS:

3          Q     And you are flying a Canadian kit today in

4     your airplane, correct?

5          A     There is a Canadian kit in my airplane.

6          Q     And you have installed Canadian kits on other

7     people's airplanes?

8          A     Yes.

9          Q     Okay.  At no time did you ever receive a

10    license from any patent, any owner of the '260 patent,

11    to install Canadian kits or to use Canadian kits,

12    correct?

13         A     No.

14         Q     That was a bad question, and probably

15    confusing when we read it later.

16         A     That's correct.

17         Q     Did you ever receive a license from any owner

18    of the '260 patent to install or use the Canadian kit?

19         A     No.

20         Q     There are counterclaims that have been raised

21    by you in your answer.  The first counterclaim you're

22    seeking a judgment of non infringement.  Other than the

23    things we've already talked about today in your

24    deposition, is there any other reason you assert that

25    your use of the Canadian kit does not infringe the

1    patent?

2        A    No other reasons.

3        Q    The second counterclaim is seeking a judgment

4    of invalidity.  Other than the things that we've talked

5    about in here today, which we've explored fairly deeply,

6    do you have any other reason to assert that the patent

7    is invalid other than what you've already said here

8    today?

9        A    At this moment, no.

10       Q    The third counterclaim seeks a judgment of

11   unenforceability and specifically mentions the

12   applicants, the inventories breaching their duty with

13   the patent office, and breaching their duty of candor,

14   and good faith and honesty.

15           Other than what we've already talked about

16   here today, is there any other reason for you to claim

17   that they were somehow dishonest or breached their good

18   faith duty with the patent office?

19       A    At this time, no.

20       Q    I want to give you a document to look at here

21   that we may or may not mark as an exhibit.  I'd like you

22   to take a look at that please, along with your attorney,

23   and when you've had enough time to feel comfortable that

24   you understand what is there, answer for me please --

25   Identify this document if you can.

1          Do you recognize this document?

2     A    No.

3     Q    Do you recognize the name Puddle Jumper?

4     A    Not Puddle Jumper.

5     Q    There's a designation after Puddle Jumper,

6  it's 6686L.  What is that, do you know?

7     A    It appears to be a registration number for an

8  aircraft.

9     Q    Any idea which aircraft that would be?

10    A    The number does not --

11    Q    Doesn't tell you what kind of airplane it is?

12    A    No.

13    Q    That's the from line.  On the to line there's

14 an M. Rodstein.  Would this be the same Rodstein that

15 was mentioned earlier --

16    A    Yes.

17    Q    -- in the deposition today?  Mark Rodstein?

18    A    Probably, yes.

19    Q    And you mentioned he is the president of the

20 Lake Amphibian Flyers Club?

21    A    Correct.

22    Q    Would this appear to you to be a bulletin

23 board printout from the bulletin board you mentioned

24 earlier?

25    A    It could be.

1      Q    Let's see, the third line down there's a

2   mention of Armand.  "I have not talked to Armand about

3   this," it says.

4           MR. YOUNG:  I'm going to object on relevance.

5           MR. THOMAS:  It's very relevant.  It's

6       communication regarding the lawsuit.

7           MR. YOUNG:  Not by him and not --

8      A    Not by me.

9           MR. THOMAS:  You can make a relevance

10      objection at trial, if you want, but this is

11      discovery.

12          MR. YOUNG:  I just wanted to go on record.

13          You can answer.

14   BY MR. THOMAS:

15     Q    Do you think that might be Armand Rivard?

16     A    Yes.

17     Q    There's a statement here that says, "I can

18   tell you this, based on the little I know of these

19   patent issues, if I were representing the

20   patent-collector, I sure as hell wouldn't want Armand on

21   the witness stand on my client's behalf."

22          Do you have any idea what that sentence means?

23     A    No.

24     Q    And I'm going to ask you again, do you have

25   any idea who the identity of Puddle Jumper is?

Page 186

1       A     If you read the document, there's also another

2   name, Pete.

3       Q     Down at the signature line?

4       A     Yeah.  What is that?

5       Q     "Sponsoonerater Pete"?

6       A     I may, without certainty, have an idea of the

7   identification of this individual.

8       Q     Who would that be please?

9       A     A gentleman named -- an individual named Pete

10  Hartmann.

11      Q     Hartmann, is Pete Hartmann a Lake owner?

12      A     I think he is.

13      Q     Have you ever communicated directly with Pete

14  Hartmann?

15      A     Yes.

16      Q     When was the last time you communicated with

17  Mr. Hartmann?

18      A     A couple of weeks ago.  Pete had had some work

19  scheduled with our shop in conjunction with a Lake

20  fly-in.  Pete has since had an engine problem, and had

21  to cancel that work.

22      Q     Does Mr. Hartmann live in Florida?

23      A     No.

24      Q     What state does he reside in?

25      A     I think Arizona.

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 187

1     Q    Has he come to you for his Lake work in the

2    past?

3     A    We have done some work on Mr. Hartmann's

4    airplane, but it's not usually in Florida.

5     Q    Did you install either one of the kits on

6    Mr. Hartmann's airplane?

7     A    To my knowledge, no.  As to Mr. Hartmann, you

8    know, I can check records as we've previously discussed

9    to see if that end number had a kit installed by our

10   shop, but I don't remember.

11    Q    Well, based on your -- I realize it's a guess

12   that this is Mr. Hartmann authoring this to

13   Mr. Rodstein, who we've already identified, and Armand

14   is addressed in here, and the patent is addressed, and

15   there's obviously a patent suit involved here.  Would

16   you be relatively certain that this is a communication

17   regarding the lawsuit?

18    A    It has that possibility.

19    Q    Well, I'll just point out at the bottom

20   there's a note edited November 8th, 2010.  Would you

21   agree that falls within the time frame of the lawsuit?

22    A    It could.

23    Q    And Armand's kit is addressed, the first

24   sentence, does that help you identify this as --

25    A    Could be.

Page 188

1      Q      -- probably associated with the lawsuit?

2      A      Right.

3      Q      Let me ask it this way:  Given the factors we

4   just talked about, is it more probable than not that

5   this is a communication relative to the lawsuit?

6      A      We're going to define something.  A

7   communication relative to the lawsuit would be a

8   communication, in other words, my lawsuit would have to

9   include me.  Okay?  And I have not seen, prior to today,

10  this communication.

11     Q      Okay.  Very good.  You haven't seen this?  So

12  let's define relative to the lawsuit then in a different

13  way since you're going to define it as including you, a

14  communication addressing you.  Why don't we say a

15  communication relative to the issues of the lawsuit?

16     A      It could.  That could, not necessarily is it,

17  but that could be a definition.

18     Q      Let me show you another correspondence.  I

19  should characterize it as another document.  Do you know

20  who Gary Silver, MD is?

21     A      I'm not positive, but I think Mr. Silver is a

22  Lake owner, and again, location, I want to say out west,

23  but I'm not sure.

24     Q      Does this appear to you to be a bulletin board

25  message from the Lake Amphibian Flyers Club?

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1       A    I can't verify that because it is examples of

2   this why I don't go on the bulletin board.

3       Q    I understand.  I'd like for you to go ahead

4   and hang on to it because I'm going to ask some

5   questions.  Again, M. Rodstein is the recipient, best

6   guess be that would be Marc Rodstein, correct?

7       A    Best guess, that is correct.

8       Q    Now, in the first sentence this talks about

9   registered Lake owners.  In the second paragraph it

10  addresses an opinion regarding lawsuits.  So again, I'm

11  going to ask the question more probable than not that

12  this is relative to the issues of the lawsuit?

13      A    I don't see that in this document.  What I see

14  in this document is the way owners are notified relative

15  to issues with their aircraft.

16      Q    Well, let me ask you this:  The first sentence

17  says, "Have you responded to the obviously misguided

18  letter?  This almost sounds like they're sending this

19  letter to every registered Lake owner."

20          Do you have any idea which letter he's

21  referring to here?

22      A    Technically, no.  Intuitively it has come to

23  my attention that some Lake owners have received a

24  demand letter in the mail.

25      Q    From Enpat?

1       A     From Enpat.

2       Q     Regarding the patent and the installation of

3   infringing kits on Lake airplanes, correct?

4       A     Something like that.  I don't think it

5   consists of those few words, but yes.

6       Q     I understand it's longer than that.  Okay.

7             Obviously we're going to have a few of these.

8   I'm going to hand you another document.  Hopefully, we

9   can go a little more quickly through these.

10            For identification sake, from line is Puddle

11  Jumper, and to line is P. Furnee?

12      A     Yes.

13      Q     Now, Puddle Jumper was also in the from line

14  of the first one of these that we looked at.  At the

15  bottom there's a signature line, BS Hartmann.  The BS is

16  in quotes?

17      A     Yeah.  Yes, it is in quotes.

18      Q     It's in quotes?  Do you think that may be Pete

19  Hartmann?

20      A     There's a possibility of that.

21      Q     Here's another one.  We're going to eventually

22  attach this as a composite exhibit.  I've handed you

23  another document.  It looks similar in nature, at least,

24  to the others.  From line, CMcFarland2.  And it's signed

25  at the bottom, Charlie.  Do you know who CMcFarland2 is?

1        A     I know a Charlie McFarland.

2        Q     A Lake aircraft owner?

3        A     I believe he's a Lake aircraft owner.

4        Q     Is he a Florida resident, to your knowledge?

5        A     No.

6        Q     Do you know what state he lives in or the

7   general area of the country?

