# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**ENPAT, INC.,**

                                   **Plaintiff,**

**-vs-**                                                    **Case No.  6:11-cv-00084-GAP-KRS**

**HARRY SHANNON,**

                                   **Defendant.**
_____/

## ORDER

This cause comes before the Court for consideration, after hearing oral arguments on September 28, 2011, on the following:

1.     Motion for Patent Claim Construction by Enpat, Inc. (Doc. 59, filed July 1, 2011);

2.     Response to Enpat, Inc.'s Motion for Patent Claim Construction by Harry Shannon (Doc. 63, filed Aug. 15, 2011);

3.     Supplemental *Markman* Brief by Enpat, Inc. (Doc. 69, filed Oct. 14, 2011); and

4.     Supplemental Claim Construction Brief by Harry Shannon (Doc. 70, filed Oct. 14, 2011).

### Introduction

This matter is before the Court for the construction of a patent, United States Patent Number 6,328,260 (the "Patent"), that claims a wing spar modification kit to be used for strengthening wing spars on all models of Lake amphibious aircraft.  Plaintiff Enpat, Inc. ("Enpat") and Defendant Harry Shannon ("Shannon") agree that most of the terms of the Patent are unambiguous, and they raise only two claim construction issues.  (Doc. No. 59 at 20-24; Doc. No. 63-2).

The first issue is whether the preamble of independent claim 1, which provides some detail concerning the airplane and wing spar to which the wing spar modification kit is to be applied, should be construed as limiting.  (Doc. No. 59 at 16-19; Doc. No. 63 at 2, 6-16).  Enpat argues that the preamble is not limiting (Doc. No. 59 at 16-19; Doc. No. 69 at 2-6), and Shannon takes the opposite position (Doc. No. 63 at 6-16; Doc. No. 70 at 1-7).  The second issue is whether the phrase "doubler-protective coating" in independent claim 1 should be construed to mean only "a heat-cured ceramic powder coating."  (Doc. No. 63 at 2, 33-34).  Enpat argues that such a limiting construction is contrary to the plain meaning of doubler-protective coating and would violate the concept of claim differentiation.  (Doc. No. 69 at 7-10).  Shannon counters that the specification and prosecution history compel that the phrase "doubler-protective coating" be so limited.  (Doc. No. 63 at 2, 16-18; Doc. No. 70 at 7-9).  After reviewing the record, hearing arguments from counsel, and applying applicable law, the Court rejects Shannon's arguments and concludes that:  (1) the preamble of independent claim 1 does not provide additional limitations not found in the body of the claim, and (2) the phrase "doubler-protective coating" is not limited to "a heat-cured ceramic powder coating".

### Applicable Law

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention."  *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999).  In construing claims, courts first examine the patent's intrinsic evidence to define the patented invention's scope.[1]  *See, e.g., Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc); *C.R. Bard, Inc. v. U.S.*

---

[1] Claim construction is an issue of law for the court to decide.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc).

*Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004).   This intrinsic evidence includes the claims themselves, the specification, and the prosecution history.  *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the pertinent art at the time of filing.  *Chamberlain Group, Inc. v. Lear Corp.*, 516 F.3d 1331, 1335 (Fed. Cir. 2008); *Phillips*, 415 F.3d at 1312.

"The claims themselves provide substantial guidance as to the meaning of particular claim terms."  *Phillips*, 415 F.3d at 1314.  A term's context in the asserted claim can be very instructive, as courts presume a difference in meaning and scope when a patentee uses different phrases in separate claims.  *Id.*  For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation.  *Id.*  However, courts may not use this principal of claim differentiation to broaden claims beyond their correct scope. *Id.*  "[C]laims must always be read in view of the specification of which they are a part."  *Markman*, 52 F.3d at 979.

"The specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of the disputed term.'" *Markman*, 52 F.3d at 979 (quoting *Vitronics*, 90 F.3d at 1582).  A patentee may define his own terms in the specification, giving a claim term a different meaning than the term would otherwise possess, or a patentee may disclaim or disavow the claim scope otherwise included in the ordinary and accustomed meaning of the terms. *Phillips*, 415 F.3d at 1315;  *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  While "the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims."  *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998)

(quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323.

The prosecution history is another tool used to supply the proper context for claim construction. *Home Diagnostics, Inc. v. Lifescan Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004). The doctrine of prosecution history disclaimer "limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowances." *Omeg Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). This doctrine does not apply where the prosecution history is ambiguous. *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1375 (Fed. Cir. 2008). The disclaimer of claim scope must be clear and unmistakable. *Id.* at 1374.

Extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one of skill in the art might use the claim terms, but technical dictionaries and treatises may provide definitions that are too broad or that may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Accordingly, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

-4-

### The Patent, Prosecution History, and Procedural Background

On October 25, 2000, inventors Jack M. Tarbox and Philip J. Baker (the "Inventors") filed the application that matured into the Patent.  (Doc. No. 59-2).  On December 11, 2001, the United States Patent and Trademark Office ("USPTO") granted the Patent with minimal modifications to the initial application.  The few modifications that were made followed an office action dated April 26, 2001, where the examiner rejected all 14 claims under 35 U.S.C. 112 (the "Office Action").  The examiner stated, in pertinent part:

> In claim 1, lines 1 and 7, the phrase "Lake model airplane" is vague and indefinite since the phrase contains what appears to be a trademarked name and is thus not clearly defined since a trademark defines the source of an object, not its parameters.  The limitations of the claimed plane should be made in generic terms of art.  Likewise, claim 7 contains an improper trademark name.  Also, the limitations of the bolts of claim 14 is indefinite, since the designations made are subject to change.
>
> 3.   Claims 1-14 would be allowable if rewritten or amended to overcome the rejection(s) under 35 U.S.C. 112, 2nd paragraph set forth in this Office action.

(Doc. No. 70 at 14).

The Inventors responded to the Office Action on May 9, 2001 (the "OA Response"), by: (1) amending the application to replace references to trademarks in the claims and the specification; and (2) explaining that the limitations of the bolts in claim 14 were not subject to change because the referenced National Aerospace Standard specification are not subject to change, but are commonly relied upon in the aviation industry.  (Doc. No. 70 at 20.)  In addition, the Inventors made a supplemental disclosure of the following prior art: (1) Service Bulletin B-79, sent by REVO, Inc. in June of 1999 ("SB-79") to the Federal Aviation Administration (the "FAA"); and (2) a Notice of

Proposed Rulemaking published in the Federal Register on October 6, 1999.  (*Id.*)  Following the OA

Response, the examiner issued a Notice of Allowance on September 13, 2001, and the Patent then

issued on December 11, 2001.  (*Id.*)

As issued, the Patent is comprised of 14 claims, the Specification, and 6 drawings.  Claim 1

is an independent claim, and the remaining 13 claims depend on claim 1, which recites:

> 1.     A modification kit for retrofitting a wing spar on an amphibious airplane, said
> airplane having a root rib, and said wing spar comprising a wing-spar cap angle
> that is attached to a wing spar web, said wing spar web having an upper edge
> and a lower edge and an inboard end that attaches to said root rib, a first series
> of wing-attach bolt-holes that is provided in said upper edge and a second
> series of wing-attach bolt-holes that is provided in said lower edge of said wing
> spar web, wherein said root rib is angled relative to a vertical plane of said
> amphibious airplanes, and wherein said inboard end of said wing spar has an
> inboard-end angle that corresponds to an angle of said root rib, said
> modification kit comprising:
>
> > an upper doubler-strap and an upper filler-strap;
> >
> > a lower doubler-strap and a lower filler-strap; and
> >
> > a plurality of wing-spar attachment-bolts;
> >
> > wherein each said upper filler-strap and each said upper doubler-strap have
> > a third series of wing-attach bolt-holes that corresponds precisely with
> > a first series of wing-attach bolt-holes in an upper edge of a wing spar
> > web, and said lower filler-strap and said lower doubler-strap have a
> > fourth series of wing-attach bolt-holes that corresponds precisely with
> > a second series of wing-attach bolt holes in a lower edge of said wing
> > spar;
> >
> > wherein said upper and said lower doubler straps have a *doubler protective
> > coating* and said lower filler straps have a filler-protective-coating, and
> >
> > wherein said upper doubler-strap has an upper *inboard angle* and said lower
> > doubler-strap has a lower *inboard angle.*

(Doc. No. 59-1 at col. 7, ll. 4-34 (emphasis added)).