8        A     Oklahoma.

9        Q     There's a comment made in the second paragraph

10  towards the end of the second paragraph where he says,

11  "It is in all our best interests to support Harry.  I

12  will have a check in the mail tomorrow to him."

13        Did Charlie McFarland contribute to your

14  defense of this lawsuit?

15        A     It's possible.  I would have to look at that

16  list.

17        Q     And would you agree that in that portion of

18  the sentence I just read he is encouraging others to

19  support you in your defense?

20        A     Yes.

21        Q     The fourth paragraph down starts off with

22  this, "Let them spend time and money figuring out who

23  has the kit and who doesn't."

24        Moving on down there's a sentence that starts

25  with the word but, "But to just give them the

1    information after the first request letter seems to be

2    making it too easy for them.  Make them at least earn

3    it."

4         When he is talking about them, he's talking

5    about Enpat, isn't he?

6         A    He could be.

7         Q    Enpat requested information from the Lake

8    aircraft owners in an effort to determine who had

9    Canadian kits and who didn't, didn't they?

10        A    I believe they did.

11        Q    And it's true to say that there is a concerted

12   effort on the part of the Lake aircraft owners to

13   frustrate the efforts of Enpat to ascertain that

14   information?

15        A    I can't honestly verify that.

16        Q    Would you agree at least that this

17   correspondence would tend to support that notion?

18        A    I would agree that there is definitely some

19   unhappiness with the overall methods used to determine

20   that information.

21        Q    I understand.  Let's just be honest about it,

22   the Enpat owners aren't happy about the fact that Enpat

23   is requesting their log -- copies of their logbooks and

24   information relative to what kit they have in the

25   airplane, isn't that correct?

Page 193

 1        A     I can't think for them.

 2              MR. YOUNG:  Objection.

 3        A     You're asking me --

 4   BY MR. THOMAS:

 5        Q     I'm asking you based on what you heard.

 6              MR. YOUNG:  Can you read back the question?

 7              (Requested portion read back.)

 8   BY MR. THOMAS:

 9        Q     The aircraft owners, the Lake aircraft owners,

10   are not happy because Enpat has requested copies of

11   their logbooks in an effort to figure out which kit they

12   have in their airplanes, isn't that correct?

13        A     Yes.

14        Q     And isn't it correct that there is an effort

15   on the part of a group of Enpat -- of -- I'll state it

16   again, of Lake aircraft owners to frustrate Enpat in

17   their efforts to try to understand which airplanes have

18   which kit?

19        A     Reading these documents it appears that you

20   are correct.

21        Q     These documents do tend to support that

22   theory, correct?

23        A     They do tend to support that theory.

24        Q     I'm going to try to move fairly quickly

25   because time is going to run out on us.  This next

1    document is similar in nature, and it looks like the

2    from line is C-G-M-A-I-N-E.  Do you have any idea who

3    that -- the identity of that person is?

4         A    That person could be a Lake owner that I know.

5         Q    What's that Lake owner's name please?

6         A    Cliff Maine.

7         Q    Cliff Maine?  What state does Cliff reside in?

8         A    Michigan.

9         Q    Do you know a Rob Biceyskis?

10        A    I can't pronounce it either.

11        Q    Do you know this person?

12        A    Yes.

13        Q    He's identified in the to line of this

14   particular --

15        A    Yes.

16        Q    Is he a Lake aircraft owner?

17        A    Yes.

18        Q    The first line on this says, "public

19   information from the attorney, colon," which attorney is

20   that?

21        A    Cliff Maine.

22        Q    Cliff Maine is an attorney?

23        A    Yes.

24        Q    Has he provided an opinion to you regarding

25   any of the issues in this lawsuit?

1      A    Other than the fact to retain appropriate

2  counsel, no.

3      Q    Has he contributed to your defense in this

4  lawsuit?

5      A    That's possible.  I would have to look.

6      Q    Take a minute and read this.  Would you agree

7  with me that in this correspondence apparently Attorney

8  Maine is providing a link for the file wrapper for the

9  patent?

10     A    Reading the document it appears that is the

11 case.

12     Q    On its face?  And he's also provided,

13 apparently, a separate copy of the Board of Patent

14 Appeals' decision, is that correct, just reading the

15 document on its face?

16     A    I'm not sure what the link is.

17     Q    Okay.  The next one, for identification

18 purposes at the top it says, message 2768.62, and in the

19 from line it's Lgs3128P.  The signature line says Gary.

20 Previously we had one of these.  He identified himself

21 as Gary Silver, MD.  Same from line.  To Puddle Jumper.

22         Second paragraph starts off, "I am with

23 Charlie and Paul on discovery.  I take a dim view of the

24 seemingly scatter-gun approach Enpat seems to be using."

25         The fourth paragraph down, "Enpat seems to

1   have no basis for their approach if people with REVO

2   kits are receiving demand letters."

3          The second sentence in, "I agree with Charlie

4   and Paul, I have no obligation to incriminate myself."

5          Would you agree with me that this

6   correspondence also tends to support the theory that the

7   Lake aircraft owners are frustrating Enpat's efforts to

8   obtain copies of the logbooks?

9      A    It may indicate that.

10     Q    The next one is identified at the top as

11   message 2768.63.  Again from Rob Biceyskis.  I'm

12   probably not pronouncing it correctly.

13   B-I-C-E-V-S-K-I-S.  To Puddle Jumper, who is identified

14   as Pete in the salutation.

15         Third paragraph, "Well if Enpat is the bunch

16   of ambulance chasers that we believe they are, then why

17   not have them work for their dinner."

18         Further down, "If everyone were to delay their

19   response, then we are helping each other.  Why should we

20   help them narrow their targets?"

21         Same question:  In light of what's on the face

22   of this communication, would you agree that this

23   communication tends to support the theory that the Lake

24   aircraft owners are acting in concert to frustrate

25   Enpat's efforts to obtain copies of the logbooks?

1       A    This communication indicates to me that there

2   are owners of Lake aircraft who are attempting to

3   frustrate the efforts of Enpat on some level.  And

4   notice I said, "some Lake owners."

5       Q    The next one at the top for identification

6   purposes only, message 2768.66.  The from line is from

7   LA4200EP.  It's signed signature Michael.  Do you know

8   who Michael would be?

9       A    No.  The from line is the model of the

10  airplane, so there's a Michael out there with that

11  model.  And I don't know.

12      Q    I understand.  First sentence states, "Why

13  would anyone respond to a letter from a lawyer anyway?

14  Unless it is a legal subpoena, I would throw the letter

15  in the trash.  I do not have to answer any questions

16  from an attorney just because they send me a letter."

17          Same question:  Does this correspondence on

18  the face of it tend to support the theory that some Lake

19  aircraft owners are attempting to frustrate the efforts

20  of Enpat --

21      A    This is certain circumstances.

22      Q    -- to obtain information regarding the kits?

23      A    None of that is mentioned here.  It just says

24  a letter from an attorney unless it's a subpoena.

25      Q    You would admit that the LA-4-200-EP is --

1       A     That's a Lake owner.

2       Q     And it's a model subject to the AD?

3       A     That I would admit to.

4       Q     This next one is rather short.  For

5    identification purposes it's message 2768.68.  The from

6    line looks like it's T-T-U-X-I-L-L, in parentheses

7    "TurboTax" or maybe "TurboTux".  Do you recognize Tom

8    Tuxill?

9       A     Tom Tuxill.

10      Q     Did he contribute to your defense?

11      A     I think so.

12      Q     The next one at the top has the identification

13   message 2768.70.  Would you agree this is from Paul

14   Furnee?

15      A     It appears to be.

16      Q     To Mark Rodstein?

17      A     It appears to be.

18      Q     Addressed to Marc, that's M-A-R-C.  I'll ask

19   you to take a minute and read it.  Would you agree that

20   in this correspondence Mr. Furnee is encouraging a group

21   of Lake aircraft owners to act in a concerted fashion?

22      A     That appears to be one of the thoughts in his

23   communication and it's -- Off the record?

24      Q     Sure.  We can go off the record for a second.

25      A     I need to go to the bathroom.

1              (Off the record at 3:46 PM.)

2              (Back on the record at 3:53 PM.)

3    BY MR. THOMAS:

4        Q    The next communication and from line, for

5    identification purposes at the top reads 2768.72.  Does

6    this appear to be a communication from Paul Furnee from

7    what you can tell?

8        A    It appears to be.  It has a from line of P.

9    Furnee.

10       Q    The to line is LakeWash, L-A-K-E-W-A-S-H.  Do

11   you know who LakeWash is?

12       A    No.  Well, I may know LakeWash, but I don't

13   know who this identifies.

14       Q    Who is the LakeWash you know?

15       A    I may know that person, but this doesn't

16   identify him.

17       Q    For you?  I understand.  The second -- maybe

18   it's the third sentence of the first paragraph --

19   "Furthermore, there were quite a number of kits sold

20   that were genuine kits, but -- then in caps -- were not

21   sold by Lake or Aerofab.  In other words, there was a

22   black market for these kits that Armand knew nothing

23   about."

24              What does he mean when he says there were

25   quite a number of kits sold that were genuine kits, but

1  were not sold by Lake or Aerofab?

2       A    At one time there were some kits sold by the

3  person who manufactured the kits, and those sales did

4  not go through Lake or Aerofab.