Claims 2 through 9 each provide discrete additional limitations to the "kit" of claim 1.  (*Id.* at col. 7, ll. 35 - col. 8, ll. 8).  Specifically, claim 2 specifies that the doubler-straps of the "kit" are "made of 4340 steel," and claim 3 discloses the "kit" from claim 2 wherein the doubler-straps "are heated to 180,000 psi."  (*Id.* at col. 7, ll. 35 - 38). Claim 4 recites that the filler-straps of the kit "are made of 2024-T3 aluminum."  (*Id.* at col. 7, ll. 39 - 40).  Claims 5 and 6 disclose that the "angle" of the upper doubler-strap and the lower doubler-strap are 5° and 6° respectively.  (*Id.* at col. 7, ll. 41 - 44).  Claim 7 recites:  "The kit of claim 1, wherein *said doubler-protective coating* is a powder coating that is heat-cured to form a ceramic coating."  (*Id.* at col. 7, ll. 45-47 (emphasis added)).  Claim 8 specifies that the filler-protective-coating "includes a first coating that is an alodine conversion coating and a second coating that is an epoxy primer."  (*Id.* at col. 8, ll. 1-3.)  And, claim 9 recites that certain bolt holes of the double-straps and filler-straps are "free" of any "protective-coating."  (*Id.* at col. 8, ll. 4-8).  Finally, claims 10 through 14 recite additional limitations concerning: (1) the orientation and number of wing-attach bolt-holes (claim 10); (2) the orientation of rivet holes on the doubler-straps and filler-straps (claim 11); (3) the number of rivet holes in the lower doubler and filler-straps (claim 12); (4) the inclusion in the "kit" of bolt, nuts, washers, and rivets (claim 13); and (5) an identification of the number and type of bolts, nuts, washers and rivets recited in the kit of claim 13.  (*Id.* at col. 8, ll. 9-45).

After issuance, the Inventors assigned all right, title and interest in the Patent to Revo, Inc., who subsequently assigned all right, title and interest in the Patent to Enpat.  (Doc. No. 1 ¶¶ 18-22).  Enpat first filed suit against Shannon for infringement of the Patent in 2002.  *Enpat, Inc. v. Harry Shannon*, Case No. 6:02-cv-00769-PCF (the "*2002 Case*").  Soon after Enpat filed the *2002 Case*,

reexamination proceedings commenced in the USPTO (at the request of Shannon and others), and

Enpat voluntarily dismissed the *2002 Case* without prejudice.  (*2002 Case*, at Doc. No. 35, 36).

In an Action Closing Prosecution ("ACP"), dated February 8, 2005, the reexamination

examiner rejected all fourteen claims of the Patent under 35 U.S.C. § 103(a) as obvious in view of

certain prior art,[2] including SB-79, the Lake Aircraft Maintenance Manual, and the Lake LA-4

Blueprint.  (Doc. No. 44 ¶ 31.)  Enpat appealed, and on May 20, 2010, the Board of Patent Appeals

and Interferences (the "Board") reversed the reexamination examiner's decision, and held that all

fourteen claims of the Patent are patentable without amendment.  (Doc. No. 63 at 133-151).

The primary issue on appeal in the reexamination proceeding was construction of the phrase

"inboard-end angle."[3]  The Board rejected the reexamination examiner's conclusion that "inboard-end

angle" included "an angle of 'generally 90° relative to the longitudinal direction of the straps,'" and

---

[2] Section 103(a) provides:

> A patent may not be obtained though the invention is not identically
> disclosed or described as set forth in section 102 of this title, if the
> differences between the subject matter sought to be patented and the
> prior art are such that the subject matter as a whole would have been
> obvious at the time the invention was made to a person having ordinary
> skill in the art to which said subject matter pertains.  Patentability shall
> not be negatived by the manner in which the invention was made.

35 U.S.C. § 103(a).

[3] In its *Markman* Motion, Enpat contends that a "thorough review of the intrinsic evidence"
of the Patent reveals that the "original Examiner, the Reexamination Examiner, and the [Board] each
reviewed the claims of the patent in light of the specification and raised no issue as to claim
interpretation for any of the terms of the Asserted Claims as issued."  (Doc. No. 59 at 12.)  At least
as to the reexamination proceedings, Enpat's assertion is incorrect as construction of the phrase
"inboard-end angle" was crucial to resolution of arguments concerning anticipation and obviousness.
(Doc. No. 63 at 139, 143).

that the Patent was anticipated by SB-79, which disclosed inboard end angles of 90°. (Doc. No. 63 at 139, 143). Specifically, the Board noted that the Patent explicitly rejected use of a "rectangular shape" for the doubler straps in favor of an "angle other than 90° to match the angle of the wing-spar cap." (*Id.* at 138.) The Board concluded that a person of ordinary skill in the art would understand from a review of the Patent that "the doubler's claimed 'inboard end' is oriented at an angle to correspond to the outwardly tipped root rib and wing-spar cap, rather than configured in a straight perpendicular orientation." (*Id.* at 139; *id.* at 143 (explaining that "persons of ordinary skill in the art would have recognized that the inboard end angle had been distinguished from the prior art rectangular shape")). Based on this correct construction, the Board held that the Patent was not anticipated by the disclosure of rectangular doubler straps in SB-79. The Board further concluded that it would not have been obvious to one of ordinary skill in the art to reject the rectangular shape disclosed in SB-79 in favor of an "angled edge." (*Id.* at 146-48). Accordingly, the Board reversed the "obviousness rejection of claims 1-14" of the Patent. (*Id.* at 150). Shannon requested that the Board rehear the matter, and Enpat submitted comments in opposition to the request. (Doc. No. 63 at 124-30). The Board declined to rehear the matter, and the USPTO issued a Reexamination Certificate for the Patent on March 8, 2011. (Doc. No. 59-1 at 12-13).