5       Q    Okay.  When you say the person who

6  manufactured the kits, who was that?

7       A    Mibec is the name that comes to mind.  At the

8  time these kits were produced, Aerofab did not have a

9  production certificate, so someone had to be retained

10  who could acquire an FAA --

11       Q    Uh-huh.

12       A    -- to make parts for production for

13  installation on certified airplanes.  This firm, I want

14  to say, was Mibec.

15       Q    Do you know how to spell that?

16       A    M-I-B-E-C.  It was the initials or something

17  of his daughters.  And somewhere, as this goes back now

18  nearly ten years, I may have the name of the person who

19  ran that shop.  And there was an issue of nonpayment,

20  this is rumor, by Aerofab, so he had kits.  People

21  needed kits, and people contacted him directly.

22       Q    Where was he located, what state?

23       A    Maine.

24       Q    City?

25       A    I'm not sure.  I've heard mention it was also

1    in New York.  Try Rochester, but I'm not positive.

2         Q    But you're saying he was a supplier to

3    Aerofab?

4         A    Yes.

5         Q    But that he also sold kits not through

6    Aerofab?

7         A    Yes.

8         Q    Did you ever order a kit from this Mibec?

9         A    I think I got one Aerofab kit from Mibec.

10        Q    You called it an Aerofab kit, but you ordered

11   it directly from Mibec?

12        A    Yes.

13        Q    The last sentence, "In other words, there was

14   a black market for these kits that Armand knew nothing

15   about," Mr. Furnee seems to be saying that Armand didn't

16   know that Mibec was selling kits?

17        A    That's Mr. Furnee's opinion.  I can't verify

18   that.

19        Q    He says here in the -- I guess it's the third

20   line again, "There were quite a number of kits sold in

21   this manner," do you have any idea what he means by

22   number of kits?

23        A    No.

24        Q    But you think that you purchased at least one

25   from Mibec?

1       A     I believe it was one and only one.

2       Q     The last sentence in the correspondence says,

3    "You should do whatever will cost them the most money,

4    and you will help everyone."

5             The first sentence in that last paragraph

6    says, "Inviting them out to inspect your airplane might

7    help you out, but would not help out the general cause."

8             The sentence I just read, the "them" there is

9    Enpat, isn't it?

10      A     It could be, yes.

11      Q     And would you agree with the assertion that

12   these statements tend to support the idea that at least

13   some of the aircraft owners are acting in concert to

14   frustrate the efforts of Enpat --

15      A     You can read --

16      Q     Let me finish the question, to ascertain which

17   --

18      A     When you pause, it appears to be an end.

19      Q     My brain is working more slowly as yours is

20   too.

21      A     Okay.

22      Q     But do you agree that this communication tends

23   to support the theory that Enpat may be frustrated by

24   some of the Lake aircraft owners?

25      A     I can't tell you if Enpat is frustrated, but

1    it appears that the Lake owners are -- there appear to

2    be some Lake owners who are attempting to frustrate some

3    of Enpat's efforts.

4         Q    When you say some Lake aircraft owners, based

5    on your communication in the industry, not only what

6    we've gone through here today, but what you know, would

7    you say that's a majority of the Lake aircraft owners.

8         A    No.

9         Q    Why do you say no?

10        A    The level of communication, in other words,

11   how many people, how many unique individuals are evident

12   in this communication.

13        Q    You would agree, though, that it's more than

14   likely that it's just a subset of the aircraft owners

15   that participate in the bulletin board, correct?

16        A    It has to be at least that.

17        Q    You said you don't participate very much?

18        A    I avoid it like the plague.

19        Q    The next is another message, and at the top it

20   says, message 2768.18.  Does this appear to be from Paul

21   Furnee?

22        A    It has a P. Furnee from line.

23        Q    In the to line do you recognize the name

24   SunnyDon?

25        A    No.

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1      Q      S-U-N-N-Y-D-O-N?

2      A      No, I don't.

3      Q      The third paragraph down about halfway through

4    the paragraph, "How can some kooky law firm prove that I

5    have an infringing kit installed?  They can't.  Not to

6    mention the fact that somehow, after the kit was

7    installed, I lost my logbooks.  The funny thing about

8    logbooks, they have a habit of disappearing."

9            The next paragraph down, "Now, of course,

10   someone could (only by court order) inspect my airplane

11   to see if they somehow could determine what kit might be

12   installed."

13           Skipping ahead, "but I just flew my airplane

14   to Siberia last week.  Have fun guys."

15           Is it fair to characterize this communication

16   as encouraging Lake aircraft owners to not produce their

17   logbooks and not to produce their airplanes for

18   inspection?

19      A      No.

20      Q      Why do you say no?

21      A      Because I think most Lake aircraft owners

22   would view this communication as something less than

23   most Lake aircraft owners would feel proper with.

24      Q      I understand that.  But my question was:  Is

25   it fair to characterize this as encouraging Lake

1    aircraft owners to not produce logbooks?

2        A    This individual appears to be encouraging

3    that.

4        Q    Would you agree with me, though, that Paul

5    Furnee enjoys some level of respect in the Lake Aircraft

6    community?

7        A    Yes.

8        Q    He is somewhat looked up to by the owners,

9    isn't that true?

10       A    Some owners do indeed look up to Paul.

11       Q    Okay.  Thank you.  This next posting is -- at

12   the top identifies message 2768.26.  In the from line it

13   says flyeddy, F-L-Y-E-D-D-Y.  Do you know who flyeddy

14   is?

15       A    No.

16       Q    In the to line it says simply to all.  Just to

17   paraphrase, he mentioned hiding slaves in the 1850s and

18   draft dodgers in the '60s and '70s.  "Would be easy to

19   understand how a US Lake owner may decide to use an

20   obscure Canadian base of operation for an unexpected

21   duration while exploring the North."

22            Would you agree that this correspondence tends

23   to support the notion that again there are at least some

24   Lake aircraft owners who are suggesting to the community

25   don't make your airplanes available for inspection?

Page 206

1       A     It appears this individual is suggesting that.

2       Q     This next message is, for identification

3    purposes at the top 2768.21.  In the signature line BS

4    Hartmann.  Again this is from Puddle Jumper at the top.

5    Do you think it's likely from Pete Hartmann?

6       A     It has a great possibility of being Pete.

7       Q     The to line is, to all.  I'm going to read

8    excerpts of this, "Bottom line, dash, stand behind Harry

9    on this."

10           Mr. Shannon, would you agree that the Harry in

11   that sentence most likely means you?

12      A     Good possibility.

13      Q     And further on down is a sentence that starts,

14   "But defending it will involve time, money and

15   aggravation, period.  Suggest we let Harry's lawyers

16   handle this."

17           Further on down, "Bottom line, support Harry,

18   dash, his fight is our fight."  Our is capitalized."

19           So would you agree that this communication to

20   all tends to support the theory that the Lake aircraft

21   owners, maybe not all of them, but in general as a

22   community, have been encouraged to stand behind you in

23   your fight to defend this lawsuit?

24      A     That is correct.

25      Q     Okay.  The next one is, at the top for

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 207

1    identification purposes, message 2768.11.  Again it's

2    signed BS Hartmann.  In the from line it says Puddle

3    Jumper.  Would you agree most likely Pete Hartmann

4    authored this?

5        A    Yes.

6        Q    The fourth paragraph down in all caps, "United

7    we stand, together we fall.  This is our fight."

8    Exclamation point.  And then, "Now send Harry an

9    insurance check."

10            Again, would you agree that this

11   correspondence tends to support the notion that the Lake

12   aircraft owners, at least some of them, are united and

13   standing behind you in your defense of this case and

14   contributing money?

15       A    Yes.

16       Q    The next is another correspondence, and at the

17   top identifies message 2768.20.  This is from

18   F-S-T-E-E-V-E-S this time.  Do you know who that

19   identity of -- do you know the identity of this person

20   who has authored this correspondence?

21       A    No.

22       Q    It's addressed to Harry.

23       A    It assumes.

24       Q    The Harry would be you, yes?

25       A    I don't know.

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1      Q    Most likely?

2      A    There is a chance.

3      Q    Well, it's -- when I say it's addressed to

4  Harry -- actually it's C-G-M-A-I-N-E, which is

5  Mr. Maine, I think you said earlier?

6      A    Could be.

7      Q    Then the salutation is, "Harry," comma, and

8  apparently this person asked one of their patent

9  attorneys to review this, whatever this means, then it

10  says, it says, "Frank," so do you think the Frank could

11  be the fsteeves up there?

12      A    Could be.

13      Q    Do you know a Frank Steeves?

14      A    I don't think -- I don't recall a Frank

15  Steeves.

16      Q    Okay.  This correspondence -- Apparently,

17  whoever addressed communication to Frank has reviewed

18  the Board of Patent Appeals decision on its face, and

19  the involved patent would be the '260 patent, then

20  provides some opinion down at the bottom, says, "In

21  order to develop more complex defenses, I would have to

22  review the file wrapper for the '260 patent, and do some

23  searching in Canada for a patent there.  I can do the

24  Canadian rather quickly, but perhaps I could simply talk

25  to Mark Young, the attorney for Harry Shannon.  If he

1    has a PDF copy of either, that would save time and

2    effort.  Also, I would be happy to give him my thoughts

3    on defenses, if that would help."

4           On the second page, "Let me know whether or

5    not to contact Mark Young.  I'll continue research on

6    the kit issue."  Signed Linda.