Enpat initiated this action on September 13, 2010. (Doc. No. 1). As it did in 2002, Enpat alleged that Shannon used and continues to use a wing spar modification kit (the "JCM Kit") that infringes one or more claims of the Patent in violation of 35 U.S.C. § 271(a).[4] (*Id.*). According to

---

[4] Section 271(a) provides: "[e]xcept as otherwise provided in this title [35 U.S.C. §§ 1 *et seq.*], whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States, or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a).

Enpat, Shannon's use of aircraft with the JCM Kit installed is a direct and willful violation of 35 U.S.C. § 271(a).[5]  (*Id.* ¶¶ 27-31).  Shannon filed his Answer and Counterclaim seeking a declaratory judgment that he is not infringing the Patent and that the Patent is invalid and unenforceable.  (Doc. 4, filed October 4, 2010).  Enpat filed its Reply to Shannon's Counterclaim on October 20, 2010.  (Doc. No. 10).

On March 16, 2011, Enpat filed an Amended Complaint seeking to have Shannon designated as a representative of a class of alleged direct infringers comprised of persons "who own at least one or more of the airplanes known as Lake Aircraft models LA-4, LA-4A, LA-4P, LA-4-200, or Lake 250 airplanes" (the "Lake Aircraft").[6]  (Doc. No. 43 ¶¶ 39-64).  In its Amended Complaint, Enpat also added a claim that Shannon, who "is a certified Federal Aviation Authority ("FAA") mechanic with Inspection Authority" and operates a business repairing and maintaining Lake Aircraft, (Doc. No. 43 ¶ 73; Doc. No. 44 ¶ 73), is liable for willfully inducing infringement of the Patent in violation of Title 35, United States Code, § 271(b).[7]  (Doc. No. 43).  On March 30, 2011, Shannon filed his Answer to Enpat's Amended Complaint.  (Doc. 44).  Among his affirmative defenses, Shannon alleged that the

_____

[5] Non-party JCM Aerodesign Limited ("JCM") manufactured or distributed the JCM Modification Kit.  (Doc. No. 1 at ¶¶ 15, 23-25).

[6] Enpat has filed at least six other direct infringement actions concerning the Patent.  (Doc. No. 7;  *see also*, *Enpat, Inc. v. Robinson Air Crane, Inc.*, Case No. 6:11-cv-310-GAP-KRS; *Enpat, Inc. v. Herbert Denny*, Case No. 6:11-cv-250-GAP-KRS; *Enpat, Inc. v. George Bauer*, Case No. 6:10-cv-1491-GAP-KRS; *Enpat, Inc. v. Pavel Budnic*, 6:11-cv-86-PCF-KRS; *Enpat, Inc. v. Jordon Klein*, 5:11-cv-0077-GAP-KRS; *Enpat, Inc. v. Latitude 2855, LLC*, 6:10-cv-1490-GAP-KRS).  Each of these cases are considered to be related, and the parties have agreed to a coordinate discovery and deadlines in the Case Management and Scheduling Orders for each of the pending cases.  (*See* Doc. Nos. 57, 58.)

[7] Section 271(b) provides: "Whoever actively induces infringement of a patent shall be liable as an infringer."  35 U.S.C. § 271(b).

-10-

claims of the Patent are invalid and unenforceable because:  (1) the claims are obvious and anticipated (citing 35 U.S.C. §§102 and 103); (2) the claims are indefinite (citing 35 U.S.C. §112); and (3) the claim are unenforceable due to inequitable conduct.  (*Id.*)

In its Amended Case Management and Scheduling Order, the Court ordered that if the parties seek a ruling pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), then they must file appropriate motions on or before November 4, 2011.  (Doc. No. 57).  The Court further ordered the parties to "prepare a glossary of technical or scientific terms where appropriate for the Court."[8] (*Id.* at ¶ I).  On July 1, 2011, Plaintiff filed its Motion for Claim Construction (the "*Markman* Motion") concerning claims 1-6, 8, 9, 12, and 13 of the Patent.  (Doc. No. 59.)  After obtaining one extension of time, Shannon filed his Response to the *Markman* Motion on August 15, 2011, and the Court had a hearing on September 28, 2011.  (Doc. Nos. 63, 67.)  On October 14, 2011, Enpat and Shannon each filed Supplemental *Markman* Briefs.  (Doc. No. 69, 70.)  Finally, on November 1, 2011, the Court granted Enpat's unopposed Motion to Extend the deadline to file dispositive motions to not more than 14 days after the Court enters an order on the *Markman* Motion.  (Doc. No. 72).  A Final Pretrial Conference is presently set for 8:30 a.m. on February 10, 2012, and trial is set for the trial term beginning on March 5, 2012.  (Doc. No. 57).