7           Did you ever talk with a Linda who apparently

8    is an attorney?

9       A    I got an e-mail from -- I think I got an

10   e-mail from someone I didn't recognize as knowing that

11   dealt with this subject, and I forwarded that to Mark.

12      Q    You did forward that to Mr. Young, your

13   attorney?

14      A    Yes.

15      Q    Did you engage this Linda as an attorney to

16   represent you in this case?

17      A    No.

18      Q    But she e-mailed you directly, did she?

19      A    Someone specifically pointed this

20   communication out to me, and it, like I said, I fight

21   going onto that forum with a passion, but someone had

22   said -- and I don't remember who it was -- said, check

23   this one, and I may have made a response to her to

24   contact Mark.

25      Q    Okay.  To your knowledge, did she contact

1    Mr. Young?

2        A    I don't know.

3        Q    Did she respond to you in any way?

4        A    To my knowledge, I never got another response.

5        Q    But you would agree that someone in the Lake

6    community asked her to get involved and provide some

7    opinion regarding the issues in the case?

8        A    It appears to be the case.

9        Q    Okay.  This last one I'm going to show you --

10   I shouldn't say last.  This next one is identified at

11   the top as message 2768.22.  Could you identify for me,

12   please, who you -- who would be your best guess as to

13   who that is in the from line there?

14       A    From line reads M. Rodstein.

15       Q    Would that be the same Marc Rodstein we talked

16   about earlier today?

17       A    Could be.

18       Q    Since it's signed Marc Rodstein?

19       A    Yes.

20       Q    The to line is fsteeves.  Take a minute and

21   read this if you would please.

22            Looking at this communication, it addresses

23   Enpat, and the bottom line in the bottom paragraph is,

24   "This is why I'm sending Harry my check for $500 on top

25   of the $1000 previously contributed."

 1                Would the Harry in that line be you?

 2       A     I think so.

 3       Q     So would you agree that this communication is

 4   related to the issues in the lawsuit here?

 5       A     It could be.

 6       Q     The next one is message 2768.24.  Could you

 7   tell me, please, can you identify who this is from?

 8       A     This name means nothing to me.

 9       Q     S-A-N-V-E-8 addressed to Puddle Jumper, which

10   is most likely Pete Hartmann?

11       A     Could indeed be Pete Hartmann.

12       Q     This says, "In talking with Harry the other

13   day, he told me they are requiring the owners that they

14   potentially are going to sue to prove which kit they

15   have installed on their airplane."

16                Would you agree that on the face of this

17   communication it looks like the author of it spoke with

18   you about the lawsuit?

19       A     It could be.

20       Q     Does that help you identify snave8?

21       A     No.

22       Q     It follows in the bottom there, "My check to

23   Harry is going out Monday morning."

24                So someone you spoke with, someone who sent

25   you a check and is identified as snave8, you don't --

1     A     Snave8 does not allow me to identify the

2   individual referenced.

3     Q     Okay.  The next one, the top is 2768.30 from

4   Puddle Jumper to the person we've previously talked

5   about, Rob Bicevskis.  The third sentence down, "Face

6   it, we Lake owners are a cult of sorts.  Let's stick

7   together and support Harry."

8     A     Your point.

9     Q     The question is:  On the face of it, would you

10   agree that this correspondence is related to the issues

11   in the lawsuit?

12     A     It could be, yes.

13     Q     Okay.  I'd like to collect all of those up

14   that I just handed you, I don't know where you've been

15   putting them, and make that a composite exhibit.

16           Are you aware of -- Are you aware of a kit

17   that was manufactured in South Florida that was intended

18   to help aircraft owners comply with the AD?

19     A     No.

20     Q     Going back to the kit that was manufactured by

21   Mibec.  If you used a Mibec kit to comply with the AD,

22   would you have to file an AMOC?

23     A     No.

24     Q     Would you file a 337?

25     A     Probably, no.

1      Q      Would it fall under the protections of the FAA

2   approval that Aerofab had for that kit?

3      A      I think, yes.

4      Q      So it would have been possible to purchase a

5   kit from Mibec, and not pay Aerofab, comply with the AD,

6   and not have to file a 337 or an AMOC?

7      A      Yes.

8      Q      Do you recall what the price of that Mibec kit

9   was that you purchased?

10     A      I want to say -- it would be speculation -- I

11   mean, I know there was a price.  It can be determined.

12     Q      Do you have any records that would reflect

13   what the price was of the kit you purchased from Mibec?

14     A      I'm not 100 percent guaranteed, but reasonably

15   confident I do have a record.

16     Q      Would that be in your possession or the

17   company's possession?

18     A      Company.

19     Q      That's at the Bartow facility?

20     A      Yes.  And if I bought it, I installed it.  I

21   say "I," me or my entity installed it.

22     Q      I understand.  I'm going to ask you to

23   speculate here.

24     A      Okay.

25     Q      Based on the communication that you saw from

1    Paul Furnee where he said quite a number of these kits

2    were sold, is it likely, in your opinion, that Paul

3    Furnee would be accurate in the statements he made there

4    in that communication regarding the number of kits being

5    sold by Mibec?

6         A    There is potential of that.

7         Q    Just to put it in really common, you know,

8    just to boil it down, does Paul Furnee know what he's

9    talking about when he talks about this company selling

10   these kits?

11        A    It's likely that he does.

12        Q    Do you recall if the price of the Mibec kit to

13   you was less than the price of the Aerofab-ordered kit?

14        A    Yes.

15        Q    Substantially less?

16        A    Yes.

17        Q    I'm going to take a break, and go off the

18   record.

19                  (Off the record at 4:27 PM.)

20                  (On the record at 4:33 PM.)

21   BY MR. THOMAS:

22        Q    Regarding documents relative to any issues in

23   the lawsuit, do you know of anyone who we haven't

24   identified here today -- Scratch that.  Do you know of

25   any documents in the possession of anyone other than you

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    or your attorney that are related to the issues in the

2    lawsuit, and if so, who possesses those documents?  I'm

3    going to except from that the FAA.  We understand that

4    they have records and certainly the plaintiff.

5         A    The FAA has records.  I'm sure there are other

6    communications similar to what you exposed here today

7    that may have been e-mailed or snail mailed that could

8    have --

9         Q    Would that be back and forth between the Lake

10   aircraft owners?

11        A    I don't know.

12        Q    Is it likely that there are such documents out

13   there, e-mail communications and such, documents other

14   than you --

15        A    Are you assured that you have all of the

16   communications on the website?

17        Q    No, absolutely not.

18        A    Neither am I.  You're asking me a question far

19   beyond my reach to answer.

20        Q    I'm asking if you have specific knowledge

21   as --

22        A    No, I don't have specific knowledge.

23        Q    Today, as we've been in your deposition here

24   today, have you been on any medication that would render

25   it difficult for you to give clear and precise answers?

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

```
 1       A     No.

 2       Q     Have you ever been convicted of a felony?

 3       A     No.

 4       Q     In any state have you ever been convicted of a

 5  crime involving fraud or dishonesty?

 6       A     No.

 7       Q     Have you ever been convicted of a crime that

 8  could have resulted in imprisonment for more than a

 9  year?

10       A     No.

11             MR. THOMAS:  We'll tender the witness for

12       cross.

13                       CROSS EXAMINATION

14  BY MR. YOUNG:

15       Q     For the record, my name is Mark Young.  I'm

16  your attorney.  And I'm going to ask you a few questions

17  to clarify some things, maybe help clear up some things

18  that were addressed previously today.  The same

19  admonitions apply.  Please answer yes or no.  If you

20  don't understand the question, please ask me to restate

21  it.  I'll do my best to be as quick as possible.  I

22  understand it's been a long day.

23             MR. YOUNG:  Is this a copy of the exhibits

24       that we have?

25             MR. THOMAS:  I have a complete set for you.
```

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 217

1         It's gotten messed up.  What we can do -- What are

2         you looking for?

3    BY MR. YOUNG:

4         Q    I can work off my copy of the patent for now.

5    Mr. Shannon, would you mind turning your attention to

6    claim one of the patent labeled Exhibit D.  I'll try to

7    be as clear and concise as possible.  Does claim one

8    require a root rib angled relative to a vertical plane?

9              MR. THOMAS:  I'm going to object.  That calls

10        for a legal conclusion, but go ahead and answer.

11        A    Claim one appears to state, "Wherein said root

12   rib is angled relative to the vertical plane of said

13   amphibious airplanes."

14   BY MR. YOUNG:

15        Q    Let me rephrase the question to address the

16   objection.  Does claim one recite a root rib angled to a

17   vertical -- angled relative to the vertical plane?

18             MR. THOMAS:  Objection, mischaracterizes the

19        claim.

20        A    Yes.

21   BY MR. YOUNG:

22        Q    Is the root rib of a Lake aircraft angled

23   relative to the vertical plane of the aircraft?

24        A    No.

25        Q    How do you know?

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1     A    I've worked on them, taken them apart, put

2  them together.  You can look at it visually.  And the

3  root rib of the wing is parallel with the vertical

4  access of the aircraft.

5     Q    Does that language in the claim make it

6  confusing and unclear?

7     A    Well, they're talking about an airplane here

8  that has a root rib with angle relative to the vertical

9  access.  My aircraft is not configured that way.

10    Q    Is there another element that's recited in the

11 claim that has an angle related to the root rib?