---

[8] No party submitted a glossary of "technical or scientific terms" to the Court.  To the contrary, Enpat contends that the claim terms of the Patent "are of such simple and everyday terminology that the Court should simply adopt a lay person's understanding of the terms."  (Doc. No. 59 at 9-10, 12 ("[I]t is apparent that the terms of each of the Asserted Claims are of the type . . . 'in which claim construction . . . involves little more than the application of the widely accepted meaning of commonly understood words.'")).  Aside from his argument concerning the phrase "doubler-protective coating," Shannon does not appear to dispute that the claim terms are plain and unambiguous.  (Doc. No. 63).

**Analysis**

**A.     The Preamble**

The first dispute between the parties concerns the preamble of independent claim 1.  The

preamble consists of the first thirteen lines of Claim One as follows:

> A modification kit for retrofitting a wing spar on an amphibious
> airplane,  said airplane having a root rib, and said wing spar comprising
> a wing-spar cap angle that is attached to a wing spar web, said wing
> spar web having an upper edge and a lower edge and an inboard end
> that attaches to said root rib, a first series of wing-attach bolt-holes that
> is provided in said upper edge and a second series of wing-attach bolt-
> holes that is provided in said lower edge of said wing spar web,
> wherein said root rib is angled relative to a vertical plane of said
> amphibious airplanes, and wherein said inboard end of said wing spar
> has an inboard-end angle that corresponds to an angle of said root rib,
> said modification kit comprising:

(Doc. No. 59-1 at col. 7, ll. 4-34 (emphasis added)).  Shannon urges that the Court should find the

foregoing language "limits the claim and should not be ignored. . . . In particular, the preamble should

be construed to require the amphibious airplane to have "a root rib that is angled relative to a vertical

plane of the airplane . . . ."  (Doc. No. 63 at 33).  Enpat counters that the preamble language "merely

states an intended use. . . . The Preamble is not a limitation."  (Doc. No. 59 at 20).

Resolution of the parties' dispute requires the court to review the entire Patent "'to gain an

understanding of what the inventors actually invented and intended to encompass by the claim.'"

*Catalina Mktg. Int'l., Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting

*Corning Glass Works v. Sumitomo Electric U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989)).  "No

litmus test defines when a preamble limits claim scope."  *Catalina Mktg.*, 289 F.3d at 808.  Rather,

the issue is "determined on the facts of each case in light of the overall form of the claim, and the

-12-

invention as described in the specification and illuminated in the prosecution history." *Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1572-73 (Fed. Cir. 1996).

Although no "litmus test" exists, the Federal Circuit Court of Appeals has recognized some "guideposts" that may be relevant in determining whether a preamble limits claim scope. *Catalina Mktg.*, 289 F.3d at 808. For instance, a preamble is not limiting if it merely describes "the use of an invention" while the body of the claim sets forth a "structurally complete invention." *Id.* at 808-09 (quoting *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997); *e.g.*, *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1434 (Fed. Cir. 2000) ("If the preamble adds no limitation to those in the body of the claim, the preamble is not itself a claim limitation and is irrelevant to proper construction of the claim."); *Insured Deposits Conduit, LLC v. Index Powered Fin'l Servs., LLC*, Case No. 07-22735-CIV-UNGARO, 2008 WL 5691352, at *9-*12 (S.D. Fla. July 28, 2008 (holding that a preamble is not limiting if it sets forth "no distinct definition of any of the invention's limitations")). A preamble may be limiting if: (1) the applicant clearly relies "on the preamble during prosecution to distinguish the claimed invention from prior art," or (2) "a particular disputed preamble phrase" provides the antecedent basis for a limitation in the body of the claim. *Catalina Mktg.*, 289 F.3d at 808-09 (citing *Bristol-Myers Squibb Co. v. Ben Venue Labs, Inc.*, 246 F.3d 1368, 1375 (Fed. Cir. 2001)).