12        MR. THOMAS:  Objection that you've

13        characterized the root rib as an element of the

14        claim.

15 BY MR. YOUNG:

16    Q    You can answer.

17    A    I believe it says -- claim five says upper

18 doubler-strap -- inboard-end angle on said upper

19 doubler-strap is approximately five degrees.

20    Q    Okay.

21    A    And further, actually the answer to your

22 question is yes, claims five and six reflect that, and

23 indicate angles on the inboard ends of the doubler.

24    Q    What about claim one, is there anything in

25 claim one that refers to the inboard end of the doubler?

1      A      Yes.  Claim one does indicate an upper

2      doubler-strap -- where it says upper doubler-strap has

3      an upper inboard end angle and said lower doubler-strap

4      has a lower inboard end angle, so that would also be

5      reflected in claim one.

6      Q      Would changing the angular orientation of the

7      root rib impact the inboard end of the doubler?

8      A      Yes.

9      Q      How?

10     A      The root rib is attached to the spar.  The

11     root rib is attached to the spar in close proximity to

12     the bolts that attach the wing to the airplane.  If that

13     angle is changed, to maintain an appropriate

14     relationship of the inboard bolthole, then that angle

15     would also have to be changed on the doubler.  I think I

16     got that right.

17     Q      Did you previously initiate a reexamination

18     proceeding against the patent?

19     A      Yes.

20     Q      By patent, I'm referring to the same patent

21     that we've been discussing all day.

22     A      The '260 patent.

23     Q      In connection with that, did you identify

24     prior art that was cited against the claims of the

25     patent in that reexamination?

1       A     I know I submitted information to the firm

2    doing the reexamination to specify prior art, you know.

3    We talked about numerous things during that period.

4       Q     Do you recall if you included any prior art

5    that showed or described a doubler having an inboard

6    angled end?

7       A     At that time I can't remember specifically

8    including a doubler with an inboard end angle.  I know

9    I've dealt with doublers with angles, but I don't know

10   if that was provided to counsel at that time.

11           MR. THOMAS:  Objection.  Mark, when you say

12       cited, cited by whom?  You said cited against the

13       claims of the patent.

14   BY MR. YOUNG:

15      Q     Of the prior art that you supplied, what you

16   recall that you supplied, did you include any prior art

17   that showed a doubler having an angled inboard end?

18      A     No.

19      Q     As a follow-on question:  Did you include any

20   prior art that showed a doubler having an angled inboard

21   end to accommodate some adjacent structure?

22      A     No.

23      Q     Do you recall what happened during the

24   reexamination proceeding initially, prior to appeal?

25      A     There was a tremendous amount of

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    communication, but I remember actually at the first

2    review or reexamination all 14 claims were rejected.

3        Q    On appeal do you recall -- you had an

4    opportunity to review the appellate decision, the

5    decision by the Board of Patent Appeals, didn't you?

6        A    I read them.  But if you will, counsel was

7    handling that.  They knew a lot more of how this is

8    worded, and so forth, than I did; but yes, I reviewed

9    them briefly when they came back.

10        Q    Do you recall if the panel considered a lack

11    of prior art relating to the angle of the inboard end of

12    the doubler to be important in their decision?

13        A    I don't recall that.

14        Q    Have you ever seen this drawing before?

15        A    Yes.

16        Q    I want to mark this as an exhibit.  I don't

17    know how we're going to deal with it.  I believe earlier

18    you testified that you were in the aircraft maintenance

19    business?

20        A    Yes.

21        Q    And you, in particular, you focus on Lake

22    aircraft?

23        A    Since 1987 Lake amphibians have been a major

24    portion of my work.

25        Q    What does an aircraft maintenance professional

1   like yourself do?

2       A    We inspect.  We repair.  We counsel customers.

3   We have participated in development of ADs.  In '99 I

4   was National Aviation Maintenance Technician for the

5   United States, and selected by the FAA process.  And in

6   essence that related or one of reasons for that

7   selection for that honor, if you will, was the work put

8   into another AD, specifically on the LA-4-200.  And so

9   we -- in my case, as I'm also a licensed pilot, I test

10  fly the work that we perform, and make sure it's ready

11  for true delivery to a customer.

12      Q    What kind of tools do you use in your

13  business?

14      A    Wrenches, socket screwdrivers, sheet metal

15  tools, things that would cut metal, shape metal, measure

16  metal, you know, rivet guns, screw guns, bucking bars,

17  shears.

18      Q    Do you ever work with drawings?

19      A    Drawings are a frequent part of that.

20  Drawings were supplied with the kits to install them

21  from the AD.

22      Q    Earlier you testified about some familiarity

23  with the job of Jack Tarbox and Phil Baker?

24      A    Yes.

25      Q    Would they ever have occasion to work with

1    drawings?

2         A    They more so than the average mechanic because

3    at the factory all of drawings of the aircraft would be

4    available to someone like Mr. Tarbox or Mr. Baker.

5         Q    Ever have occasion to use a compass?

6         A    Say again?

7         Q    Did you ever have occasion to use a compass?

8         A    Yes.

9         Q    Is this the type of drawing that a

10   professional such as yourself might use in the ordinary

11   course of your business?

12        A    If you have access to such a drawing, yes.  It

13   can be very useful in repairing and developing things

14   for aircraft.

15        Q    Did you have access to such a drawing?

16        A    I have a copy of this drawing, but it came

17   into my possession relatively recently.

18        Q    Is this something that Mr. Tarbox and

19   Mr. Baker, the named inventors on the patent, might have

20   access to while they were working for Aerofab or REVO?

21        A    I would think, yes.  I'm not -- they worked

22   for the factory, you know, and at times in the past I've

23   called Mr. Tarbox, and said, "I need an answer about a

24   given component of the airplane."

25             Jack's reply could be, "Just a moment, let me

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1   look at the drawings."  So Jack had access probably to

2   these drawings.

3        Q    Is there anyway of determining when this

4   drawing may have been created?

5        A    There appears to be a failure of the print

6   mode here, but this says, "checked by," it could be Jack

7   Tarbox.  This date appears to be 11/6/53, perhaps.

8        Q    Are drawings like this occasionally amended

9   from time to time?

10       A    Yes, this drawing would have been amended from

11  its original.

12       Q    Why might a drawing be amended?

13       A    As we progress through different models of an

14  airplane, different structural changes to accommodate

15  more weight, different engines, you know, different

16  equipment.

17       Q    What, in general, does this drawing show?

18  Take a moment to look it over if you need to.

19       A    Like I say, there appears to be a lack of

20  print here, but I believe this BEA is the first letters

21  of beam, B-E-A-M.  Meaning that beam is one definition

22  of the wing spar of the Lake amphibian.  And this

23  appears to be a drawing that would depict construction

24  and details of the wing spar of a Lake amphibian.

25       Q    Do you believe this drawing has been revised?

1       A    Yes.

2       Q    Why?

3       A    This drawing shows wing doublers on the

4  inboard end of the beam assembly.

5       Q    Can you point to the doublers that you're

6  referring to?

7       A    The doublers appear to be this material here,

8  and this material here.  There was a picture earlier,

9  and also in the patent, that shows the installation of

10  the doubler positioned on the spar.  But earlier there

11  was perhaps something submitted that would show the

12  similar shape.

13       Q    And are the doublers the parts that are

14  horizontal and parallel near the left corner of the

15  document, each of which says one-and-five-eighths on

16  them?

17       A    Okay.  In this area there is a description of

18  one-and-five-eights -- to be more specific, I think if

19  you look here, it calls a -96, -93.  Here it calls

20  a -101, -99.  There's a chance that those numbers would

21  be related over here.  So let's see if we can find -101,

22  I think is one of the numbers I gave you.  It says

23  doubler steel.  It could reflect, if we had a little

24  better copy of this, what the alloy was.  So there's a

25  good chance that those items identified are the doublers

1    used to satisfy the wing spar AD on the Lake Amphibian.

2            MR. THOMAS:  I'm going to object, Mark, when

3        we're reading the transcript, it's going to be very

4        difficult, if not impossible, to understand here

5        and here when we're pointing on the drawing.

6            MR. YOUNG:  Could we mark up the drawing,

7        would that be okay?

8            MR. THOMAS:  Sure.

9            MR. YOUNG:  Do it in pencil?  We could always

10       erase it.

11           MR. THOMAS:  Ink would be better.

12   BY MR. YOUNG:

13       Q    Why don't you -- would you be so kind as to

14   label the upper doubler, and let's use the language from

15   the patent, is it lower or bottom?  Upper and lower

16   doubler-straps?

17       A    (Complying.)

18       Q    Thank you.  Okay.  For the record, Mr. Shannon

19   has labeled the upper doubler upper doubler, and labeled

20   the lower doubler lower doubler.

21           If you were designing a doubler to address a

22   cracking issue near the root rib, would a drawing like

23   this be helpful?

24       A    Yes.

25       Q    How so?

1       A     It gives you the angle, you know, it gives you

2    the shape of what you're attempting to make a piece

3    from.  Here in a room with pencil and paper we can

4    accurately draw the exact shape of a doubler to fit what

5    we're working on.

6       Q     Can you clarify that for me please?

7       A     One, let's define where cracks have been

8    discovered on the wing beam.  They were found primarily,

9    to my knowledge, they were found on the lower, the

10   phrase is cat strip of the beam.  As the lower beam is

11   in tension, it's attempting to tear things apart as

12   opposed to compression, which the upper beam is pretty

13   dominantly in compression.