Here, a review of the Patent as a whole reveals that the claimed invention *does not* include an amphibious airplane, a wing spar, or any other part of an amphibious airplane. Rather, the amphibious airplane parts are discussed in detail in the specification and generally in the preamble to explain the development and purpose of the modification kit invention. Importantly, the body of claim 1, read

-13-

without reference to the preamble, describes a complete modification kit.  While the preamble, at most, provides "reference points" for understanding limitations set forth in the body of claim 1.  *See C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1350 (Fed. Cir. 1998); *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 879-80 (Fed. Cir. 1991) (affirming district court's decision that "breast beam" and "breast plate" in preamble indicated reference points for the invention but were not additional parts to the loom apparatus recited in the body of the claim).

The preamble here is similar to the non-limiting preamble in *C.R. Bard.*, 157 F.3d at 1350, where the invention cited was a biopsy needle with a modified hub and flange structure and slit to facilitate placement in and use with a specific needle gun.  *C.R. Bard*, 157 F.3d at 1348-50.  The preamble of the pertinent claim in *C.R. Bard* recited "the portion and structure of the gun housing into which the needles fit, and provide[d] reference points in the gun that aid in defining the needles as set forth in the body of the claim."  *Id.* at 1350.  The *C.R. Bard* Court held that this form of claim did not expand the patent to claim the gun housing described in the preamble.  *Id.*  Similarly, the preamble of claim 1 of the Patent here recites the portion and structure of the amphibious plane wing and reference points on which the kit is applied, and provides reference points on the wing spar that aid in defining the claimed angle of the doubler straps of the claimed kit.  As in *C.R. Bard*, this form of claim, viewed in the context of the Patent as a whole, does not expand the patent to claim the structures of the amphibious plane referenced in the preamble.

Shannon's argument that the preamble provides the only antecedent basis for a limitation in the body of claim 1 does not compel a different result.  According to Shannon, the only antecedent basis for "said wing spar" in the body of claim 1 is "a wing spar" in the preamble.  (Doc. No. 63, at

9).  While a cursory reading of claim 1 confirms Shannon's statement, a fair reading of claim 1 in the

context of the entire Patent reveals that "said wing spar" in the body of the claim 1 should read "said

wing spar web."[9]  (Doc. No. 69 at 5-6).  Read without the scrivener's omission of "web," one need

not resort to the preamble to find and antecedent basis for the "wing spar" referenced in the body of

the claim.  (*Id.*)

      Shannon also points to multiple incidents in dependent claim 10 where one must resort to the

preamble for the antecedent basis of terms in the body of dependent claim 10 (specifically, "wing spar

cap angle," "upper edge" and "lower edge").[10]  (Doc. No. 70 at 2).  Enpat does not dispute that the

---

      [9]Unfortunately, the Patent is replete with scrivener's errors that would cause considerable difficulty were it not for the relative simplicity of the invention.  For instance, column 3 of the Patent provides two nearly identical paragraphs describing the materials and coatings for the doubler-straps and the filler-straps.  (Doc. No. 59-1 at col. 3, ll. 3-41).  In its Supplemental *Markman* Brief, Enpat explained that the second of the two paragraphs was printed in error after the applicants provided a replacement paragraph in its OA Response dated May 10, 2001.  (Doc. No. 69, at 1, n.1).  Even more troubling than the duplicate paragraphs are the numerous errors in the drawing descriptions.  For instance, item 1 (seen in figures 4A and 6) is referred to alternatively as a "lower filler strap" (Doc. No. 59-1 at col. 5, ll. 53, an "upper doubler strap" (*id.* at col. 5, ll. 33-34; *id.* at col. 6, ll. 32), and most frequently, a "lower doubler strap" (*id.* at col. 5, ll. 25; *id.* at col. 5, ll. 39-40; *id.* at col. 5, ll. 51; *id.* at col. 6, ll. 4; *id.* at col. 6, ll. 26).  Similarly, item 2 (seen in figure 4B) is referred to at varying places as an "upper filler strap" (*id.* at col. 5, ll. 54), a "lower doubler strap" (*id.* at col. 5, ll. 34-35), and most commonly, an "upper doubler strap" (*id.* at col. 5, ll. 26; *id.* at col. 5, ll. 42; *id.* col. 5, ll. 52; *id.* at col. 6, ll. 8-9; *id.* at col. 6, ll. 26).  Further, reference is made to a "cap-angle bolt-hole SA" even though no corresponding "SA" designation appears in the figures.  (*Id.* at col. 5, ll. 33).  Notwithstanding such errors, the simplicity of the invention permits the Court to conclude that a proper understanding of the drawings is that: (1) "cap-angle bolt-hole SA" should be read as "cap-angle bolt-hole 5A"; (2) item 1 is the lower doubler strap in all figures; and (3) item 2 is the upper doubler strap in all figures.