14          To date, to my knowledge, we found no cracks

15   in the upper beams.  In the lower beams we found

16   numerous cracks in this radius of the spar-cap cutout,

17   which is in detail here.  And on the aircraft that I

18   inspected on the pre-purchase, that showed the spar near

19   a potential failure, showed a crack through the outboard

20   lower bolthole that included the spar cap and the

21   spar-cap doubler at that time.

22      Q     For the record, would you mind identifying

23   those parts by marking them as crack or cracking?

24      A     Okay.  We will describe this as an inboard-end

25   crack.  And in this area, where this -83 is, is the

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    doubler.  And I'm trying to think.  This is -- I'm

2    looking at this from the front, so this would be a

3    hidden line -- but we have a crack through this point,

4    this area, that includes -- this is a crack in the lower

5    spar-cap doubler and the lower spar-cap angle.

6           Let me define that.  The lower spar cap has an

7    unique angle that is attached to the bottom of the beam

8    making the lower spar cap --

9        Q    What is that angle due to?

10       A    Well, this word "angle" here refers to an

11   extrusion in an angle.  Here is an end view of the lower

12   spar-cap angle.  Meaning a physical angle.  Not -- it

13   does have an -- the angle has an angle to, but it is

14   defined as an angle like an angle extrusion or -- let's

15   say you could buy an angle at Lowe's or Home Depot --

16   but this is a specific angle made for the lower spar cap

17   of this spar structure.

18       Q    When referring to angles, you may be referring

19   to a structure, or you may be referring to an

20   orientation of a particular component?

21       A    Or an end or shape of a particular component.

22   And this particular thing, I'm referring to a crack in a

23   physical angle, not an angular measurement.

24       Q    Now, are the wings of the Lake aircraft

25   dihedral?

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1       A     Yes.

2       Q     What does that mean?

3       A     It means relative to the horizontal access of

4    the aircraft the wing tips, the wings I'm going to say,

5    slope upward.  We have then what is considered a

6    positive dihedral meaning the wings from the root to the

7    tip go up.

8       Q     And what does that mean in terms of the

9    internal wing structure?  Just let me restate the

10   question.  What does that mean in terms of the spars

11   comprising the internal wing structure?

12      A     On the Lake spar or Lake wing we have positive

13   dihedral, and we have a wing that tapers from root to

14   tip.  So we have a four-sided polygon that those angles

15   through there are going to have a total to 360 degrees

16   on a polygon.  We have a dihedral, if my memory is

17   correct, of approximately five-and-a-half degrees on the

18   aircraft.  So the reference line of the spar is sloped

19   up at five-and-a-half degrees.

20      Q     Does that mean the top spar and bottom spar

21   are both sloped up at five-and-a-half degrees?

22      A     No.  Because as we mentioned earlier, the wing

23   spar has a taper.  So that the upper spar cap is going

24   to have a slightly different angle from dihedral, and

25   the lower spar cap will have a slightly different angle.

Page 230

1        Q     Can you estimate the angle for the lower spar?

2        A     You can measure it with a protractor.  We have

3   a drawing, and we're estimating this appears to be a

4   reference line of the vertical -- a reference line of

5   the doubler.  This measures from 90.  This is going to

6   give us a six-degree angle off of the -- at the end of

7   the doubler or six degrees from the 90.  In other words,

8   you're measuring --

9        Q     Would you mind marking that on the drawing for

10  the record?

11       A     We're going to mark here to here, six degrees.

12  That is this angle from vertical.

13       Q     Would you mind doing the same for the upper

14  doubler?

15       A     Let's see if I can accomplish that.  This

16  drawing is measuring approximately four, four-and-a-half

17  degrees.  I would say four-and-a-half is what we're

18  measuring on the drawing.

19       Q     Okay.  Having a drawing such as this, would

20  that make it easier to design a doubler to fit the

21  spars?

22       A     Yes.

23       Q     Can you clarify that?

24       A     If you're designing -- Let me back up a little

25  bit.  We're designing a doubler to re-enforce the weak

1    areas of this spar.  It appears that the research done

2    in developing the doubler showed that we were

3    experiencing potential fatigue failure at the lower

4    outboard attach bolt in normal operations, 1G, you know

5    flying along in stable level flight.

6              Due to a phenomenon called first effect, this

7    outboard fastener does the majority of attaching the

8    wings.  Under those conditions, likewise, as you hit

9    small bumps in flying, this one bolt is exposed to a lot

10   more fatigue forces than the other fasteners attached.

11   When you go the ultimate strength of the structure, the

12   things stretch, and now other fasteners do more of the

13   job.

14             Because of the discovery of the crack at this

15   point, the initial cracks were found inboard, we found

16   that the doubler had to extend to include -- to

17   strengthen the area here.  We need a doubler to bridge

18   that fatigue area on that.  We need a doubler that gives

19   us good attachment.  As we go through the six bolts, if

20   this doubler were cut at a vertical angle or square on

21   the end of it, we lose effective edge distance on the

22   inboard attach bolt.

23        Q    Let me see if I understand correctly.  Does

24   referring to the drawing facilitate determining a

25   suitable angle for the doubler so that it abuts or

1  nearly abuts the structure at the end?

2      A    The drawing shows you what the angle is.  In

3  other words, that's the angle, that's where it needs to

4  fit.

5      Q    To your knowledge, was this drawing or any

6  version of this drawing or drawings similar to this

7  drawing ever submitted to the US Patent and Trademark

8  Office as prior art in connection with the patent?

9      A    To my knowledge, no.

10     Q    I'm done with this drawing for now.  Are you

11 familiar with the manufacturer and installation of

12 aircraft reinforcing structures?

13     A    I have seen things that are to reinforce

14 aircraft manufactured in the past, yes.

15     Q    Would a doubler be an example of a reinforcing

16 structure?

17     A    Yes.

18     Q    If you were to, referring to the patent, if

19 you were to replicate that kit from the patent so that

20 you could use the patent as a recipe to make a suitable

21 kit, what type of information would you need?

22     A    We would need the physical dimensions of the

23 strap, you know, the -- how thick it is.

24     Q    Would you need information about the material?

25     A    Yes.

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    Q    Would you need information about the coatings?

2    A    Well, I believe your question was if we were

3    making a doubler to reinforce something on an aircraft.

4    There's general practices that want you to protect the

5    materials involved.  There are publications that as a

6    mechanic you're exposed to that say protect the

7    material, so you want a coating on the material to

8    protect the base and the doubler itself.

9    Q    Let me rephrase the question.  Assume this

10   patent is your recipe.

11   A    Okay.

12   Q    Your goal is to replicate the doubler

13   described in the patent so you can use it for a

14   particular Lake aircraft.

15   A    Okay.

16   Q    To create that doubler, would you need

17   information about the material?

18   A    Yes.

19   Q    Would you need information about the coatings?

20   A    To create this specific doubler, yes.

21   Q    What about the heat treating?

22   A    You would need that information as well.

23   Q    Would you need information about dimensions?

24   A    Yes.

25   Q    What dimensions?

1      A      The width of it, thickness of it, length, any

2   angular cuts that need to be done on it.

3      Q      Could you determine length and height by

4   examining a two-dimensional CAD drawing?

5      A      You could, yes.

6      Q      What if you did not have a thickness, would

7   that create a problem for you?

8      A      Yes.

9      Q      To your knowledge, does this patent provide

10  any thicknesses for the filler?

11     A      To my knowledge, there's no specified

12  thickness on the fillers in this patent.

13     Q      Does the filler thickness make any difference

14  whatsoever?

15     A      It could indeed make a difference.

16     Q      Could it be inadequate?

17     A      Say again?

18     Q      Could it be too --

19     A      Too thick?

20     Q      Could it be excessive?

21     A      It could be excessive and too thick.

22     Q      Referring to this patent how would you

23  possibly know what the thickness of the filler should be

24  from this patent?

25     A      You don't.

1       Q     I believe earlier you mentioned that you are

2    familiar with the individuals that are named as

3    inventors in this patent; is that correct?

4       A     That's correct.

5       Q     And I believe earlier you mentioned that

6    you're familiar with Elton Townsend?

7       A     That is correct.

8       Q     For clarification, who is Elton Townsend?

9       A     Elton Townsend is a principal or owner of Lake

10   Central Air Services, an operation in Canada.  He has

11   been dealing with Lakes for a long time.

12      Q     I believe you mentioned earlier that Elton

13   Townsend had faxed some document to you regarding a

14   proposed doubler?

15      A     Yes.

16      Q     Is that correct?

17      A     That is correct.

18      Q     Do you recall in the reexamination proceeding

19   whether there was any declaration or similar document

20   that was submitted on behalf of Elton Townsend?

21      A     I am not positive.  I think there was

22   discussion on that, but I don't know if it was actually

23   submitted.

24      Q     Okay.  Let me shift gears a bit.  Prior to the

25   doubler kit that is claimed in the patent had you

1  yourself seen doublers in use before?

2     A    Yes.

3     Q    Have doublers been around for a long time?

4     A    Yes.

5     Q    Are you aware of other doublers used on Lake

6  aircraft?

7     A    I have created and used doublers on Lake

8  aircraft.

9     Q    Can you elaborate?

10    A    Another area of Lake exposed to high stresses

11 is the bottom, the forward bottom of the main hull.  And

12 in essence, it's a boat on the water exposed to waves.