      [10]Shannon also claims that the antecedent basis of "said wing spar web" and "said wing-attach bolt-holes" also is only located in the preamble.  (Doc. No. 70 at 2).  Shannon is incorrect.  As noted above, by ignoring a scrivener's error, the antecedent basis for "wing spar web" is in the body of independent claim 1, upon which dependent claim 10 relies.  (Doc. No. 59-1 at col. 7, ll. 23-24).  The antecedent basis for "wing-attach bolt-holes" also is found in the body of dependent claim 1.  (*Id.* at col. 7, ll. 23, 25-27).

antecedent basis of certain limitations in the body of dependent claim 10 are found only in the preamble. (Doc. No. 69 at 6). And, Enpat makes no argument against finding that the specific structures referenced in that body of claim 10 that have their antecedent basis in the preamble 10 may be construed as limitations to the invention recited in claim 10. Accordingly, the Court finds that the antecedent basis for the "wing-spar cap angle," the "upper edge" and the "lower edge" recited in claim 10 are limiting – but only as to the invention of dependent claim 10. *See Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1137 (Fed. Cir. 1985); *see also* 35 U.S.C. § 282. At this time, the Court will not opine on what (if any) impact this ruling will have with respect to Shannon's Counterclaim that claim 10 is indefinite, obvious and anticipated.[11]

Finally, the Court rejects Shannon's argument that the preamble is limiting because of Enpat's purported "heavy and repeated reliance on the preamble in prosecution." (Doc. No. 63 at 10-16). First, Enpat's revision of the preamble in its only OA Response dated May 9, 2011, was *not* in response to cited prior art. Accordingly, this minor revision of the preamble is not the sort of activity which clearly establishes an applicant's intent to use the preamble to define her invention by distinguishing prior art. *See Catalina Mktg.*, 289 F.3d at 808-09.

In contrast, the issue in the reexamination proceeding was whether the invention was disclosed by prior art showing rectangular 90° angles in the doubler straps of an earlier wing spar modification kit (SB-79). (Doc. No. 63 at 139, 143). Thus, reliance on the preamble to distinguish this reference in the reexamination may be pertinent to determining whether the preamble is limiting. A reading of

---

[11]Given Shannon's Counterclaim that all of the Patent claims are invalid, unenforceable, and not infringed, and absent a covenant not to sue by Enpat and/or dismissal with prejudice of Enpat's claims based on claims 7, 10, 11 and 14, the Court will not find that Shannon's claim construction argument concerning claim 10 is moot as Enpat contends.

the Board's decision, however, makes clear that reference to the preamble language was not necessary to distinguish this prior art.  To the contrary, the opinion of the Board was based entirely on analysis of the Patent's specification and the inventors' clear disavowal therein of the 90° angles in the doubler straps of the prior art (SB-79).  The Board never cited to the preamble to reach its conclusion. Accordingly, the prosecution history does not compel a finding that the preamble is anything more than a non-limiting statement of the purpose and use of the claimed kit with mere "reference points" for understanding limitations set forth in the body of claim 1.  *See C.R. Bard,*, 157 F.3d at 1350; *Vaupel Textilmaschinen KG*, 944 F.2d at 879-80.

## B.      "Doubler-Protective-Coating"

The second dispute between the parties concerns construction of the phrase "doubler-protective-coating," which appears in the following portion of independent claim 1: "wherein said upper and said lower doubler-straps have a *doubler-protective-coating* and said upper and lower filler straps have a filler-protective-coating."  (Doc. No. 59-1 at col. 7, ll. 29-31).  In its *Markman* Motion, Enpat did not propose a construction of the foregoing language other than to state that the terms are "unambiguous" and should "be given their plain, ordinary meaning."  (Doc. No. 59 at 21).  Shannon does not dispute Enpat's statement that the terms should be given their plain and ordinary meaning, except for the phrase "doubler-protective-coating," which Shannon contends must "mean 'a heat cured ceramic powder coating.'"  (Doc. No. 63 at 33-34).  According to Shannon, this construction is compelled by the specification and the prosecution history.  (Doc. No. 63 at 16-18).

The Federal Circuit has repeatedly stated that claim terms are to be given their plain and ordinary meaning to ones of skill in the art, and courts must carefully guard against "importing

limitations" into the claims from the specification. *E.g. Phillips*, 415 F.3d at 1323; *MBO Labs. Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007). Of course, the "line between construing the claims in light of the specification and improperly importing a limitation from the specification into the claims" is very fine. *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir.), *rehearing en banc denied*, 659 F.3d 1369 (Fed. Cir. 2011); *Seachange Int'l, Inc. V. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005) (explaining courts must "strive to capture the scope of the actual invention, rather than strictly limit the scope of the claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention").