13 These areas can be cracked.  They can be worn down in

14 improper landings, and they need to be repaired to

15 restore the airworthiness of the airplane.  So you're in

16 essence doubling an area of the bottom by installing

17 another later of material.

18    Q    Are there other doublers with angled ends, one

19 end angled or both even, ends angled to use in

20 connection with Lake aircraft or other aircraft?

21    A    I have seen others that have doublers on them.

22 The bottom of the Lake aircraft is a polygon with a

23 mixture of straight and curved lines with angled

24 relationship between edges.  So if a bottom doubler is a

25 doubler, then yes, it has an angle on it.

1     Q    Are doublers often shaped to accommodate

2 adjacent structures?

3     A    Doublers are often shaped to accommodate their

4 relationship with adjacent structures.

5     Q    Were any such doublers in use before October

6 25, 2000?

7     A    I have made patches to the bottom of Lakes

8 that had an angle prior to October 25, 2000.

9     Q    I'll hand you what's marked as Defendant's

10 Exhibit B.  This document identifies -- does this

11 document identify certain components for an aircraft?

12     A    This document appears to identify components

13 for an airplane, yes.

14     Q    Do you have any idea what aircraft those

15 components are for?

16     A    This goes way back in my history.  This

17 appears to identify components used on an aircraft

18 referred to as the mid-jet Mustang, as in small Mustang.

19     Q    To your knowledge, how long has the mid-jet

20 Mustang been around?

21     A    I want to say early '60s.  I want to say '70,

22 '71, I started building a Mustang kit personally.

23     Q    Would you describe what the kit is?

24     A    Well, there's a lot more available now in kit

25 form.  But at that time in my career you bought a set of

1    blueprints.  Then you made components to those

2    blueprints.  As years have gone by, people who market

3    the blueprints also market components to make building

4    an amateur-built aircraft easier so that you can -- to

5    qualify for an amateur-built airplane, the builder has

6    to do 51 percent, but you can buy a lot of 49 percent

7    that helps.

8         Q    Do you still have those drawings?

9         A    I don't have the complete set of drawings for

10    the airplane.

11         Q    Can you describe for me -- Before we get to

12    that, does the mid-jet Mustang have dihedral wings?

13         A    Yes.

14         Q    Does the wing structure of the mid-jet Mustang

15    include spars?

16         A    Yes.

17         Q    Do the spars have an angled inboard end?

18         A    Yes.

19         Q    Does this document identify any components

20    related to the spars for a mid-jet Mustang?

21         A    Yes.

22         Q    Can you describe what component?

23         A    Component 130.316, what is described as a wing

24    rear spar reinforcement left and right.

25         Q    Is the inboard end of that rear spar

1   reinforcement -- is the inboard angled -- is the inboard

2   end of that component angled?

3       A    Yes.

4       Q    Would that angle have any relationship to the

5   angle of the spar?

6       A    The angle cut on that doubler, which matches

7   the cut on the spar, is due to the relationship between

8   the fit of that spar between the spar and the fuselage.

9       Q    I have just a few more questions.  Earlier you

10  mentioned that you were previously sued for infringement

11  of this patent?

12      A    Yes.

13      Q    About when was that?

14      A    Approximately 2002.

15      Q    I believe earlier you mentioned that the

16  lawsuit was dismissed with prejudice -- without

17  prejudice -- about how long after the lawsuit was

18  dismissed did you receive a copy of the complaint in

19  this lawsuit?

20          MR. THOMAS:  I'm going to object because that

21      mischaracterizes the testimony.  I think what he

22      testified was he wasn't sure what his attorney did.

23          MR. YOUNG:  Thank you.

24  BY MR. YOUNG:

25      Q    After the lawsuit was filed, was a

1    reexamination proceeding initiated in the Patent and

2    Trademark Office?

3        A    Yes.

4        Q    From the time the reexamination proceeding was

5    initiated until the time that you were sued in this

6    lawsuit, did Enpat send any correspondence threatening

7    to sue you?

8        A    No.

9        Q    Did the examiner assigned to the reexamination

10   initially reject the claims of the patent?

11       A    Yes.

12       Q    Do you recall about how long the claims stood

13   rejected?

14       A    Nearly eight years.

15       Q    During this time did you believe that any

16   risks of infringement was extinguished?

17       A    Not extinguished, but confident of no

18   infringement there.  I wasn't the only person with an

19   opinion that the claims were not valid.

20       Q    Earlier when discussing the Canadian kits,

21   also referred to as JCM kits, you mentioned that the JCM

22   kits were installed on approximately 26 aircraft?

23       A    I mentioned that I installed or my

24   organization installed JCM kits on approximately 26

25   aircraft.

1       Q     Were any of those kits installed before

2  December 11, 2001?

3       A     Yes.

4       Q     To the best of your recollection about how

5  many?

6       A     My recollection is 25.

7       Q     Earlier today there seemed to be some

8  confusion in addressing the subpoena that was served and

9  the request for production of documents that was served

10 in this action.  Were you confused in answering the

11 questions relating to the subpoena versus the request to

12 produce documents?

13      A     Yes.

14      Q     Earlier today you had mentioned -- Well, were

15 you ever instructed not to destroy any evidence relating

16 to this case?

17      A     Not instructed, no.

18      Q     Let me rephrase the question.  Were you ever

19 instructed to preserve materials related to this case?

20      A     No.

21      Q     You spoke earlier about e-mails that you had

22 deleted.  Were any of the e-mails that you deleted

23 material to this case?

24            MR. THOMAS:  I'm going to object because that

25       calls for a legal conclusion, but you can go ahead

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1        and answer.

2        A     It's possible, but there would not be -- I

3     don't have a system of saving e-mails, you know.  But

4     e-mails that are not relevant, I don't need to keep them

5     in my possession.  I didn't consciously reject or to --

6     what was the word we just used?  An effort to eliminate

7     e-mails relative to the case was not made.  In other

8     words, in casual communications it could, you know,

9     there was no conscious effort to eliminate e-mails

10    pertinent to this case.

11             MR. YOUNG:  I have no further questions at

12        this point.

13                   REDIRECT EXAMINATION

14    BY MR. THOMAS:

15        Q     Okay.  We want to refer to defendant's -- the

16    big drawing -- which is exhibit Defendant's A.  I'm

17    going to ask you, to your knowledge, has this drawing

18    ever been published to the public?

19        A     To the public?

20        Q     Made available to the public through

21    publication?

22        A     Yes.

23        Q     Where?

24        A     Made available to the public?  Someone

25    outside -- someone outside the factory has possession.

1   Does that mean available to the public?

2        Q    What I mean by that is, available to someone

3   who is not under -- not involved with the construction

4   or maintenance of the airplane?

5        A    I would think that would be unlikely that

6   someone not involved with the construction or

7   maintenance would have a drawing.

8        Q    Can you tell from looking at the title block

9   here who created this drawing?

10       A    Part of the title block is not evident.

11       Q    Right, it's been wiped out.

12       A    I would have seen it on other drawings, that's

13  Mr. Tarbox's.

14       Q    You can identify that under the -- in the

15  drawn by block?

16       A    In the drawn by block there's a good chance

17  Mr. Tarbox drew this original.

18       Q    Is there anything in the title block to tell

19  you if there was a corporate entity to control this

20  document?

21       A    Lake Aircraft.

22       Q    Written above Sanford?

23       A    Right.

24       Q    This drawing has a revision history on its

25  face, correct?

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 244

1      A    Yes.

2      Q    What was the level of the last revision?

3      A    Probably K.

4      Q    As far as this copy is concerned?

5      A    That's correct.

6      Q    So this drawing was revised at least up

7  through Revision K?

8      A    Correct.

9      Q    And you testified earlier that this drawing

10  originated in 1953.  How did you get there?

11     A    The date here, normally by the "drawn by"

12  there's a date.

13     Q    Is there anything that to you indicates that

14  the doublers that are indicated where you made your

15  notations earlier were on the original drawing, in other

16  words, the Rev 0 of this drawing?

17     A    There's nothing on the drawing to indicate

18  that they weren't there at Rev 0.  There is other

19  evidence to indicate that they weren't there.

20     Q    That they were not there when the drawing was

21  originally created?

22     A    That's correct.

23     Q    When you looked at the title block to find the

24  date we mentioned for the original drawing, is it your

25  testimony back then when the drawing was originally

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1   created it did not include doublers?

2        A     That's correct.

3        Q     That they were added some time later?

4        A     That's correct.

5        Q     When Mr. Young was asking you if you had ever

6   created doublers for the aircraft, I think your answer

7   was you created what you called patches for Lake

8   aircraft?

9        A     Repairs, yes, doubling certain areas, patching

10  areas, yes.

11       Q     What do you mean by patch?

12       A     You have an area on the bottom that has a

13  crack, for example, so you will map out an area that

14  you're going to double, bring it to existing seams or

15  existing edges, and install that material.  That is

16  often referred to as patching the airplane.

17       Q     So you were using it exchangeably with the

18  word doubler; is that correct?

19       A     Yes.

20       Q     Just curious.  Earlier you testified that, to

21  your knowledge, this drawing had never been provided to

22  the Patent and Trademark Office; is that correct?

23       A     To my knowledge, it has not.

24       Q     But you admit you don't have perfect knowledge

25  of everything that has ever been submitted to the patent

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    office?