Here, the term "doubler-protective-coating" is very broad, and certainly encompasses coatings other than "heat cured ceramic powder coatings". No party has argued to the contrary. Thus, the Court will limit this broad term only if the specification explicitly defines the term or the inventors unmistakably disavowed doubler coatings other than heat cured ceramic powder coatings during the prosecution history. *Omeg Eng'g Inc.*, 334 F.3d at 1323; *Computer Docking Station Corp.*, 519 F.3d at 1374-75. In this case, neither condition is satisfied, and the doctrine of claim differentiation provides an additional reason to reject Shannon's request to limit the broad claim term.

As initially filed, the application for the Patent referenced two trademark names in relation to the doubler-protective-coating. Specifically, the "Summary of the Invention" in the initial application provided in pertinent part:

> In the present invention, the web spar web is made of aluminum, so the filler-strap is also made of aluminum, to eliminate the danger of corrosion on the web spar resulting from contact between dissimilar metals. The doubler-strap, is made of steel for structural reasons.

> Direct contact between the aluminum filler-strap and the steel doubler-strap, however, introduces the risk of corrosion on these two parts, thereby exacerbating concerns of prolonged structural integrity.  To counter this problem, *the doubler-strap is coated with a protective coating, either Midrofin Allseal or preferably SermeTel® 5389DP,* and the filler-straps are coated with an alodine conversion coating and then a primer coat.

(Doc. No. 59-2 at 45 (emphasis added)).  Independent Claim 1 of the initial application further recited: "wherein said upper and said lower doubler-straps have a *doubler-protective-coating* and said upper and said lower filler-straps have a filler-protective coating."  (*Id.* at 52 (emphasis added)).  Finally, dependent claim 7 of the initial application recited: "The kit of Claim 1, wherein said doubler-protective-coating *is a SermeTel® protective coating.*"  (*Id.* at 53 (emphasis added)).  The examiner rejected claim 7 because it "contains an improper trademark name" – not because of any prior art.  (Doc. No. 70 at 14).

The inventors responded to the examiner's rejection by amending claim 7 to replace the phrase "SermeTel® protective coating" with the phrase "a powder coating that is heat-cured to form a ceramic coating."  (Doc. No. 70 at 18).   Although the examiner did not object to the trademark references in the specification, the inventors also amended the specification to specify that "the doubler strap is coated with a protective coating *that is a heat-cured ceramic powder coating,* either Midrofin Allseal or preferably SermeTel® 5380DP."  (Doc. No. 70 at 17 (emphasis added)).  Notably, the inventors left unchanged the phrase "doubler-protective coating" in claim 1.  Thus, it was apparent after the amendments that the "doubler-protective coating" in claim 1 had to be something other than the "powder coating that is heat-cured to form a ceramic coating" recited in claim 7.  Following the amendments, all of the claims were allowed and the Patent issued.  (Doc. No. 70 at 20.)

Because the amendments were not made to avoid prior art, and the examiner had to recognize that claims 1 and 7 involved different coatings, the Court finds that the inventors' amendments lack "the clarity required to exclude from the scope of the claims" all varieties of doubler protective coatings aside from powder ceramic. *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1304 (Fed. Cir.), *rehearing en banc denied*, 659 F.3d 1369 (Fed. Cir. 2011). Accordingly, the Court would cross that fine line of importing limitations from the specification were it to adopt Shannon's narrow construction of doubler-protective coating in claim 1. Accordingly, the Court rejects Shannon's proposed construction, and finds that the "doubler-protective-coating" in claim 1 requires no construction.[12]

---

[12]Again, the Court will not opine on what (if any) impact its rejection of Shannon's narrowed definition of the phrase "doubler-protective-coating" may have on the parties' respective claims and defenses. *See Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 659 F.3d 1369, 1371 (Fed. Cir. 2011) (Moore, C.J., dissenting from denial of rehearing en banc) (noting that the inventor's choice of "a broad claim term" may place the validity of the patent in jeopardy).

**Conclusion**

As set forth above, the Court concludes that the proper construction of the preamble of claim 1 of the Patent is that is it does not set forth additional limitations not recited in the body of claim 1. The Court further concludes that the term "doubler-protective-coating" in claim 1 requires no construction, and it is not limited to "a heat cured ceramic powder coating."  In accordance with the forgoing, it is **ORDERED** and **ADJUDGED** that the Motion for Patent Claim Construction by Enpat, Inc. (Doc. 59, filed July 1, 2011) is **GRANTED**.

**DONE** and **ORDERED** in Orlando, Florida on November 30, 2011.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

-21-