2         A    That's correct.

3         Q    You also testified that this drawing would aid

4    in fabricating the doubler that's shown here on the wing

5    spar, correct?

6         A    What I think I said is, it would help in

7    designing and fabricating a component to fit in that

8    area of the wing.

9         Q    That's because there's dimensional information

10   on this drawing?

11        A    There's dimensions on this drawing.

12        Q    You could refer to this drawing to fabricate

13   the part?

14        A    That's correct.

15        Q    That's the purpose of a fabrication drawing,

16   is it not?

17        A    That's one of the purposes.

18        Q    This is a fabrication drawing?

19        A    I would assume the factory has to maintain

20   enough drawings to build an airplane.

21        Q    When did you first come into possession of a

22   copy of the drawing that we have here as Defendant's A?

23        A    Three, four months ago.

24        Q    The first time you came into possession was

25   three or four months ago?

EXHIBIT F ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1        A    Of this particular drawing, yes.

2        Q    You were asked with regard to the

3   reexamination what the initial action from the patent

4   office regarding validity of claims was.  And you had

5   said all 14 claims had been rejected?

6        A    It is my opinion that the first examiner at

7   the patent office when reviewing the patent rejected all

8   14 claims.

9        Q    Mr. Young neglected to ask you this question,

10  but I'm going to ask it.  You also knew that there was

11  an appeal of that decision?

12       A    Yes.

13       Q    So you understood that there was an appeal in

14  process?

15       A    It was in reexamination, so as it went through

16  the process people are talking and communicating.

17       Q    And you got copies of things like the appeal,

18  for instance?

19       A    It's in that banker's box.

20       Q    So I'm going to change your statement that you

21  thought that you were free.  I'm going to

22  characterize -- these are not your exact words -- but

23  free to operate because the claims were invalid.  That's

24  not entirely accurate because you also knew that an

25  appeal was pending?

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1        A        Yes.

2        Q        You knew that decision appealed?

3        A        That process continued.

4        Q        The reality is while you wanted to believe the

5   patent wasn't validated, you understood that there was

6   an appeal in process, and you assumed the risk of

7   continuing to fly your airplane using the Canadian kit,

8   true statement?

9        A        Could be a true statement.

10       Q        Could be a true statement?

11       A        Yeah.

12       Q        In fact, the general Lake aircraft community,

13  let's extend it to the general Lake aircraft community,

14  there is a feeling that the patent should be

15  invalidated?  There was an understanding that there was

16  an appeal in the process in the general Lake aircraft

17  community; was there not?

18       A        No, sir.

19       Q        You're telling me that the general Lake

20  aircraft community out there did not understand that

21  appealed?

22       A        That's correct.

23       Q        You don't know that?

24       A        I don't.  I base that on conversation with

25  Lake owners.  When the review board rendered its opinion

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1    of the patent, and I was sued, a number of people said I

2    thought that was all over.

3        Q    Okay.  But are you saying that that

4    communication only occurred after you were served with a

5    complaint in the current action?

6        A    That would be my memory of it.

7        Q    Okay.  Just one minute please.

8            Would you agree with me that if it was your

9    attorney in the original lawsuit who requested that the

10   lawsuit be stay pending the outcome of the

11   reexamination, that Enpat would not be responsible for

12   the delay in filing the current lawsuit?

13       A    No.

14       Q    How can you say that?

15       A    I can't make decisions based on Enpat's

16   benefit or loss.

17       Q    Well, I'm not asking you to make a decision.

18   What I'm asking you is:  If it was your attorney who

19   requested the delay, Enpat can't be held responsible for

20   the delay, can they?  It doesn't seem reasonable, does

21   it?

22       A    A lot of attorneys request a lot of things.

23   People don't always respect those requests.

24       Q    Do you maintain that Enpat took any action,

25   whatsoever, to delay the re-exam process at the PTO?

1       A    No.

2       Q    In fact, Enpat doesn't really have any control

3    of the re-exam process at the PTO, does it?

4       A    To the best of my knowledge, no.

5       Q    Is it your -- Well, let me back up.  The

6    present lawsuit was -- Would you agree with me that the

7    present lawsuit was filed in general terms almost

8    immediately after the re-exam process was concluded?

9       A    It appears it was.

10       Q    That doesn't sound like an unreasonable delay,

11    does it?

12       A    No.

13       Q    Thank you.  I need to confer with Kelly.

14    We'll go off the record for a second.  I'll be right

15    back.

16                     (Off record at 5:47 PM.)

17                     (On record at 5:49 PM.)

18            MR. THOMAS:  I don't have any more questions.

19                     RECROSS EXAMINATION

20    BY MR. YOUNG:

21       Q    I have one more question to clear up.

22    Previously I had asked you if you had been advised to

23    retain records, and I believe you indicated that you

24    weren't advised.  Were you indicating in your response

25    that Mr. Buesse did not advise you to retain records?

Page 251

1      A    Mr. Buesse did not.  And when you asked the

2   question, that was my fault.

3           MR. THOMAS:  I'm going to object because on

4        the record this question has been asked and

5        answered.  In fact, you answered it a couple of

6        different ways.  These questions are now being

7        asked after the deponent had an opportunity to

8        confer outside of record here.

9   BY MR. YOUNG:

10      Q    Do you recall our initial meeting at the

11   inception of this lawsuit?

12      A    Yes.

13      Q    And at our initial meeting did I instruct you

14   to maintain records?

15      A    You said keep records.  It was a three-hour

16   meeting, so there was a discussion.

17           MR. YOUNG:  Nothing further.

18           (Deposition concluded at 5:50 PM.  Reading and

19        signing were not waived.)

20

21

22

23

24

25

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

Page 252

1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA   )

3    COUNTY OF BREVARD )

4

5

6            I, VICKI HUMPHRIES, Court Reporter,

7             the undersigned authority, hereby

8                  certify that the witness

9                      HARRY SHANNON

10    personally appeared before me on February 4, 2011

11                   and was duly sworn.

12

13          WITNESS MY HAND AND OFFICIAL SEAL

14             this 4th day of February, 2011

15                 at Melbourne, Florida.

16                  Produced ID:_____

17                Personally Known:_____

18        Accompanied by Counsel: Mark Young, Esquire

19

20

21

22        _____
                      VICKI HUMPHRIES
23           Court Reporter and Notary Public,
                 State of Florida at Large
24

25

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1                    CERTIFICATE OF REPORTER

2    STATE OF FLORIDA   )

3    COUNTY OF BREVARD )

4

5         I, VICKI HUMPHRIES, Court Reporter, do hereby
     certify that I was authorized to and did
6    stenographically report the deposition of HARRY
     SHANNON, that a review of the transcript WAS
7    requested; and that the foregoing transcript, pages
     1 through 251, inclusive, are a true and correct
8    record of my stenographic notes.

9         I FURTHER CERTIFY that I am not a relative,
     employee, or attorney, or counsel of any of the
10   parties, nor am I a relative or employee of any of
     the parties' attorney or counsel connected with the
11   action, nor am I financially interested in the
     action.

12
          DATED this 9th day of February, 2011.
13

14

15   _____
                    Vicki Humphries,
16                  Court Reporter

17

18

19

20

21

22

23

24

25

Page 254

1                    ERRATA SHEET
2         DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
3    IN RE:  Enpat v Shannon
     CASE NO: 6:11-cv-00084-PCF-KRS
4    DEPOSITION OF:  Harry Shannon
     TAKEN: February 4, 2011
5    _____

     Page No.    Line No.    Change           Reason
6
     _____
7    _____
     _____
8    _____
     _____
9    _____
     _____
10   _____
     _____
11   _____
     _____
12   _____
     _____
13   _____
     _____
14   _____
     _____
15   _____
     _____
16   _____
     _____
17   _____
     _____
18   _____
     _____
19   _____
     _____
20   _____
     _____
21   _____
     _____
22   Under penalties of perjury, I declare I have read my
     deposition in this matter and that it is true and
23   correct, subject to any changes in form or substance as
     reflected above.
24
     _____    _____
25        Date                         Harry Shannon

EXHIBIT F  ENPAT'S MARKMAN MOTION
6:11-cv-00084-GAP-KRS

1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
2

3   _____
                                    )
4   ENPAT, INC.,                    )
    a Florida Corporation,          )
5                     Plaintiff,    )
                                    ) Case No.:
6        v.                         ) 6:11-cv-00084-PCF-KRS
                                    )
7   HARRY SHANNON,                  )
                      Defendant.    )
8                                   )
    _____)
9

10  IN RE:  Deposition of Harry Shannon
            Taken:  February 4, 2011
11          Date Letter Sent:_____

12  TO:     Harry Shannon
            c/o Mark Young, Esquire
13          12086 Ft. Caroline Road, Suite 202
            Jacksonville, Florida 32225
14
            The transcript of your deposition has been
15  completed and awaits reading and signing.
            Please call our office at 321-242-8080 and make
16  arrangements to review the transcript as soon as
    possible.
17          If the reading and signing have not been completed
    prior to _____, we shall conclude that the
18  reading and signing of the transcript have been waived.
            The original of this deposition has been forwarded
19  to the ordering party.  The errata, once completed, is
    to be forwarded to all ordering parties as listed below.
20

21                              Thank you,

22
                                Vicki Humphries
23

24  cc:  Stephen C. Thomas, Esquire; Mark Young, Esquire.

25